## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BANK OF AMERICA, N.A.      )
                           )
        Plaintiff,       )
                           )
        v.             )    C.A. No. _____
                           )
SIP ASSETS, LLC AND      )
EVERY PENNY COUNTS, INC.   )
                           )
        Defendants.    )

## COMPLAINT

Plaintiff Bank of America, N.A. (hereinafter "Plaintiff"), for its Complaint herein against defendants SIP Assets, LLC ("SIP") and Every Penny Counts, Inc. ("EPC") alleges as follows:

## PARTIES

1.      Plaintiff is a federally chartered banking institution having its headquarters and principal place of business in Charlotte, North Carolina.

2.      On information and belief, Defendant SIP is a limited liability company incorporated under the laws of the State of Delaware, that was voided in June 2006 for delinquent tax status, and having a principal place of business in New York.

3.      On information and belief, Defendant EPC is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business in Cape Coral, Lee County, Florida.

## JURISDICTION AND VENUE

4.      This is an action for a declaratory judgment in a case of actual controversy between Plaintiff, on the one hand, and SIP and EPC on the other, arising under the Declaratory Judgment Act, 28, U.S.C.§§ 2201 and 2202, and the United States Patent Laws, 35 U.S.C. § 101 *et seq.*  This action arises from patent infringement

allegations and inconsistent assertions regarding ownership of that patent made by EPC and SIP. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5. Personal jurisdiction exists over defendant SIP because it is a voided Delaware limited liability company that was incorporated under the laws of the State of Delaware and in good standing until June 2006, including when it committed the acts that give rise to this action.

6. Personal jurisdiction exists over EPC because it is incorporated under the laws of the State of Delaware.

7. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)-(c) and 28 U.S.C. § 1400(b).

## BACKGROUND

8. United States Patent No. 6,112,191 ("the '191 patent"), entitled "Method and System to Create and Distribute Excess Funds from Consumer Spending Transactions," states that it issued on August 29, 2000 to named inventor Bertram V. Burke. On its face, the '191 patent states that it is assigned to "Every Penny Counts, Inc., Red Bank, N.J." In addition, the assignment records available from the United States Patent and Trademark Office website still show that the patent is assigned to "Every Penny Counts, Inc., 500 HGWY 36, Navesink, New Jersey, 07752." A copy of the '191 patent is attached as Exhibit A.

9. In the fall of 2004, SIP approached Plaintiff about the '191 patent and, during a presentation it had prepared for Plaintiff, represented that it had "fully acquired" the '191 patent ("SIP presentation").

10. On January 25, 2007, Defendant EPC filed suit against Bank of America Corporation and Visa U.S.A., Inc. in the Middle District of Florida for infringement of the '191 patent. This case is currently pending before Judge John E. Steele in the Middle District of Florida and is captioned *Every Penny Counts, Inc. v. Bank*

2

*of America Corporation et al*, Case No. 2:07-cv-0042-JES-SPC (the "Florida Action"). In its complaint, EPC represented that it was the sole owner of the '191 patent and that it obtained the '191 patent from Every Penny Counts, Inc. (a New Jersey Corporation) on June 29, 2005, a few months after SIP represented to Plaintiff that it has acquired the '191 patent. A copy of EPC's Complaint in the Florida Action is attached as Exhibit B.

11.    The sole product or system accused of infringement in EPC's complaint in the Florida Action is the "Keep the Change Program" ("KTC program"), which is a banking deposit savings product tied to debit cards provided by Plaintiff to its customers. The entity accused of infringement in the Florida action is Bank of America Corporation. Bank of America Corporation, however, is a holding corporation that is separate and distinct from Plaintiff, does not provide savings accounts or debit cards to customers, and does not operate the KTC program. As a result, the Bank of America Corporation cannot, as a matter of law, "establish" or "launch" the accused KTC program. *See* Ex. B, ¶ 8.

12.    As a result of EPC bringing suit in the Florida Action and accusing the Keep the Change program of infringement of the '191 patent therein, there is a substantial controversy between Plaintiff and EPC, parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment that Plaintiff does not infringe the '191 patent.

13.    As a result of SIP asserting that it had "fully acquired" the '191 patent being asserted against Plaintiff, Plaintiff is in real apprehension that SIP is a real party in interest that, if not joined in this suit, may subject Plaintiff to a multiplicity of suits concerning Plaintiff's alleged infringement of the '191 patent. EPC alleges in its Complaint in the Florida action that it "had written communications and discussions with BOA about the ['191 patent] and a possible licensing agreement" "[i]n or about November 2004." *See* Ex. B at ¶ 5. It is Plaintiff's understanding that these alleged "communications and discussions" refer to the SIP presentation.

## COUNT I –DECLARATORY RELIEF FOR NON-INFRINGEMENT

14.    Plaintiff incorporates each of the preceding paragraphs 1 to 13 as if fully set forth herein.

15.    A case or controversy exists concerning the alleged infringement of the '191 patent, which requires a declaration of rights by this Court.

16.    Plaintiff is entitled to a declaratory judgment that it has not, and is not currently, directly infringing, contributorily infringing, or inducing infringement of any valid claim of the '191 patent.

## COUNT II –DECLARATORY RELIEF FOR PATENT INVALIDITY

17.    Plaintiff incorporates each of the preceding paragraphs 1 to 16 as if fully set forth herein.

18.    A case or controversy exists concerning the invalidity of the '191 patent, which requires a declaration of rights by this Court.

19.    Plaintiff is entitled to a judgment that the claims of the '191 patent are invalid because they fail to meet the conditions of patentability specified in 35 U.S.C. §§ 101, 102, 103, and/or 112.

## COUNT III –DECLARATION OF PATENT OWNERSHIP

20.    Plaintiff incorporates each of the preceding paragraphs 1 to 19 as if fully set forth herein.

21.    It is the patent owner's burden to show that it owns the patent and has the right to sue for infringement. *See Fieldturf, Inc. v. Southwest Recreational Industries, Inc.*, 357 F.3d 1266, 1268 (Fed. Cir. 2004).

22.    Plaintiff is entitled to a judgment as to who owns and is entitled to sue for infringement of the '191 patent. Plaintiff is also entitled to a judgment as to who has owned and has been entitled to sue for infringement of the '191 patent since its issuance so that Plaintiff may assess the chain of title of the '191 patent and who has rights for the entire period over which damages may be sought.

4

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter a Judgment and Order:

        A.      Declaring that Plaintiff has not, and is not currently, directly infringing, contributorily infringing, or inducing infringement of any valid claim of the '191 patent;

        B.      Declaring that the claims of the '191 patent are invalid;

        C.      Declaring who owns and is entitled to enforce the '191 patent;

        D.      Preliminarily and permanently enjoining defendants SIP and EPC from threatening Plaintiff with suit for infringement of the '191 patent;

        E.      Awarding costs and expenses in this action; and

        F.      Granting such other and further relief as the Court may deem just and proper.

OF COUNSEL:

Steven C. Cherny
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834
Tel: (212) 906-1200
Fax: (212) 751-4864

David A. Nelson
Amanda J. Hollis
Jennifer Travers
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
Chicago, IL 60606
Tel: (312) 876-7700
Fax: (312) 993-9767

Dated: March 20, 2007
784516 / 31292

POTTER ANDERSON & CORROON LLP

By: _____
      Richard L. Horwitz (#2246)
      Kenneth L. Dorsney (#3726)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, DE 19801
      Tel: (302) 984-6027
      Fax: (302) 658-1192
      rhorwitz@potteranderson.com
      kdorsney@potteranderson.com

*Attorneys for Plaintiff Bank of America, N.A.*

# EXHIBIT A

US006112191A

# United States Patent [19]

## Burke

[11] **Patent Number:** 6,112,191

[45] **Date of Patent:** *Aug. 29, 2000

[54] **METHOD AND SYSTEM TO CREATE AND DISTRIBUTE EXCESS FUNDS FROM CONSUMER SPENDING TRANSACTIONS**

[75] Inventor: **Bertram V. Burke**, Seabright, N.J.

[73] Assignee: **Every Penny Counts, Inc.**, Red Bank, N.J.

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **08/429,758**

[22] Filed: **Apr. 27, 1995**

### Related U.S. Application Data

[63] Continuation-in-part of application No. 08/018,821, Feb. 18, 1993, abandoned, and a continuation-in-part of application No. 08/172,221, Dec. 23, 1993, abandoned, and a continuation-in-part of application No. 08/349,353, Dec. 5, 1994, which is a continuation of application No. 08/018,821, Feb. 18, 1993, and a continuation-in-part of application No. 08/428,401, Apr. 25, 1995.

[51] **Int. Cl.⁷** ............................... G06G 1/12; G06G 7/52; G06G 1/14; G06F 17/60

[52] **U.S. Cl.** ........................... **705/41**; 235/375; 235/379; 705/17; 705/21; 705/24; 705/309

[58] **Field of Search** ...................... 235/375, 376, 235/379, 380; 705/1, 14, 15, 16, 17, 18, 21, 24, 30, 34, 39, 40, 41, 42, 43, 44; 902/4, 8, 20, 21, 22, 24, 25, 41

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,833,885 | 9/1974 | Gentile et al. | 235/379 |
| 4,355,369 | 10/1982 | Garvin | 235/379 |
| 4,607,335 | 8/1986 | Mizuno | 705/14 |
| 4,673,802 | 6/1987 | Ohmae et al. | 235/379 |
| 5,111,395 | 5/1992 | Smith et al. | 705/45 |
| 5,220,501 | 6/1993 | Lawlor et al. | 380/24 |
| 5,253,345 | 10/1993 | Fernandes et al. | 705/17 |
| 5,302,811 | 4/1994 | Fukatsu | 235/380 |
| 5,339,239 | 8/1994 | Manabe et al. | 705/1 |
| 5,466,919 | 11/1995 | Hovakimian | 705/17 |
| 5,475,585 | 12/1995 | Bush | 705/26 |
| 5,506,393 | 4/1996 | Ziarno | 235/380 |
| 5,546,303 | 8/1996 | Helbling | 705/30 |
| 5,555,497 | 9/1996 | Helbling | 705/14 |
| 5,621,640 | 4/1997 | Burke | 235/375 |

*Primary Examiner*—Stephen R. Tkacs
*Attorney, Agent, or Firm*—Leo Stanger

[57] **ABSTRACT**

An improved system for consumer payors to save and donate whenever they use cash at a point of sale terminal, write a check, use an ATM machine, or use a credit or debit card. The POS system is a network composed of subscriber/payors, neutral merchant/collectors, a central clearinghouse, and provider accounts. The Rounder system is a network composed of subscriber/payors, payees, account managers, and provider services. The systems together provide subscriber/payors with a seamless way to save/donate every time they spend.

**34 Claims, 28 Drawing Sheets**



US006112191A

# United States Patent [19]

## Burke

[11] **Patent Number:** **6,112,191**

[45] **Date of Patent:** ***Aug. 29, 2000**

[54] **METHOD AND SYSTEM TO CREATE AND DISTRIBUTE EXCESS FUNDS FROM CONSUMER SPENDING TRANSACTIONS**

[75] Inventor: **Bertram V. Burke**, Seabright, N.J.

[73] Assignee: **Every Penny Counts, Inc.**, Red Bank, N.J.

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **08/429,758**

[22] Filed: **Apr. 27, 1995**

### Related U.S. Application Data

[63] Continuation-in-part of application No. 08/018,821, Feb. 18, 1993, abandoned, and a continuation-in-part of application No. 08/172,221, Dec. 23, 1993, abandoned, and a continuation-in-part of application No. 08/349,353, Dec. 5, 1994, which is a continuation of application No. 08/018,821, Feb. 18, 1993, and a continuation-in-part of application No. 08/428,401, Apr. 25, 1995.

[51] **Int. Cl.7** ............................. G06G 1/12; G06G 7/52; G06G 1/14; G06F 17/60

[52] **U.S. Cl.** ............................. **705/41**; 235/375; 235/379; 705/17; 705/21; 705/24; 705/39

[58] **Field of Search** ...................... 235/375, 376, 235/379, 380; 705/1, 14, 15, 16, 17, 18, 21, 24, 30, 34, 39, 40, 41, 42, 43, 44; 902/4, 8, 20, 21, 22, 24, 25, 41

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,833,885 | 9/1974 | Gentile et al. | 235/379 |
| 4,355,369 | 10/1982 | Garvin | 235/379 |
| 4,607,335 | 8/1986 | Mizuno | 705/14 |
| 4,673,802 | 6/1987 | Ohmae et al. | 235/379 |
| 5,111,395 | 5/1992 | Smith et al. | 705/45 |
| 5,220,501 | 6/1993 | Lawlor et al. | 380/24 |
| 5,253,345 | 10/1993 | Fernandes et al. | 705/17 |
| 5,302,811 | 4/1994 | Fukatsu | 235/380 |
| 5,339,239 | 8/1994 | Manabe et al. | 705/1 |
| 5,466,919 | 11/1995 | Hovakimian | 705/17 |
| 5,475,585 | 12/1995 | Bush | 705/26 |
| 5,506,393 | 4/1996 | Ziarno | 235/380 |
| 5,546,303 | 8/1996 | Helbling | 705/30 |
| 5,555,497 | 9/1996 | Helbling | 705/14 |
| 5,621,640 | 4/1997 | Burke | 235/375 |

*Primary Examiner*—Stephen R. Tkacs
*Attorney, Agent, or Firm*—Leo Stanger

[57] **ABSTRACT**

An improved system for consumer payors to save and donate whenever they use cash at a point of sale terminal, write a check, use an ATM machine, or use a credit or debit card. The POS system is a network composed of subscriber/payors, neutral merchant/collectors, a central clearinghouse, and provider accounts. The Rounder system is a network composed of subscriber/payors, payees, account managers, and provider services. The systems together provide subscriber/payors with a seamless way to save/donate every time they spend.

**34 Claims, 28 Drawing Sheets**



FIG. 1A



POS SYSTEM

LEVEL 1        SUBSCRIBER/PAYOR            SP

LEVEL 2        MERCHANT/COLLECTOR            MC

LEVEL 3        CLEARINGHOUSE            CCC

LEVEL 4        PROVIDER ACCOUNTS            PA

## FIG. 1A



POS SYSTEM

LEVEL 1    SUBSCRIBER/PAYOR    SP

LEVEL 2    MERCHANT/COLLECTOR    MC

LEVEL 3    CLEARINGHOUSE    CCC

LEVEL 4    PROVIDER ACCOUNTS    PA

U.S. Patent          Aug. 29, 2000        Sheet 2 of 28          6,112,191

FIG. 1 B

CLEARINGHOUSE MANAGED SYSTEM (CMS)

TENDERS AN "OVERPAYMENT"
(CASH, CHECK, CREDIT, OR DEBIT DRAFT)



| SP | MC | CCC | PA |
|---|---|---|---|
| LEVEL 1 SUBSCRIBER/ PAYOR (SP).<br><br>SP OPENS AC-COUNT WITH CCC. SP USES MAG STRIPE CARD ISSUED BY CCC. CARD IDENTIFIES SP ACCOUNT DEPOSITS | LEVEL 2 MERCHANT/ COLLECTOR (MC)<br><br>MC TRANSFER THE SP DATA AND FUNDS TO THE CLEARING-HOUSE. MC IS PASSIVE TO ACCOUNT, ENROLLMENT AND MANAGEMENT | LEVEL 3 CLEARING-HOUSE (CCC)<br><br>CLEARING-HOUSE ACCEPTS ALL DEPOSITS FROM MC BANKS AND FROM STORE TERMINALS. CCC OPENS SP ACCOUNTS & ISSUES CARDS. CCC TRANSFERS FUNDS TO FINAL PARTIES PER SC INSTRUCTIONS | LEVEL 4 PROVIDER ACCOUNTS (PA)<br><br>PA ACCEPTS FUNDS. PA OPENS ACCOUNTS WITH SP |

FIG. 1 B

CLEARINGHOUSE MANAGED SYSTEM (CMS)

TENDERS AN "OVERPAYMENT"
(CASH, CHECK, CREDIT, OR DEBIT DRAFT)



SP            MC            CCC           PA

| LEVEL 1 SUBSCRIBER/ PAYOR (SP).   SP OPENS AC-COUNT WITH CCC. SP USES MAG STRIPE CARD ISSUED BY CCC. CARD IDENTIFIES SP ACCOUNT DEPOSITS | LEVEL 2 MERCHANT/ COLLECTOR (MC)   MC TRANSFER THE SP DATA AND FUNDS TO THE CLEARING-HOUSE. MC IS PASSIVE TO ACCOUNT, ENROLLMENT AND MANAGEMENT | LEVEL 3 CLEARING-HOUSE (CCC)   CLEARING-HOUSE ACCEPTS ALL DEPOSITS FROM MC BANKS AND FROM STORE TERMINALS. CCC OPENS SP ACCOUNTS & ISSUES CARDS. CCC TRANSFERS FUNDS TO FINAL PARTIES PER SC INSTRUCTIONS | LEVEL 4 PROVIDER ACCOUNTS (PA)   PA ACCEPTS FUNDS. PA OPENS ACCOUNTS WITH SP |

FIG. 1C



FIG. 1C



FIG. 1D



PROVIDER MANAGED SYSTEM (PMS)

TENDERS AN "OVERPAYMENT"
(CASH, CHECK, CREDIT, OR DEBIT DRAFT)

SP            MC            CCC            PA

| LEVEL 1 SUBSCRIBER/ PAYOR (SP). | LEVEL 2 MERCHANT/ COLLECTOR (MC) | LEVEL 3 CLEARING-HOUSE (CCC) | LEVEL 4 PROVIDER ACCOUNTS (PA) |
|---|---|---|---|
| SP OPENS AC-COUNT WITH PA OF THEIR CHOICE AND USES PA ISSUED MAG STRIPE CARD TO IDENTIFY THEIR DEPOSITS | MC TRANS-FERS THE SP DATA AND FUNDS TO THE CLEARING-HOUSE. MC IS PASSIVE TO ACCOUNT, ENROLLMENT AND MANAGEMENT | CLEARING-HOUSE ACCEPTS ALL DEPOSITS FROM MC BANKS AND FROM STORE TERMINALS. CCC IS PASSIVE TO ACCOUNT, ENROLLMENT AND MANAGEMENT | PA OPENS ACCOUNTS FOR SP. PA PROVIDES MAG STRIPE CARDS. PA MANAGES ACCOUNTS PER SP INSTRUC-TIONS |

FIG. 1D

PROVIDER MANAGED SYSTEM (PMS)

TENDERS AN "OVERPAYMENT"
(CASH, CHECK, CREDIT, OR DEBIT DRAFT)



SP

LEVEL 1
SUBSCRIBER/
PAYOR (SP).

SP OPENS AC-
COUNT WITH
PA OF THEIR
CHOICE AND
USES PA
ISSUED MAG
STRIPE CARD
TO IDENTIFY
THEIR
DEPOSITS

MC

LEVEL 2
MERCHANT/
COLLECTOR
(MC)

MC TRANS-
FERS THE SP
DATA AND
FUNDS TO THE
CLEARING-
HOUSE.
MC IS PASSIVE
TO ACCOUNT,
ENROLLMENT
AND
MANAGEMENT

CCC

LEVEL 3
CLEARING-
HOUSE (CCC)

CLEARING-
HOUSE
ACCEPTS ALL
DEPOSITS
FROM MC
BANKS AND
FROM STORE
TERMINALS.
CCC IS
PASSIVE TO
ACCOUNT,
ENROLLMENT
AND
MANAGEMENT

PA

LEVEL 4
PROVIDER
ACCOUNTS
(PA)

PA OPENS
ACCOUNTS
FOR SP.
PA PROVIDES
MAG STRIPE
CARDS. PA
MANAGES
ACCOUNTS
PER SP
INSTRUC-
TIONS

FIG. 1E



FIG. 1E



FIG. 1 F



DATA & FUNDS TRANSFER

LEVEL 1        SUBSCRIBER/PAYORS (SP)

LEVEL 2        MERCHANT/COLLECTOR (MC)

⎯ EDI TRANSFER

MC BANK

DATA TRANSMISSION
VIA PROPRIETARY
NETWORK

EDI TRANSFER

LEVEL 3    CCC DATA        LEVEL 3    CCC BANK

DATA TRANSMISSION
VIA PROPRIETARY
NETWORK

LEVEL 4        PROVIDER ACCOUNT # 1

PROVIDER ACCOUNT # 2

PROVIDER ACCOUNT # 3

PROVIDER ACCOUNT # 4

FIG. 1 F



DATA & FUNDS TRANSFER

LEVEL 1    SUBSCRIBER/PAYORS (SP)

LEVEL 2    MERCHANT/COLLECTOR (MC)

─ EDI TRANSFER

MC BANK

DATA TRANSMISSION
VIA PROPRIETARY
NETWORK

EDI TRANSFER

LEVEL 3    CCC DATA    LEVEL 3    CCC BANK

DATA TRANSMISSION
VIA PROPRIETARY
NETWORK

LEVEL 4    PROVIDER ACCOUNT # 1

PROVIDER ACCOUNT # 2

PROVIDER ACCOUNT # 3

PROVIDER ACCOUNT # 4



FIG. 2

U.S. Patent

Aug. 29, 2000

Sheet 7 of 28

6,112,191



FIG. 2

U.S. Patent

Aug. 29, 2000

Sheet 7 of 28

6,112,191

FIG. 3

Transaction Card

DC 1



MS

DC 2



BC

FIG. 3

Transaction Card

DC 1



MS

DC 2



BC

FIG. 4A



FIG. 4A



FIG. 4B



FIG. 4B





FIG. 4C



FIG. 4C

FIG. 5A



U.S. Patent          Aug. 29, 2000          Sheet 12 of 28          6,112,191

FIG. 5A



FIG. 5B



FIG. 5B



332 — DEFAULT ALL CENTS, OTHER OPTIONS
A. ALL CHANGES, B. SPECIFY AMT $0.00

338

334 — SELECT A SPECIAL CHARITY?     NO     ADVANCE TO STEP 340

YES

338 — ENTER CHARITY NUMBER

340 — PRINT RECEIPT

342 — WRITE TRANSACTION TO MEMORY

344 — TRANSACTION ENDS. GO TO STEP 300     STEP 300

346 — BATCH FILE OF ALL TRANSACTIONS SENT TO CCC

FIG. 6A



404 — DO YOU HAVE A CARD?
YES
NO

407 — REQUEST ENTRY OR NAME AND ADDRESS

408 — COMPLETE?
NO
YES

410 — REQUEST PIN #

414 — QUALIFIED?
NO
YES

417 — ASSIGN NEW CARD NUMBER

420 — ENTER CARD

424 — ENTER PIN #

427 — MATCHING NUMBER?
NO
YES

430 — LIST EXISTING ACCOUNTS & AMOUNTS

434 — LIST ACCOUNTS & BALANCES

TO 437

FIG. 6A



FIG. 6B



**U.S. Patent**      Aug. 29, 2000      Sheet 15 of 28      **6,112,191**

FIG. 6B



FIG. 6C



FIG. 6C



# FIG. 7



# FIG. 7



FIG. 8



FIG. 8



FIG. 9A



## FIG. 9A



FIG. 9B



FIG. 9B



FIG. 9C



FIG. 9C



FIG. 9D



Case 1:07-cv-00159-GMS    Document 1-2    Filed 03/20/2007    Page 47 of 81

*FIG. 9D*



*FIG. 9E*



FIG. 9E



FIG. 10A



FIG. 10A



**U.S. Patent**    Aug. 29, 2000    Sheet 25 of 28    **6,112,191**

*FIG. 10B*



FIG. 10B



Case 1:07-cv-00159-GMS    Document 1-2    Filed 03/20/2007    Page 54 of 81

FIG. 10C



FIG. 10C



FIG. 10D



FIG. 10D



**U.S. Patent**     Aug. 29, 2000     Sheet 28 of 28     **6,112,191**

*FIG. 10E*



FIG. 10E



6,112,191

1

## METHOD AND SYSTEM TO CREATE AND DISTRIBUTE EXCESS FUNDS FROM CONSUMER SPENDING TRANSACTIONS

### REFERENCE TO CO-PENDING APPLICATIONS

This is a Continuation In Part of applications Ser. No. 08/018,821 filed on Feb. 18, 1993, now abandoned, Ser. No. 08/172,221 filed on Dec. 23, 1993. This application is also a continuation-in-part of application Ser. No. 08/349,353 filed Dec. 5, 1994, which is a continuation of the aforementioned application Ser. No. 08/018,821 filed Feb. 18, 1993. This application is also a continuation-in-part of application Ser. No. 08/428,401 filed Apr. 25, 1995, now abandoned.

### FIELD OF THE INVENTION

The present application relates to improved methods and systems to create excess funds from traditional consumer spending transactions using cash, checks, credit or debit card. The excess funds created are then put aside in special accounts for future spending.

### BACKGROUND OF THE INVENTION

Presently the methods and systems of creating excess funds from spending transactions have the following limitations:

(1.) Now consumers can create excess funds for future spending by making excess payments and having the excess amount assigned for future spending under very limited circumstances. Effectively consumers can tender an excess payment to a payee that they have an existing account with (e.g. utility and gas companies) and allow the excess funds to stay with the payee for the payment of future services or direct the payee to distribute the excess funds onto an outside provider, such as a charity. Under this "closed" process the payee provides an active role as to account management and selection/distribution of the excess funds for internal purposes, as well as to outside providers. Within this current arrangement the consumer has very limited opportunities to create excessive funds, as well as to determine the application of said funds, since the existing state of the art is a "closed" system essentially operated by payees with whom they have existing account relationship.

(2.) Now consumers can only create excess funds when the face amount paid to a payee is in excess of the purchase price. In addition to the requirement for an excess payment, there is also the need for the payee to process the transaction by subtracting the amount of the purchase price from the amount tendered. Therefore, the payee is now actively involved in managing and/or distributing the consumers' excess funds.

An object of the invention is to improve the aforementioned situation.

### SUMMARY OF THE INVENTION

According to one aspect of the invention, such object is obtained in a method of accumulating credits in payor surplus accounts from financial transactions between a payor and a payee, by entering a demanded amount due the payee, entering an additional amount offered by the payor, and depositing the additional amount in the surplus account.

According to another aspect of the invention, the step of depositing the additional amount includes the payee crediting the additional amount to the surplus account in the hands of a central clearing entity, so that the payee remains neutral to the additional amounts.

2

According to yet another aspect of the invention, said step of entering an additional amount includes calculating the additional amount from predetermined data associated with the surplus account.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1A is a block diagram of the POS system embodying features of the invention.

FIGS. 1B&C are block diagrams of the Clearinghouse Managed System embodying features of the invention.

FIGS. 1D&E are block diagrams of the Provider Managed System embodying features of the invention.

FIG. 1F is a block diagram of the Data and Funds Transfer used in both POS systems embodying features of the invention.

FIG. 2 is a block diagram of POS system hardware in FIG. 1.

FIG. 3 are views of transaction cards forming part of the embodiment in FIG. 1.

FIGS. 4A, 4B, and 4C are flow diagrams of the steps that take place in FIG. 1B.

FIG. 5 is another flow diagram of steps that take place in a computer in FIG. 1C.

FIGS. 6A, 6B, and 6C are flow diagram of enrollment steps that take place in a computer in FIGS. 1B&C.

FIG. 7 is a block diagram of the rounder system embodying features of the invention.

FIG. 8 is a flow chart of the steps that take place to enroll subscribers in the rounder system shown in FIG. 7.

FIGS. 9A–E is a flow chart of the data processing methodology used in the terminals and central computers operated by banks to process rounder transactions in FIGS. 7A&B.

FIGS. 10A–E is a flow chart of the data processing methodology used in the terminals and central computers operated by banks and credit institutions to process rounder transactions in FIGS. 7A&B.

### DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

The invention has two main embodiments:

(1.) In FIG. 1A, an "open" POS network embodies a four level spending/saving system comprised of Level 1 SP (multiple subscriber/payors), who tender excess payments or deposit excess funds to Level 2 MC (multiple merchant/collectors), who in turn make computer entry of data and funds for electronic transfer to Level 3 CCC (a singular managed clearinghouse central computer), who in turn transfers data and funds to Level 4 (multiple provider accounts), for the final purchase of products or services.

In FIG. 1A the excess funds are created at point of sale counters (POS) by the merchant/collectors (MC) who "front end" process the subscriber/payor (SP) spending transactions to determine the excess difference between the purchase price of goods or services and the amount of payment rendered.

After the amount of excess funds is determined by the MC's electronic cash register (ECR), the SP makes a deposit into a clearinghouse central computer (CCC) by providing a transaction card or an account number to the MC. The MC then swipes the card or enters the account number through an ECR or a draft capture remote terminal to record the time, the terminal location, the amount of funds entered, and the

6,112,191

**1**

## METHOD AND SYSTEM TO CREATE AND DISTRIBUTE EXCESS FUNDS FROM CONSUMER SPENDING TRANSACTIONS

### REFERENCE TO CO-PENDING APPLICATIONS

This is a Continuation In Part of applications Ser. No. 08/018,821 filed on Feb. 18, 1993, now abandoned, Ser. No. 08/172,221 filed on Dec. 23, 1993. This application is also a continuation-in-part of application Ser. No. 08/349,353 filed Dec. 5, 1994, which is a continuation of the aforementioned application Ser. No. 08/018,821 filed Feb. 18, 1993. This application is also a continuation-in-part of application Ser. No. 08/428,401 filed Apr. 25, 1995, now abandoned.

### FIELD OF THE INVENTION

The present application relates to improved methods and systems to create excess funds from traditional consumer spending transactions using cash, checks, credit or debit card. The excess funds created are then put aside in special accounts for future spending.

### BACKGROUND OF THE INVENTION

Presently the methods and systems of creating excess funds from spending transactions have the following limitations:

(1.) Now consumers can create excess funds for future spending by making excess payments and having the excess amount assigned for future spending under very limited circumstances. Effectively consumers can tender an excess payment to a payee that they have an existing account with (e.g. utility and gas companies) and allow the excess funds to stay with the payee for the payment of future services or direct the payee to distribute the excess funds onto an outside provider, such as a charity. Under this "closed" process the payee provides an active role as to account management and selection/distribution of the excess funds for internal purposes, as well as to outside providers. Within this current arrangement the consumer has very limited opportunities to create excessive funds, as well as to determine the application of said funds, since the existing state of the art is a "closed" system essentially operated by payees with whom they have existing account relationship.

(2.) Now consumers can only create excess funds when the face amount paid to a payee is in excess of the purchase price. In addition to the requirement for an excess payment, there is also the need for the payee to process the transaction by subtracting the amount of the purchase price from the amount tendered. Therefore, the payee is now actively involved in managing and/or distributing the consumers' excess funds.

An object of the invention is to improve the aforementioned situation.

### SUMMARY OF THE INVENTION

According to one aspect of the invention, such object is obtained in a method of accumulating credits in payor surplus accounts from financial transactions between a payor and a payee, by entering a demanded amount due the payee, entering an additional amount offered by the payor, and depositing the additional amount in the surplus account.

According to another aspect of the invention, the step of depositing the additional amount includes the payee crediting the additional amount to the surplus account in the hands of a central clearing entity, so that the payee remains neutral to the additional amounts.

**2**

According to yet another aspect of the invention, said step of entering an additional amount includes calculating the additional amount from predetermined data associated with the surplus account.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1A is a block diagram of the POS system embodying features of the invention.

FIGS. 1B&C are block diagrams of the Clearinghouse Managed System embodying features of the invention.

FIGS. 1D&E are block diagrams of the Provider Managed System embodying features of the invention.

FIG. 1F is a block diagram of the Data and Funds Transfer used in both POS systems embodying features of the invention.

FIG. 2 is a block diagram of POS system hardware in FIG. 1.

FIG. 3 are views of transaction cards forming part of the embodiment in FIG. 1.

FIGS. 4A, 4B, and 4C are flow diagrams of the steps that take place in FIG. 1B.

FIG. 5 is another flow diagram of steps that take place in a computer in FIG. 1C.

FIGS. 6A, 6B, and 6C is a flow diagram of enrollment steps that take place in a computer in FIGS. 1B&C.

FIG. 7 is a block diagram of the rounder system embodying features of the invention.

FIG. 8 is a flow chart of the steps that take place to enroll subscribers in the rounder system shown in FIG. 7.

FIGS. 9A–E is a flow chart of the data processing methodology used in the terminals and central computers operated by banks to process rounder transactions in FIGS. 7A&B.

FIGS. 10A–E is a flow chart of the data processing methodology used in the terminals and central computers operated by banks and credit institutions to process rounder transactions in FIGS. 7A&B.

### DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

The invention has two main embodiments:

(1.) In FIG. 1A, an "open" POS network embodies a four level spending/saving system comprised of Level 1 SP (multiple subscriber/payors), who tender excess payments or deposit excess funds to Level 2 MC (multiple merchant/collectors), who in turn make computer entry of data and finds for electronic transfer to Level 3 CCC (a singular managed clearinghouse central computer), who in turn transfers data and funds to Level 4 (multiple provider accounts), for the final purchase of products or services.

In FIG. 1A the excess funds are created at point of sale counters (POS) by the merchant/collectors (MC) who "front end" process the subscriber/payor (SP) spending transactions to determine the excess difference between the purchase price of goods or services and the amount of payment rendered.

After the amount of excess funds is determined by the MC's electronic cash register (ECR), the SP makes a deposit into a clearinghouse central computer (CCC) by providing a transaction card or an account number to the MC. The MC then swipes the card or enters the account number through an ECR or a draft capture remote terminal to record the time, the terminal location, the amount of funds entered, and the

6,112,191

| 3 | 4 |

account number used. The terminal or cash register then prints out a receipt of the depositing transaction and the MC returns the card and the receipt to the SP.

The depositing of individual transactions into the MC remote terminal can be completed in an "off-line" or "on-line" or a combination of both modes. At the completion of a specified period or amount, e.g. day, week, $50.00, the total off line transaction file stored in the MC terminal is then batched "on line" to the CCC (clearinghouse's central computer). The ability to process individual depositing transactions in an off line mode is made possible due to the fact that the system does not require on line authorization, as in credit and debit card processing.

Each terminal location follows the same reporting procedure so that the CCC will have a record of all transactions made into the system, regardless of the location of the terminals. The files transferred to the CCC contain details of each deposited transaction by the identification of the account, the amount of the deposit, the date, and the terminal that accepted the deposit. The actual transfer of cash into the system starts when the MC deposit the cash received from the SP into their bank for EFT transfer to the clearinghouse's bank account and concludes with the CCC EFT transferring funds to each listed PC (provider account) per the transaction records received from the merchant terminals. The transfer of cash from one account to the next is accomplished by the usual and customary bank EFT transferring through the ACH (Automatic Clearing House) or via EDI (Electronic Data Interchange).

Effectively, the system allows each SP the ability to make multiple deposits, in varied cross country locations, into terminals operated by unrelated parties, depositing as little as a penny in any one transaction, and often on a 24 hour demand basis.

The MC that operate the ECR terminals are at the time of depositing both neutral and passive as to the selection of the consumer's provider(s), as well as not directing the distribution of funds to the consumer's provider(s). Only in this system are SP able to deposit their excess change created when dealing with multiple and diverse payees. The money is deposited into an "open" network that will pool and then transfer the once fragmented funds onto PA selected by the SP. In this system as compared to the existing state of art, the PA who will receive the deposited funds from the network need not also be the original collector of the deposits. Therefore, we have a "open" system that allows for a mix and match of diverse collectors and providers.

Under the system it is possible for one entity to provide both a collector and provider role, but under different and autonomous points in the network cycle. For example, Sears may enroll a subscriber consumer in a Sears store account allowing the consumer to use their Sears issued mag stripe card to identify them when they deposit excess change into any merchant/collector terminal. In this capacity Sears is playing the role of a distinct provider in the network. The card may then be used to deposit excess funds at fast food restaurants, convenience stores, other department stores, etc. Also the SP could go into any Sears store and deposit excess funds into a Sears terminal for transfer to the network. On these occasions Sears would be playing a distinct role as a participating MC, within the network, and follow the same procedures as any other MC, as well as also being a PA at the end of the network chain.

In FIGS. 1B&C, the Clearinghouse Managed System (CMS) starts with Level 1, the subscriber/payors, tendering an excess financial payment to Level 2, merchant/collectors.

They in turn enter the amount of the excess payment into an electronic cash register/remote terminals which then sends the funds and data on-line per transaction, or along with other deposits in a batched format, by a communication system to Level 3, clearinghouse central computer. Level 3 assigns the funds to an account previously opened by Level 1 SP through services provided by Level 3. The funds are then forwarded, when they reach pre-selected thresholds, by EDI (Electronic Data Interface) transfer to Level 4, the provider accounts, selected by Level 1 SP.

The Clearinghouse Managed System (CMS), has the network providing a more active role by the system's central computer enrolling the SP in accounts and then assuming the role of an account manager. Under this arrangement the network will direct the overall operation of the system, issue transaction cards (bar code, mag stripe and/or "smart" cards or devices), operate the system's central computer, provide both on-line and off-line communications between the POS terminals and the central computer, accept funds, assume fiscal responsibility for the SP funds on deposit, maintain all account records, provide all outside payments to parties selected by the SP, and even allow the SP the ability to access their accounts for the purpose of receiving credit at the time of POS purchase to pay the MC. Under the CMS, in addition to the network serving as an account manager, it will also appoint banks, credit card institutions, and merchant/collectors to assume additional fiduciary responsibilities.

In FIGS. 1D&E, the Provider Managed System (PMS) starts with Level 1, the subscriber/payors, tendering an excess financial payment to Level 2, merchant/collectors. They in turn enter the amount of the excess payment into an electronic cash register/remote terminals which then preferably send the funds and data, along with other deposits in a batched format, by a communication system to Level 3, clearinghouse central computer. Level 3 then segregates the transactions per provider accounts. The data and funds are then forwarded, when they reach pre-selected thresholds, by EDI (Electronic Data Interface) transfer to the Level 4 providers for account management and final distribution. Level 1 SP initially join the network by enrolling in accounts with Level 4 providers.

The Provider Managed System (PMS), is an "open" system that creates a network whereupon SP will directly enroll in accounts managed by PA, receive mag stripe cards issued by the PA, and deposit their excess change at POS locations to be transferred by the MC to a neutral network clearinghouse (CCC). Under the PMS, the CCC will accept and process the transaction data and funds and forward both to the PA according to the card identification. The PA will then manage the accounts per the SP instructions.

In the PMS scenario both the merchant/clearinghouse are passive as to the opening of accounts and the SP selections of the final distribution of the funds. Here both the payees and the clearinghouse only accept deposits and transfer both the cash and transaction records onto the end PA.

Also under the PMS embodiment, once the funds are received by the PA, who can be banks, insurance companies, security firms, merchandisers, travel agencies, charitable institutions, etc., the SP will determine how to spend the savings for services and/or products.

In FIG. 1F, in both the Clearinghouse Managed System or Provider Managed System the data transfer is sent via a proprietary network from Level 2 MC to Level 3. After processing Level 3 selected data is sent via a proprietary network to Level 4. On the funds transfer side Level 1

6,112,191

3

account number used. The terminal or cash register then prints out a receipt of the depositing transaction and the MC returns the card and the receipt to the SP.

The depositing of individual transactions into the MC remote terminal can be completed in an "off-line" or "on-line" or a combination of both modes. At the completion of a specified period or amount, e.g. day, week, $50.00, the total off line transaction file stored in the MC terminal is then batched "on line" to the CCC (clearinghouse's central computer). The ability to process individual depositing transactions in an off line mode is made possible due to the fact that the system does not require on line authorization, as in credit and debit card processing.

Each terminal location follows the same reporting procedure so that the CCC will have a record of all transactions made into the system, regardless of the location of the terminals. The files transferred to the CCC contain details of each deposited transaction by the identification of the account, the amount of the deposit, the date, and the terminal that accepted the deposit. The actual transfer of cash into the system starts when the MC deposit the cash received from the SP into their bank for EFT transfer to the clearinghouse's bank account and concludes with the CCC EFT transferring funds to each listed PC (provider account) per the transaction records received from the merchant terminals. The transfer of cash from one account to the next is accomplished through the usual and customary bank EFT transferring through the ACH (Automatic Clearing House) or via EDI (Electronic Data Interchange).

Effectively, the system allows each SP the ability to make multiple deposits, in varied cross country locations, into terminals operated by unrelated parties, depositing as little as a penny in any one transaction, and often on a 24 hour demand basis.

The MC that operate the ECR terminals are at the time of depositing both neutral and passive as to the selection of the consumer's provider(s), as well as not directing the distribution of funds to the consumer's provider(s). Only in this system are SP able to deposit their excess change created when dealing with multiple and diverse payees. The money is deposited into an "open" network that will pool and then transfer the once fragmented funds onto PA selected by the SP. In this system as compared to the existing state of art, the PA who will receive the deposited funds from the network need not also be the original collector of the deposits. Therefore, we have a "open" system that allows for a mix and match of diverse collectors and providers.

Under the system it is possible for one entity to provide both a collector and provider role, but under different and autonomous points in the network cycle. For example, Sears may enroll a subscriber consumer in a Sears store account allowing the consumer to use their Sears issued mag stripe card to identify them when they deposit excess change into any merchant/collector terminal. In this capacity Sears is playing the role of a distinct provider in the network. The card may then be used to deposit excess funds at fast food restaurants, convenience stores, other department stores, etc. Also the SP could go into any Sears store and deposit excess funds into a Sears terminal for transfer to the network. On these occasions Sears would be playing a distinct role as a participating MC, within the network, and follow the same procedures as any other MC, as well as also being a PA at the end of the network chain.

In FIGS. 1B&C, the Clearinghouse Managed System (CMS) starts with Level 1, the subscriber/payors, tendering an excess financial payment to Level 2, merchant/collectors.

4

They in turn enter the amount of the excess payment into an electronic cash register/remote terminals which then sends the funds and data on-line per transaction, or along with other deposits in a batched format, by a communication system to Level 3, clearinghouse central computer. Level 3 assigns the funds to an account previously opened by Level 1 SP through services provided by Level 3. The funds are then forwarded, when they reach pre-selected thresholds, by EDI (Electronic Data Interface) transfer to Level 4, the provider accounts, selected by Level 1 SP.

The Clearinghouse Managed System (CMS), has the network providing a more active role by the system's central computer enrolling the SP in accounts and then assuming the role of an account manager. Under this arrangement the network will direct the overall operation of the system, issue transaction cards (bar code, mag stripe and/or "smart" cards or devices), operate the system's central computer, provide both on-line and off-line communications between the POS terminals and the central computer, accept funds, assume fiscal responsibility for the SP funds on deposit, maintain all account records, provide all outside payments to parties selected by the SP, and even allow the SP the ability to access their accounts for the purpose of receiving credit at the time of POS purchase to pay the MC. Under the CMS, in addition to the network serving as an account manager, it will also appoint banks, credit card institutions, and merchant/collectors to assume additional fiduciary responsibilities.

In FIGS. 1D&E, the Provider Managed System (PMS) starts with Level 1, the subscriber/payors, tendering an excess financial payment to Level 2, merchant/collectors. They in turn enter the amount of the excess payment into an electronic cash register/remote terminals which then preferably send the funds and data, along with other deposits in a batched format, by a communication system to Level 3, clearinghouse central computer. Level 3 then segregates the transactions per provider accounts. The data and funds are then forwarded, when they reach pre-selected thresholds, by EDI (Electronic Data Interface) transfer to the Level 4 providers for account management and final distribution. Level 1 SP initially join the network by enrolling in accounts with Level 4 providers.

The Provider Managed System (PMS), is an "open" system that creates a network whereupon SP will directly enroll in accounts managed by PA, receive mag stripe cards issued by the PA, and deposit their excess change at POS locations to be transferred by the MC to a neutral network clearinghouse (CCC). Under the PMS, the CCC will accept and process the transaction data and funds and forward both to the PA according to the card identification. The PA will then manage the accounts per the SP instructions.

In the PMS scenario both the merchant/clearinghouse are passive as to the opening of accounts and the SP selections of the final distribution of the funds. Here both the payees and the clearinghouse only accept deposits and transfer both the cash and transaction records onto the end PA.

Also under the PMS embodiment, once the funds are received by the PA, who can be banks, insurance companies, security firms, merchandisers, travel agencies, charitable institutions, etc., the SP will determine how to spend the savings for services and/or products.

In FIG. 1F, in both the Clearinghouse Managed System or Provider Managed System the data transfer is sent via a proprietary network from Level 2 MC to Level 3. After processing by Level 3 selected data is sent via a proprietary network to Level 4. On the funds transfer side Level 1

6,112,191

**5**

deposits the funds at Level 2 outlets. Level 2 deposits the finds into the MC's bank account and by EDI the finds are transferred to Level 3's bank account for final EDI to Level 4's bank account.

In FIG. 2, a system embodying the POS invention includes a clearinghouse central computer (CCC) containing a central processor CPU and a large data storage DS. A communications system CS that may include telephone lines, satellites, or cables connects the CCC to a number of electronic cash registers (ECRx) (where x=1, . . . M, . . . N) in retail outlets, such as shops, supermarkets, gasoline stations, department stores, etc. at locations remote from the central computer. Throughout this specification, the term x, when appended to the end of a reference character, is equal to 1, . . . M, . . . N.

The ECRx cash registers are connected to respective keypads KPx and card readers CDx. Along with other components together they constitute a remote terminal RT that is connected to a variety of central computers.

In the CMS embodiment of the invention accounts are managed in the CCC. Money is collected at the ECRx for crediting to the consumers' ledgers in the accounts of various charities and other institutions such as banks, debit card issuers, credit card issuers, etc. The data storage DS contains individual storage for charity accounts CA and other accounts OA, such as for banks etc., all with ledgers for individual consumers.

In the PMS embodiment of the invention the CCC acts as a clearinghouse and transfers all data and funds onto the respective PA for account management and final distribution.

The CCC communications system CS also connects the CCC to charity computers CHy and other computer OCz, where y=1 . . . k, and z=1 . . . j such as bank computers, merchandise computers, debit account holders, credit card issuers, etc. These charities and other institutions are the ultimate receivers of the donations and deposits collected at the electronic cash registers ECRx. The CCC also includes a default account DA with consumer ledgers to hold moneys not otherwise allocated.

The ECRx includes a change display for exhibiting cash transactions, credit cards, or check purchases. The display automatically operates to show numbers in question. A card reader CDx with a keypad KPx allows the SP or clerk to enter the deposit directly. The keypad KPx permits the SP to change the allocation for this transaction alone or permanently. The keypad KPx also allows the SP to reduce the amount deposited so that he can receive cash change. The terminal RTx or ECRx reports the deposit directly to the CCC via the communication system CS. The CCC prints out periodic reports for interested parties on a need-to-know basis.

According to the invention, a consumer in a shop, supermarket, gasoline station, department store, etc. selects the desired merchandise and brings them to a clerk. The clerk inputs the price of all items in a ECRx by way of a register keyboard or a bar code reader and the register totals the price. The consumer offers the clerk either the exact amount of cash or a sum exceeding the price. Then the clerk enters that cash and the amount into the cash register. The ECR subtracts the price from the cash.

If the consumer gives the clerk the exact price nothing more need happen. However, if the money presented by the clerk exceeds the price, the consumer may, if he or she wishes, choose to receive the change or to donate or deposit all or a portion of the change. To do the latter, he or she enters a card

**6**

number into the keypad KPx or enters the card itself into the card reader CDx. The latter reads the number from a bar code or magnetic stripe on the card. The consumer can also enter into the keypad how much of the total change, he or she is to receive, should be credited to various predetermined accounts in the CCC. The register ECRx reads the numbers entered into the keyboard or the number entered by way of the card reader CDx.

In addition if SP wish to make a direct deposit of finds into the network, (rather than make a purchase and tender excess funds), all that is necessary is to enter the amount deposited into the ECRx and the funds will be transferred to the CCC.

A transaction card DC1 according to the invention appears in FIG. 3 with a magnetic stripe MS carrying the donor's number. A card DC2 in FIG. 3 includes the number in the form of a bar code BC. In another embodiment of the invention the card may be a smart card. Also in regard to the use of bar codes, the codes may be incorporated in the design of a key chain device or displayed on windshields or car windows to allow the invention to be accessed under a variety circumstances, i.e., drive through window, toll booth, etc.

After receiving the data, the ECR accesses the CCC. The latter allocates the change, a portion of the change, or the amount of a direct deposit provided by the SP among various charity accounts CA and other accounts OA in the CCC. The distributions to various accounts are preprogrammed commands which the consumer has previously instructed the CCC to complete. For each deposit or donation made, the SP receives a printed receipt of the transaction from the ECRx or RTx.

If desired, the consumer can choose to deposit only a fraction of the difference between the cash presented and the price. The consumer then enters the amount to be deposited and receives the appropriate cash change.

According to an embodiment of the invention, with every transaction, the computer electronically transfers all amounts allocated to each charity CHy immediately, as soon as the computer can access the charity computer, or when there is a sufficient amount of money. In this way the donor is always assured that the contribution takes effect. Deposits in the other accounts OA may be sent immediately or held until a sufficient amount is accumulated to be acceptable by the other institutions.

An example of the operation of the CMS embodiment appears in the flow chart of FIGS. 4A, 4B, and 4C. This flow chart depicts an on-line version of the CMS embodiment. The CMS, however, could also be operated in an off-line mode and the transactions that are processed by Level 2 MC would then be stored in memory and transferred in a batched format to Level 3 CCC at periodic intervals. In FIGS. 4A, 4B, and 4C it is assumed that the customer is purchasing merchandise that may carry bar codes. However, the invention is also applicable for purchase of services, rentals, or other valuables.

In step 104 of FIG. 4A, the clerk enters the prices of the various pieces of merchandise, either by way of a keyboard (not shown) or a bar code reader BCRx, into the cash register ECR. In step 107, the cash register determines the total price. The customer then gives the clerk the cash to cover or exceed the total price. While this example refers to cash, the invention is also applicable to payment by check, credit or debit card. That is, the customer may wish to have an amount charged to the checking account, credit or debit card in excess of the price in order to make donations or distributions according to the invention. For purposes of this

6,112,191

**5**

deposits the funds at Level 2 outlets. Level 2 deposits the finds into the MC's bank account and by EDI the finds are transferred to Level 3's bank account for final EDI to Level 4's bank account.

In FIG. 2, a system embodying the POS invention includes a clearinghouse central computer (CCC) containing a central processor CPU and a large data storage DS. A communications system CS that may include telephone lines, satellites, or cables connects the CCC to a number of electronic cash registers (ECRx) (where x=1, . . . M, . . . N) in retail outlets, such as shops, supermarkets, gasoline stations, department stores, etc. at locations remote from the central computer. Throughout this specification, the term x, when appended to the end of a reference character, is equal to 1, . . . M, . . . N.

The ECRx cash registers are connected to respective keypads KPx and card readers CDx. Along with other components together they constitute a remote terminal RT that is connected to a variety of central computers.

In the CMS embodiment of the invention accounts are managed in the CCC. Money is collected at the ECRx for crediting to the consumers' ledgers in the accounts of various charities and other institutions such as banks, debit card issuers, credit card issuers, etc. The data storage DS contains individual storage for charity accounts CA and other accounts OA, such as for banks etc., all with ledgers for individual consumers.

In the PMS embodiment of the invention the CCC acts as a clearinghouse and transfers all data and funds onto the respective PA for account management and final distribution.

The CCC communications system CS also connects the CCC to charity computers CHy and other computer OCz, where y=1 . . . k, and z=1 . . . j such as bank computers, merchandise computers, debit account holders, credit card issuers, etc. These charities and other institutions are the ultimate receivers of the donations and deposits collected at the electronic cash registers ECRx. The CCC also includes a default account DA with consumer ledgers to hold moneys not otherwise allocated.

The ECRx includes a change display for exhibiting cash transactions, credit cards, or check purchases. The display automatically operates to show numbers in question. A card reader CDx with a keypad KPx allows the SP or clerk to enter the deposit directly. The keypad KPx permits the SP to change the allocation for this transaction alone or permanently. The keypad KPx also allows the SP to reduce the amount deposited so that he can receive cash change. The terminal RTx or ECRx reports the deposit directly to the CCC via the communication system CS. The register prints out periodic reports for interested parties on a need-to-know basis.

According to the invention, a consumer in a shop, supermarket, gasoline station, department store, etc. selects the desired merchandise and brings them to a clerk. The clerk inputs the price of all items in a ECRx by way of a register keyboard or a bar code reader and the register totals the price. The consumer offers the clerk either the exact amount of cash or a sum exceeding the price. Then the clerk enters that cash and the amount into the cash register. The ECR subtracts the price from the cash.

If the consumer gives the clerk the exact price nothing more need happen. However, if the money offered the clerk exceeds the price, the consumer may, if he or she wishes, choose to receive the change or to donate or deposit all or a portion of the change. To do the latter, he or she enters a card

**6**

number into the keypad KPx or enters the card itself into the card reader CDx. The latter reads the number from a bar code or magnetic stripe on the card. The consumer can also enter into the keypad how much of the total change, he or she is to receive, should be credited to various predetermined accounts in the CCC. The register ECRx reads the numbers entered into the keyboard or the number entered by way of the card reader CDx.

In addition if SP wish to make a direct deposit of finds into the network, (rather than make a purchase and tender excess funds), all that is necessary is to enter the amount deposited into the ECRx and the funds will be transferred to the CCC.

A transaction card DC1 according to the invention appears in FIG. 3 with a magnetic stripe MS carrying the donor's number. A card DC2 in FIG. 3 includes the number in the form of a bar code BC. In another embodiment of the invention the card may be a smart card. Also in regard to the use of bar codes, the codes may be incorporated in the design of a key chain device or displayed on windshields or car windows to allow the invention to be accessed under a variety circumstances, i.e., drive through window, toll booth, etc.

After receiving the data, the ECR accesses the CCC. The latter allocates the change, a portion of the change, or the amount of a direct deposit provided by the SP among various charity accounts CA and other accounts OA in the CCC. The distributions to various accounts are preprogrammed commands which the consumer has previously instructed the CCC to complete. For each deposit or donation made, the SP receives a printed receipt of the transaction from the ECRx or RTx.

If desired, the consumer can choose to deposit only a fraction of the difference between the cash presented and the price. The consumer then enters the amount to be deposited and receives the appropriate cash change.

According to an embodiment of the invention, with every transaction, the computer electronically transfers all amounts allocated to each charity CHy immediately, as soon as the computer can access the charity computer, or when there is a sufficient amount of money. In this way the donor is always assured that the contribution takes effect. Deposits in the other accounts OA may be sent immediately or held until a sufficient amount is accumulated to be acceptable to the other institutions.

An example of the operation of the CMS embodiment appears in the flow chart of FIGS. 4A, 4B, and 4C. This flow chart depicts an on-line version of the CMS embodiment. The CMS, however, could also be operated in an off-line mode and the transactions that are processed by Level 2 MC would then be stored in memory and transferred in a batched format to Level 3 CCC at periodic intervals. In FIGS. 4A, 4B, and 4C it is assumed that the customer is purchasing merchandise that may carry bar codes. However, the invention is also applicable for purchase of services, rentals, or other valuables.

In step 104 of FIG. 4A, the clerk enters the prices of the various pieces of merchandise, either by way of a keyboard (not shown) or a bar code reader BCRx, into the cash register ECR. In step 107, the cash register determines the total price. The customer then gives the clerk the cash to cover or exceed the total price. While this example refers to cash, the invention is also applicable to payment by check, credit or debit card. That is, the customer may wish to have an amount charged to the checking account, credit or debit card in excess of the price in order to make donations or distributions according to the invention. For purposes of this

6,112,191

7

description the word cash is used also to embrace check, credit or debit card payments.

In step 110, the clerk then enters the amount of the cash payment into the ECRx. Under normal circumstances, the cash payment will equal or exceed the total spending price unless there is deposit of cash into the system without a purchase. However, the invention allows the SP to withdraw moneys from a credit balance in one of the accounts recorded in the CCC. While unlikely, this may also occur with a credit or debit card sale. Thus, in some situations, the amount of cash may fill short of the total price. In step 114 the cash register determines if the amount of cash exceeds the total price.

If the answer is yes, the cash exceeds the sale price, the ECRx determines the amount of change by subtracting the price from the cash in step 117. If the answer is no, the cash does not exceed the sale price, the register determines the amount due in step 120. In step 124, the cash register ECRx asks whether the customer has and wishes to use a network card. The clerk or customer may respond by keyboard, or directly by entering the card into the card reader CDx.

If the customer does not have or does not wish to use a network card in response to step 124, the cash register ECRx prints the transaction in step 127 and in step 130, prompts the clerk to make change or collect more cash. If the customer does not offer any needed cash the clerk must abort or otherwise correct the transaction.

If the customer wishes to use a network card, the clerk may enter this information into the register's keyboard, or the customer may enter the card into the card reader CDx. In step 134, the ECRx reads the network card. In step 137 of FIG. 4B, the ECRx determines whether the card is valid. If not, the register ECRx returns to step 127.

If the card is valid, the ECR again asks if the cash offered exceeds the total price in step 140. If not, in step 144, the ECR prompts the cash receipt CR display DS to ask if the cash register should debit the deficient amount from one of the SP cardholder's accounts. If not, the process returns to step 127.

If the answer to step 144 is yes, the computer CCC, in step 145, asks the customer to enter his or her personal identification (PIN) number. In step 146, the CCC determines if the PIN number matches the card number. If not, the computer returns to step 127. If yes, it determines if the card contains a sufficient balance to cover the amount due. If not, the process again returns to step 127. If yes in step 150, the computer withdraws the money from the card account and credits it to the account of the establishment or the sponsor SPx as pre-programmed. In step 150 the cash register ECRx also prints out the transaction.

If the answer to step 140, namely to the question whether there is more cash than the price, is yes, step 154 causes the ECR to display a message asking whether the customer wishes to retain some of the change due. If yes, the ECR prompts the customer to enter into the keypad KPx how much he or she wishes to retain or deposit. In step 157, the cash register ECR indicates to the clerk to give the appropriate net change and shows the net deposit amount.

The process now goes to A in FIG. 4C. If the answer to step 154 is no, the process also continues at point A in FIG. 4C.

At A, step 204, in FIG. 4C the CCC searches the records to find the pre-programmed pay out amounts for the particular network card. The pay out amounts are entered as shown in FIG. 6. In step 207 of FIG. 4C, the CCC starts apportioning the pay out amounts in the pre-programmed

8

proportions by priorities and amounts. In steps 210 to 227 it enters the selected amounts in the accounts of various charities, banks, debit card, and vouchers. Normally there should be no remaining amount. However, such an amount may exist. Thus in step 230 the CCC asks if there remains any outstanding amount. If yes, step 234 enters it into a default account selected by the SP at an earlier time. In step 237, the CCC updates the accounts both in its own data banks and in the computers CHy and OCz. The computers CHy and OCz confirm the transactions.

If the answer to step 230 is no, there are outstanding amounts, the process goes to step 237 directly. In step 240 the ECRx prints out the amounts deposited, entered into various accounts, the prices, the change, etc.

The CCC and the ECRx then prompt the customer in step 244 to ask if he or she wishes to change the programming of the various accounts in the CCC. If yes, the card reader CDx or the CCC displays the apportionment and the amounts, including balances in step 247, the consumer then enters the desired changes in step 250, and the CCC or the card reader makes the changes in step 254. This ends the transaction in step 257. If the answer to step 244 is no, the process goes directly to step 257.

In one embodiment of the invention, the consumer carries out steps 244 to 254 at a separate time in a separate card reader CDx and keypad KPx. This prevents the consumer from using these machines while the clerk serves another customer. In fact, the establishment may furnish a separate terminal RTx just for this purpose.

Prior to listing in the CCC, the invention qualifies each charity for their tax exempt status, operations, management activities, litigation, and other pertinent legal and financial information. The charity must certify to the facts. If the reported information meets the requirement, the charity qualifies. The CCC initiates a checking and updating of the qualification facts on a regular basis. The CCC keeps the qualified charities current on an ongoing basis.

The register furnishes the SP with a printed receipt of each donation for tax purposes and authentication that the charity will receive the money. In an on line mode the receipt can show the date, outlet location, serial number, amount donated, total donated to date, and the current financial results of any specific campaigns or projects received by the charity overall.

One embodiment of the invention furnishes other rewards to the donor. For example, the terminal may play a tune, such as "It's a Small World" in response to a donation to the United Nations children's fund. Alternatively, the donor may receive a message that the last ten cent donation has closed another $100 unit in donations to this charity and provide a special discount coupon. As another example the donor may receive a message that the donor's contribution is being matched by an independent sponsor with a bonus donation.

The invention supervises, implements, and coordinates charitable contributions to benefit all participants in the giving cycle, including the donors, sponsors, charitable organizations, Internal Revenue Service, and end recipients. It allows remote receiving and sending stations, connected to a central processing station, to accept any denomination of giving from a single penny to unlimited dollars. Regardless of the size of the donation, it effectively warrants to all participants that the designated charity has received the donated funds. It thus supports the authenticity of each donation. It can offer unlimited access to the donors concerning their contributions to charities and savings accounts, the intended use of the funds, and feedback concerning the total received by the funds.

6,112,191

7

description the word cash is used also to embrace check, credit or debit card payments.

In step 110, the clerk then enters the amount of the cash payment into the ECRx. Under normal circumstances, the cash payment will equal or exceed the total spending price unless there is deposit of cash into the system without a purchase. However, the invention allows the SP to withdraw moneys from a credit balance in one of the accounts recorded in the CCC. While unlikely, this may also occur with a credit or debit card sale. Thus, in some situations, the amount of cash may fall short of the total price. In step 114 the cash register determines if the amount of cash exceeds the total price.

If the answer is yes, the cash exceeds the sale price, the ECRx determines the amount of change by subtracting the price from the cash in step 117. If the answer is no, the cash does not exceed the sale price, the register determines the amount due in step 120. In step 124, the cash register ECRx asks whether the customer has and wishes to use a network card. The clerk or customer may respond by keyboard, or directly by entering the card into the card reader CDx.

If the customer does not have or does not wish to use a network card in response to step 127, the cash register ECRx prints the transaction in step 127 and in step 130, prompts the clerk to make change or collect more cash. If the customer does not offer any needed cash the clerk must abort or otherwise correct the transaction.

If the customer wishes to use a network card, the clerk may enter this information into the register's keyboard, or the customer may enter the card into the card reader CDx. In step 134, the ECRx reads the network card. In step 137 of FIG. 4B, the ECRx determines whether the card is valid. If not, the register ECRx returns to step 127.

If the card is valid, the ECR again asks if the cash offered exceeds the total price in step 140. If not, in step 144, the ECR prompts the cash register CR display DS to ask if the cash register should debit the deficient amount from one of the SP cardholder's accounts. If not, the process returns to step 127.

If the answer to step 144 is yes, the computer CCC, in step 145, asks the customer to enter his or her personal identification (PIN) number. In step 146, the CCC determines if the PIN number matches the card number. If not, the computer returns to step 127. If yes, it determines if the card contains a sufficient balance to cover the amount due. If not, the process again returns to step 127. If yes in step 150, the computer withdraws the money from the card account and credits it to the account of the establishment or the sponsor SPx as pre-programmed. In step 150 the cash register ECRx also prints out the transaction.

If the answer to step 140, namely to the question whether there is more cash than the price, is yes, step 154 causes the ECR to display a message asking whether the customer wishes to retain some of the change due. If yes, the ECR prompts the customer to enter into the keypad KPx how much he or she wishes to retain or deposit. In step 157, the cash register ECR indicates to the clerk to give the appropriate net change and shows the net deposit amount.

The process now goes to A in FIG. 4C. If the answer to step 154 is no, the process also continues at point A in FIG. 4C.

At A, step 204, in FIG. 4C the CCC searches the records to find the pre-programmed pay out amounts for the particular network card. The pay out amounts are entered as shown in FIG. 6. In step 207 of FIG. 4C, the CCC starts apportioning the pay out amounts in the pre-programmed

8

proportions by priorities and amounts. In steps 210 to 227 it enters the selected amounts in the accounts of various charities, banks, debit card, and vouchers. Normally there should be no remaining amount. However, such an amount may exist. Thus in step 230 the CCC asks if there remains any outstanding amount. If yes, step 234 enters it into a default account selected by the SP at an earlier time. In step 237, the CCC updates the accounts both in its own data banks and in the computers CHy and OCz. The computers CHy and OCz confirm the transactions.

If the answer to step 230 is no, there are outstanding amounts, the process goes to step 237 directly. In step 240 the ECRx prints out the amounts deposited, entered into various accounts, the prices, the change, etc.

The CCC and the ECRx then prompt the customer in step 244 to ask if he or she wishes to change the programming of the various accounts in the CCC. If yes, the card reader CDx or the CCC displays the apportionment and the amounts, including balances in step 247, the consumer then enters the desired changes in step 250, and the CCC or the card reader makes the changes in step 254. This ends the transaction in step 257. If the answer to step 244 is no, the process goes directly to step 257.

In one embodiment of the invention, the consumer carries out steps 244 to 254 at a separate time in a separate card reader CDx and keypad KPx. This prevents the consumer from using these machines while the clerk serves another customer. In fact, the establishment may furnish a separate terminal RTx just for this purpose.

Prior to listing in the CCC, the invention qualifies each charity for their tax exempt status, operations, management activities, litigation, and other pertinent legal and financial information. The charity must certify to the facts. If the reported information meets the requirement, the charity qualifies. The CCC initiates a checking and updating of the qualification facts on a regular basis. The CCC keeps the qualified charities current on an ongoing basis.

The register furnishes the SP with a printed receipt of each donation for tax purposes and authentication that the charity will receive the money. In an on line mode the receipt can show the date, outlet location, serial number, amount donated, total donated to date, and the current financial results of any specific campaigns or projects received by the charity overall.

One embodiment of the invention furnishes other rewards to the donor. For example, the terminal may play a tune, such as "It's a Small World" in response to a donation to the United Nations children's fund. Alternatively, the donor may receive a message that the last ten cent donation has closed another $100 unit in donations to this charity and provide a special discount coupon. As another example the donor may receive a message that the donor's contribution is being matched by an independent sponsor with a bonus donation.

The invention supervises, implements, and coordinates charitable contributions to benefit all participants in the giving cycle, including the donors, sponsors, charitable organizations, Internal Revenue Service, and end recipients. It allows remote receiving and sending stations, connected to a central processing station, to accept any denomination of giving from a single penny to unlimited dollars. Regardless of the size of the donation, it effectively warrants to all participants that the designated charity has received the donated funds. It thus supports the authenticity of each donation. It can offer unlimited access to the donors concerning their contributions to charities and savings accounts, the intended use of the funds, and feedback concerning the total received by the funds.

6,112,191

9

The invention effectively leverages the power of mere pennies into substantial dollars that in turn become available to charities on a short term collection basis. It rewards and encourages philanthropic giving and savings to all individuals on an everyday basis.

An example of the operation of the PMS embodiment appears in the flow chart of FIGS. 5A&B. In the PMS embodiment, the opening and closing of accounts is assumed by PA central computers. This flow chart depicts an off line version of the PMS embodiment in which transactions are processed at Level 2 MC and then stored in memory and transferred via a batched format to Level 3 CCC at periodic intervals. Level 3 would then sort the transactions according to Level 4 account origination and forward said transactions to Level 4. The PMS, however, could also be operated in an on line mode and the transactions would then be processed by a smart card or on line with a central computer located at Level 3 or 4.

Referring now to FIGS. 5A&B, there is a flow chart which illustrates the steps which the PMS processes transactions made through ECRx at Level 2 MC.

Beginning at the top, in step 300, the remote terminal at the POS counter stands ready to receive input and is also scrolling information messages on how to use the system.

In step 302, the clerk inputs the price of each item into ECRx by a bar code reader or keypad.

In step 304, the terminal computer totals the price of all of the items.

In step 306, the clerk enters the amount of payment, on most occasions cash, into the terminal computer. However, if a check, debit or credit card is tendered by the SP, any excess payment effectively becomes cash and is therefore eligible for deposit.

In step 308, the terminal computer asks if the amount tendered is more than the total purchase price.

If no and the number is zero, the terminal computer goes to step 310 and a receipt is printed out. In step 312 the transaction would end and the terminal computer returns to step 300 for new transactions.

If yes, in step 314 the terminal computer calculates the difference and displays the value and goes to step 316.

In step 316 the terminal computer asks if the consumer wishes to use the system.

If the answer is no, in step 318 a receipt is printed out, and in step 320 the transaction is ended and the terminal computer returns to step 300.

If the answer to step 316 is yes, in step 322 the terminal computer asks if you are a subscriber?

If the answer is no, step 324 allows a non-subscriber to use the system by asking the clerk to enter in a generic access code. On these occasions, most likely, the non-subscriber will be making a donation for charitable purposes. At this time in step 326, the non-subscriber will pick from a list of approved charities and the clerk will key in the selection. In step 328 a receipt will be printed showing evidence of the contribution. This same receipt will also provide an audit trail for individuals and or organizations to confirm that the charitable institutions received the donation. In step 330 the transaction would end and the terminal computer returns to step 300.

Referring now to FIG. 5B if the answer is yes, in step 332 the subscriber or the clerk enters the subscriber's card into the terminal. The terminal computer reads the card and automatically records all of the cents in the POS change as a deposit or contribution. If the subscriber wishes to add in

10

all of the change (coins and bills) 332A is entered into the computer. If the subscriber wishes to add in a specified portion of the change, 332B is prompted into the keypad along with the specified amount, for example $1.54 out of $2.54 in available change.

In step 334, the terminal computer asks if the subscriber wishes to bypass their default instructions for charities and select a special charity for this transaction.

In step 336 if the answer is no, the terminal computer advances to step 340.

If yes in 334, in step 338 the bypass charity account number is entered into the terminal computer through the keypad.

In step 340 the subscriber will receive a receipt showing their donor contribution.

In step 342 the terminal computer writes the transaction into memory.

In step 344 the transaction would end and the terminal computer returns to step 300.

In step 346, on a programmed time basis, the terminal computer forwards, by modem, the batch transactions held in memory to Level 3 CCC.

In order to enroll in the CMS embodiment, SP would sign up for accounts with Level 3 CCC. In order to enroll in the PMS embodiment, SP would sign up for accounts with Level 4 PA.

FIGS. 6A, 6B, and 6C is a flow chart that illustrates the enrollment steps for a CMS or PMS account which a central computer takes, through the keypad KPx, to open or revise an SP account. A display DSx on the keypad KPx or the ECRx allows a central computer to ask the consumer to perform certain acts. After the party has accessed the computer, in step 404, it asks whether the consumer has a network card. If no in step 407, the computer asks the consumer to enter his or her name or address. In step 408 the computer determines if all information has been entered. If not, it advances to step 407 to ask again for the desired information. If yes, the computer proceeds to step 410 to ask the consumer to choose a personal identification (PIN) number. In step 414 the computer determines if the PIN number is acceptable. If not, it returns to step 410 for another number. If yes, the computer advances to step 417 to assign a new card number.

If the answer in step 404 is yes, that the consumer has a card, the computer proceeds to step 420 to have the customer enter the card. In step 424 it asks the consumer to enter his or her pre-selected PIN number. In step 427 it determines whether the entered PIN number matches the pre-selected PIN number. If not, it returns to step 424 for a corrected number. The computer allows this procedure between steps 424 and 427 to occur only three times, thereafter it aborts the program.

If the PIN number is correct and thereby qualified, the computer in step 430 lists all existing accounts and amounts deposited during any specific time period, such as the calendar year. The consumer may request any time period. In step 434 it also lists all accounts with balances. In step 437 it asks the consumer to list all accounts to be eliminated, if any. In step 440 it asks the consumer to approve any accounts to be eliminated if any. The computer then proceeds to step 444 to list all new accounts. Step 444 also receives a prompt from step 417 if the card number is new.

In step 447 it determines if the account, in the form of a charity, merchant, or institution, is in the list of charities or institutions that have been accepted by the system. If the

6,112,191

**9**

The invention effectively leverages the power of mere pennies into substantial dollars that in turn become available to charities on a short term collection basis. It rewards and encourages philanthropic giving and savings to all individuals on an everyday basis.

An example of the operation of the PMS embodiment appears in the flow chart of FIGS. 5A&B. In the PMS embodiment, the opening and closing of accounts is assumed by PA central computers. This flow chart depicts an off line version of the PMS embodiment in which transactions are processed at Level 2 MC and then stored in memory and transferred via a batched format to Level 3 CCC at periodic intervals. Level 3 would then sort the transactions according to Level 4 account origination and forward said transactions to Level 4. The PMS, however, could also be operated in an on line mode and the transactions would then be processed by a smart card or on line with a central computer located at Level 3 or 4.

Referring now to FIGS. 5A&B, there is a flow chart which illustrates the steps which the PMS processes transactions made through ECRx at Level 2 MC.

Beginning at the top, in step **300**, the remote terminal at the POS counter stands ready to receive input and is also scrolling information messages on how to use the system.

In step **302**, the clerk inputs the price of each item into ECRx by a bar code reader or by keypad.

In step **304**, the terminal computer totals the price of all of the items.

In step **306**, the clerk enters the amount of payment, on most occasions cash, into the terminal computer. However, if a check, debit or credit card is tendered by the SP, any excess payment effectively becomes cash and is therefore eligible for deposit.

In step **308**, the terminal computer asks if the amount tendered is more than the total purchase price.

If no and the number is zero, the terminal computer goes to step **310** and a receipt is printed out. In step **312** the transaction would end and the terminal computer returns to step **300** for new transactions.

If yes, in step **314** the terminal computer calculates the difference and displays the value and goes to step **316**.

In step **316** the terminal computer asks if the consumer wishes to use the system.

If the answer is no, in step **318** a receipt is printed out, and in step **320** the transaction is ended and the terminal computer returns to step **300**.

If the answer to step **316** is yes, in step **322** the terminal computer asks if you are a subscriber?

If the answer is no, step **324** allows a non-subscriber to use the system by asking the clerk to enter in a generic access code. On these occasions, most likely, the non-subscriber will be making a donation for charitable purposes. At this time in step **326**, the non-subscriber will pick from a list of approved charities and the clerk will key in the selection. In step **328** a receipt will be printed showing evidence of the contribution. This same receipt will also provide an audit trail for individuals and or organizations to confirm that the charitable institutions received the donation. In step **330** the transaction would end and the terminal computer returns to step **300**.

Referring now to FIG. 5B if the answer is yes, in step **332** the subscriber or the clerk enters the subscriber's card into the terminal. The terminal computer reads the card and automatically records all of the cents in the POS change as a deposit or contribution. If the subscriber wishes to add in

**10**

all of the change (coins and bills) **332A** is entered into the computer. If the subscriber wishes to add in a specified portion of the change, **332B** is prompted into the keypad along with the specified amount, for example $1.54 out of $2.54 in available change.

In step **334**, the terminal computer asks if the subscriber wishes to bypass their default instructions for charities and select a special charity for this transaction.

In step **336** if the answer is no, the terminal computer advances to step **340**.

If yes in **334**, in step **338** the bypass charity account number is entered into the terminal computer through the keypad.

In step **340** the subscriber will receive a receipt showing their donor contribution.

In step **342** the terminal computer writes the transaction into memory.

In step **344** the transaction would end and the terminal computer returns to step **300**.

In step **346**, on a programmed time basis, the terminal computer forwards, by modem, the batch transactions held in memory to Level 3 CCC.

In order to enroll in the CMS embodiment, SP would sign up for accounts with Level 3 CCC. In order to enroll in the PMS embodiment, SP would sign up for accounts with Level 4 PA.

FIGS. 6A, 6B, and 6C is a flow chart that illustrates the enrollment steps for a CMS or PMS account which a central computer takes, through the keypad KPx, to open or revise an SP account. A display DSx on the keypad KPx or the ECRx allows a central computer to ask the consumer to perform certain acts. After the party has accessed the computer, in step **404**, it asks whether the consumer has a network card. If no in step **407**, the computer asks the consumer to enter his or her name or address. In step **408** the computer determines if all information has been entered. If not, it returns to step **407** to ask again for the desired information. If yes, the computer proceeds to step **410** to ask the consumer to choose a personal identification (PIN) number. In step **414** the computer determines if the PIN number is acceptable. If not, it returns to step **410** for another number. If yes, the computer advances to step **417** to assign a new card number.

If the answer in step **404** is yes, that the consumer has a card, the computer proceeds to step **420** to have the customer enter the card. In step **424** it asks the consumer to enter his or her pre-selected PIN number. In step **427** it determines whether the entered PIN number matches the pre-selected PIN number. If not, it returns to step **424** for a corrected number. The computer allows this procedure between steps **424** and **427** to occur only three times, thereafter it aborts the program.

If the PIN number is correct and thereby qualified, the computer in step **430** lists all existing accounts and amounts deposited during any specific time period, such as the calendar year. The consumer may request any time period. In step **434** it also lists all accounts with balances. In step **437** it asks the consumer to list all accounts to be eliminated, if any. In step **440** it asks the consumer to approve any accounts to be eliminated if any. The computer then proceeds to step **444** to list all new accounts. Step **444** also receives a prompt from step **417** if the card number is new.

In step **447** it determines if the account, in the form of a charity, merchant, or institution, is in the list of charities or institutions that have been accepted by the system. If the

6,112,191

**11**

answer is no, the computer in step **448** asks if the consumer wishes to have a temporary account set up for that donee or institution pending investigation. If yes to step **448**, the computer in step **449** sets up a temporary account, and lists it as qualified pending investigation. If the answer to **448** is no, the computer goes back to step **447**.

Once the computer has qualified a donee or institution, it goes to step **450** to ask if this is the last account the consumer wishes to add. If not, the process goes back to step **444**. If yes, the computer cancels all prior allocations in step **454** and in step **457** sequentially lists all remaining and new accounts showing the old allocations where applicable. In step **460** it asks the consumer to enter a new percentage allocation for each account. As a check, in step **464**, the computer asks if the total percentages exceed 100%. If yes, it returns to step **460** for a new entry. If not, it proceeds to step **467** to ask if this is the last account. If not, it goes to step **470** to ask the consumer to go to the next account and returns to step **460**. If yes, the computer goes to step **474** where it asks if the total percentage is 100%. If not, the computer places the remaining percentage in a consumer's personal default account and asks the consumer to select accounts and change allocations in step **477**. The computer in step **480** ends the process and prints out the results.

(2.) Referring now to calculating the additional amount by predetermined data, referred to as the rounder system, FIG. 7A is a block design that describes the invention's four level rounder system that will allow consumers to create excess funds when they make exact payments for services or goods using checks, credit, or debit drafts.

In FIG. 7 Level 1 a subscriber subscriber (SP) makes an exact payment using a check, credit or debit card and tenders the draft to a payee on Level 2 who in turn deposits the draft for customary authorization, approval, and payment by Level 3 Account Managers (AM) (as in banks or credit institutions). Under the provisions of the invention Level 3 AM will now also add or subtract a predetermined calculation to the face amount of the draft or the account entry itself for the purpose of creating an excess payment. The amount of excess payment called a rounder amount is then added to the face amount of the draft and the total number is then debited (as in withdrawals or account fees) or added (as in deposits or interest payments) to the account balance. Level 3 AM will then manage the funds and make distributions to Provider Services (PS) Level 4 (as in mutual funds, annuities, etc.).

The rounder system embodiment of the invention creates excess funds from exact payments and without the cooperation or even awareness of the payee who accepts payments for the purchase of services or goods. The system is based on the ability to create excess funds by applying a determinant to the face amount or number of account entries, e.g. checks, ATM withdrawals, credit and debit drafts.

The rounder system versus the POS system occurs in a different environment and at a different point in the commercial purchasing cycle. The processing of transactions occurs at the "back end" of the commercial cycle when check and credit drafts are debited against their existing account balances. Effectively, the invention adds (as in withdrawals or account fees) or subtracts (as in deposits/ payments or interest dividends) an amount of excess funds, e.g. $1, $2.14, $5.01, $10, $0.28, etc., to the face amount or number of entries and then adjusts the account balance accordingly. The amount of excess funds are then displayed in the account and periodically transferred to accounts for provider services, i.e., mutual funds, annuities, merchandise, charities, etc.

**12**

Under this system the SP opens up a new account or updates an existing account, e.g. checking, credit, or debit account, and instructs the bank or credit card issuer to add or subtract a determinant to each transaction after they are returned to the bank or credit issuer for final debiting against the consumer's account.

The excess funds that are created by the rounder system can be held internally by the bank or credit institution or assigned to other providers for the purchase of mutual funds, annuities, bonds, travel services, merchandise, etc.

When consumers use the above described improved methods to create excess funds from spending transactions in a combined form, they will have achieved the ability to save every time they spend, regardless of whether they use cash, write a check, use an ATM machine, use a credit or debit card.

Referring now to FIG. 8, there is a flow chart which illustrates the steps which central computers take, through a keypad and display, to open or revise a rounder account. The subscriber/subscriber's account instructions will then be applied by the institutions' central computers (CC) to create the excess funds.

In step **500** the CC asks the consumer if you have a rounder account.

If no, in step **502** the CC asks the consumer to enter his or her name, address, social security number, select a pin number, as well as any other vital information needed to open an account.

In step **504** the CC determines if all the needed information has been entered. If not, it returns to step **502** to ask again for the desired information.

If yes, the CC proceeds to step **506** to input the consumer's PIN number or code name. In step **508** the CC determines if the PIN number is acceptable. If not, it returns to step **506** for another number.

If yes, the CC advances to step **510** to assign a rounder account number. The computer then goes to step **522** to create new accounts.

If the answer in step **500** is yes, that the consumer is already a subscriber, the CC proceeds to step **512** to have the subscriber enter their rounder account number. In step **514** it asks the subscriber to enter his or her pre-selected PIN number. In step **516** it determines whether the entered PIN number matches the pre-selected PIN number for the subscriber number entered. If not, it returns to step **512** to correct the subscriber number and/or PIN number. The CC allows this procedure between steps **512** and **516** to recur only three times, thereafter it aborts the program.

If the PIN number is correct and thereby qualified, the CC in step **518** lists the rounder number or percentage that is applied to each account entry ($1, $3, 2%, etc.), stop orders (when to stop processing rounder transactions), the vehicles used for processing and depositing, e.g., checking accounts & ATM terminals, debit card use, and credit card use, names and addresses of all sub-accounts (savings, investing, and charitable choices), and the percentage of the rounder transaction assigned to each sub-account for a cumulative total of 100%.

In step **520** it asks the subscriber to list all accounts to be eliminated or modified, if any.

In step **522** the CC asks the subscriber if there are any new accounts to add.

If the answer is no, the computer goes to step **526** to write an updated rounder account file.

If yes, the CC then proceeds to step **524**, and asks the subscriber to enter any new accounts according to the

6,112,191

11

answer is no, the computer in step 448 asks if the consumer wishes to have a temporary account set up for that donee or institution pending investigation. If yes to step 448, the computer in step 449 sets up a temporary account, and lists it as qualified pending investigation. If the answer to 448 is no, the computer goes back to step 447.

Once the computer has qualified a donee or institution, it goes to step 450 to ask if this is the last account the consumer wishes to add. If not, the process goes back to step 444. If yes, the computer cancels all prior allocations in step 454 and in step 457 sequentially lists all remaining and new accounts showing the old allocations where applicable. In step 460 it asks the consumer to enter a new percentage allocation for each account. As a check, in step 464, the computer asks if the total percentages exceed 100%. If yes, it returns to step 460 for a new entry. If not, it proceeds to step 467 to ask if this is the last account. If not, it goes to step 470 to ask the consumer to go to the next account and returns to step 460. If yes, the computer goes to step 474 where it asks if the total percentage is 100%. If not, the computer places the remaining percentage in a consumer's personal default account and asks the consumer to select accounts and change allocations in step 477. The computer in step 480 ends the process and prints out the results.

(2.) Referring now to calculating the additional amount by predetermined data, referred to as the rounder system, FIG. 7A is a block design that describes the invention's four level rounder system that will allow consumers to create excess funds when they make exact payments for services or goods using checks, credit, or debit drafts.

In FIG. 7 Level 1 a subscriber subscriber (SP) makes an exact payment using a check, credit or debit card and tenders the draft to a payee on Level 2 who in turn deposits the draft for customary authorization, approval, and payment by Level 3 Account Managers (AM) (as in banks or credit institutions). Under the provisions of the invention Level 3 AM will now also add or subtract a predetermined calculation to the face amount of the draft or the account entry itself for the purpose of creating an excess payment. The amount of excess payment called a rounder amount is then added to the face amount of the draft and the total number is then debited (as in withdrawals or account fees) or added (as in deposits or interest payments) to the account balance. Level 3 AM will then manage the funds and make distributions to Provider Services (PS) Level 4 (as in mutual funds, annuities, etc.).

The rounder system embodiment of the invention creates excess funds from exact payments and without the cooperation or even awareness of the payee who accepts payments for the purchase of services or goods. The system is based on the ability to create excess funds by applying a determinant to the face amount or number of account entries, e.g. checks, ATM withdrawals, credit and debit drafts.

The rounder system versus the POS system occurs in a different environment and at a different point in the commercial purchasing cycle. The processing of transactions occurs at the "back end" of the commercial cycle when check and credit drafts are debited against their existing account balances. Effectively, the invention adds (as in withdrawals or account fees) or subtracts (as in deposits/ payments or interest dividends) an amount of excess funds, e.g. $1, $2.14, $5.01, $10, $0.28, etc., to the face amount or number of entries and then adjusts the account balance accordingly. The amount of excess funds are then displayed in the account and periodically transferred to accounts for provider services, i.e., mutual funds, annuities, merchandise, charities, etc.

12

Under this system the SP opens up a new account or updates an existing account, e.g. checking, credit, or debit account, and instructs the bank or credit card issuer to add or subtract a determinant to each transaction after they are returned to the bank or credit issuer for final debiting against the consumer's account.

The excess funds that are created by the rounder system can be held internally by the bank or credit institution or assigned to other providers for the purchase of mutual funds, annuities, bonds, travel services, merchandise, etc.

When consumers use the above described improved methods to create excess funds from spending transactions in a combined form, they will have achieved the ability to save every time they spend, regardless of whether they use cash, write a check, use an ATM machine, use a credit or debit card.

Referring now to FIG. 8, there is a flow chart which illustrates the steps which central computers take, through a keypad and display, to open or revise a rounder account. The subscriber/subscriber's account instructions will then be applied by the institutions' central computers (CC) to create the excess funds.

In step 500 the CC asks the consumer if you have a rounder account.

If no, in step 502 the CC asks the consumer to enter his or her name, address, social security number, select a pin number, as well as any other vital information needed to open an account.

In step 504 the CC determines if all the needed information has been entered. If not, it returns to step 502 to ask again for the desired information.

If yes, the CC proceeds to step 506 to input the consumer's PIN number or code name. In step 508 the CC determines if the PIN number is acceptable. If not, it returns to step 506 for another number.

If yes, the CC advances to step 510 to assign a rounder account number. The computer then goes to step 522 to create new accounts.

If the answer in step 500 is yes, that the consumer is already a subscriber, the CC proceeds to step 512 to have the subscriber enter their rounder account number. In step 514 it asks the subscriber to enter his or her pre-selected PIN number. In step 516 it determines whether the entered PIN number matches the pre-selected PIN number for the subscriber number entered. If not, it returns to step 512 to correct the subscriber number and/or PIN number. The CC allows this procedure between steps 512 and 516 to recur only three times, thereafter it aborts the program.

If the PIN number is correct and thereby qualified, the CC in step 518 lists the rounder number or percentage that is applied to each account entry ($1, $3, 2%, etc.), stop orders (when to stop processing rounder transactions), the vehicles used for processing and depositing, e.g., checking accounts & ATM terminals, debit card use, and credit card use, names and addresses of all sub-accounts (savings, investing, and charitable choices), and the percentage of the rounder transaction assigned to each sub-account for a cumulative total of 100%.

In step 520 it asks the subscriber to list all accounts to be eliminated or modified, if any.

In step 522 the CC asks the subscriber if there are any new accounts to add.

If the answer is no, the computer goes to step 526 to write an updated rounder account file.

If yes, the CC then proceeds to step 524, and asks the subscriber to enter any new accounts according to the

6,112,191

13

rounder number or percentage that is applied to each account entry ($1, $3, 2%, etc.), stop orders (when to stop future processing), the vehicles used for processing and depositing, (e.g., checking accounts & ATM terminals, debit card use, and credit card use), names and addresses of all sub-accounts (savings, investing, and/or three charitable choices), and the percentage of the rounder transaction assigned to each sub-account for a cumulative total of 100%.

In step **526** the computer writes a file, called the rounder account file, containing the new or revised subscriber's identification information and account instructions.

In step **528** the process ends and the computer returns to step **500**.

The following information will provide clarity for the steps that will be detailed in FIGS. 9A–E and FIGS. 10A–E.

The face or entry amount means the actual amount of the check/ATM withdrawal or credit/debit card charges prior to any rounder activity.

The rounder transaction is the numerical function applied against the face amount or the entry itself, i.e., $1.00, $3.00, 2%, or a specific number $1.50 to create excess funds. In the preferred embodiment this will be a whole dollar amount such as $1.00, $5.00, $10.00, etc. added to the entry.

The coin amount is the presence of coins in the face amount, i.e. check for $10.14.

The rounder amount is the amount of excess funds produced by applying the rounder transaction to the entry minus the coin amount, i.e. $10.14 using a $1.00 rounder will produce $0.86 as the rounder amount of excess funds.

The total withdrawal will be the rounder amount plus the entry amount which will be debited against the checking account or credit card balance to determine the new account balance.

Referring now to FIGS. 9A–E, there is a flow chart which illustrates the steps which bank central computers take, through a keypad and display, to collect funds, manage funds internally and to disburse funds.

Beginning at the top of FIG. 9A the bank first transmits to the CC, assigned to the clearing and reconciling of checking accounts, all transactional information and directions for rounder account processing.

In step **600** the checking account transaction is read. The transaction can be a check draft, an ATM withdrawal, checking account fee, an interest payment, etc.

In step **605** the computer gets the checking account balance.

In step **610** the computer asks, Is this account a rounder account subscriber?

If the answer is yes, in step **620** the transactions are processed according to rounder transaction instructions.

If the answer is no, in step **740** the transactions are processed without the rounder transaction instructions (See FIG. 4E).

In step **747** basic account balances are updated.

In step **750** the computer writes processed transactions to file.

In step **755** the computer reads next checking transaction.

In step **760** the computer asks, Is this the end of the file? If the answer is yes, computer goes to step **765**. If the answer is no, computer goes to step **600**.

In step **765** the computer sorts all transactions.

In step **770** the computer apportions rounder account contributions per account instructions contained in step **526**, the rounder account file.

14

In step **775** the computer transfers out the charity contributions, savings, investments, and other accounts.

The computer processing required to create rounder account contributions is detailed in FIG. 9B. Starting at the top, in step **622** the computer asks, Is this transaction a debit or withdrawal?

If the answer is no, computer goes to step **634**.

If the answer is yes, computer asks in step **624**, In the transaction are the cents greater than zero cents?

The following will assume the application of a $1.00 rounder transaction.

If the answer is no, in step **628** the rounder transaction would equal the rounder amount. For example if the rounder transaction is $1.00, to be added to the entry amount of a $10.00 withdrawal, the rounder amount of $1.00 will be created as excess funds for the rounder account and the total withdrawal will be $11.00.

If the answer is yes, in step **626** the cents in the purchase price will be subtracted from the rounder transaction and the net difference will become the rounder amount which will then be deposited into the rounder account. For example if the purchase price was $10.14 cents and $1.00 was the rounder transaction $0.14 would be subtracted from the $1.00 and the net of $0.86 would be the rounder amount which would then be deposited into the rounder account. The total withdrawal would still be $11.00.

In step **630** the rounder amount and the entry amount are added together to determine the total withdrawal.

In step **632** the total withdrawal is then subtracted from the existing balance to determine the new balance.

The detailed computer processing required to create rounder account contributions is continued in FIG. 9C in regard to deposits or fee income.

In the processing of deposits or interest into accounts we reverse the process and decrement the amount of money going into the checking account so that we can create excess funds. Therefore, we can apply similar rules, as previously discussed, when the invention dealt with account withdrawals, but only in a decrementing fashion.

In the preferred embodiment we will decrement deposits and interest payments only to eliminate coin amounts.

Starting at the top, in step **634** the computer asks, Is this transaction a deposit or interest fee?

If the answer is no, the computer goes to step **648**.

If the answer is yes, the computer asks in step **638**, In the transaction are the cents greater than zero cents?

If the answer is no, in step **640** the rounder account contribution equals zero since there are no coins in the entry amount of the deposit. The program then goes to step **644**.

If the answer is yes, in step **642** the cents are subtracted from the face amount and the coins become rounder contributions. For example, if the deposit was for $10.14 the rounder would take off the $0.14 and the net deposit would be for $10.00.

In step **644** the rounder amount is subtracted from the face amount to determine the total deposit.

In step **646** the total deposit is then added to the existing balance to determine the new balance.

The ability for the invention to remove coins from checking account deposits will allow for easier balancing of checking accounts.

The detailed computer processing required to create rounder amounts is continued in FIG. 9D when the transaction is a fee.

6,112,191

13

rounder number or percentage that is applied to each account entry ($1, $3, 2%, etc.), stop orders (when to stop future processing), the vehicles used for processing and depositing, (e.g., checking accounts & ATM terminals, debit card use, and credit card use), names and addresses of all sub-accounts (savings, investing, and/or three charitable choices), and the percentage of the rounder transaction assigned to each sub-account for a cumulative total of 100%.

In step **526** the computer writes a file, called the rounder account file, containing the new or revised subscriber's identification information and account instructions.

In step **528** the process ends and the computer returns to step **500**.

The following information will provide clarity for the steps that will be detailed in FIGS. 9A–E and FIGS. 10A–E.

The face or entry amount means the actual amount of the check/ATM withdrawal or credit/debit card charges prior to any rounder activity.

The rounder transaction is the numerical function applied against the face amount or the entry itself, i.e., $1.00, $3.00, 2%, or a specific number $1.50 to create excess funds. In the preferred embodiment this will be a whole dollar amount such as $1.00, $5.00, $10.00, etc. added to the entry.

The coin amount is the presence of coins in the face amount, i.e. check for $10.14.

The rounder amount is the amount of excess funds produced by applying the rounder transaction to the entry minus the coin amount, i.e. $10.14 using a $1.00 rounder will produce $0.86 as the rounder amount of excess funds.

The total withdrawal will be the rounder amount plus the entry amount which will be debited against the checking account or credit card balance to determine the new account balance.

Referring now to FIGS. 9A–E, there is a flow chart which illustrates the steps which bank central computers take, through a keypad and display, to collect funds, manage funds internally and to disburse funds.

Beginning at the top of FIG. 9A the bank first transmits to the CC, assigned to the clearing and reconciling of checking accounts, all transactional information and directions for rounder account processing.

In step **600** the checking account transaction is read. The transaction can be a check draft, an ATM withdrawal, checking account fee, an interest payment, etc.

In step **605** the computer gets the checking account balance.

In step **610** the computer asks, Is this account a rounder account subscriber?

If the answer is yes, in step **620** the transactions are processed according to rounder transaction instructions.

If the answer is no, in step **740** the transactions are processed without the rounder transaction instructions (See FIG. 4E).

In step **747** basic account balances are updated.

In step **750** the computer writes processed transactions to file.

In step **755** the computer reads next checking transaction.

In step **760** the computer asks, Is this the end of the file? If the answer is yes, computer goes to step **765**. If the answer is no, computer goes to step **600**.

In step **765** the computer sorts all transactions.

In step **770** the computer apportions rounder account contributions per account instructions contained in step **526**, the rounder account file.

14

In step **775** the computer transfers out the charity contributions, savings, investments, and other accounts.

The computer processing required to create rounder account contributions is detailed in FIG. 9B. Starting at the top, in step **622** the computer asks, Is this transaction a debit or withdrawal?

If the answer is no, computer goes to step **634**.

If the answer is yes, computer asks in step **624**, In the transaction are the cents greater than zero cents?

The following will assume the application of a $1.00 rounder transaction.

If the answer is no, in step **628** the rounder transaction would equal the rounder amount. For example if the rounder transaction is $1.00, to be added to the entry amount of a $10.00 withdrawal, the rounder amount of $1.00 will be created as excess funds for the rounder account and the total withdrawal will be $11.00.

If the answer is yes, in step **626** the cents in the purchase price will be subtracted from the rounder transaction and the net difference will become the rounder amount which will then be deposited into the rounder account. For example if the purchase price was $10.14 cents and $1.00 was the rounder transaction $0.14 would be subtracted from the $1.00 and the net of $0.86 would be the rounder amount which would then be deposited into the rounder account. The total withdrawal would still be $11.00.

In step **630** the rounder amount and the entry amount are added together to determine the total withdrawal.

In step **632** the total withdrawal is then subtracted from the existing balance to determine the new balance.

The detailed computer processing required to create rounder account contributions is continued in FIG. 9C in regard to deposits or fee income.

In the processing of deposits or interest into accounts we reverse the process and decrement the amount of money going into the checking account so that we can create excess funds. Therefore, we can apply similar rules, as previously discussed, when the invention dealt with account withdrawals, but only in a decrementing fashion.

In the preferred embodiment we will decrement deposits and interest payments only to eliminate coin amounts.

Starting at the top, in step **634** the computer asks, Is this transaction a deposit or interest fee?

If the answer is no, the computer goes to step **648**.

If the answer is yes, the computer asks in step **638**, In the transaction are the cents greater than zero cents?

If the answer is no, in step **640** the rounder account contribution equals zero since there are no coins in the entry amount of the deposit. The program then goes to step **644**.

If the answer is yes, in step **642** the cents are subtracted from the face amount and the coins become rounder contributions. For example, if the deposit was for $10.14 the rounder would take off the $0.14 and the net deposit would be for $10.00.

In step **644** the rounder amount is subtracted from the face amount to determine the total deposit.

In step **646** the total deposit is then added to the existing balance to determine the new balance.

The ability for the invention to remove coins from checking account deposits will allow for easier balancing of checking accounts.

The detailed computer processing required to create rounder amounts is continued in FIG. 9D when the transaction is a fee.

6,112,191

**15**

The rules applied here are the same as in processing withdrawals. But again for the preferred embodiment, which will follow, the process will only be applied to the presence of coin amounts in the fee charges.

Starting at the top, in step **648** the computer asks, Is this a fee?

If the answer is no, the computer goes to step **662**.

If the answer is yes, the computer asks in step **650**, In the transaction are the cents greater than zero cents?

If the answer is no, in step **652** the rounder account contribution equals zero since there are no coins in the face amount of the fee. The program then goes to step **656**.

If the answer is yes, in step **654** the cents are added to the face amount and the coins become the rounder amount. For example, if the fee was for $10.14 a one dollar rounder add another $0.86 and the net withdrawal would be for $11.00.

In step **656** the rounder amount is added to the face amount to determine the total withdrawal.

In step **660** the total withdrawal is then subtracted from the existing balance to determine the new balance.

The ability for the invention to remove coins from checking account fees will allow for easier balancing of checking accounts.

The computer steps required to process non-rounder account transactions are detailed in FIG. 9E. Starting at the top, in step **741** the computer asks, Is this transaction a debit, withdrawal, or fee?

If the answer is yes, in step **742** the checking account balance is determined by subtracting the transaction amount from the account balance.

If the answer is no, computer goes to step **743** and asks, Is this transaction a deposit or interest?

If the answer is yes, in step **744** the checking account balance is determined by subtracting the transaction amount from the account balance.

If the answer is no, the computer in step **745** displays error message.

Referring now to FIGS. 10A–E, there is a flow chart which illustrates the steps which card issuers central computers take, through a keypad and display, to collect funds, manage finds internally and to disburse funds.

Beginning at the top of FIG. 10A, the card issuers first transmit to the CC used in clearing and reconciling debit and credit card accounts all transactional information of the subscribers who round up or down their debit/credit card transactions. This information has been obtained, see FIG. 8, through the enrollment process.

In step **800** the debit/credit account transaction is read. The transaction can be a debit/credit charge processed through a POS terminal, filled in by hand, called in over the telephone, etc.

In step **805** the computer gets the cardholder's account balance.

In step **810** the computer asks, Is this account a rounder account subscriber?

If the answer is yes, in step **820** the transactions are processed according to rounder instructions.

If the answer is no, in step **920** the transactions are processed without the rounder instructions.

In step **930** the account balances are updated.

In step **940** the computer writes processed transaction to file.

In step **950** the computer reads next debit/credit card transaction.

**16**

In step **960** the computer asks, Is this the end of the file? If the answer is yes, computer goes to step **970**. If the answer is no, computer goes to step **800**.

In step **970** the computer sorts all transactions.

In step **980** the computer apportions rounder account contributions per account instructions contained in step **526** of the rounder account file.

In step **990** the computer transfers out the charity contributions, savings, investments, and other accounts.

The computer processing required to create rounder transaction contributions is detailed in FIG. 10B. Starting at the top, in step **822** the computer asks, Is this transaction a debit or credit card charge?

If the answer is no, the computer goes to step **834**.

If the answer is yes, the computer asks in step **824**, In the transaction are the cents greater than zero cents?

If the answer is no, in step **828** the rounder transaction would equal the rounder amount. The computer then goes to step **830**. For example, if the rounder transaction is $1.00, to be added to the entry amount of the credit charge of say $300.00, the rounder amount of $1.00 will be created as excess funds for the rounder account and the total charge will be $301.00.

If the answer is yes, in step **826** the cents in the charged amount will be subtracted from the rounder transaction and the net difference will become the rounder amount which will then be deposited into the rounder account. For example if the credit charge was $300.14 cents and $1.00 was the rounder transaction $0.14 would be subtracted from the $1.00 and the net of $0.86 would be the rounder amount which would then be deposited into the rounder account. The total charge would still be $301.00.

In step **830** the rounder amount and the entry amount are added together to determine the total charge.

In step **832** the total withdrawal is then subtracted from the existing balance to determine the new balance.

The detailed computer processing required to create rounder account contributions is continued in FIG. 10C in regard to account payments or interest dividends.

In the processing of payments to accounts we reverse the process and decrement the amount of money going into the account so that we can create excess funds. Therefore we can apply similar rules, as previously discussed when the invention dealt with account withdrawals, but only in a decrementing fashion.

In the preferred embodiment, the invention will only decrement payments when coins are present.

Starting at the top, in step **834** the computer asks, Is this transaction a payment or interest dividend?

If the answer is no, computer goes to step **848**.

If the answer is yes, computer asks in step **838**, In the transaction are the cents greater than zero cents?

If the answer is no, in step **840** the rounder account contribution equals zero since there are not any coins in the entry amount of the deposit. The computer then goes to step **844**.

If the answer is yes, in step **842** the cents are subtracted from the entry amount and the coins become rounder contributions. For example if the payment was for $500.14, the rounder would take off the $0.14 and the net deposit would be for $500.00.

In step **844** the rounder amount is subtracted from the entry amount to determine the total payment.

In step **846** the total withdrawal is then subtracted from the existing balance to determine the new balance.

6,112,191

**15**

The rules applied here are the same as in processing withdrawals. But again for the preferred embodiment, which will follow, the process will only be applied to the presence of coin amounts in fee charges.

Starting at the top, in step **648** the computer asks, Is this a fee?

If the answer is no, the computer goes to step **662**.

If the answer is yes, the computer asks in step **650**, In the transaction are the cents greater than zero cents?

If the answer is no, in step **652** the rounder account contribution equals zero since there are no coins in the face amount of the fee. The program then goes to step **656**.

If the answer is yes, in step **654** the cents are added to the face amount and the coins become the rounder amount. For example, if the fee was for $10.14 a one dollar rounder add another $0.86 and the net withdrawal would be for $11.00.

In step **656** the rounder amount is added to the face amount to determine the total withdrawal.

In step **660** the total withdrawal is then subtracted from the existing balance to determine the new balance.

The ability for the invention to remove coins from checking account fees will allow for easier balancing of checking accounts.

The computer steps required to process non-rounder account transactions are detailed in FIG. 9E. Starting at the top, in step **741** the computer asks, Is this transaction a debit, withdrawal, or fee?

If the answer is yes, in step **742**, the checking account balance is determined by subtracting the transaction amount from the account balance.

If the answer is no, computer goes to step **743** and asks, Is this transaction a deposit or interest?

If the answer is yes, in step **744** the checking account balance is determined by subtracting the transaction amount from the account balance.

If the answer is no, the computer in step **745** displays error message.

Referring now to FIGS. 10A–E, there is a flow chart which illustrates the steps which card issuers central computers take, through a keypad and display, to collect funds, manage finds internally and to disburse funds.

Beginning at the top of FIG. 10A, the card issuers first transmit to the CC used in clearing and reconciling debit and credit card accounts all transactional information of the subscribers who round up or down their debit/credit card transactions. This information has been obtained, see FIG. 8, through the enrollment process.

In step **800** the debit/credit account transaction is read. The transaction can be a debit/credit charge processed through a POS terminal, filled in by hand, called in over the telephone, etc.

In step **805** the computer gets the cardholder's account balance.

In step **810** the computer asks, Is this account a rounder account subscriber?

If the answer is yes, in step **820** the transactions are processed according to rounder instructions.

If the answer is no, in step **920** the transactions are processed without the rounder instructions.

In step **930** the account balances are updated.

In step **940** the computer writes processed transaction to file.

In step **950** the computer reads next debit/credit card transaction.

**16**

In step **960** the computer asks, Is this the end of the file? If the answer is yes, computer goes to step **970**. If the answer is no, computer goes to step **800**.

In step **970** the computer sorts all transactions.

In step **980** the computer apportions rounder account contributions per account instructions contained in step **526** of the rounder account file.

In step **990** the computer transfers out the charity contributions, savings, investments, and other accounts.

The computer processing required to create rounder transaction contributions is detailed in FIG. **10**B. Starting at the top, in step **822** the computer asks, Is this transaction a debit or credit card charge?

If the answer is no, the computer goes to step **834**.

If the answer is yes, the computer asks in step **824**, In the transaction are the cents greater than zero cents?

If the answer is no, in step **828** the rounder transaction would equal the rounder amount. The computer then goes to step **830**. For example, if the rounder transaction is $1.00, to be added to the entry amount of the credit charge of say $300.00, the rounder amount of $1.00 will be created as excess funds for the rounder account and the total charge will be $301.00.

If the answer is yes, in step **826** the cents in the charged amount would be subtracted from the rounder transaction and the net difference will become the rounder amount which will then be deposited into the rounder account. For example if the credit charge was $300.14 cents and $1.00 was the rounder transaction $0.14 would be subtracted from the $1.00 and the net of $0.86 would be the rounder amount which would then be deposited into the rounder account. The total charge would still be $301.00.

In step **830** the rounder amount and the entry amount are added together to determine the total charge.

In step **832** the total withdrawal is then subtracted from the existing balance to determine the new balance.

The detailed computer processing required to create rounder account contributions is continued in FIG. **10**C in regard to account payments or interest dividends.

In the processing of payments into accounts we reverse the process and decrement the amount of money going into the account so that we can create excess funds. Therefore we can apply similar rules, as previously discussed when the invention dealt with account withdrawals, but only in a decrementing fashion.

In the preferred embodiment, the invention will only decrement payments when coins are present.

Starting at the top, in step **834** the computer asks, Is this transaction a payment or interest dividend?

If the answer is no, computer goes to step **848**.

If the answer is yes, computer asks in step **838**, In the transaction are the cents greater than zero cents?

If the answer is no, in step **840** the rounder account contribution equals zero since there are not any coins in the entry amount of the deposit. The computer then goes to step **844**.

If the answer is yes, in step **842** the cents are subtracted from the entry amount and the coins become rounder contributions. For example if the payment was for $500.14, the rounder would take off the $0.14 and the net deposit would be for $500.00.

In step **844** the rounder amount is subtracted from the entry amount to determine the total payment.

In step **846** the total withdrawal is then subtracted from the existing balance to determine the new balance.

6,112,191

**17**

The detailed computer processing required to create rounder amounts is continued in FIG. 10D when the transaction is a fee.

The rules applied here are the same as in processing withdrawals. But again for the preferred embodiment, which will follow, the process will only be applied to the presence of coin amounts in fee charges.

Starting at the top, in step **848** the computer asks, Is this a fee?

If the answer is no, computer goes to step **860**.

If the answer is yes, computer asks in step **850**, In the transaction are the cents greater than zero cents?

If the answer is no, in step **852** the rounder account contribution equals zero since there are not any coins in the face amount of the fee. The computer then goes to step **856**.

If the answer is yes, in step **854** the cents are added to the entry amount and the coins become the rounder amount. For example if the fee was for $10.14 and a one dollar rounder, add another $0.86 and the net withdrawal would be for $11.00.

In step **856** the rounder amount is added to the entry amount to determine the total withdrawal.

In step **858** the total withdrawal is then subtracted from the existing balance to determine the new balance.

The computer steps required to process non-rounder account transactions are detailed in FIG. **10E**. Starting at the top, in step **921** the computer asks, Is this transaction a charge or fee?

If the answer is yes, in step **922**, the credit balance is determined by subtracting the transaction amount from the account balance.

If the answer is no, the computer goes to step **923** and asks, Is this transaction a payment or interest dividend?

If the answer is yes, in step **924** the credit account balance is determined by subtracting the transaction amount from the account balance.

If the answer is no, the computer in step **925** displays error message.

The invention provides a unique and presently unavailable way for consumers to save every time they spend, regardless of whether they use cash, write a check, use an ATM machine, use a credit or debit card.

The invention provides an "open" POS system whereupon consumers can make excess payments at point of sale counters and have the excess funds be put in special accounts. The "open" system for making excess payments will comprise a four level network utilized in combination with consumers referred to as subscriber/subscribers (SP), payees referred to as merchant/collectors (MC), a central computer/clearinghouse/network (CCC), and provider accounts (PA). The POS system will allow SP the ability to create excess funds from the overpayment of spending transactions using cash, check, credit, or debit card, at POS counters and have said excess overpayments be transferred through a CCC onto provider accounts selected by said subscriber/subscribers (SP).

The invention also provides a four level rounder system (RS) for subscriber/subscribers to create excess funds from account entries connected with transactions paid for by check, ATM machine, credit, or debit card (which can occur at a variety of commercial points: POS counters, on a person to person basis, by mail, by wire transfer, by telephone, by computer, etc.). The rounder system would apply a computerized rounder amount to create excess funds in which the

**18**

active cooperation of the payee is not needed and when the face amount of the payment being tendered is not in excess of the actual purchase price as the required means to establish the excess funds.

While embodiments of the invention have been described in detail, it will be evident to those skilled in the art that the invention may be embodied otherwise without departing from its spirit and scope. Therefore, the following claims are meant to encompass all alternatives and modifications within the scope and spirit of the present invention.

What is claimed is:

1. A method of accumulating credits in payor surplus accounts from financial transactions between a payor and a payee, comprising:
   entering a demanded amount due the payee into a station of a network controlled by the payee;
   entering an additional amount offered by the payor into a station of a network controlled by the payee; and
   transmitting data of the additional amount to a separate station forming part of a network controlled by other than the payee, and within the separate station. apportioning the data of at least a part of the additional amount into one or more of the payor surplus accounts determined by the payor.

2. A method as in claim 1, wherein the step of transmitting the data of the additional amount includes the step of the payee crediting the additional amount to the one or more of the payor surplus accounts in the separate station of the network, wherein the separate station is in the means of a central clearing entity, so that the payee remains neutral to the additional amounts.

3. A method as in claim 2, further comprising the step of printing out the status of said surplus accounts.

4. A method as in claim 2, wherein said one or more of said other payor surplus account includes sub accounts identifying a plurality of charities, banks, and other sub accounts and the step of transmitting data of the additional amount includes assigning predetermined portions of the one or more of said payor surplus accounts to said sub accounts.

5. A method as in claim 1, wherein said step of entering an additional amount includes calculating the additional amount from predetermined data associated with the one or more of the payor surplus accounts.

6. A method as in claim 5, further comprising the step of printing out the status of said surplus account.

7. A method as in claim 5, wherein said one or more of the payor surplus accounts includes sub accounts identifying a plurality of charities, banks, and other sub accounts and the step of transmitting the additional amount includes assigning predetermined portions of the one or more of said surplus accounts to said sub accounts.

8. A system for accumulating credits in surplus accounts from financial transactions between a payor and a payee, comprising:
   a network;
   an entry receiving device in the network for receiving entries of an amount due the payee and an additional amount offered by the payor; and
   an additional-amount depositing station in the network, containing one of said surplus accounts, and coupled to the entry receiving device for depositing the additional amount in the one of the payor surplus account;
   said entry device being controlled by entities which include the payee, and said depositing device being controlled by entities other than the payee.

6,112,191

## 17

The detailed computer processing required to create rounder amounts is continued in FIG. 10D when the transaction is a fee.

The rules applied here are the same as in processing withdrawals. But again for the preferred embodiment, which will follow, the process will only be applied to the presence of coin amounts in fee charges.

Starting at the top, in step 848 the computer asks, Is this a fee?

If the answer is no, computer goes to step 860.

If the answer is yes, computer asks in step 850, In the transaction are the cents greater than zero cents?

If the answer is no, in step 852 the rounder account contribution equals zero since there are not any coins in the face amount of the fee. The computer then goes to step 856.

If the answer is yes, in step 854 the cents are added to the entry amount and the coins become the rounder amount. For example if the fee was for $10.14 and a one dollar rounder, add another $0.86 and the net withdrawal would be for $11.00.

In step 856 the rounder amount is added to the entry amount to determine the total withdrawal.

In step 858 the total withdrawal is then subtracted from the existing balance to determine the new balance.

The computer steps required to process non-rounder account transactions are detailed in FIG. 10E. Starting at the top, in step 921 the computer asks, Is this transaction a charge or fee?

If the answer is yes, in step 922, the credit balance is determined by subtracting the transaction amount from the account balance.

If the answer is no, the computer goes to step 923 and asks, Is this transaction a payment or interest dividend?

If the answer is yes, in step 924 the credit account balance is determined by subtracting the transaction amount from the account balance.

If the answer is no, the computer in step 925 displays error message.

The invention provides a unique and presently unavailable way for consumers to save every time they spend, regardless of whether they use cash, write a check, use an ATM machine, use a credit or debit card.

The invention provides an "open" POS system whereupon consumers can make excess payments at point of sale counters and have the excess funds be put in special accounts. The "open" system for making excess payments will comprise a four level network utilized in combination with consumers referred to as subscriber/subscribers (SP), payees referred to as merchant/collectors (MC), a central computer/clearinghouse/network (CCC), and provider accounts (PA). The POS system will allow SP the ability to create excess funds from the overpayment of spending transactions using cash, check, credit, or debit card, at POS counters and have said excess overpayments be transferred through a CCC onto provider accounts selected by said subscriber/subscribers (SP).

The invention also provides a four level rounder system (RS) for subscriber/subscribers to create excess funds from account entries connected with transactions paid for by check, ATM machine, credit, or debit card (which can occur at a variety of commercial points: POS counters, on a person to person basis, by mail, by wire transfer, by telephone, by computer, etc.). The rounder system would apply a computerized rounder amount to create excess funds in which the

## 18

active cooperation of the payee is not needed and when the face amount of the payment being tendered is not in excess of the actual purchase price as the required means to establish the excess funds.

While embodiments of the invention have been described in detail, it will be evident to those skilled in the art that the invention may be embodied otherwise without departing from its spirit and scope. Therefore, the following claims are meant to encompass all alternatives and modifications within the scope and spirit of the present invention.

What is claimed is:

1. A method of accumulating credits in payor surplus accounts from financial transactions between a payor and a payee, comprising:

entering a demanded amount due the payee into a station of a network controlled by the payee;

entering an additional amount offered by the payor into a station of a network controlled by the payee; and

transmitting data of the additional amount to a separate station forming part of a network controlled by other than the payee, and apportioning the data of at least a part of the additional amount into one or more of the payor surplus accounts determined by the payor.

2. A method as in claim 1, wherein the step of transmitting the data of the additional amount includes the step of the payee crediting the additional amount to the one or more of the payor surplus accounts in the separate station of the network, wherein the separate station is in the hands of a central clearing entity, so that the payee remains neutral to the additional amounts.

3. A method as in claim 2, further comprising the step of printing out the status of said surplus accounts.

4. A method as in claim 2, wherein said one or more of said other payor surplus account includes sub accounts identifying a plurality of charities, banks, and other sub accounts and the step of transmitting data of the additional amount includes assigning predetermined portions of the one or more of said payor surplus accounts to said sub accounts.

5. A method as in claim 1, wherein said step of entering an additional amount includes calculating the additional amount from predetermined data associated with the one or more of the payor surplus accounts.

6. A method as in claim 5, further comprising the step of printing out the status of said surplus account.

7. A method as in claim 5, wherein said one or more of the payor surplus accounts includes sub accounts identifying a plurality of charities, banks, and other sub accounts and the step of transmitting the additional amount includes assigning predetermined portions of the one or more of said surplus accounts to said sub accounts.

8. A system for accumulating credits in surplus accounts from financial transactions between a payor and a payee, comprising:

a network;

an entry receiving device in the network for receiving entries of an amount due the payee and an additional amount offered by the payor; and

an additional-amount depositing station in the network, containing one of said surplus accounts, and coupled to the entry receiving device for depositing the additional amount in the one of the payor surplus accounts;

said entry device being controlled by entities which include the payee, and said depositing device being controlled by entities other than the payee.

6,112,191

<table>
<tr><td>

**19**

9. A system as in claim 8, wherein the depositing station includes payee crediting means for the payee crediting the additional amount to the one of the payor surplus account in the hands of a central clearing entity, so that the payee remains neutral to the additional amounts.

10. A system as in claim 9, further comprising a status printer responsive to the status of said surplus account.

11. A system as in claim 9, wherein said surplus account includes sub accounts identifying a plurality of charities, bank, and other financial institutions and the depositing station assigns predetermined portions of said surplus account to said sub accounts.

12. A system as in claim 8, wherein said entry device includes calculating means for calculating the additional amount from predetermined data associated with the surplus account.

13. A system as in claim 12, further comprising a status printer responsive to the status of said surplus account.

14. A system as in claim 12, wherein said surplus account includes sub accounts identifying a plurality of charities, banks, and other financial institutions and said the depositing station assigns predetermined portions of said surplus account to said sub accounts.

15. A system, comprising:

a network;

entry means coupled to said network for entering into the network an amount being paid in a transaction by a payor;

identification entering means in said entry means and coupled to said network for entering an identification of the payor;

said network including computing means having data concerning the payor including an excess determinant established by the payor for the accounts;

said computing means in said network being responsive to said data and said identification entering means for determining an excess payment to the basis of the determinant established by the payor, and

said computing means in said network being responsive to the excess payment for apportioning at least a part of the excess payment among said accounts on the basis of the excess determined and established by the payor and on the basis of commands established by the payor and controlled by other than the payee.

16. A system as in claim 15, wherein said entry means includes change making means for returning any remains from the excess payment as cash.

17. A system as in claim 16, wherein said entry means includes a display for displaying the excess payment.

18. A system as in claim 16, wherein said excess payment is apportioned to an account.

19. A system as in claim 16, further comprising printout means prints out the status of each of the accounts.

20. A system as in claim 16, wherein said network includes means for entering changes in the calculating formulas.

21. A system as in claim 16, wherein said network includes means for entering changes in the apportionment.

22. A system as in claim 15, wherein said entry means prints out the status of each of the accounts.

23. A system as in claim 15, wherein said entry means is responsive to entries for entering changes in the allocations.

</td><td>

**20**

24. A system as in claim 15, wherein said computing is responsive to the apportioning for allocating a portion of the excess to charity donee accounts with each apportionment.

25. A system as in claim 24, wherein said computing means is responsive to the apportioning for transferring the portion of the excess for the charity donee account directly to the charity donee with each apportionment.

26. A system as in claim 15, wherein said computing means includes;

data for storing the names of qualified charities;

data with the names of banks;

data storing numbers of client accounts;

said entry means serving for entering the names of charities and;

said computer means being responsive to said entry means for comparing the entered names with the stored and numbers names to determine if the entered name matches a stored name;

said computer means being responsive to said entry means for assigning a charity, bank, financial institution, purchasing account to an account when a client has selected the charity or the bank;

said entry means being responsive to entries for recording money entries into said accounts and storing the entries in said computer means; and

allocating said computer means being responsive to the excess by said entry means for registering an allocation of parts of any monies recorded into any accounts among the charities and banks.

27. A system as in claim 15, wherein said calculating means serves for applying predetermined calculations to the face amount of account entries for the purpose of creating an excess payment.

28. A point of sale operating method, comprising:

entering an amount corresponding to a price of a product into a cash register;

entering an amount corresponding to cash being paid;

determining any excess payment;

entering a card number;

transmitting data of the excess payment to a separate station and in said separate station apportioning at least a part of the amounts of excess cash payment to one or more predetermined accounts selected on the basis of the card number and controlled by other than the payee;

crediting the excess paid to the selected accounts to the card number.

29. A method as in claim 28, wherein said apportioning step includes making change for returning any remains from the excess payment, after apportionment, as cash.

30. A method as in claim 28, wherein said printout step includes printing out the status of each of the accounts.

31. A method as in claim 28, wherein said step of apportioning includes entering changes in the apportionment.

32. A method as in claim 28, wherein said step of apportioning includes allocating a portion of the excess to accounts with each apportionment.

33. A method as in claim 28, wherein said apportionment step includes:

storing of a plurality of qualified charities;

storing names of a number of banks;

storing number of other accounts;

</td></tr>
</table>

6,112,191

**19**

**20**

9. A system as in claim **8**, wherein the depositing station includes payee crediting means for the payee crediting the additional amount to the one of the payor surplus account in the hands of a central clearing entity, so that the payee remains neutral to the additional amounts.

10. A system as in claim **9**, further comprising a status printer responsive to the status of said surplus account.

11. A system as in claim **9**, wherein said surplus account includes sub accounts identifying a plurality of charities, bank, and other financial institutions and the depositing station assigns predetermined portions of said surplus account to said sub accounts.

12. A system as in claim **8**, wherein said entry device includes calculating means for calculating the additional amount from predetermined data associated with the surplus account.

13. A system as in claim **12**, further comprising a status printer responsive to the status of said surplus account.

14. A system as in claim **12**, wherein said surplus account includes sub accounts identifying a plurality of charities, banks, and other financial institutions and said the depositing station assigns predetermined portions of said surplus account to said sub accounts.

15. A system, comprising:

a network;

entry means coupled to said network for entering into the network an amount being paid in a transaction by a payor;

identification entering means in said entry means and coupled to said network for entering an identification of the payor;

said network including computing means having data concerning the payor including an excess determinant established by the payor for the accounts;

said computing means in said network being responsive to said data and said identification entering means for determining an excess payment to the basis of the determinant established by the payor, and

said computing means in said network being responsive to the excess payment for apportioning at least a part of the excess payment among said accounts on the basis of the excess determined and established by the payor and on the basis of commands established by the payor and controlled by other than the payee.

16. A system as in claim **15**, wherein said entry means includes change making means for returning any remains from the excess payment as cash.

17. A system as in claim **16**, wherein said entry means includes a display for displaying the excess payment.

18. A system as in claim **16**, wherein said excess payment is apportioned to an account.

19. A system as in claim **16**, further comprising printout means prints out the status of each of the accounts.

20. A system as in claim **16**, wherein said network includes means for entering changes in the calculating formulas.

21. A system as in claim **16**, wherein said network includes means for entering changes in the apportionment.

22. A system as in claim **15**, wherein said entry means prints out the status of each of the accounts.

23. A system as in claim **15**, wherein said entry means is responsive to entries for entering changes in the allocations.

24. A system as in claim **15**, wherein said computing is responsive to the apportioning for allocating a portion of the excess to charity donee accounts with each apportionment.

25. A system as in claim **24**, wherein said computing means is responsive to the apportioning for transferring the portion of the excess for the charity donee account directly to the charity donee with each apportionment.

26. A system as in claim **15**, wherein said computing means includes;

data for storing the names of qualified charities;

data with the names of banks;

data storing numbers of client accounts;

said entry means serving for entering the names of charities and;

said computer means being responsive to said entry means for comparing the entered names with the stored and numbers names to determine if the entered name matches a stored name;

said computer means being responsive to said entry means for assigning a charity, bank, financial institution, purchasing account to an account when a client has selected the charity or the bank;

said entry means being responsive to entries for recording money entries into said accounts and storing the entries in said computer means; and

allocating said computer means being responsive to the excess by said entry means for registering an allocation of parts of any monies recorded into any accounts among the charities and banks.

27. A system as in claim **15**, wherein said calculating means serves for applying predetermined calculations to the face amount of account entries for the purpose of creating an excess payment.

28. A point of sale operating method, comprising:

entering an amount corresponding to a price of a product into a cash register;

entering an amount corresponding to cash being paid;

determining any excess payment;

entering a card number;

transmitting data of the excess payment to a separate station and in said separate station apportioning at least a part of the amounts of excess cash payment to one or more predetermined accounts selected on the basis of the card number and controlled by other than the payee;

crediting the excess paid to the selected accounts to the card number.

29. A method as in claim **28**, wherein said apportioning step includes making change for returning any remains from the excess payment, after apportionment, as cash.

30. A method as in claim **28**, wherein said printout step includes printing out the status of each of the accounts.

31. A method as in claim **28**, wherein said step of apportioning includes entering changes in the apportionment.

32. A method as in claim **28**, wherein said step of apportioning includes allocating a portion of the excess to accounts with each apportionment.

33. A method as in claim **28**, wherein said apportionment step includes:

storing of a plurality of qualified charities;

storing names of a number of banks;

storing number of other accounts;

6,112,191

## 21

entering the names of one of charities, banks, and other accounts so as to define an entered name for each entry of a name,

comparing each entered with a stored name to determine if the entered name matches the stored name;

assigning one of said accounts to an account when a charity, bank, or other account has been entered;

recording money entries into set accounts;

## 22

registering an allocation of parts of monies recorded into accounts among charities, banks, or other accounts entered for that account.

34. A method as in claim 28, wherein said step of apportioning includes allocating the excess to accounts with each apportionment.

\* \* \* \* \*

6,112,191

21

entering the names of one of charities, banks, and other accounts so as to define an entered name for each entry of a name,

comparing each entered with a stored name to determine if the entered name matches the stored name;

assigning one of said accounts to an account when a charity, bank, or other account has been entered;

recording money entries into set accounts;

22

registering an allocation of parts of monies recorded into accounts among charities, banks, or other accounts entered for that account.

34. A method as in claim 28, wherein said step of apportioning includes allocating the excess to accounts with each apportionment.

* * * * *

# EXHIBIT B

FILED

07 JAN 25 PM 2: 26

CLERK U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS, FLORIDA

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | | |
|---|---|---|
| **EVERY PENNY COUNTS, INC.** | ) | **CASE NO:** |
| **Plaintiff** | ) | |
| | ) | 2: _07_ -C_V_- _42_ -FtM- 99SPC |
| **v.** | ) | **DIVISION:** |
| | ) | |
| **BANK OF AMERICA CORPORATION** | ) | **MAG. SECTION:** |
| **AND VISA U.S.A., INC.** | ) | |
| **Defendant** | ) | |
| | ) | **JURY TRIAL DEMANDED** |

## COMPLAINT SEEKING DAMAGES AND
## PERMANENT INJUNCTIVE RELIEF FOR PATENT INFRINGEMENT

NOW INTO COURT, through undersigned counsel, come Plaintiff, Every Penny Counts,

Inc., and for its complaint seeking damages and permanent injunctive relief against Defendants,

Bank of America Corporation and VISA U.S.A., Inc. respectfully represents as follows:

## I. INTRODUCTION.

This is an action seeking the recovery of the significant damages sustained by Plaintiff,

Every Penny Counts, Inc. ("EPC") as a direct result of the knowing and willful infringement of

its patent by Defendants, Bank of America Corporation and VISA USA, Inc.  As more fully

detailed below, EPC is holder of United States Patent Number 6,112,191 commonly known as

the "Rounder Patent."  For a period of several years, Defendants were approached by EPC, or its

predecessor in interest, concerning licensing agreement for the Rounder Patent.  Defendants

obtained information concerning the Rounder Patent, and its potential, now realized, for

generating significant new accounts and profits for Defendants. Rather than entering into a

licensing agreement, Defendants knowingly and intentionally infringed upon the Rounder Patent

causing significant damage to EPC. EPC now seeks recovery of those damages together with

treble damages, attorney's fees and permanent injunctive relief.

## II. PARTIES, THE COURT'S JURISDICTION AND VENUE.

1.

Plaintiff, EPC, a corporation organized and existing under the laws of the State of

Delaware, with its principal place of business in Cape Coral, Lee County, Florida.

2.

Defendant, Bank of America Corporation ("BOA") is a corporation organized and

existing under the laws of the State of Delaware, with its principal place of business in Charlotte,

North Carolina. BOA maintains one or more offices within this judicial district, and engages in

systematic activities in this judicial district.

3.

Defendant, VISA, U.S.A., Inc. is a corporation organized and existing under the laws of

the State of Delaware, with its principal place of business in San Francisco, California.

4.

VISA engaged in systematic activities within this judicial district. This Court enjoys

subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws

of the United States. This Court also enjoys jurisdiction pursuant to 28 U.S.C. § 1338(a).

5.

This Court has venue pursuant to 28 U.S.C. § 1391(b) as both BOA and VISA are subject

to personal jurisdiction in this judicial district. Alternatively, venue is proper pursuant to 28

U.S.C. § 1400(b) because both of the Defendants have committed acts of infringement within this judicial district and have regular and established places of business within this judicial district.

## III. STATEMENT OF GROUNDS FOR RELIEF.

1.

In August of 2000, United States Patent Number 6,112,191 (the "Rounder Patent") was duly and regularly issued to Every Penny Counts, Inc., a corporation formed under the laws of the State of New Jersey ("OLD EPC"). A copy of the patent is attached hereto and made a part hereof as Exhibit "A."

2.

On September 2, 2004, OLD EPC reformed as EPC, the Plaintiff in this action.

3.

On June 29, 2005, EPC became the sole owner of the Rounder Patent all as more fully set forth in Exhibit "B" attached hereto and made a part hereof.

4.

At least as early as December 2001, OLD EPC contacted BOA to describe the Rounder Patent and to inquire of BOA's interest in entering into a licensing agreement.

5.

In or about November 2004, and for several months thereafter, EPC had written communications and discussions with BOA about the Rounder Patent and a possible licensing agreement.

6.

At least as early as February 2001, OLD EPC contacted VISA about the Rounder Patent.

7.

In June 2004, EPC contacted VISA concerning the Rounder Patent and proposed a licensing agreement for other business arrangements between VISA and EPC.

8.

Discussions between EPC and BOA concerning the Rounder Patent and a possible licensing agreement continued into the Spring of 2005. BOA ceased further communications at that time. It apparently did so upon concluding that rather than entering into a licensing agreement with EPC, BOA would establish its own program modeled on the Rounder Patent, but without compensation to EPC. Consistent with that strategy, in or about October, 2005, BOA launched the "Keep the Change Program."

9.

The "Keep the Change Program" utilizes systems that falls within the scope of at least one claim of the Rounder Patent.

10.

Upon information and belief, prior to institution of the "Keep the Change Program," both BOA and VISA were aware of the Rounder Patent, knew that EPC is the lawful owner of the Rounder Patent and knew or should have known that the "Keep the Change Program" would infringe on the Rounder Patent.

11.

As the "Keep the Change Program" employs systems that fall within the scope of the Rounder Patent, the Defendants' actions constituted an infringement on the Rounder Patent.

12.

BOA and VISA willfully infringed, and continue to infringe willfully, knowingly and intentionally, upon EPC's Rounder Patent.

13.

As a result of the infringing acts committed by the Defendants, EPC has suffered and continues to suffer damages which will continue unless this Court enjoins such acts of infringement.

14.

EPC demands a trial by jury.

WHEREFORE, Every Penny Counts, Inc. respectfully prays that, after due proceedings, there be judgment in its favor and against Defendants, Bank of America Corporation and VISA, U.S.A., Inc. and that Every Penny Counts be granted the following relief:

(a) permanent injunctive relief prohibiting the Defendants, their agents, employees, officers, directors, licensees and all of those in privity with either Defendants from continuing to engage in acts of infringement of the Rounder Patent;

(b) an award of all damages recoverable under the United States Patent laws;

(c) an award of treble damages for the Defendants' willful infringement;

(d) an award of interest, costs and reasonable attorneys' fees; and

(e) such other relief as may be just and equitable.

Respectfully submitted,

**PHELPS DUNBAR LLP**

HARVEY S. KAUGET (#116254)
KARL J. BRANDES (#0329797)
100 South Ashley Drive, Suite 1900
Tampa, Florida  33602-5311
Telephone:  (813) 472-7550
Telecopy:  (813) 472-7570
E-mail:  kaugeth@phelps.com
E-mail:  brandesk@phelps.com

and

PHELPS DUNBAR LLP
Brent B. Barriere (#2818)
David L. Patron (#22566)
Harry M. Barton (#29751)
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130
Telephone:  (504) 566-1311
Telecopy:   (504) 568-9130
E-mail:  barrierb@phelps.com
E-mail:  patrond@phelps.com
E-mail:  bartonh@phelps.com

COUNSEL FOR EVERY PENNY COUNTS, INC.

# EXHIBIT A



US006112191A

# United States Patent [19]

**Burke**

[11] Patent Number: 6,112,191

[45] Date of Patent: *Aug. 29, 2000

[54] **METHOD AND SYSTEM TO CREATE AND DISTRIBUTE EXCESS FUNDS FROM CONSUMER SPENDING TRANSACTIONS**

[75] Inventor: **Bertram V. Burke**, Seabright, N.J.

[73] Assignee: **Every Penny Counts, Inc.**, Red Bank, N.J.

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **08/429,758**

[22] Filed: **Apr. 27, 1995**

### Related U.S. Application Data

[63] Continuation-in-part of application No. 08/018,821, Feb. 18, 1993, abandoned, and a continuation-in-part of application No. 08/172,221, Dec. 23, 1993, abandoned, and a continuation-in-part of application No. 08/349,353, Dec. 5, 1994, which is a continuation of application No. 08/018,821, Feb. 18, 1993, and a continuation-in-part of application No. 08/428,401, Apr. 25, 1995.

[51] Int. Cl.[7] ............................. **G06G 1/12; G06G 7/52; G06G 1/14; G06F 17/60**

[52] U.S. Cl. ........................... **705/41**; 235/375; 235/379; 705/17; 705/21; 705/39

[58] Field of Search ...................................... 235/375, 376, 235/379, 380; 705/1, 14, 15, 16, 17, 18, 21, 24, 30, 34, 39, 40, 41, 42, 43, 44; 902/4, 8, 20, 21, 22, 24, 25, 41

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,833,885 | 9/1974 | Gentile et al. | 235/379 |
| 4,355,369 | 10/1982 | Garvin | 235/379 |
| 4,607,335 | 8/1986 | Mizuno | 705/14 |
| 4,673,802 | 6/1987 | Ohmae et al. | 235/379 |
| 5,111,395 | 5/1992 | Smith et al. | 705/45 |
| 5,220,501 | 6/1993 | Lawlor et al. | 380/24 |
| 5,253,345 | 10/1993 | Fernandes et al. | 705/17 |
| 5,302,811 | 4/1994 | Fukatsu | 235/380 |
| 5,339,239 | 8/1994 | Manabe et al. | 705/1 |
| 5,466,919 | 11/1995 | Hovakimian | 705/17 |
| 5,475,585 | 12/1995 | Bush | 705/26 |
| 5,506,393 | 4/1996 | Ziarno | 235/380 |
| 5,546,303 | 8/1996 | Helbling | 705/30 |
| 5,555,497 | 9/1996 | Helbling | 705/14 |
| 5,621,640 | 4/1997 | Burke | 235/375 |

*Primary Examiner*—Stephen R. Tkacs
*Attorney, Agent, or Firm*—Leo Stanger

[57] **ABSTRACT**

An improved system for consumer payors to save and donate whenever they use cash at a point of sale terminal, write a check, use an ATM machine, or use a credit or debit card. The POS system is a network composed of subscriber/payors, neutral merchant/collectors, a central clearinghouse, and provider accounts. The Rounder system is a network composed of subscriber/payors, payees, account managers, and provider services. The systems together provide subscriber/payors with a seamless way to save/donate every time they spend.

**34 Claims, 28 Drawing Sheets**



## FIG. 1A



POS SYSTEM

U.S. Patent          Aug. 29, 2000          Sheet 1 of 28          6,112,191

FIG. 1A



POS SYSTEM

LEVEL 1          SUBSCRIBER/PAYOR          SP

LEVEL 2          MERCHANT/COLLECTOR          MC

LEVEL 3          CLEARINGHOUSE          CCC

LEVEL 4          PROVIDER ACCOUNTS          PA

FIG. 1 B



CLEARINGHOUSE MANAGED SYSTEM (CMS)

TENDERS AN "OVERPAYMENT"
(CASH, CHECK, CREDIT, OR DEBIT DRAFT)

SP                    MC                    CCC                    PA

| LEVEL 1 SUBSCRIBER/ PAYOR (SP). | LEVEL 2 MERCHANT/ COLLECTOR (MC) | LEVEL 3 CLEARING-HOUSE (CCC) | LEVEL 4 PROVIDER ACCOUNTS (PA) |
|---|---|---|---|
| SP OPENS AC-COUNT WITH CCC. SP USES MAG STRIPE CARD ISSUED BY CCC. CARD IDENTIFIES SP ACCOUNT DEPOSITS | MC TRANSFER THE SP DATA AND FUNDS TO THE CLEARING-HOUSE. MC IS PASSIVE TO ACCOUNT, ENROLLMENT AND MANAGEMENT | CLEARING-HOUSE ACCEPTS ALL DEPOSITS FROM MC BANKS AND FROM STORE TERMINALS. CCC OPENS SP ACCOUNTS & ISSUES CARDS. CCC TRANSFERS FUNDS TO FINAL PARTIES PER SC INSTRUCTIONS | PA ACCEPTS FUNDS. PA OPENS ACCOUNTS WITH SP |

U.S. Patent          Aug. 29, 2000          Sheet 2 of 28          6,112,191

FIG. 1 B

CLEARINGHOUSE MANAGED SYSTEM (CMS)

TENDERS AN "OVERPAYMENT"
(CASH, CHECK, CREDIT, OR DEBIT DRAFT)

| SP | MC | CCC | PA |
|---|---|---|---|
| LEVEL 1 SUBSCRIBER/ PAYOR (SP). | LEVEL 2 MERCHANT/ COLLECTOR (MC) | LEVEL 3 CLEARING-HOUSE (CCC) | LEVEL 4 PROVIDER ACCOUNTS (PA) |
| SP OPENS AC-COUNT WITH CCC. SP USES MAG STRIPE CARD ISSUED BY CCC. CARD IDENTIFIES SP ACCOUNT DEPOSITS | MC TRANSFER THE SP DATA AND FUNDS TO THE CLEARING-HOUSE. MC IS PASSIVE TO ACCOUNT, ENROLLMENT AND MANAGEMENT | CLEARING-HOUSE ACCEPTS ALL DEPOSITS FROM MC BANKS AND FROM STORE TERMINALS. CCC OPENS SP ACCOUNTS & ISSUES CARDS. CCC TRANSFERS FUNDS TO FINAL PARTIES PER SC INSTRUCTIONS | PA ACCEPTS FUNDS. PA OPENS ACCOUNTS WITH SP |

FIG. 1C



U.S. Patent          Aug. 29, 2000          Sheet 3 of 28          6,112,191

FIG. 1C



FIG. 1D

PROVIDER MANAGED SYSTEM (PMS)

TENDERS AN "OVERPAYMENT"
(CASH, CHECK, CREDIT, OR DEBIT DRAFT)



| SP | MC | CCC | PA |
|---|---|---|---|
| LEVEL 1 SUBSCRIBER/ PAYOR (SP). | LEVEL 2 MERCHANT/ COLLECTOR (MC) | LEVEL 3 CLEARING-HOUSE (CCC) | LEVEL 4 PROVIDER ACCOUNTS (PA) |
| SP OPENS AC-COUNT WITH PA OF THEIR CHOICE AND USES PA ISSUED MAG STRIPE CARD TO IDENTIFY THEIR DEPOSITS | MC TRANS-FERS THE SP DATA AND FUNDS TO THE CLEARING-HOUSE. MC IS PASSIVE TO ACCOUNT, ENROLLMENT AND MANAGEMENT | CLEARING-HOUSE ACCEPTS ALL DEPOSITS FROM MC BANKS AND FROM STORE TERMINALS. CCC IS PASSIVE TO ACCOUNT, ENROLLMENT AND MANAGEMENT | PA OPENS ACCOUNTS FOR SP. PA PROVIDES MAG STRIPE CARDS. PA MANAGES ACCOUNTS PER SP INSTRUC-TIONS |

U.S. Patent          Aug. 29, 2000          Sheet 4 of 28          6,112,191

FIG. 1D



PROVIDER MANAGED SYSTEM (PMS)

TENDERS AN "OVERPAYMENT"
(CASH, CHECK, CREDIT, OR DEBIT DRAFT)

SP                MC                CCC                PA

LEVEL 1
SUBSCRIBER/
PAYOR (SP).

SP OPENS AC-
COUNT WITH
PA OF THEIR
CHOICE AND
USES PA
ISSUED MAG
STRIPE CARD
TO IDENTIFY
THEIR
DEPOSITS

LEVEL 2
MERCHANT/
COLLECTOR
(MC)

MC TRANS-
FERS THE SP
DATA AND
FUNDS TO THE
CLEARING-
HOUSE.
MC IS PASSIVE
TO ACCOUNT,
ENROLLMENT
AND
MANAGEMENT

LEVEL 3
CLEARING-
HOUSE (CCC)

CLEARING-
HOUSE
ACCEPTS ALL
DEPOSITS
FROM MC
BANKS AND
FROM STORE
TERMINALS.
CCC IS
PASSIVE TO
ACCOUNT,
ENROLLMENT
AND
MANAGEMENT

LEVEL 4
PROVIDER
ACCOUNTS
(PA)

PA OPENS
ACCOUNTS
FOR SP.
PA PROVIDES
MAG STRIPE
CARDS. PA
MANAGES
ACCOUNTS
PER SP
INSTRUC-
TIONS

FIG. 1E



FIG. 1E



FIG. 1 F



DATA & FUNDS TRANSFER

FIG. 1 F



DATA & FUNDS TRANSFER

LEVEL 1          SUBSCRIBER/PAYORS (SP)

LEVEL 2          MERCHANT/COLLECTOR (MC)

                                        — EDI TRANSFER

                              MC BANK

DATA TRANSMISSION
VIA PROPRIETARY
NETWORK                                 EDI TRANSFER

LEVEL 3    CCC DATA      LEVEL 3    CCC BANK

DATA TRANSMISSION
VIA PROPRIETARY
NETWORK

LEVEL 4          PROVIDER ACCOUNT # 1

                 PROVIDER ACCOUNT # 2

                 PROVIDER ACCOUNT # 3

                 PROVIDER ACCOUNT # 4

U.S. Patent

Aug. 29, 2000

Sheet 7 of 28

6,112,191

FIG. 2



U.S. Patent

Aug. 29, 2000

Sheet 7 of 28

6,112,191

FIG. 2



U.S. Patent          Aug. 29, 2000       Sheet 8 of 28          6,112,191

FIG. 3

Transaction Card

DC 1

Name
Address

_____
_____

MS

DC 2

Name
Address

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

BC

FIG. 3

Transaction Card

DC 1

Name
Address

_____

_____

MS

DC 2

Name
Address

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

BC

FIG. 4A



FIG. 4A



FIG. 4B



FIG. 4B





A

FIG. 4C

204 — SEARCH RECORD TO FIND PAYOUT AMOUNTS

207 — APPORTION PAYOUT

210 — CREDIT CHARITY 1

214 — CREDIT CHARITY 2

217 — CREDIT OTHER CHARITIES

220 — CREDIT BANK ACCOUNT

224 — CREDIT DEBIT CARD

227 — CREDIT VOUCHERS

230 — ANY AMOUNT REMAINING?    YES    NO

234 — ENTER IN DEFAULT ACCOUNT

237 — UPDATE ACCOUNT

240 — PRINT PAYOUT

244 — HAS CARD HOLDER ENTERED CARD FOR CHANGES?    NO    YES

247 — DISPLAY APPORTIONMENTS WITH AMOUNTS

ENTER CHANGES

MAKE CHANGES

END

250    254    257



FIG. 4C

FIG. 5A



FIG. 5A



FIG. 5B



332 — DEFAULT ALL CENTS, OTHER OPTIONS
A. ALL CHANGES, B. SPECIFY AMT $0.00

334 — SELECT A SPECIAL CHARITY?    NO → 338 — ADVANCE TO STEP 340

YES

338 — ENTER CHARITY NUMBER

340 — PRINT RECEIPT

342 — WRITE TRANSACTION TO MEMORY

344 — TRANSACTION ENDS. GO TO STEP 300    STEP 300

346 — BATCH FILE OF ALL TRANSACTIONS SENT TO CCC

FIG. 5B



FIG. 6A



U.S. Patent          Aug. 29, 2000          Sheet 14 of 28          6,112,191

FIG. 6A



U.S. Patent          Aug. 29, 2000          Sheet 15 of 28          6,112,191

FIG. 6B



**U.S. Patent**    Aug. 29, 2000    Sheet 15 of 28    6,112,191

FIG. 6B



FIG. 6C



FIG. 6C



# FIG. 7



ROUNDER SYSTEM

LEVEL 1    SUBSCRIBER/PAYOR

LEVEL 2    PAYEE

LEVEL 3    ACCOUNT MANAGER

LEVEL 4    PROVIDER SERVICES

# FIG. 7



ROUNDER SYSTEM

LEVEL 1     SUBSCRIBER/PAYOR

LEVEL 2     PAYEE

LEVEL 3     ACCOUNT MANAGER

LEVEL 4     PROVIDER SERVICES

FIG. 8



FIG. 8



U.S. Patent          Aug. 29, 2000          Sheet 19 of 28          6,112,191

FIG. 9A



FIG. 9A



FIG. 9B



FIG. 9B



*FIG. 9C*



FIG. 9C



U.S. Patent          Aug. 29, 2000      Sheet 22 of 28          6,112,191

FIG. 9D



U.S. Patent          Aug. 29, 2000          Sheet 22 of 28          6,112,191

FIG. 9D



FIG. 9E



FIG. 9E



**U.S. Patent**    Aug. 29, 2000    Sheet 24 of 28    **6,112,191**

*FIG. 10A*



## FIG. 10A



*FIG. 10B*



## FIG. 10B



FIG. 10C



FIG. 10C



## FIG. 10D



## FIG. 10D



*FIG. 10E*



FIG. 10E



6,112,191

1

## METHOD AND SYSTEM TO CREATE AND DISTRIBUTE EXCESS FUNDS FROM CONSUMER SPENDING TRANSACTIONS

### REFERENCE TO CO-PENDING APPLICATIONS

This is a Continuation In Part of applications Ser. No. 08/018,821 filed on Feb. 18, 1993, now abandoned, Ser. No. 08/172,221 filed on Dec. 23, 1993. This application is also a continuation-in-part of application Ser. No. 08/349,353 filed Dec. 5, 1994, which is a continuation of the aforementioned application Ser. No. 08/018,821 filed Feb. 18, 1993. This application is also a continuation-in-part of application Ser. No. 08/428,401 filed Apr. 25, 1995, now abandoned.

### FIELD OF THE INVENTION

The present application relates to improved methods and systems to create excess funds from traditional consumer spending transactions using cash, checks, credit or debit card. The excess funds created are then put aside in special accounts for future spending.

### BACKGROUND OF THE INVENTION

Presently the methods and systems of creating excess funds from spending transactions have the following limitations:

(1.) Now consumers can create excess funds for future spending by making excess payments and having the excess amount assigned for future spending under very limited circumstances. Effectively consumers can tender an excess payment to a payee that they have an existing account with (e.g. utility and gas companies) and allow the excess funds to stay with the payee for the payment of future services or direct the payee to distribute the excess funds onto an outside provider, such as a charity. Under this "closed" process the payee provides an active role as to account management and selection/distribution of the excess funds for internal purposes, as well as to outside providers. Within this current arrangement the consumer has very limited opportunities to create excessive funds, as well as to determine the application of said funds, since the existing state of the art is a "closed" system essentially operated by payees with whom they have existing account relationship.

(2.) Now consumers can only create excess funds when the face amount paid to a payee is in excess of the purchase price. In addition to the requirement for an excess payment, there is also the need for the payee to process the transaction by subtracting the amount of the purchase price from the amount tendered. Therefore, the payee is now actively involved in managing and/or distributing the consumers' excess funds.

An object of the invention is to improve the aforementioned situation.

### SUMMARY OF THE INVENTION

According to an aspect of the invention, such object is obtained in a method of accumulating credits in payor surplus accounts from financial transactions between a payor and a payee, by entering a demanded amount due the payee, entering an additional amount offered by the payor, and depositing the additional amount in the surplus account.

According to another aspect of the invention, the step of depositing the additional amount includes the payee crediting the additional amount to the surplus account in the hands of a central clearing entity, so that the payee remains neutral to the additional amounts.

2

According to yet another aspect of the invention, said step of entering an additional amount includes calculating the additional amount from predetermined data associated with the surplus account.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1A is a block diagram of the POS system embodying features of the invention.

FIGS. 1B&C are block diagrams of the Clearinghouse Managed System embodying features of the invention.

FIGS. 1D&E are block diagrams of the Provider Managed System embodying features of the invention.

FIG. 1F is a block diagram of the Data and Funds Transfer used in both POS systems embodying features of the invention.

FIG. 2 is a block diagram of POS system hardware in FIG. 1.

FIG. 3 are views of transaction cards forming part of the embodiment in FIG. 1.

FIGS. 4A, 4B, and 4C are flow diagrams of the steps that take place in FIG. 1B.

FIG. 5 is another flow diagram of steps that take place in a computer in FIG. 1C.

FIGS. 6A, 6B, and 6C is a flow diagram of enrollment steps that take place in a computer in FIGS. 1B&C.

FIG. 7 is a block diagram of the rounder system embodying features of the invention.

FIG. 8 is a flow chart of the steps that take place to enroll subscribers in the rounder system shown in FIG. 7.

FIGS. 9A–E is a flow chart of the data processing methodology used in the terminals and central computers operated by banks to process rounder transactions in FIGS. 7A&B.

FIGS. 10A–E is a flow chart of the data processing methodology used in the terminals and central computers operated by banks and credit institutions to process rounder transactions in FIGS. 7A&B.

### DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

The invention has two main embodiments:

(1.) In FIG. 1A, an "open" POS network embodies a four level spending/saving system comprised of Level 1 SP (multiple subscriber/payors), who tender excess payments or deposit excess funds to Level 2 MC (multiple merchant/collectors), who in turn make computer entry of data and funds for electronic transfer to Level 3 CCC (a singular managed clearinghouse central computer), who in turn transfers data and funds to Level 4 (multiple provider accounts), for the final purchase of products or services.

In FIG. 1A the excess funds are created at point of sale counters (POS) by the merchant/collectors (MC) who "front end" process the subscriber/payor (SP) spending transactions to determine the excess difference between the purchase price of goods or services and the amount of payment rendered.

After the amount of excess funds is determined by the MC's electronic cash register (ECR), the SP makes a deposit into a clearinghouse central computer (CCC) by providing a transaction card or an account number to the MC. The MC then swipes the card or enters the account number through an ECR or a draft capture remote terminal to record the time, the terminal location, the amount of funds entered, and the

6,112,191

# 1

## METHOD AND SYSTEM TO CREATE AND DISTRIBUTE EXCESS FUNDS FROM CONSUMER SPENDING TRANSACTIONS

### REFERENCE TO CO-PENDING APPLICATIONS

This is a Continuation In Part of applications Ser. No. 08/018,821 filed on Feb. 18, 1993, now abandoned, Ser. No. 08/172,221 filed on Dec. 23, 1993. This application is also a continuation-in-part of application Ser. No. 08/349,353 filed Dec. 5, 1994, which is a continuation of the aforementioned application Ser. No. 08/018,821 filed Feb. 18, 1993. This application is also a continuation-in-part of application Ser. No. 08/428,401 filed Apr. 25, 1995, now abandoned.

### FIELD OF THE INVENTION

The present application relates to improved methods and systems to create excess funds from traditional consumer spending transactions using cash, checks, credit or debit card. The excess funds created are then put aside in special accounts for future spending.

### BACKGROUND OF THE INVENTION

Presently the methods and systems of creating excess funds from spending transactions have the following limitations:

(1.) Now consumers can create excess funds for future spending by making excess payments and having the excess amount assigned for future spending under very limited circumstances. Effectively consumers can tender an excess payment to a payee that they have an existing account with (e.g. utility and gas companies) and allow the excess funds to stay with the payee for the payment of future services or direct the payee to distribute the excess funds onto an outside provider, such as a charity. Under this "closed" process the payee provides an active role as to account management and selection/distribution of the excess funds for internal purposes, as well as to outside providers. Within this current arrangement the consumer has very limited opportunities to create excessive funds, as well as to determine the application of said funds, since the existing state of the art is a "closed" system essentially operated by payees with whom they have existing account relationship.

(2.) Now consumers can only create excess funds when the face amount paid to a payee is in excess of the purchase price. In addition to the requirement for an excess payment, there is also the need for the payee to process the transaction by subtracting the amount of the purchase price from the amount tendered. Therefore, the payee is now actively involved in managing and/or distributing the consumers' excess funds.

An object of the invention is to improve the aforementioned situation.

### SUMMARY OF THE INVENTION

According to an aspect of the invention, such object is obtained in a method of accumulating credits in payor surplus accounts from financial transactions between a payor and a payee, by entering a demanded amount due the payee, entering an additional amount offered by the payor, and depositing the additional amount in the surplus account.

According to another aspect of the invention, the step of depositing the additional amount includes the payee crediting the additional amount to the surplus account in the hands of a central clearing entity, so that the payee remains neutral to the additional amounts.

# 2

According to yet another aspect of the invention, said step of entering an additional amount includes calculating the additional amount from predetermined data associated with the surplus account.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1A is a block diagram of the POS system embodying features of the invention.

FIGS. 1B&C are block diagrams of the Clearinghouse Managed System embodying features of the invention.

FIGS. 1D&E are block diagrams of the Provider Managed System embodying features of the invention.

FIG. 1F is a block diagram of the Data and Funds Transfer used in both POS systems embodying features of the invention.

FIG. 2 is a block diagram of POS system hardware in FIG. 1.

FIG. 3 are views of transaction cards forming part of the embodiment in FIG. 1.

FIGS. 4A, 4B, and 4C are flow diagrams of the steps that take place in FIG. 1B.

FIG. 5 is another flow diagram of steps that take place in a computer in FIG. 1C.

FIGS. 6A, 6B, and 6C is a flow diagram of enrollment steps that take place in a computer in FIGS. 1B&C.

FIG. 7 is a block diagram of the rounder system embodying features of the invention.

FIG. 8 is a flow chart of the steps that take place to enroll subscribers in the rounder system shown in FIG. 7.

FIGS. 9A–E is a flow chart of the data processing methodology used in the terminals and central computers operated by banks to process rounder transactions in FIGS. 7A&B.

FIGS. 10A–E is a flow chart of the data processing methodology used in the terminals and central computers operated by banks and credit institutions to process rounder transactions in FIGS. 7A&B.

### DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

The invention has two main embodiments:

(1.) In FIG. 1A, an "open" POS network embodies a four level spending/saving system comprised of Level 1 SP (multiple subscriber/payors), who tender excess payments or deposit excess funds to Level 2 MC (multiple merchant/collectors), who in turn make computer entry of data and finds for electronic transfer to Level 3 CCC (a singular managed clearinghouse central computer), who in turn transfers data and funds to Level 4 (multiple provider accounts), for the final purchase of products or services.

In FIG. 1A the excess funds are created at point of sale counters (POS) by the merchant/collectors (MC) who "front end" process the subscriber/payor (SP) spending transactions to determine the excess difference between the purchase price of goods or services and the amount of payment rendered.

After the amount of excess funds is determined by the MC's electronic cash register (ECR), the SP makes a deposit into a clearinghouse central computer (CCC) by providing a transaction card or an account number to the MC. The MC then swipes the card or enters the account number through an ECR or a draft capture remote terminal to record the time, the terminal location, the amount of funds entered, and the

6,112,191

3

account number used. The terminal or cash register then prints out a receipt of the depositing transaction and the MC returns the card and the receipt to the SP.

The depositing of individual transactions into the MC remote terminal can be completed in an "off-line" or "on-line" or a combination of both modes. At the completion of a specified period or amount, e.g. day, week, $50.00, the total off line transaction file stored in the MC terminal is then batched "on line" to the CCC (clearinghouse's central computer). The ability to process individual depositing transactions in an off line mode is made possible due to the fact that the system does not require on line authorization, as in credit and debit card processing.

Each terminal location follows the same reporting procedure so that the CCC will have a record of all transactions made into the system, regardless of the location of the terminals. The files transferred to the CCC contain details of each deposited transaction by the identification of the account, the amount of the deposit, the date, and the terminal that accepted the deposit. The actual transfer of cash into the system starts when the MC deposit the cash received from the SP into their bank for EFT transfer to the clearinghouse's bank account and concludes with the CCC EFT transferring funds to each listed PC (provider account) per the transaction records received from the merchant terminals. The transfer of cash from one account to the next is accomplished by the usual and customary bank EFT transferring through the ACH (Automatic Clearing House) or via EDI (Electronic Data Interchange).

Effectively, the system allows each SP the ability to make multiple deposits, in varied cross country locations, into terminals operated by unrelated parties, depositing as little as a penny in any one transaction, and often on a 24 hour demand basis.

The MC that operate the ECR terminals are at the time of depositing both neutral and passive as to the selection of the consumer's provider(s), as well as not directing the distribution of funds to the consumer's provider(s). Only in this system are SP able to deposit their excess change created when dealing with multiple and diverse payees. The money is deposited into an "open" network that will pool and then transfer the once fragmented funds onto PA selected by the SP. In this system as compared to the existing state of art, the PA who will receive the deposited funds from the network need not also be the original collector of the deposits. Therefore, we have a "open" system that allows for a mix and match of diverse collectors and providers.

Under the system it is possible for one entity to provide both a collector and provider role, but under different and autonomous points in the network cycle. For example, Sears may enroll a subscriber consumer in a Sears store account allowing the consumer to use their Sears issued mag stripe card to identify them when they deposit excess change into any merchant/collector terminal. In this capacity Sears is playing the role of a distinct provider in the network. The card may then be used to deposit excess funds at fast food restaurants, convenience stores, other department stores, etc. Also the SP could go into any Sears store and deposit excess funds into a Sears terminal for transfer to the network. On these occasions Sears would be playing a distinct role as a participating MC, within the network, and follow the same procedures as any other MC, as well as also being a PA at the end of the network chain.

In FIGS. 1B&C, the Clearinghouse Managed System (CMS) starts with Level 1, the subscriber/payors, tendering an excess financial payment to Level 2, merchant/collectors.

4

They in turn enter the amount of the excess payment into an electronic cash register/remote terminals which then sends the funds and data on-line per transaction, or along with other deposits in a batched format, by a communication system to Level 3, clearinghouse central computer. Level 3 assigns the funds to an account previously opened by Level 1 SP through services provided by Level 3. The funds are then forwarded, when they reach pre-selected thresholds, by EDI (Electronic Data Interface) transfer to Level 4, the provider accounts, selected by Level 1 SP.

The Clearinghouse Managed System (CMS), has the network providing a more active role by the system's central computer enrolling the SP in accounts and then assuming the role of an account manager. Under this arrangement the network will direct the overall operation of the system, issue transaction cards (bar code, mag stripe and/or "smart" cards or devices), operate the system's central computer, provide both on-line and off-line communications between the POS terminals and the central computer, accept funds, assume fiscal responsibility for the SP funds on deposit, maintain all account records, provide all outside payments to parties selected by the SP, and even allow the SP the ability to access their accounts for the purpose of receiving credit at the time of POS purchase to pay the MC. Under the CMS, in addition to the network serving as an account manager, it will also appoint banks, credit card institutions, and merchant/collectors to assume additional fiduciary responsibilities.

In FIGS. 1D&E, the Provider Managed System (PMS) starts with Level 1, the subscriber/payors, tendering an excess financial payment to Level 2, merchant/collectors. They in turn enter the amount of the excess payment into an electronic cash register/remote terminals which then preferably send the funds and data, along with other deposits in a batched format, by a communication system to Level 3, clearinghouse central computer. Level 3 then segregates the transactions per provider accounts. The data and funds are then forwarded, when they reach pre-selected thresholds, by EDI (Electronic Data Interface) transfer to the Level 4 providers for account management and final distribution. Level 1 SP initially join the network by enrolling in accounts with Level 4 providers.

The Provider Managed System (PMS), is an "open" system that creates a network whereupon SP will directly enroll in accounts managed by PA, receive mag stripe cards issued by the PA, and deposit their excess change at POS locations to be transferred by the MC to a neutral network clearinghouse (CCC). Under the PMS, the CCC will accept and process the transaction data and funds and forward both to the PA according to the card identification. The PA will then manage the accounts per the SP instructions.

In the PMS scenario both the merchant/clearinghouse are passive as to the opening of accounts and the SP selections of the final distribution of the funds. Here both the payees and the clearinghouse only accept deposits and transfer both the cash and transaction records onto the end PA.

Also under the PMS embodiment, once the funds are received by the PA, who can be banks, insurance companies, security firms, merchandisers, travel agencies, charitable institutions, etc., the SP will determine how to spend the savings for services and/or products.

In FIG. 1F, in both the Clearinghouse Managed System or Provider Managed System the data transfer is sent via a proprietary network from Level 2 MC to Level 3. After processing by Level 3 selected data is sent via a proprietary network to Level 4. On the funds transfer side Level 1

6,112,191

3

account number used. The terminal or cash register then
prints out a receipt of the depositing transaction and the MC
returns the card and the receipt to the SP.

The depositing of individual transactions into the MC
remote terminal can be completed in an "off-line" or "on-
line" or a combination of both modes. At the completion of
a specified period or amount, e.g. day, week, $50.00, the
total off line transaction file stored in the MC terminal is then
batched "on line" to the CCC (clearinghouse's central
computer). The ability to process individual depositing
transactions in an off line mode is made possible due to the
fact that the system does not require on line authorization, as
in credit and debit card processing.

Each terminal location follows the same reporting proce-
dure so that the CCC will have a record of all transactions
made into the system, regardless of the location of the
terminals. The files transferred to the CCC contain details of
each deposited transaction by the identification of the
account, the amount of the deposit, the date, and the terminal
that accepted the deposit. The actual transfer of cash into the
system starts when the MC deposit the cash received from
the SP into their bank for EFT transfer to the clearinghouse's
bank account and concludes with the CCC EFT transferring
funds to each listed PC (provider account) per the transac-
tion records received from the merchant terminals. The
transfer of cash from one account to the next is accom-
plished by the usual and customary bank EFT transferring
through the ACH (Automatic Clearing House) or via EDI
(Electronic Data Interchange).

Effectively, the system allows each SP the ability to make
multiple deposits, in varied cross country locations, into
terminals operated by unrelated parties, depositing as little
as a penny in any one transaction, and often on a 24 hour
demand basis.

The MC that operate the ECR terminals are at the time of
depositing both neutral and passive as to the selection of the
consumer's provider(s), as well as not directing the distri-
bution of funds to the consumer's provider(s). Only in this
system are SP able to deposit their excess change created
when dealing with multiple and diverse payees. The money
is deposited into an "open" network that will pool and then
transfer the once fragmented funds onto PA selected by the
SP. In this system as compared to the existing state of art, the
PA who will receive the deposited funds from the network
need not also be the original collector of the deposits.
Therefore, we have a "open" system that allows for a mix
and match of diverse collectors and providers.

Under the system it is possible for one entity to provide
both a collector and provider role, but under different and
autonomous points in the network cycle. For example, Sears
may enroll a subscriber consumer in a Sears store account
allowing the consumer to use their Sears issued mag stripe
card to identify them when they deposit excess change into
any merchant/collector terminal. In this capacity Sears is
playing the role of a distinct provider in the network. The
card may then be used to deposit excess funds at fast food
restaurants, convenience stores, other department stores, etc.
Also the SP could go into any Sears store and deposit excess
funds into a Sears terminal for transfer to the network. On
these occasions Sears would be playing a distinct role as a
participating MC, within the network, and follow the same
procedures as any other MC, as well as also being a PA at
the end of the network chain.

In FIGS. 1B&C, the Clearinghouse Managed System
(CMS) starts with Level 1, the subscriber/payors, tendering
an excess financial payment to Level 2, merchant/collectors.

4

They in turn enter the amount of the excess payment into an
electronic cash register/remote terminals which then sends
the funds and data on-line per transaction, or along with
other deposits in a batched format, by a communication
system to Level 3, clearinghouse central computer. Level 3
assigns the funds to an account previously opened by Level
1 SP through services provided by Level 3. The funds are
then forwarded, when they reach pre-selected thresholds, by
EDI (Electronic Data Interface) transfer to Level 4, the
provider accounts, selected by Level 1 SP.

The Clearinghouse Managed System (CMS), has the
network providing a more active role by the system's central
computer enrolling the SP in accounts and then assuming the
role of an account manager. Under this arrangement the
network will direct the overall operation of the system, issue
transaction cards (bar code, mag stripe and/or "smart" cards
or devices), operate the system's central computer, provide
both on-line and off-line communications between the POS
terminals and the central computer, accept funds, assume
fiscal responsibility for the SP funds on deposit, maintain all
account records, provide all outside payments to parties
selected by the SP, and even allow the SP the ability to
access their accounts for the purpose of receiving credit at
the time of POS purchase to pay the MC. Under the CMS,
in addition to the network serving as an account manager, it
will also appoint banks, credit card institutions, and
merchant/collectors to assume additional fiduciary respon-
sibilities.

In FIGS. 1D&E, the Provider Managed System (PMS)
starts with Level 1, the subscriber/payors, tendering an
excess financial payment to Level 2, merchant/collectors.
They in turn enter the amount of the excess payment into an
electronic cash register/remote terminals which then prefer-
ably send the funds and data, along with other deposits in a
batched format, by a communication system to Level 3,
clearinghouse central computer. Level 3 then segregates the
transactions per provider accounts. The data and funds are
then forwarded, when they reach pre-selected thresholds, by
EDI (Electronic Data Interface) transfer to the Level 4
providers for account management and final distribution.
Level 1 SP initially join the network by enrolling in accounts
with Level 4 providers.

The Provider Managed System (PMS), is an "open"
system that creates a network whereupon SP will directly
enroll in accounts managed by PA, receive mag stripe cards
issued by the PA, and deposit their excess change at POS
locations to be transferred by the MC to a neutral network
clearinghouse (CCC). Under the PMS, the CCC will accept
and process the transaction data and funds and forward both
to the PA according to the card identification. The PA will
then manage the accounts per the SP instructions.

In the PMS scenario both the merchant/clearinghouse are
passive as to the opening of accounts and the SP selections
of the final distribution of the funds. Here both the payees
and the clearinghouse only accept deposits and transfer both
the cash and transaction records onto the end PA.

Also under the PMS embodiment, once the funds are
received by the PA, who can be banks, insurance companies,
security firms, merchandisers, travel agencies, charitable
institutions, etc., the SP will determine how to spend the
savings for services and/or products.

In FIG. 1F, in both the Clearinghouse Managed System or
Provider Managed System the data transfer is sent via a
proprietary network from Level 2 MC to Level 3. After
processing by Level 3 selected data is sent via a proprietary
network to Level 4. On the funds transfer side Level 1

6,112,191

5

deposits the funds at Level 2 outlets. Level 2 deposits the finds into the MC's bank account and by EDI the finds are transferred to Level 3's bank account for final EDI to Level 4's bank account.

In FIG. 2, a system embodying the POS invention includes a clearinghouse central computer (CCC) containing a central processor CPU and a large data storage DS. A communications system CS that may include telephone lines, satellites, or cables connects the CCC to a number of electronic cash registers (ECRx) (where x=1, . . . M, . . . N) in retail outlets, such as shops, supermarkets, gasoline stations, department stores, etc. at locations remote from the central computer. Throughout this specification, the term x, when appended to the end of a reference character, is equal to 1, . . . M, . . . N.

The ECRx cash registers are connected to respective keypads KPx and card readers CDx. Along with other components together they constitute a remote terminal RT that is connected to a variety of central computers.

In the CMS embodiment of the invention accounts are managed in the CCC. Money is collected at the ECRx for crediting to the consumers' ledgers in the accounts of various charities and other institutions such as banks, debit card issuers, credit card issuers, etc. The data storage DS contains individual storage for charity accounts CA and other accounts OA, such as for banks etc., all with ledgers for individual consumers.

In the PMS embodiment of the invention the CCC acts as a clearinghouse and transfers all data and funds onto the respective PA for account management and final distribution.

The CCC communications system CS also connects the CCC to charity computers CHy and other computer OCz, where y=1 . . . k, and z=1 . . . j such as bank computers, merchandise computers, debit account holders, credit card issuers, etc. These charities and other institutions are the ultimate receivers of the donations and deposits collected at the electronic cash registers ECRx. The CCC also includes a default account DA with consumer ledgers to hold moneys not otherwise allocated.

The ECRx includes a change display for exhibiting cash transactions, credit cards, or check purchases. The display automatically operates to show numbers in question. A card reader CDx with a keypad KPx allows the SP or clerk to enter the deposit directly. The keypad KPx permits the SP to change the allocation for this transaction alone or permanently. The keypad KPx also allows the SP to reduce the amount deposited so that he can receive cash change. The terminal RTx or ECRx reports the deposit directly to the CCC via the communication system CS. The CCC prints out periodic reports for interested parties on a need-to-know basis.

According to the invention, a consumer in a shop, supermarket, gasoline station, department store, etc. selects the desired merchandise and brings them to a clerk. The clerk inputs the price of all items in a ECRx by way of a register keyboard or a bar code reader and the register totals the price. The consumer offers the clerk either the exact amount of cash or a sum exceeding the price. Then the clerk enters that cash and the amount into the cash register. The ECR subtracts the price from the cash.

If the consumer gives the clerk the exact price nothing more need happen. However, if the money offered the clerk exceeds the price, the consumer may, if he or she wishes, choose to receive the change or to donate or deposit all or a portion of the change. To do the latter, he or she enters a card

6

number into the keypad KPx or enters the card itself into the card reader CDx. The latter reads the number from a bar code or magnetic stripe on the card. The consumer can also enter into the keypad how much of the total change, he or she is to receive, should be credited to various predetermined accounts in the CCC. The register ECRx reads the numbers entered into the keyboard or the number entered by way of the card reader CDx.

In addition if SP wish to make a direct deposit of finds into the network, (rather than make a purchase and tender excess funds), all that is necessary is to enter the amount deposited into the ECRx and the funds will be transferred to the CCC.

A transaction card DC1 according to the invention appears in FIG. 3 with a magnetic stripe MS carrying the donor's number. A card DC2 in FIG. 3 includes the number in the form of a bar code BC. In another embodiment of the invention the card may be a smart card. Also in regard to the use of bar codes, the codes may be incorporated in the design of a key plain device or displayed on windshields or car windows to allow the invention to be accessed under a variety circumstances, i.e., drive through window, toll booth, etc.

After receiving the data, the ECR accesses the CCC. The latter allocates the change, a portion of the change, or the amount of a direct deposit provided by the SP among various charity accounts CA and other accounts OA in the CCC. The distributions to various accounts are preprogrammed commands which the consumer has previously instructed the CCC to complete. For each deposit or donation made, the SP receives a printed receipt of the transaction from the ECRx or RTx.

If desired, the consumer can choose to deposit only a fraction of the difference between the cash presented and the price. The consumer then enters the amount to be deposited and receives the appropriate cash change.

According to an embodiment of the invention, with every transaction, the computer electronically transfers all amounts allocated to each charity CHy immediately, as soon as the computer can access the charity computer, or when there is a sufficient amount of money. In this way the donor is always assured that the contribution takes effect. Deposits in the other accounts OA may be sent immediately or held until a sufficient amount is accumulated to be acceptable by the other institutions.

An example of the operation of the CMS embodiment appears in the flow chart of FIGS. 4A, 4B, and 4C. This flow chart depicts an on-line version of the CMS embodiment. The CMS, however, could also be operated in an off-line mode and the transactions that are processed by Level 2 MC would then be stored in memory and transferred in a batched format to Level 3 CCC at periodic intervals. In FIGS. 4A, 4B, and 4C it is assumed that the customer is purchasing merchandise that may carry bar codes. However, the invention is also applicable for purchase of services, rentals, or other valuables.

In step 104 of FIG. 4A, the clerk enters the prices of the various pieces of merchandise, either by way of a keyboard (not shown) or a bar code reader BCRx, into the cash register ECR. In step 107, the cash register determines the total price. The customer then gives the clerk the cash to cover or exceed the total price. While this example refers to cash, the invention is also applicable to payment by check, credit or debit card. That is, the customer may wish to have an amount charged to the checking account, credit or debit card in excess of the price in order to make donations or distributions according to the invention. For purposes of this

6,112,191

5

deposits the funds at Level 2 outlets. Level 2 deposits the finds into the MC's bank account and by EDI the finds are transferred to Level 3's bank account for final EDI to Level 4's bank account.

In FIG. 2, a system embodying the POS invention includes a clearinghouse central computer (CCC) containing a central processor CPU and a large data storage DS. A communications system CS that may include telephone lines, satellites, or cables connects the CCC to a number of electronic cash registers (ECRx) (where x=1, . . . M, . . . N) in retail outlets, such as shops, supermarkets, gasoline stations, department stores, etc. at locations remote from the central computer. Throughout this specification, the term x, when appended to the end of a reference character, is equal to 1, . . . M, . . . N.

The ECRx cash registers are connected to respective keypads KPx and card readers CDx. Along with other components together they constitute a remote terminal RT that is connected to a variety of central computers.

In the CMS embodiment of the invention accounts are managed in the CCC. Money is collected at the ECRx for crediting to the consumers' ledgers in the accounts of various charities and other institutions such as banks, debit card issuers, credit card issuers, etc. The data storage DS contains individual storage for charity accounts CA and other accounts OA, such as for banks etc., all with ledgers for individual consumers.

In the PMS embodiment of the invention the CCC acts as a clearinghouse and transfers all data and funds onto the respective PA for account management and final distribution.

The CCC communications system CS also connects the CCC to charity computers CHy and other computer OCz, where y=1 . . . k, and z=1 . . . j such as bank computers, merchandise computers, debit account holders, credit card issuers, etc. These charities and other institutions are the ultimate receivers of the donations and deposits collected at the electronic cash registers ECRx. The CCC also includes a default account DA with consumer ledgers to hold moneys not otherwise allocated.

The ECRx includes a change display for exhibiting cash transactions, credit cards, or check purchases. The display automatically operates to show numbers in question. A card reader CDx with a keypad KPx allows the SP or clerk to enter the deposit directly. The keypad KPx permits the SP to change the allocation for this transaction alone or permanently. The keypad KPx also allows the SP to reduce the amount deposited so that he can receive cash change. The terminal RTx or ECRx reports the deposit directly to the CCC via the communication system CS. The CCC prints out periodic reports for interested parties on a need-to-know basis.

According to the invention, a consumer in a shop, supermarket, gasoline station, department store, etc. selects the desired merchandise and brings them to a clerk. The clerk inputs the price of all items in a ECRx by way of a register keyboard or a bar code reader and the register totals the price. The consumer offers the clerk either the exact amount of cash or a sum exceeding the price. Then the clerk enters that cash and the amount into the cash register. The ECR subtracts the price from the cash.

If the consumer gives the clerk the exact price nothing more need happen. However, if the money offered the clerk exceeds the price, the consumer may, if he or she wishes, choose to receive the change or to donate or deposit all or a portion of the change. To do the latter, he or she enters a card

6

number into the keypad KPx or enters the card itself into the card reader CDx. The latter reads the number from a bar code or magnetic stripe on the card. The consumer can also enter into the keypad how much of the total change, he or she is to receive, should be credited to various predetermined accounts in the CCC. The register ECRx reads the numbers entered into the keyboard or the number entered by way of the card reader CDx.

In addition if SP wish to make a direct deposit of finds into the network, (rather than make a purchase and tender excess funds), all that is necessary is to enter the amount deposited into the ECRx and the funds will be transferred to the CCC.

A transaction card DC1 according to the invention appears in FIG. 3 with a magnetic stripe MS carrying the donor's number. A card DC2 in FIG. 3 includes the number in the form of a bar code BC. In another embodiment of the invention the card may be a smart card. Also in regard to the use of bar codes, the codes may be incorporated in the design of a key chain device or displayed on windshields or car windows to allow the invention to be accessed under a variety circumstances, i.e., drive through window, toll booth, etc.

After receiving the data, the ECR accesses the CCC. The latter allocates the change, a portion of the change, or the amount of a direct deposit provided by the SP among various charity accounts CA and other accounts OA in the CCC. The distributions to various accounts are preprogrammed commands which the consumer has previously instructed the CCC to complete. For each deposit or donation made, the SP receives a printed receipt of the transaction from the ECRx or RTx.

If desired, the consumer can choose to deposit only a fraction of the difference between the cash presented and the price. The consumer then enters the amount to be deposited and receives the appropriate cash change.

According to an embodiment of the invention, with every transaction, the computer electronically transfers all amounts allocated to each charity CHy immediately, as soon as the computer can access the charity computer, or when there is a sufficient amount of money. In this way the donor is always assured that the contribution takes effect. Deposits in the other accounts OA may be sent immediately or held until a sufficient amount is accumulated to be acceptable by the other institutions.

An example of the operation of the CMS embodiment appears in the flow chart of FIGS. 4A, 4B, and 4C. This flow chart depicts an on-line version of the CMS embodiment. The CMS, however, could also be operated in an off-line mode and the transactions that are processed by Level 2 MC would then be stored in memory and transferred in a batched format to Level 3 CCC at periodic intervals. In FIGS. 4A, 4B, and 4C it is assumed that the customer is purchasing merchandise that may carry bar codes. However, the invention is also applicable for purchase of services, rentals, or other valuables.

In step 104 of FIG. 4A, the clerk enters the prices of the various pieces of merchandise, either by way of a keyboard (not shown) or a bar code reader BCRx, into the cash register ECR. In step 107, the cash register determines the total price. The customer then gives the clerk the cash to cover or exceed the total price. While this example refers to cash, the invention is also applicable to payment by check, credit or debit card. That is, the customer may wish to have an amount charged to the checking account, credit or debit card in excess of the price in order to make donations or distributions according to the invention. For purposes of this

6,112,191

7

description the word cash is used also to embrace check, credit or debit card payments.

In step 110, the clerk then enters the amount of the cash payment into the ECRx. Under normal circumstances, the cash payment will equal or exceed the total spending price unless there is deposit of cash into the system without a purchase. However, the invention allows the SP to withdraw moneys from a credit balance in one of the accounts recorded in the CCC. While unlikely, this may also occur with a credit or debit card sale. Thus, in some situations, the amount of cash may fall short of the total price. In step 114 the cash register determines if the amount of cash exceeds the total price.

If the answer is yes, the cash exceeds the sale price, the ECRx determines the amount of change by subtracting the price from the cash in step 117. If the answer is no, the cash does not exceed the sale price, the register determines the amount due in step 120. In step 124, the cash register ECRx asks whether the customer has and wishes to use a network card. The clerk or customer may respond by keyboard, or directly by entering the card into the card reader CDx.

If the customer does not have or does not wish to use a network card in response to step 124, the cash register ECRx prints the transaction in step 127 and in step 130, prompts the clerk to make change or collect more cash. If the customer does not offer any needed cash the clerk must abort or otherwise correct the transaction.

If the customer wishes to use a network card, the clerk may enter this information into the register's keyboard, or the customer may enter the card into the card reader CDx. In step 134, the ECRx reads the network card. In step 137 of FIG. 4B, the ECRx determines whether the card is valid. If not, the register ECRx returns to step 127.

If the card is valid, the ECR again asks if the cash offered exceeds the total price in step 140. If not, in step 144, the ECR prompts the cash register CR display DS to ask if the cash register should debit the deficient amount from one of the SP cardholder's accounts. If not, the process returns to step 127.

If the answer to step 144 is yes, the computer CCC, in step 145, asks the customer to enter his or her personal identification (PIN) number. In step 146, the CCC determines if the PIN number matches the card number. If not, the computer returns to step 127. If yes, it determines if the card contains a sufficient balance to cover the amount due. If not, the process again returns to step 127. If yes in step 150, the computer withdraws the money from the card account and credits it to the account of the establishment or the sponsor SPx as pre-programmed. In step 150 the cash register ECRx also prints out the transaction.

If the answer to step 140, namely to the question whether there is more cash than the price, is yes, step 154 causes the ECR to display a message asking whether the customer wishes to retain all or some of the change due. If yes, the ECR prompts the customer to enter into the keypad KPx how much he or she wishes to retain or deposit. In step 157, the cash register ECR indicates to the clerk to give the appropriate net change and shows the net deposit amount.

The process now goes to A in FIG. 4C. If the answer to step 154 is no, the process also continues at point A in FIG. 4C.

At A, step 204, in FIG. 4C the CCC searches the records to find the pre-programmed pay out amounts for the particular network card. The pay out amounts are entered as shown in FIG. 6. In step 207 of FIG. 4C, the CCC starts apportioning the pay out amounts in the pre-programmed

8

proportions by priorities and amounts. In steps 210 to 227 it enters the selected amounts in the accounts of various charities, banks, debit card, and vouchers. Normally there should be no remaining amount. However, such an amount may exist. Thus in step 230 the CCC asks if there remains any outstanding amount. If yes, step 234 enters it into a default account selected by the SP at an earlier time. In step 237, the CCC updates the accounts both in its own data banks and in the computers CHy and OCz. The computers CHy and OCz confirm the transactions.

If the answer to step 230 is no, there are outstanding amounts, the process goes to step 237 directly. In step 240 the ECRx prints out the amounts deposited, entered into various accounts, the prices, the change, etc.

The CCC and the ECRx then prompt the customer in step 244 to ask if he or she wishes to change the programming of the various accounts in the CCC. If yes, the card reader CDx or the CCC displays the apportionment and the amounts, including balances in step 247, the consumer then enters the desired changes in step 250, and the CCC or the card reader makes the changes in step 254. This ends the transaction in step 257. If the answer to step 244 is no, the process goes directly to step 257.

In one embodiment of the invention, the consumer carries out steps 244 to 254 at a separate time in a separate card reader CDx and keypad KPx. This prevents the consumer from using these machines while the clerk serves another customer. In fact, the establishment may furnish a separate terminal RTx just for this purpose.

Prior to listing in the CCC, the invention qualifies each charity for their tax exempt status, operations, management activities, litigation, and other pertinent legal and financial information. The charity must certify to the facts. If the reported information meets the requirement, the charity qualifies. The CCC initiates a checking and updating of the qualification facts on a regular basis. The CCC keeps the qualified charities current on an ongoing basis.

The register furnishes the SP with a printed receipt of each donation for tax purposes and authentication that the charity will receive the money. In an on line mode the receipt can show the date, outlet location, serial number, amount donated, total donated to date, and the current financial results of any specific campaigns or projects received by the charity overall.

One embodiment of the invention furnishes other rewards to the donor. For example, the terminal may play a tune, such as "It's a Small World" in response to a donation to the United Nations children's fund. Alternatively, the donor may receive a message that the last ten cent donation has closed another $100 unit in donations to this charity and provide a special discount coupon. As another example the donor may receive a message that the donor's contribution is being matched by an independent sponsor with a bonus donation.

The invention supervises, implements, and coordinates charitable contributions to benefit all participants in the giving cycle, including the donors, sponsors, charitable organizations, Internal Revenue Service, and end recipients. It allows remote receiving and sending stations, connected to a central processing station, to accept any denomination of giving from a single penny to unlimited dollars. Regardless of the size of the donation, it effectively warrants to all participants that the designated charity has received the donated funds. It thus supports the authenticity of each donation. It can offer unlimited access to the donors concerning their contributions to charities and savings accounts, the intended use of the funds, and feedback concerning the total received by the funds.

6,112,191

7

description the word cash is used also to embrace check, credit or debit card payments.

In step 110, the clerk then enters the amount of the cash payment into the ECRx. Under normal circumstances, the cash payment will equal or exceed the total spending price unless there is deposit of cash into the system without a purchase. However, the invention allows the SP to withdraw moneys from a credit balance in one of the accounts recorded in the CCC. While unlikely, this may also occur with a credit or debit card sale. Thus, in some situations, the amount of cash may fill short of the total price. In step 114 the cash register determines if the amount of cash exceeds the total price.

If the answer is yes, the cash exceeds the sale price, the ECRx determines the amount of change by subtracting the price from the cash in step 117. If the answer is no, the cash does not exceed the sale price, the register determines the amount due in step 120. In step 124, the cash register ECRx asks whether the customer has and wishes to use a network card. The clerk or customer may respond by keyboard, or directly by entering the card into the card reader CDx.

If the customer does not have or does not wish to use a network card in response to step 124, the cash register ECRx prints the transaction in step 127 and in step 130, prompts the clerk to make change or collect more cash. If the customer does not offer any needed cash the clerk must abort or otherwise correct the transaction.

If the customer wishes to use a network card, the clerk may enter this information into the register's keyboard, or the customer may enter the card into the card reader CDx. In step 134, the ECRx reads the network card. In step 137 of FIG. 4B, the ECRx determines whether the card is valid. If not, the register ECRx returns to step 127.

If the card is valid, the ECR again asks if the cash offered exceeds the total price in step 140. If not, in step 144, the ECR prompts the cash register CR display DS to ask if the cash register should debit the deficient amount from one of the SP cardholder's accounts. If not, the process returns to step 127.

If the answer to step 144 is yes, the computer CCC, in step 145, asks the customer to enter his or her personal identification (PIN) number. In step 146, the CCC determines if the PIN number matches the card number. If not, the computer returns to step 127. If yes, it determines if the card contains a sufficient balance to cover the amount due. If not, the process again returns to step 127. If yes in step 150, the computer withdraws the money from the card account and credits it to the account of the establishment and the sponsor SPx as pre-programmed. In step 150 the cash register ECRx also prints out the transaction.

If the answer to step 140, namely to the question whether there is more cash than the price, is yes, step 154 causes the ECR to display a message asking whether the customer wishes to retain some of the change due. If yes, the ECR prompts the customer to enter into the keypad KPx how much he or she wishes to retain or deposit. In step 157, the cash register ECR indicates to the clerk to give the appropriate net change and shows the net deposit amount.

The process now goes to A in FIG. 4C. If the answer to step 154 is no, the process also continues at point A in FIG. 4C.

At A, step 204, in FIG. 4C the CCC searches the records to find the pre-programmed pay out amounts for the particular network card. The pay out amounts are entered as shown in FIG. 6. In step 207 of FIG. 4C, the CCC starts apportioning the pay out amounts in the pre-programmed

8

proportions by priorities and amounts. In steps 210 to 227 it enters the selected amounts in the accounts of various charities, banks, debit card, and vouchers. Normally there should be no remaining amount. However, such an amount may exist. Thus in step 230 the CCC asks if there remains any outstanding amount. If yes, step 234 enters it into a default account selected by the SP at an earlier time. In step 237, the CCC updates the accounts both in its own data banks and in the computers CHy and OCz. The computers CHy and OCz confirm the transactions.

If the answer to step 230 is no, there are outstanding amounts, the process goes to step 237 directly. In step 240 the ECRx prints out the amounts deposited, entered into various accounts, the prices, the change, etc.

The CCC and the ECRx then prompt the customer in step 244 to ask if he or she wishes to change the programming of the various accounts in the CCC. If yes, the card reader CDx or the CCC displays the apportionment and the amounts, including balances in step 247, the consumer then enters the desired changes in step 250, and the CCC or the card reader makes the changes in step 254. This ends the transaction in step 257. If the answer to step 244 is no, the process goes directly to step 257.

In one embodiment of the invention, the consumer carries out steps 244 to 254 at a separate time in a separate card reader CDx and keypad KPx. This prevents the consumer from using these machines while the clerk serves another customer. In fact, the establishment may furnish a separate terminal RTx just for this purpose.

Prior to listing in the CCC, the invention qualifies each charity for their tax exempt status, operations, management activities, litigation, and other pertinent legal and financial information. The charity must certify to the facts. If the reported information meets the requirement, the charity qualifies. The CCC initiates a checking and updating of the qualification facts on a regular basis. The CCC keeps the qualified charities current on an ongoing basis.

The register furnishes the SP with a printed receipt of each donation for tax purposes and authentication that the charity will receive the money. In an on line mode the receipt can show the date, outlet location, serial number, amount donated, total donated to date, and the current financial results of any specific campaigns or projects received by the charity overall.

One embodiment of the invention furnishes other rewards to the donor. For example, the terminal may play a tune, such as "It's a Small World" in response to a donation to the United Nations children's fund. Alternatively, the donor may receive a message that the last ten cent donation has closed another $100 unit in donations to this charity and provide a special discount coupon. As another example the donor may receive a message that the donor's contribution is being matched by an independent sponsor with a bonus donation.

The invention supervises, implements, and coordinates charitable contributions to benefit all participants in the giving cycle, including the donors, sponsors, charitable organizations, Internal Revenue Service, and end recipients. It allows remote receiving and sending stations, connected to a central processing station, to accept any denomination of giving from a single penny to unlimited dollars. Regardless of the size of the donation, it effectively warrants to all participants that the designated charity has received the donated funds. It thus supports the authenticity of each donation. It can offer unlimited access to the donors concerning their contributions to charities and savings accounts, the intended use of the funds, and feedback concerning the total received by the funds.

6,112,191

9

The invention effectively leverages the power of mere pennies into substantial dollars that in turn become available to charities on a short term collection basis. It rewards and encourages philanthropic giving and savings to all individuals on an everyday basis.

An example of the operation of the PMS embodiment appears in the flow chart of FIGS. 5A&B. In the PMS embodiment, the opening and closing of accounts is assumed by PA central computers. This flow chart depicts an off line version of the PMS embodiment in which transactions are processed at Level 2 MC and then stored in memory and transferred via a batched format to Level 3 CCC at periodic intervals. Level 3 would then sort the transactions according to Level 4 account origination and forward said transactions to Level 4. The PMS, however, could also be operated in an on line mode and the transactions would then be processed by a smart card or on line with a central computer located at Level 3 or 4.

Referring now to FIGS. 5A&B, there is a flow chart which illustrates the steps which the PMS processes transactions made through ECRx at Level 2 MC.

Beginning at the top, in step 300, the remote terminal at the POS counter stands ready to receive input and is also scrolling information messages on how to use the system.

In step 302, the clerk inputs the price of each item into ECRx by a bar code reader or by keypad.

In step 304, the terminal computer totals the price of all of the items.

In step 306, the clerk enters the amount of payment, on most occasions cash, into the terminal computer. However, if a check, debit or credit card is tendered by the SP, any excess payment effectively becomes cash and is therefore eligible for deposit.

In step 308, the terminal computer asks if the amount tendered is more than the total purchase price.

If no and the number is zero, the terminal computer goes to step 310 and a receipt is printed out. In step 312 the transaction would end and the terminal computer returns to step 300 for new transactions.

If yes, in step 314 the terminal computer calculates the difference and displays the value and goes to step 316.

In step 316 the terminal computer asks if the consumer wishes to use the system.

If the answer is no, in step 318 a receipt is printed out, and in step 320 the transaction is ended and the terminal computer returns to step 300.

If the answer to step 316 is yes, in step 322 the terminal computer asks if you are a subscriber?

If the answer is no, step 324 allows a non-subscriber to use the system by asking the clerk to enter in a generic access code. On these occasions, most likely, the non-subscriber will be making a donation for charitable purposes. At this time in step 326, the non-subscriber will pick from a list of approved charities and the clerk will key in the selection. In step 328 a receipt will be printed showing evidence of the contribution. This same receipt will also provide an audit trail for individuals and or organizations to confirm that the charitable institutions received the donation. In step 330 the transaction would end and the terminal computer returns to step 300.

Referring now to FIG. 5B if the answer is yes, in step 332 the subscriber or the clerk enters the subscriber's card into the terminal. The terminal computer reads the card and automatically records all of the cents in the POS change as a deposit or contribution. If the subscriber wishes to add in

10

all of the change (coins and bills) 332A is entered into the computer. If the subscriber wishes to add in a specified portion of the change, 332B is prompted into the keypad along with the specified amount, for example $1.54 out of $2.54 in available change.

In step 334, the terminal computer asks if the subscriber wishes to bypass their default instructions for charities and select a special charity for this transaction.

In step 336 if the answer is no, the terminal computer advances to step 340.

If yes in 334, in step 338 the bypass charity account number is entered into the terminal computer through the keypad.

In step 340 the subscriber will receive a receipt showing their donor contribution.

In step 342 the terminal computer writes the transaction into memory.

In step 344 the transaction would end and the terminal computer returns to step 300.

In step 346, on a programmed time basis, the terminal computer forwards, by modem, the batch transactions held in memory to Level 3 CCC.

In order to enroll in the CMS embodiment, SP would sign up for accounts with Level 3 CCC. In order to enroll in the PMS embodiment, SP would sign up for accounts with Level 4 PA.

FIGS. 6A, 6B, and 6C is a flow chart that illustrates the enrollment steps for a CMS or PMS account which a central computer takes, through the keypad KPx, to open or revise an SP account. A display DSx on the keypad KPx or the ECRx allows a central computer to ask the consumer to perform certain acts. After the party has accessed the computer, in step 404, it asks whether the consumer has a network card. If no in step 407, the computer asks the consumer to enter his or her name or address. In step 408 the computer determines if all information has been entered. If not, it returns to step 407 to ask again for the desired information. If yes, the computer proceeds to step 410 to ask the consumer to choose a personal identification (PIN) number. In step 414 the computer determines if the PIN number is acceptable. If not, it returns to step 410 for another number. If yes, the computer advances to step 417 to assign a new card number.

If the answer in step 404 is yes, that the consumer has a card, the computer proceeds to step 420 to have the customer enter the card. In step 424 it asks the consumer to enter his or her pre-selected PIN number. In step 427 it determines whether the entered PIN number matches the pre-selected PIN number. If not, it returns to step 424 for a corrected number. The computer allows this procedure between steps 424 and 427 to occur only three times, thereafter it aborts the program.

If the PIN number is correct and thereby qualified, the computer in step 430 lists all existing accounts and amounts deposited during any specific time period, such as the calendar year. The consumer may request any time period. In step 434 it also lists all accounts with balances. In step 437 it asks the consumer to list all accounts to be eliminated, if any. In step 440 it asks the consumer to approve any accounts to be eliminated if any. The computer then proceeds to step 444 to list all new accounts. Step 444 also receives a prompt from step 417 if the card number is new.

In step 447 it determines if the account, in the form of a charity, merchant, or institution, is in the list of charities or institutions that have been accepted by the system. If the

6,112,191

**9**

The invention effectively leverages the power of mere pennies into substantial dollars that in turn become available to charities on a short term collection basis. It rewards and encourages philanthropic giving and savings to all individuals on an everyday basis.

An example of the operation of the PMS embodiment appears in the flow chart of FIGS. 5A&B. In the PMS embodiment, the opening and closing of accounts is assumed by PA central computers. This flow chart depicts an off line version of the PMS embodiment in which transactions are processed at Level 2 MC and then stored in memory and transferred via a batched format to Level 3 CCC at periodic intervals. Level 3 would then sort the transactions according to Level 4 account origination and forward said transactions to Level 4. The PMS, however, could also be operated in an on line mode and the transactions would then be processed by a smart card or on line with a central computer located at Level 3 or 4.

Referring now to FIGS. 5A&B, there is a flow chart which illustrates the steps which the PMS processes transactions made through ECRx at Level 2 MC.

Beginning at the top, in step 300, the remote terminal at the POS counter stands ready to receive input and is also scrolling information messages on how to use the system.

In step 302, the clerk inputs the price of each item into ECRx by a bar code reader or by keypad.

In step 304, the terminal computer totals the price of all of the items.

In step 306, the clerk enters the amount of payment, on most occasions cash, into the terminal computer. However, if a check, debit or credit card is tendered by the SP, any excess payment effectively becomes cash and is therefore eligible for deposit.

In step 308, the terminal computer asks if the amount tendered is more than the total purchase price.

If no and the number is zero, the terminal computer goes to step 310 and a receipt is printed out. In step 312 the transaction would end and the terminal computer returns to step 300 for new transactions.

If yes, in step 314 the terminal computer calculates the difference and displays the value and goes to step 316.

In step 316 the terminal computer asks if the consumer wishes to use the system.

If the answer is no, in step 318 a receipt is printed out, and in step 320 the transaction is ended and the terminal computer returns to step 300.

If the answer is yes, in step 322 the terminal computer asks if you are a subscriber?

If the answer is no, step 324 allows a non-subscriber to use the system by asking the clerk to enter in a generic access code. On these occasions, most likely, the non-subscriber will be making a donation for charitable purposes. At this time in step 326, the non-subscriber will pick from a list of approved charities and the clerk will key in the selection. In step 328 a receipt will be printed showing evidence of the contribution. This same receipt will also provide an audit trail for individuals and or organizations to confirm that the charitable institutions received the donation. In step 330 the transaction would end and the terminal computer returns to step 300.

Referring now to FIG. 5B if the answer is yes, in step 332 the subscriber or the clerk enters the subscriber's card into the terminal. The terminal computer reads the card and automatically records all of the cents in the POS change as a deposit or contribution. If the subscriber wishes to add in

**10**

all of the change (coins and bills) 332A is entered into the computer. If the subscriber wishes to add in a specified portion of the change, 332B is prompted into the keypad along with the specified amount, for example $1.54 out of $2.54 in available change.

In step 334, the terminal computer asks if the subscriber wishes to bypass their default instructions for charities and select a special charity for this transaction.

In step 336 if the answer is no, the terminal computer advances to step 340.

If yes in 334, in step 338 the bypass charity account number is entered into the terminal computer through the keypad.

In step 340 the subscriber will receive a receipt showing their donor contribution.

In step 342 the terminal computer writes the transaction into memory.

In step 344 the transaction would end and the terminal computer returns to step 300.

In step 346, on a programmed time basis, the terminal computer forwards, by modem, the batch transactions held in memory to Level 3 CCC.

In order to enroll in the CMS embodiment, SP would sign up for accounts with Level 3 CCC. In order to enroll in the PMS embodiment, SP would sign up for accounts with Level 4 PA.

FIGS. 6A, 6B, and 6C is a flow chart that illustrates the enrollment steps for a CMS or PMS account which a central computer takes, through the keypad KPx, to open or revise an SP account. A display DSx on the keypad KPx or the ECRx allows a central computer to ask the consumer to perform certain acts. After the party has accessed the computer, in step 404, it asks whether the consumer has a network card. If no in step 407, the computer asks the consumer to enter his or her name or address. In step 408 the computer determines if all information has been entered. If not, it returns to step 407 to ask again for the desired information. If yes, the computer proceeds to step 410 to ask the consumer to choose a personal identification (PIN) number. In step 414 the computer determines if the PIN number is acceptable. If not, it returns to step 410 for another number. If yes, the computer advances to step 417 to assign a new card number.

If the answer in step 404 is yes, that the consumer has a card, the computer proceeds to step 420 to have the customer enter the card. In step 424 it asks the consumer to enter his or her pre-selected PIN number. In step 427 it determines whether the entered PIN number matches the pre-selected PIN number. If not, it returns to step 424 for a corrected number. The computer allows this procedure between steps 424 and 427 to occur only three times, thereafter it aborts the program.

If the PIN number is correct and thereby qualified, the computer in step 430 lists all existing accounts and amounts deposited during any specific time period, such as the calendar year. The consumer may request any time period. In step 434 it also lists all accounts with balances. In step 437 it asks the consumer to list all accounts to be eliminated, if any. In step 440 it asks the consumer to approve any accounts to be eliminated if any. The computer then proceeds to step 444 to list all new accounts. Step 444 also receives a prompt from step 417 if the card number is new.

In step 447 it determines if the account, in the form of a charity, merchant, or institution, is in the list of charities or institutions that have been accepted by the system. If the

6,112,191

| 11 | 12 |

answer is no, the computer in step 448 asks if the consumer wishes to have a temporary account set up for that donee or institution pending investigation. If yes to step 448, the computer in step 449 sets up a temporary account, and lists it as qualified pending investigation. If the answer to 448 is no, the computer goes back to step 447.

Once the computer has qualified a donee or institution, it goes to step 450 to ask if this is the last account the consumer wishes to add. If not, the process goes back to step 444. If yes, the computer cancels all prior allocations in step 454 and in step 457 sequentially lists all remaining and new accounts showing the old allocations where applicable. In step 460 it asks the consumer to enter a new percentage allocation for each account. As a check, in step 464, the computer asks if the total percentages exceed 100%. If yes, it returns to step 460 for a new entry. If not, it proceeds to step 467 to ask if this is the last account. If not, it goes to step 470 to ask the consumer to go to the next account and returns to step 460. If yes, the computer goes to step 474 where it asks if the total percentage is 100%. If not, the computer places the remaining percentage in a consumer's personal default account and asks the consumer to select accounts and change allocations in step 477. The computer in step 480 ends the process and prints out the results.

(2.) Referring now to calculating the additional amount by predetermined data, referred to as the rounder system, FIG. 7A is a block design that describes the invention's four level rounder system that will allow consumers to create excess funds when they make exact payments for services or goods using checks, credit, or debit drafts.

In FIG. 7 Level 1 a subscriber subscriber (SP) makes an exact payment using a check, credit or debit card and tenders the draft to a payee on Level 2 who in turn deposits the draft for customary authorization, approval, and payment by Level 3 Account Managers (AM) (as in banks or credit institutions). Under the provisions of the invention Level 3 AM will now also add or subtract a predetermined calculation to the face amount of the draft or the account entry itself for the purpose of creating an excess payment. The amount of excess payment called a rounder amount is then added to the face amount of the draft and the total number is then debited (as in withdrawals or account fees) or added (as in deposits or interest payments) to the account balance. Level 3 AM will then manage the funds and make distributions to Provider Services (PS) Level 4 (as in mutual funds, annuities, etc.).

The rounder system embodiment of the invention creates excess funds from exact payments and without the cooperation or even awareness of the payee who accepts payments for the purchase of services or goods. The system is based on the ability to create excess funds by applying a determinant to the face amount or number of account entries, e.g. checks, ATM withdrawals, credit and debit drafts.

The rounder system versus the POS system occurs in a different environment and at a different point in the commercial purchasing cycle. The processing of transactions occurs at the "back end" of the commercial cycle when check and credit drafts are debited against their existing account balances. Effectively, the invention adds (as in withdrawals or account fees) or subtracts (as in deposits/ payments or interest dividends) an amount of excess funds, e.g. $1, $2.14, $5.01, $10, $0.28, etc., to the face amount or number of entries and then adjusts the account balance accordingly. The amount of excess funds are then displayed in the account and periodically transferred to accounts for provider services, i.e., mutual funds, annuities, merchandise, charities, etc.

Under this system the SP opens up a new account or updates an existing account, e.g. checking, credit, or debit account, and instructs the bank or credit card issuer to add or subtract a determinant to each transaction after they are returned to the bank or credit issuer for final debiting against the consumer's account.

The excess funds that are created by the rounder system can be held internally by the bank or credit institution or assigned to other providers for the purchase of mutual funds, annuities, bonds, travel services, merchandise, etc.

When consumers use the above described improved methods to create excess funds from spending transactions in a combined form, they will have achieved the ability to save every time they spend, regardless of whether they use cash, write a check, use an ATM machine, use a credit or debit card.

Referring now to FIG. 8, there is a flow chart which illustrates the steps which central computers take, through a keypad and display, to open or revise a rounder account. The subscriber/subscriber's account instructions will then be applied by the institutions' central computers (CC) to create the excess funds.

In step 500 the CC asks the consumer if you have a rounder account.

If no, in step 502 the CC asks the consumer to enter his or her name, address, social security number, select a pin number, as well as any other vital information needed to open an account.

In step 504 the CC determines if all the needed information has been entered. If not, it returns to step 502 to ask again for the desired information.

If yes, the CC proceeds to step 506 to input the consumer's PIN number or code name. In step 508 the CC determines if the PIN number is acceptable. If not, it returns to step 506 for another number.

If yes, the CC advances to step 510 to assign a rounder account number. The computer then goes to step 522 to create new accounts.

If the answer in step 500 is yes, that the consumer is already a subscriber, the CC proceeds to step 512 to have the subscriber enter their rounder account number. In step 514 it asks the subscriber to enter his or her pre-selected PIN number. In step 516 it determines whether the entered PIN number matches the pre-selected PIN number for the subscriber number entered. If not, it returns to step 512 to correct the subscriber number and/or PIN number. The CC allows this procedure between steps 512 and 516 to recur only three times, thereafter it aborts the program.

If the PIN number is correct and thereby qualified, the CC in step 518 lists the rounder number or percentage that is applied to each account entry ($1, $3, 2%, etc.), stop orders (when to stop processing rounder transactions), the vehicles used for processing and depositing, e.g., checking accounts & ATM terminals, debit card use, and credit card use, names and addresses of all sub-accounts (savings, investing, and charitable choices), and the percentage of the rounder transaction assigned to each sub-account for a cumulative total of 100%.

In step 520 it asks the subscriber to list all accounts to be eliminated or modified, if any.

In step 522 the CC asks the subscriber if there are any new accounts to add.

If the answer is no, the computer goes to step 526 to write an updated rounder account file.

If yes, the CC then proceeds to step 524, and asks the subscriber to enter any new accounts according to the

6,112,191

11

answer is no, the computer in step 448 asks if the consumer wishes to have a temporary account set up for that donee or institution pending investigation. If yes to step 448, the computer in step 449 sets up a temporary account, and lists it as qualified pending investigation. If the answer to 448 is no, the computer goes back to step 447.

Once the computer has qualified a donee or institution, it goes to step 450 to ask if this is the last account the consumer wishes to add. If not, the process goes back to step 444. If yes, the computer cancels all prior allocations in step 454 and in step 457 sequentially lists all remaining and new accounts showing the old allocations where applicable. In step 460 it asks the consumer to enter a new percentage allocation for each account. As a check, in step 464, the computer asks if the total percentages exceed 100%. If yes, it returns to step 460 for a new entry. If not, it proceeds to step 467 to ask if this is the last account. If not, it goes to step 470 to ask the consumer to go to the next account and returns to step 460. If yes, the computer goes to step 474 where it asks if the total percentage is 100%. If not, the computer places the remaining percentage in a consumer's personal default account and asks the consumer to select accounts and change allocations in step 477. The computer in step 480 ends the process and prints out the results.

(2.) Referring now to calculating the additional amount by predetermined data, referred to as the rounder system, FIG. 7A is a block design that describes the invention's four level rounder system that will allow consumers to create excess funds when they make exact payments for services or goods using checks, credit, or debit drafts.

In FIG. 7 Level 1 a subscriber subscriber (SP) makes an exact payment using a check, credit or debit card and tenders the draft to a payee on Level 2 who in turn deposits the draft for customary authorization, approval, and payment by Level 3 Account Managers (AM) (as in banks or credit institutions). Under the provisions of the invention Level 3 AM will now also add or subtract a predetermined calculation to the face amount of the draft or the account entry itself for the purpose of creating an excess payment. The amount of excess payment called a rounder amount is then added to the face amount of the draft and the total number is then debited (as in withdrawals or account fees) or added (as in deposits or interest payments) to the account balance. Level 3 AM will then manage the funds and make distributions to Provider Services (PS) Level 4 (as in mutual funds, annuities, etc.).

The rounder system embodiment of the invention creates excess funds from exact payments and without the cooperation or even awareness of the payee who accepts payments for the purchase of services or goods. The system is based on the ability to create excess funds by applying a determinant to the face amount or number of account entries, e.g. checks, ATM withdrawals, credit and debit drafts.

The rounder system versus the POS system occurs in a different environment and at a different point in the commercial purchasing cycle. The processing of transactions occurs at the "back end" of the commercial cycle when check and credit drafts are debited against their existing account balances. Effectively, the invention adds (as in withdrawals or account fees) or subtracts (as in deposits/payments or interest dividends) an amount of excess funds, e.g. $1, $2.14, $5.01, $10, $0.28, etc., to the face amount or number of entries and then adjusts the account balance accordingly. The amount of excess funds are then displayed in the account and periodically transferred to accounts for provider services, i.e., mutual funds, annuities, merchandise, charities, etc.

12

Under this system the SP opens up a new account or updates an existing account, e.g. checking, credit, or debit account, and instructs the bank or credit card issuer to add or subtract a determinant to each transaction after they are returned to the bank or credit issuer for final debiting against the consumer's account.

The excess funds that are created by the rounder system can be held internally by the bank or credit institution or assigned to other providers for the purchase of mutual funds, annuities, bonds, travel services, merchandise, etc.

When consumers use the above described improved methods to create excess funds from spending transactions in a combined form, they will have achieved the ability to save every time they spend, regardless of whether they use cash, write a check, use an ATM machine, use a credit or debit card.

Referring now to FIG. 8, there is a flow chart which illustrates the steps which central computers take, through a keypad and display, to open or revise a rounder account. The subscriber/subscriber's account instructions will then be applied by the institutions' central computers (CC) to create the excess funds.

In step 500 the CC asks the consumer if you have a rounder account.

If no, in step 502 the CC asks the consumer to enter his or her name, address, social security number, select a pin number, as well as any other vital information needed to open an account.

In step 504 the CC determines if all the needed information has been entered. If not, it returns to step 502 to ask again for the desired information.

If yes, the CC proceeds to step 506 to input the consumer's PIN number or code name. In step 508 the CC determines if the PIN number is acceptable. If not, it returns to step 506 for another number.

If yes, the CC advances to step 510 to assign a rounder account number. The computer then goes to step 522 to create new accounts.

If the answer in step 500 is yes, that the consumer is already a subscriber, the CC proceeds to step 512 to have the subscriber enter their rounder account number. In step 514 it asks the subscriber to enter his or her pre-selected PIN number. In step 516 it determines whether the entered PIN number matches the pre-selected PIN number for the subscriber number entered. If not, it returns to step 512 to correct the subscriber number and/or PIN number. The CC allows this procedure between steps 512 and 516 to recur only three times, thereafter it aborts the program.

If the PIN number is correct and thereby qualified, the CC in step 518 lists the rounder number or percentage that is applied to each account entry ($1, $3, 2%, etc.), stop orders (when to stop processing rounder transactions), the vehicles used for processing and determining, e.g., checking accounts & ATM terminals, debit card use, and credit card use, names and addresses of all sub-accounts (savings, investing, and charitable choices), and the percentage of the rounder transaction assigned to each sub-account for a cumulative total of 100%.

In step 520 it asks the subscriber to list all accounts to be eliminated or modified, if any.

In step 522 the CC asks the subscriber if there are any new accounts to add.

If the answer is no, the computer goes to step 526 to write an updated rounder account file.

If yes, the CC then proceeds to step 524, and asks the subscriber to enter any new accounts according to the

6,112,191

13

rounder number or percentage that is applied to each account entry ($1, $3, 2%, etc.), stop orders (when to stop future processing), the vehicles used for processing and depositing, (e.g., checking accounts & ATM terminals, debit card use, and credit card use), names and addresses of all sub-accounts (savings, investing, and/or three charitable choices), and the percentage of the rounder transaction assigned to each sub-account for a cumulative total of 100%.

In step **526** the computer writes a file, called the rounder account file, containing the new or revised subscriber's identification and account instructions.

In step **528** the process ends and the computer returns to step **500**.

The following information will provide clarity for the steps that will be detailed in FIGS. 9A–E and FIGS. 10A–E.

The face or entry amount means the actual amount of the check/ATM withdrawal or credit/debit card charges prior to any rounder activity.

The rounder transaction is the numerical function applied against the face amount or the entry itself, i.e., $1.00, $3.00, 2%, or a specific number $1.50 to create excess funds. In the preferred embodiment this will be a whole dollar amount such as $1.00, $5.00, $10.00, etc. added to the entry.

The coin amount is the presence of coins in the face amount, i.e. check for $10.14.

The rounder amount is the amount of excess funds produced by applying the rounder transaction to the entry minus the coin amount, i.e. $10.14 using a $1.00 rounder will produce $0.86 as the rounder amount of excess funds.

The total withdrawal will be the rounder amount plus the entry amount which will be debited against the checking account or credit card balance to determine the new account balance.

Referring now to FIGS. 9A–E, there is a flow chart which illustrates the steps which bank central computers take, through a keypad and display, to collect funds, manage funds internally and to disburse funds.

Beginning at the top of FIG. 9A the bank first transmits to the CC, assigned to the clearing and reconciling of checking accounts, all transactional information and directions for rounder account processing.

In step **600** the checking account transaction is read. The transaction can be a check draft, an ATM withdrawal, checking account fee, an interest payment, etc.

In step **605** the computer gets the checking account balance.

In step **610** the computer asks, Is this account a rounder account subscriber?

If the answer is yes, in step **620** the transactions are processed according to rounder transaction instructions.

If the answer is no, in step **740** the transactions are processed without the rounder transaction instructions (See FIG. 4E).

In step **747** basic account balances are updated.

In step **750** the computer writes processed transactions to file.

In step **755** the computer reads next checking transaction.

In step **760** the computer asks, Is this the end of the file? If the answer is yes, computer goes to step **765**. If the answer is no, computer goes to step **600**.

In step **765** the computer sorts all transactions.

In step **770** the computer apportions rounder account contributions per account instructions contained in step **526**, the rounder account file.

14

In step **775** the computer transfers out the charity contributions, savings, investments, and other accounts.

The computer processing required to create rounder account contributions is detailed in FIG. 9B. Starting at the top, in step **622** the computer asks, Is this transaction a debit or withdrawal?

If the answer is no, computer goes to step **634**.

If the answer is yes, computer asks in step **624**, In the transaction are the cents greater than zero cents?

The following will assume the application of a $1.00 rounder transaction.

If the answer is no, in step **628** the rounder transaction would equal the rounder amount. For example if the rounder transaction is $1.00, to be added to the entry amount of a $10.00 withdrawal, the rounder amount of $1.00 will be created as excess funds for the rounder account and the total withdrawal will be $11.00.

If the answer is yes, in step **626** the cents in the purchase price will be subtracted from the rounder transaction and the net difference will become the rounder amount which will then be deposited into the rounder account. For example if the purchase price was $10.14 cents and $1.00 was the rounder transaction $0.14 would be subtracted from the $1.00 and the net of $0.86 would be the rounder amount which would then be deposited into the rounder account. The total withdrawal would still be $11.00.

In step **630** the rounder amount and the entry amount are added together to determine the total withdrawal.

In step **632** the total withdrawal is then subtracted from the existing balance to determine the new balance.

The detailed computer processing required to create rounder account contributions is continued in FIG. 9C in regard to deposits or fee income.

In the processing of deposits or interest into accounts we reverse the process and decrement the amount of money going into the checking account so that we can create excess funds. Therefore, we can apply similar rules, as previously discussed, when the invention dealt with account withdrawals, but only in a decrementing fashion.

In the preferred embodiment we will decrement deposits and interest payments only to eliminate coin amounts.

Starting at the top, in step **634** the computer asks, Is this transaction a deposit or interest fee?

If the answer is no, the computer goes to step **648**.

If the answer is yes, the computer asks in step **638**, In the transaction are the cents greater than zero cents?

If the answer is no, in step **640** the rounder account contribution equals zero since there are no coins in the entry amount of the deposit. The program then goes to step **644**.

If the answer is yes, in step **642** the cents are subtracted from the face amount and the coins become rounder contributions. For example, if the deposit was for $10.14 the rounder would take off the $0.14 and the net deposit would be for $10.00.

In step **644** the rounder amount is subtracted from the face amount to determine the total deposit.

In step **646** the total deposit is then added to the existing balance to determine the new balance.

The ability for the invention to remove coins from checking account deposits will allow for easier balancing of checking accounts.

The detailed computer processing required to create rounder amounts is continued in FIG. 9D when the transaction is a fee.

6,112,191

13

rounder number or percentage that is applied to each account entry ($1, $3, 2%, etc.), stop orders (when to stop future processing), the vehicles used for processing and depositing, (e.g., checking accounts & ATM terminals, debit card use, and credit card use), names and addresses of all sub-accounts (savings, investing, and/or three charitable choices), and the percentage of the rounder transaction assigned to each sub-account for a cumulative total of 100%.

In step 526 the computer writes a file, called the rounder account file, containing the new or revised subscriber's identification information and account instructions.

In step 528 the process ends and the computer returns to step 500.

The following information will provide clarity for the steps that will be detailed in FIGS. 9A–E and FIGS. 10A–E.

The face or entry amount means the actual amount of the check/ATM withdrawal or credit/debit card charges prior to any rounder activity.

The rounder transaction is the numerical function applied against the face amount or the entry itself, i.e., $1.00, $3.00, 2%, or a specific number $1.50 to create excess funds. In the preferred embodiment this will be a whole dollar amount such as $1.00, $5.00, $10.00, etc. added to the entry.

The coin amount is the presence of coins in the face amount, i.e. check for $10.14.

The rounder amount is the amount of excess funds produced by applying the rounder transaction to the entry minus the coin amount, i.e. $10.14 using a $1.00 rounder will produce $0.86 as the rounder amount of excess funds.

The total withdrawal will be the rounder amount plus the entry amount which will be debited against the checking account or credit card balance to determine the new account balance.

Referring now to FIGS. 9A–E, there is a flow chart which illustrates the steps which bank central computers take, through a keypad and display, to collect funds, manage funds internally and to disburse funds.

Beginning at the top of FIG. 9A the bank first transmits to the CC, assigned to the clearing and reconciling of checking accounts, all transactional information and directions for rounder account processing.

In step 600 the checking account transaction is read. The transaction can be a check draft, an ATM withdrawal, checking account fee, an interest payment, etc.

In step 605 the computer gets the checking account balance.

In step 610 the computer asks, Is this account a rounder account subscriber?

If the answer is yes, in step 620 the transactions are processed according to rounder transaction instructions.

If the answer is no, in step 740 the transactions are processed without the rounder transaction instructions (See FIG. 4E).

In step 747 basic account balances are updated.

In step 750 the computer writes processed transactions to file.

In step 755 the computer reads next checking transaction.

In step 760 the computer asks, Is this the end of the file? If the answer is yes, computer goes to step 765. If the answer is no, computer goes to step 600.

In step 765 the computer sorts all transactions.

In step 770 the computer apportions rounder account contributions per account instructions contained in step 526, the rounder account file.

14

In step 775 the computer transfers out the charity contributions, savings, investments, and other accounts.

The computer processing required to create rounder account contributions is detailed in FIG. 9B. Starting at the top, in step 622 the computer asks, Is this transaction a debit or withdrawal?

If the answer is no, computer goes to step 634.

If the answer is yes, computer asks in step 624, In the transaction are the cents greater than zero cents?

The following will assume the application of a $1.00 rounder transaction.

If the answer is no, in step 628 the rounder transaction would equal the rounder amount. For example if the rounder transaction is $1.00, to be added to the entry amount of a $10.00 withdrawal, the rounder amount of $1.00 will be created as excess funds for the rounder account and the total withdrawal will be $11.00.

If the answer is yes, in step 626 the cents in the purchase price will be subtracted from the rounder transaction and the net difference will become the rounder amount which will then be deposited into the rounder account. For example if the purchase price was $10.14 cents and $1.00 was the rounder transaction $0.14 would be subtracted from the $1.00 and the net of $0.86 would be the rounder amount which would then be deposited into the rounder account. The total withdrawal would still be $11.00.

In step 630 the rounder amount and the entry amount are added together to determine the total withdrawal.

In step 632 the total withdrawal is then subtracted from the existing balance to determine the new balance.

The detailed computer processing required to create rounder account contributions is continued in FIG. 9C in regard to deposits or fee income.

In the processing of deposits or interest into accounts we reverse the process and decrement the amount of money going into the checking account so that we can create excess funds. Therefore, we can apply similar rules, as previously discussed, when the invention dealt with account withdrawals, but only in a decrementing fashion.

In the preferred embodiment we will decrement deposits and interest payments only to eliminate coin amounts.

Starting at the top, in step 634 the computer asks, Is this transaction a deposit or interest fee?

If the answer is no, the computer goes to step 648.

If the answer is yes, the computer asks in step 638, In the transaction are the cents greater than zero cents?

If the answer is no, in step 640 the rounder account contribution equals zero since there are no coins in the entry amount of the deposit. The program then goes to step 644.

If the answer is yes, in step 642 the cents are subtracted from the face amount and the coins become rounder contributions. For example, if the deposit was for $10.14 the rounder would take off the $0.14 and the net deposit would be for $10.00.

In step 644 the rounder amount is subtracted from the face amount to determine the total deposit.

In step 646 the total deposit is then added to the existing balance to determine the new balance.

The ability for the invention to remove coins from checking account deposits will allow for easier balancing of checking accounts.

The detailed computer processing required to create rounder amounts is continued in FIG. 9D when the transaction is a fee.

6,112,191

## 15

The rules applied here are the same as in processing withdrawals. But again for the preferred embodiment, which will follow, the process will only be applied to the presence of coin amounts in fee charges.

Starting at the top, in step 648 the computer asks, Is this a fee?

If the answer is no, the computer goes to step 662.

If the answer is yes, the computer asks in step 650, In the transaction are the cents greater than zero cents?

If the answer is no, in step 652 the rounder account contribution equals zero since there are no coins in the face amount of the fee. The program then goes to step 656.

If the answer is yes, in step 654 the cents are added to the face amount and the coins become the rounder amount. For example, if the fee was for $10.14 a one dollar rounder add another $0.86 and the net withdrawal would be for $11.00.

In step 656 the rounder amount is added to the face amount to determine the total withdrawal.

In step 660 the total withdrawal is then subtracted from the existing balance to determine the new balance.

The ability for the invention to remove coins from checking account fees will allow for easier balancing of checking accounts.

The computer steps required to process non-rounder account transactions are detailed in FIG. 9E. Starting at the top, in step 741 the computer asks, Is this transaction a debit, withdrawal, or fee?

If the answer is yes, in step 742, the checking account balance is determined by subtracting the transaction amount from the account balance.

If the answer is no, computer goes to step 743 and asks, Is this transaction a deposit or interest?

If the answer is yes, in step 744 the checking account balance is determined by subtracting the transaction amount from the account balance.

If the answer is no, the computer in step 745 displays error message.

Referring now to FIGS. 10A–E, there is a flow chart which illustrates the steps which card issuers central computers take, through a keypad and display, to collect funds, manage finds internally and to disburse funds.

Beginning at the top of FIG. 10A, the card issuers first transmit to the CC used in clearing and reconciling debit and credit card accounts all transactional information of the subscribers who round up or down their debit/credit card transactions. This information has been obtained, see FIG. 8, through the enrollment process.

In step 800 the debit/credit account transaction is read. The transaction can be a debit/credit charge processed through a POS terminal, filled in by hand, called in over the telephone, etc.

In step 805 the computer gets the cardholder's account balance.

In step 810 the computer asks, Is this account a rounder account subscriber?

If the answer is yes, in step 820 the transactions are processed according to rounder instructions.

If the answer is no, in step 920 the transactions are processed without the rounder instructions.

In step 930 the account balances are updated.

In step 940 the computer writes processed transaction to file.

In step 950 the computer reads next debit/credit card transaction.

## 16

In step 960 the computer asks, Is this the end of the file? If the answer is yes, computer goes to step 970. If the answer is no, computer goes to step 800.

In step 970 the computer sorts all transactions.

In step 980 the computer apportions rounder account contributions per account instructions contained in step 526 of the rounder account file.

In step 990 the computer transfers out the charity contributions, savings, investments, and other accounts.

The computer processing required to create rounder transaction contributions is detailed in FIG. 10B. Starting at the top, in step 822 the computer asks, Is this transaction a debit or credit card charge?

If the answer is no, the computer goes to step 834.

If the answer is yes, the computer asks in step 824, In the transaction are the cents greater than zero cents?

If the answer is no, in step 828 the rounder transaction would equal the rounder amount. The computer then goes to step 830. For example, if the rounder transaction is $1.00, to be added to the entry amount of the credit charge of say $300.00, the rounder amount of $1.00 will be created as excess funds for the rounder account and the total charge will be $301.00.

If the answer is yes, in step 826 the cents in the charged amount will be subtracted from the rounder transaction and the net difference will become the rounder amount which will then be deposited into the rounder account. For example if the credit charge was $300.14 cents and $1.00 was the rounder transaction $0.14 would be subtracted from the $1.00 and the net of $0.86 would be the rounder amount which would then be deposited into the rounder account. The total charge would still be $301.00.

In step 830 the rounder amount and the entry amount are added together to determine the total charge.

In step 832 the total withdrawal is then subtracted from the existing balance to determine the new balance.

The detailed computer processing required to create rounder account contributions is continued in FIG. 10C in regard to account payments or interest dividends.

In the processing of payments into accounts we reverse the process and decrement the amount of money going into the account so that we can create excess funds. Therefore we can apply similar rules, as previously discussed when the invention dealt with account withdrawals, but only in a decrementing fashion.

In the preferred embodiment, the invention will only decrement payments when coins are present.

Starting at the top, in step 834 the computer asks, Is this transaction a payment or interest dividend?

If the answer is no, computer goes to step 848.

If the answer is yes, computer asks in step 838, In the transaction are the cents greater than zero cents?

If the answer is no, in step 840 the rounder account contribution equals zero since there are not any coins in the entry amount of the deposit. The computer then goes to step 844.

If the answer is yes, in step 842 the cents are subtracted from the entry amount and the coins become rounder contributions. For example if the payment was for $500.14, the rounder would take off the $0.14 and the net deposit would be for $500.00.

In step 844 the rounder amount is subtracted from the entry amount to determine the total payment.

In step 846 the total withdrawal is then subtracted from the existing balance to determine the new balance.

6,112,191

## 15

The rules applied here are the same as in processing withdrawals. But again for the preferred embodiment, which will follow, the process will only be applied to the presence of coin amounts in fee charges.

Starting at the top, in step **648** the computer asks, Is this a fee?

If the answer is no, the computer goes to step **662**.

If the answer is yes, the computer asks in step **650**, In the transaction are the cents greater than zero cents?

If the answer is no, in step **652** the rounder account contribution equals zero since there are no coins in the face amount of the fee. The program then goes to step **656**.

If the answer is yes, in step **654** the cents are added to the face amount and the coins become the rounder amount. For example, if the fee was for $10.14 a one dollar rounder add another $0.86 and the net withdrawal would be for $11.00.

In step **656** the rounder amount is added to the face amount to determine the total withdrawal.

In step **660** the total withdrawal is then subtracted from the existing balance to determine the new balance.

The ability for the invention to remove coins from checking account fees will allow for easier balancing of checking accounts.

The computer steps required to process non-rounder account transactions are detailed in FIG. 9E. Starting at the top, in step **741** the computer asks, Is this transaction a debit, withdrawal, or fee?

If the answer is yes, in step **742**, the checking account balance is determined by subtracting the transaction amount from the account balance.

If the answer is no, computer goes to step **743** and asks, Is this transaction a deposit or interest?

If the answer is yes, in step **744** the checking account balance is determined by subtracting the transaction amount from the account balance.

If the answer is no, the computer in step **745** displays error message.

Referring now to FIGS. 10A–E, there is a flow chart which illustrates the steps which card issuers central computers take, through a keypad and display, to collect funds, manage finds internally and to disburse funds.

Beginning at the top of FIG. 10A, the card issuers first transmit to the CC used in clearing and reconciling debit and credit card accounts all transactional information of the subscribers who round up or down their debit/credit card transactions. This information has been obtained, see FIG. 8, through the enrollment process.

In step **800** the debit/credit account transaction is read. The transaction can be a debit/credit charge processed through a POS terminal, filled in by hand, called in over the telephone, etc.

In step **805** the computer gets the cardholder's account balance.

In step **810** the computer asks, Is this account a rounder account subscriber?

If the answer is yes, in step **820** the transactions are processed according to rounder instructions.

If the answer is no, in step **920** the transactions are processed without the rounder instructions.

In step **930** the account balances are updated.

In step **940** the computer writes processed transaction to file.

In step **950** the computer reads next debit/credit card transaction.

## 16

In step **960** the computer asks, Is this the end of the file? If the answer is yes, computer goes to step **970**. If the answer is no, computer goes to step **800**.

In step **970** the computer sorts all transactions.

In step **980** the computer apportions rounder account contributions per account instructions contained in step **526** of the rounder account file.

In step **990** the computer transfers out the charity contributions, savings, investments, and other accounts.

The computer processing required to create rounder transaction contributions is detailed in FIG. 10B. Starting at the top, in step **822** the computer asks, Is this transaction a debit or credit card charge?

If the answer is no, the computer goes to step **834**.

If the answer is yes, in step **824**, In the transaction are the cents greater than zero cents?

If the answer is no, in step **828** the rounder transaction would equal the rounder amount. The computer then goes to step **830**. For example, if the rounder transaction is $1.00, to be added to the entry amount of the credit charge of say $300.00, the rounder amount of $1.00 will be created as excess funds for the rounder account and the total charge will be $301.00.

If the answer is yes, in step **826** the cents in the charged amount will be subtracted from the rounder transaction and the net difference will become the rounder amount which will then be deposited into the rounder account. For example if the credit charge was $300.14 cents and $1.00 was the rounder transaction $0.14 would be subtracted from the $1.00 and the net of $0.86 would be the rounder amount which would then be deposited into the rounder account. The total charge would still be $301.00.

In step **830** the rounder amount and the entry amount are added together to determine the total charge.

In step **832** the total withdrawal is then subtracted from the existing balance to determine the new balance.

The detailed computer processing required to create rounder account contributions is continued in FIG. 10C in regard to account payments or interest dividends.

In the processing of payments into accounts we reverse the process and decrement the amount of money going into the account so that we can create excess funds. Therefore we can apply similar rules, as previously discussed when the invention dealt with account withdrawals, but only in a decrementing fashion.

In the preferred embodiment, the invention will only decrement payments when coins are present.

Starting at the top, in step **834** the computer asks, Is this transaction a payment or interest dividend?

If the answer is no, computer goes to step **848**.

If the answer is yes, computer asks in step **838**, In the transaction are the cents greater than zero cents?

If the answer is no, in step **840** the rounder account contribution equals zero since there are not any coins in the entry amount of the deposit. The computer then goes to step **844**.

If the answer is yes, in step **842** the cents are subtracted from the entry amount and the coins become rounder contributions. For example if the payment was for $500.14, the rounder would take off the $0.14 and the net deposit would be for $500.00.

In step **844** the rounder amount is subtracted from the entry amount to determine the total payment.

In step **846** the total withdrawal is then subtracted from the existing balance to determine the new balance.

6,112,191

## 17

The detailed computer processing required to create rounder amounts is continued in FIG. 10D when the transaction is a fee.

The rules applied here are the same as in processing withdrawals. But again for the preferred embodiment, which will follow, the process will only be applied to the presence of coin amounts in fee charges.

Starting at the top, in step 848 the computer asks, Is this a fee?

If the answer is no, computer goes to step 860.

If the answer is yes, computer asks in step 850, In the transaction are the cents greater than zero cents?

If the answer is no, in step 852 the rounder account contribution equals zero since there are not any coins in the face amount of the fee. The computer then goes to step 856.

If the answer is yes, in step 854 the cents are added to the entry amount and the coins become the rounder amount. For example if the fee was for $10.14 and a one dollar rounder, add another $0.86 and the net withdrawal would be for $11.00.

In step 856 the rounder amount is added to the entry amount to determine the total withdrawal.

In step 858 the total withdrawal is then subtracted from the existing balance to determine the new balance.

The computer steps required to process non-rounder account transactions are detailed in FIG. 10E. Starting at the top, in step 921 the computer asks, Is this transaction a charge or fee?

If the answer is yes, in step 922, the credit balance is determined by subtracting the transaction amount from the account balance.

If the answer is no, the computer goes to step 923 and asks, Is this transaction a payment or interest dividend?

If the answer is yes, in step 924 the credit account balance is determined by subtracting the transaction amount from the account balance.

If the answer is no, the computer in step 925 displays error message.

The invention provides a unique and presently unavailable way for consumers to save every time they spend, regardless of whether they use cash, write a check, use an ATM machine, use a credit or debit card.

The invention provides an "open" POS system whereupon consumers can make excess payments at point of sale counters and have the excess funds be put in special accounts. The "open" system for making excess payments will comprise a four level network utilized in combination with consumers referred to as subscriber/subscribers (SP), payees referred to as merchant/collectors (MC), a central computer/clearinghouse/network (CCC), and provider accounts (PA). The POS system will allow SP the ability to create excess funds from the overpayment of spending transactions using cash, check, credit, or debit card, at POS counters and have said excess overpayments be transferred through a CCC onto provider accounts selected by said subscriber/subscribers (SP).

The invention also provides a four level rounder system (RS) for subscriber/subscribers to create excess funds from account entries connected with transactions paid for by check, ATM machine, credit, or debit card (which can occur at a variety of commercial points: POS counters, on a person to person basis, by mail, by wire transfer, by telephone, by computer, etc.). The rounder system would apply a computerized rounder amount to create excess funds in which the

## 18

active cooperation of the payee is not needed and when the face amount of the payment being tendered is not in excess of the actual purchase price as the required means to establish the excess funds.

While embodiments of the invention have been described in detail, it will be evident to those skilled in the art that the invention may be embodied otherwise without departing from its spirit and scope. Therefore, the following claims are meant to encompass all alternatives and modifications within the scope and spirit of the present invention.

What is claimed is:

1. A method of accumulating credits in payor surplus accounts from financial transactions between a payor and a payee, comprising:

   entering a demanded amount due the payee into a station of a network controlled by the payee;

   entering an additional amount offered by the payor into a station of a network controlled by the payee; and

   transmitting data of the additional amount to a separate station forming part of a network controlled by other than the payee, and within the separate station, apportioning the data of at least a part of the additional amount into one or more of the payor surplus accounts determined by the payor.

2. A method as in claim 1, wherein the step of transmitting the data of the additional amount includes the step of the payee crediting the additional amount to the one or more of the payor surplus accounts in the separate station of the network, wherein the separate station is in the hands of a central clearing entity, so that the payee remains neutral to the additional amounts.

3. A method as in claim 2, further comprising the step of printing out the status of said surplus accounts.

4. A method as in claim 2, wherein said one or more of said other payor surplus account includes sub accounts identifying a plurality of charities, banks, and other sub accounts and the step of transmitting data of the additional amount includes assigning predetermined portions of the one or more of said payor surplus accounts to said sub accounts.

5. A method as in claim 1, wherein said step of entering an additional amount includes calculating the additional amount from predetermined data associated with the one or more of the payor surplus accounts.

6. A method as in claim 5, further comprising the step of printing out the status of said surplus account.

7. A method as in claim 5, wherein said one or more of the payor surplus accounts includes sub accounts identifying a plurality of charities, banks, and other sub accounts and the step of transmitting the additional amount includes assigning predetermined portions of the one or more of said surplus accounts to said sub accounts.

8. A system for accumulating credits in surplus accounts from financial transactions between a payor and a payee, comprising:

   a network;

   an entry receiving device in the network for receiving entries of an amount due the payee and an additional amount offered by the payor; and

   an additional-amount depositing station in the network, containing one of said surplus accounts, and coupled to the entry receiving device for depositing the additional amount in the one of the payor surplus account;

   said entry device being controlled by entities which include the payee, and said depositing device being controlled by entities other than the payee.

6,112,191

17

The detailed computer processing required to create rounder amounts is continued in FIG. 10D when the transaction is a fee.

The rules applied here are the same as in processing withdrawals. But again for the preferred embodiment, which will follow, the process will only be applied to the presence of coin amounts in fee charges.

Starting at the top, in step 848 the computer asks, Is this a fee?

If the answer is no, computer goes to step 860.

If the answer is yes, computer asks in step 850, In the transaction are the cents greater than zero cents?

If the answer is no, in step 852 the rounder account contribution equals zero since there are not any coins in the face amount of the fee. The computer then goes to step 856.

If the answer is yes, in step 854 the cents are added to the entry amount and the coins become the rounder amount. For example if the fee was for $10.14 and a one dollar rounder, add another $0.86 and the net withdrawal would be for $11.00.

In step 856 the rounder amount is added to the entry amount to determine the total withdrawal.

In step 858 the total withdrawal is then subtracted from the existing balance to determine the new balance.

The computer steps required to process non-rounder account transactions are detailed in FIG. 10E. Starting at the top, in step 921 the computer asks, Is this transaction a charge or fee?

If the answer is no, in step 922, the credit balance is determined by subtracting the transaction amount from the account balance.

If the answer is no, the computer goes to step 923 and asks, Is this transaction a payment or interest dividend?

If the answer is yes, in step 924 the credit account balance is determined by subtracting the transaction amount from the account balance.

If the answer is no, the computer in step 925 displays error message.

The invention provides a unique and presently unavailable way for consumers to save every time they spend, regardless of whether they use cash, write a check, use an ATM machine, use a credit or debit card.

The invention provides an "open" POS system whereupon consumers can make excess payments at point of sale counters and have the excess funds be put in special accounts. The "open" system for making excess payments will comprise a four level network utilized in combination with consumers referred to as subscriber/subscribers (SP), payees referred to as merchant/collectors (MC), a central computer/clearinghouse/network (CCC), and provider accounts (PA). The POS system will allow SP the ability to create excess funds from the overpayment of spending transactions using cash, check, credit, or debit card, at POS counters and have said excess overpayments be transferred through a CCC onto provider accounts selected by said subscriber/subscribers (SP).

The invention also provides a four level rounder system (RS) for subscriber/subscribers to create excess funds from account entries connected with transactions paid for by check, ATM machine, credit, or debit card (which can occur at a variety of commercial points: POS counters, on a person to person basis, by mail, by wire transfer, by telephone, by computer, etc.). The rounder system would apply a computerized rounder amount to create excess funds in which the

18

active cooperation of the payee is not needed and when the face amount of the payment being tendered is not in excess of the actual purchase price as the required means to establish the excess funds.

While embodiments of the invention have been described in detail, it will be evident to those skilled in the art that the invention may be embodied otherwise without departing from its spirit and scope. Therefore, the following claims are meant to encompass all alternatives and modifications within the scope and spirit of the present invention.

What is claimed is:

1. A method of accumulating credits in payor surplus accounts from financial transactions between a payor and a payee, comprising:

entering a demanded amount due the payee into a station of a network controlled by the payee;

entering an additional amount offered by the payor into a station of a network controlled by the payee; and

transmitting data of the additional amount to a separate station forming part of a network controlled by other than the payee, and within the separate station. apportioning the data of at least a part of the additional amount into one or more of the payor surplus accounts determined by the payor.

2. A method as in claim 1, wherein the step of transmitting the data of the additional amount includes the step of the payee crediting the additional amount to the one or more of the payor surplus accounts in the separate station of the network, wherein the separate station is in the hands of a central clearing entity, so that the payee remains neutral to the additional amounts.

3. A method as in claim 2, further comprising the step of printing out the status of said surplus accounts.

4. A method as in claim 2, wherein said one or more of said other payor surplus account includes sub accounts identifying a plurality of charities, banks, and other sub accounts and the step of transmitting data of the additional amount includes assigning predetermined portions of the one or more of said payor surplus accounts to said sub accounts.

5. A method as in claim 1, wherein said step of entering an additional amount includes calculating the additional amount from predetermined data associated with the one or more of the payor surplus accounts.

6. A method as in claim 5, further comprising the step of printing out the status of said surplus account.

7. A method as in claim 5, wherein said one or more of the payor surplus accounts includes sub accounts identifying a plurality of charities, banks, and other sub accounts and the step of transmitting the additional amount includes assigning predetermined portions of the one or more of said surplus accounts to said sub accounts.

8. A system for accumulating credits in surplus accounts from financial transactions between a payor and a payee, comprising:

a network;

an entry receiving device in the network for receiving entries of an amount due the payee and an additional amount offered by the payor; and

an additional-amount depositing station in the network, containing one of said surplus accounts, and coupled to the entry receiving device for depositing the additional amount in the one of the payor surplus account;

said entry device being controlled by entities which include the payee, and said depositing device being controlled by entities other than the payee.

6,112,191

**19**

9. A system as in claim 8, wherein the depositing station includes payee crediting means for the payee crediting the additional amount to the one of the payor surplus account in the hands of a central clearing entity, so that the payee remains neutral to the additional amounts.

10. A system as in claim 9, further comprising a status printer responsive to the status of said surplus account.

11. A system as in claim 9, wherein said surplus account includes sub accounts identifying a plurality of charities, bank, and other financial institutions and the depositing station assigns predetermined portions of said surplus account to said sub accounts.

12. A system as in claim 8, wherein said entry device includes calculating means for calculating the additional amount from predetermined data associated with the surplus account.

13. A system as in claim 12, further comprising a status printer responsive to the status of said surplus account.

14. A system as in claim 12, wherein said surplus account includes sub accounts identifying a plurality of charities, banks, and other financial institutions and said the depositing station assigns predetermined portions of said surplus account to said sub accounts.

15. A system, comprising:

a network;

entry means coupled to said network for entering into the network an amount being paid in a transaction by a payor;

identification entering means in said entry means and coupled to said network for entering an identification of the payor;

said network including computing means having data concerning the payor including an excess determinant established by the payor for the accounts;

said computing means in said network being responsive to said data and said identification entering means for determining an excess payment to the basis of the determinant established by the payor, and

said computing means in said network being responsive to the excess payment for apportioning at least a part of the excess payment among said accounts on the basis of the excess determined and established by the payor and on the basis of commands established by the payor and controlled by other than the payee.

16. A system as in claim 15, wherein said entry means includes change making means for returning any remains from the excess payment as cash.

17. A system as in claim 16, wherein said entry means includes a display for displaying the excess payment.

18. A system as in claim 16, wherein said excess payment is apportioned to an account.

19. A system as in claim 16, further comprising printout means prints out the status of each of the accounts.

20. A system as in claim 16, wherein said network includes means for entering changes in the calculating formulas.

21. A system as in claim 16, wherein said network includes means for entering changes in the apportionment.

22. A system as in claim 15, wherein said entry means prints out the status of each of the accounts.

23. A system as in claim 15, wherein said entry means is responsive to entries for entering changes in the allocations.

**20**

24. A system as in claim 15, wherein said computing is responsive to the apportioning for allocating a portion of the excess to charity donee accounts with each apportionment.

25. A system as in claim 24, wherein said computing means is responsive to the apportioning for transferring the portion of the excess for the charity donee account directly to the charity donee with each apportionment.

26. A system as in claim 15, wherein said computing means includes;

data for storing the names of qualified charities;

data with the names of banks;

data storing numbers of client accounts;

said entry means serving for entering the names of charities and;

said computer means being responsive to said entry means for comparing the entered names with the stored and numbers names to determine if the entered name matches a stored name;

said computer means being responsive to said entry means for assigning a charity, bank, financial institution, purchasing account to an account when a client has selected the charity or the bank;

said entry means being responsive to entries for recording money entries into said accounts and storing the entries in said computer means; and

allocating said computer means being responsive to the excess by said entry means for registering an allocation of parts of any monies recorded into any accounts among the charities and banks.

27. A system as in claim 15, wherein said calculating means serves for applying predetermined calculations to the face amount of account entries for the purpose of creating an excess payment.

28. A point of sale operating method, comprising:

entering an amount corresponding to a price of a product into a cash register;

entering an amount corresponding to cash being paid;

determining any excess payment;

entering a card number;

transmitting data of the excess payment to a separate station and in said separate station apportioning at least a part of the amounts of excess cash payment to one or more predetermined accounts selected on the basis of the card number and controlled by other than the payee;

crediting the excess paid to the selected accounts to the card number.

29. A method as in claim 28, wherein said apportioning step includes making change for returning any remains from the excess payment, after apportionment, as cash.

30. A method as in claim 28, wherein said printout step includes printing out the status of each of the accounts.

31. A method as in claim 28, wherein said step of apportioning includes entering changes in the apportionment.

32. A method as in claim 28, wherein said step of apportioning includes allocating a portion of the excess to accounts with each apportionment.

33. A method as in claim 28, wherein said apportionment step includes:

storing of a plurality of qualified charities;

storing names of a number of banks;

storing number of other accounts;

6,112,191

| 19 | 20 |

**9.** A system as in claim 8, wherein the depositing station includes payee crediting means for the payee crediting the additional amount to the one of the payor surplus account in the hands of a central clearing entity, so that the payee remains neutral to the additional amounts.

**10.** A system as in claim 9, further comprising a status printer responsive to the status of said surplus account.

**11.** A system as in claim 9, wherein said surplus account includes sub accounts identifying a plurality of charities, bank, and other financial institutions and the depositing station assigns predetermined portions of said surplus account to said sub accounts.

**12.** A system as in claim 8, wherein said entry device includes calculating means for calculating the additional amount from predetermined data associated with the surplus account.

**13.** A system as in claim 12, further comprising a status printer responsive to the status of said surplus account.

**14.** A system as in claim 12, wherein said surplus account includes sub accounts identifying a plurality of charities, banks, and other financial institutions and said depositing station assigns predetermined portions of said surplus account to said sub accounts.

**15.** A system, comprising:

a network;

entry means coupled to said network for entering into the network an amount being paid in a transaction by a payor;

identification entering means in said entry means and coupled to said network for entering an identification of the payor;

said network including computing means having data concerning the payor including an excess determinant established by the payor for the accounts;

said computing means in said network being responsive to said data and said identification entering means for determining an excess payment to the basis of the determinant established by the payor, and

said computing means in said network being responsive to the excess payment for apportioning at least a part of the excess payment among said accounts on the basis of the excess determined and established by the payor and on the basis of commands established by the payor and controlled by other than the payee.

**16.** A system as in claim 15, wherein said entry means includes change making means for returning any remains from the excess payment as cash.

**17.** A system as in claim 16, wherein said entry means includes a display for displaying the excess payment.

**18.** A system as in claim 16, wherein said excess payment is apportioned to an account.

**19.** A system as in claim 16, further comprising printout means prints out the status of each of the accounts.

**20.** A system as in claim 16, wherein said network includes means for entering changes in the calculating formulas.

**21.** A system as in claim 16, wherein said network includes means for entering changes in the apportionment.

**22.** A system as in claim 15, wherein said entry means prints out the status of each of the accounts.

**23.** A system as in claim 15, wherein said entry means is responsive to entries for entering changes in the allocations.

**24.** A system as in claim 15, wherein said computing is responsive to the apportioning for allocating a portion of the excess to charity donee accounts with each apportionment.

**25.** A system as in claim 24, wherein said computing means is responsive to the apportioning for transferring the portion of the excess for the charity donee account directly to the charity donee with each apportionment.

**26.** A system as in claim 15, wherein said computing means includes:

data for storing the names of qualified charities;

data with the names of banks;

data storing numbers of client accounts;

said entry means serving for entering the names of charities and;

said computer means being responsive to said entry means for comparing the entered names with the stored and numbers names to determine if the entered name matches a stored name;

said computer means being responsive to said entry means for assigning a charity, bank, financial institution, purchasing account to an account when a client has selected the charity or the bank;

said entry means being responsive to entries for recording money entries into said accounts and storing the entries in said computer means; and

allocating said computer means being responsive to the excess by said entry means for registering an allocation of parts of any monies recorded into any accounts among the charities and banks.

**27.** A system as in claim 15, wherein said calculating means serves for applying predetermined calculations to the face amount of account entries for the purpose of creating an excess payment.

**28.** A point of sale operating method, comprising:

entering an amount corresponding to a price of a product into a cash register;

entering an amount corresponding to cash being paid;

determining any excess payment;

entering a card number;

transmitting data of the excess payment to a separate station and in said separate station apportioning at least a part of the amounts of excess cash payment to one or more predetermined accounts selected on the basis of the card number and controlled by other than the payee;

crediting the excess paid to the selected accounts to the card number.

**29.** A method as in claim 28, wherein said apportioning step includes making change for returning any remains from the excess payment, after apportionment, as cash.

**30.** A method as in claim 28, wherein said printout step includes printing out the status of each of the accounts.

**31.** A method as in claim 28, wherein said step of apportioning includes entering changes in the apportionment.

**32.** A method as in claim 28, wherein said step of apportioning includes allocating a portion of the excess to accounts with each apportionment.

**33.** A method as in claim 28, wherein said apportionment step includes:

storing of a plurality of qualified charities;

storing names of a number of banks;

storing number of other accounts;

6,112,191

## 21

entering the names of one of charities, banks, and other accounts so as to define an entered name for each entry of a name,

comparing each entered with a stored name to determine if the entered name matches the stored name;

assigning one of said accounts to an account when a charity, bank, or other account has been entered;

recording money entries into set accounts;

## 22

registering an allocation of parts of monies recorded into accounts among charities, banks, or other accounts entered for that account.

**34.** A method as in claim **28,** wherein said step of apportioning includes allocating the excess to accounts with each apportionment.

* * * * *

6,112,191

21

entering the names of one of charities, banks, and other accounts so as to define an entered name for each entry of a name,

comparing each entered with a stored name to determine if the entered name matches the stored name;

assigning one of said accounts to an account when a charity, bank, or other account has been entered;

recording money entries into set accounts;

22

registering an allocation of parts of monies recorded into accounts among charities, banks, or other accounts entered for that account.

**34.** A method as in claim **28**, wherein said step of apportioning includes allocating the excess to accounts with each apportionment.

\* \* \* \* \*

EXHIBIT

B

**EVERY PENNY COUNTS, INC. (A NEW JERSEY CORPORATION)**

**AND**

**EVERY PENNY COUNTS, INC. (A DELAWARE CORPORATION)**

## <u>ASSET ACQUISITION AGREEMENT</u>

This Asset Acquisition Agreement ("Agreement") is made and entered into on this 29th day of June, 2005 ("Effective Date") by and between Every Penny Counts, Inc. a New Jersey corporation ("EPC-NJ"), and Every Penny Counts, Inc., a Delaware corporation ("EPC-DE") (together with EPC-NJ, the "Parties").

WHEREAS, EPC-NJ desires to transfer and convey all of the assets, rights, and obligations of EPC-NJ to EPC-DE; and

WHEREAS, EPC-DE desires to accept and assume all of the assets, rights, and obligations of EPC-NJ;

NOW THEREFORE, in consideration of the premises, mutual promises and covenants contained herein, the Parties agree as follows:

1.    <u>Purchase and Sale of Acquired Assets</u>. EPC-NJ agrees to transfer, give, grant, set over, assign, convey, release, confirm, and deliver unto EPC-DE, and EPC-DE agrees to accept and assume from EPC-NJ, subject to and upon the terms and conditions contained herein, subject to all existing and contingent obligations, liens, encumbrances and liabilities, all of the properties and assets of EPC-NJ (collectively, the "Acquired Assets"), including the following:

   a.    all real property, improvements, fixtures and fittings thereon, easements, rights-of way, and other appurtenant rights thereto;

   b.    all tangible personal property (such as machinery, equipment, inventories, raw materials, supplies, manufactured and purchased parts, furniture, automobiles, and trucks);

   c.    all rights with respect to leasehold interests and subleases and rights thereunder relating to the real and personal property;

   d.    all rights of EPC-NJ under all licenses, permits, authorizations, orders, registrations, certificates, variances, approvals, consents and franchises used or useful in connection with the operation of the business of EPC-NJ or any pending applications relating to any of the foregoing;



EXHIBIT

B

e.   all intellectual property, including, but not limited to, rights in and to any and all patents, trademarks, copyrights, applications therefor, goodwill associated therewith, licenses and sublicenses granted in respect thereto and rights thereunder, remedies against infringements thereof and rights to protection of interest therein;

f.   all rights of EPC-NJ under any contracts, indentures, mortgages, instruments, liens, guaranties, or other agreements relating to the business of EPC-NJ;

g.   all claims, deposits, prepayments, refunds, causes of action, chooses in action, rights of recovery, rights of set off and rights of recoupment;

h.   all rights in and with respect to the insurance policies and contracts;

i.   all of EPC-NJ's rights to the use of the name "Every Penny Counts, Inc." and any variations thereof;

j.   all accounts receivable, notes receivable, cash, cash equivalents, securities, prepaid expenses, and other current assets of EPC-NJ;

k.   all business and financial records, books, ledgers, files, plans, documents, correspondence, lists, plats, architectural plans, drawings, notebooks, specifications, creative materials, advertising and promotional materials, marketing materials, studies, reports, equipment repair, maintenance, or service records relating to EPC-NJ whether written or electronically stored or otherwise recorded;

l.   all rights in and with respect to the assets associated with all employee benefit plans;

m.   all other assets of EPC-NJ of every kind and description, tangible or intangible, pertaining to or used in the operations of EPC-NJ.

EPC-NJ further agrees that if for any reason any portion of the Acquired Assets cannot be or are not fully transferred to EPC-DE, EPC-NJ will use good faith efforts to obtain any needed consents and shall undertake any and all such actions and execute and deliver any and all such documents as may be reasonably necessary to complete the transfer and assignment of the Acquired Assets to EPC-DE.

2.   Consideration for the Acquired Assets. In consideration of the transfer of the Acquired Assets, EPC-DE will assume and satisfy or perform when due all debts, obligations, and other liabilities of EPC-NJ ("Assumed Liabilities"), known and unknown, whenever arising, including but not limited to all current liabilities of EPC-NJ required in accordance with generally accepted accounting principles to be set forth on the face of the most recent balance sheet of EPC-NJ. Any value of the Acquired Assets in excess of the Assumed Liabilities is intended to be a donation to EPC-DE by EPC-NJ for all purposes.

3. _Closing._ Closing shall take place contemporaneously with the execution of this Agreement on the Effective Date. The Acquired Assets shall be deemed as transferred from EPC-NJ to EPC-DE as of the Effective Date.

4. _Headings._ The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

5. _Governing Law._ This Agreement shall be governed by and construed in accordance with the domestic laws of the Delaware without giving effect to any choice or conflict of law provision or rule (whether of the Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the Delaware.

6. _Amendments and Waivers._ No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by EPC-DE and EPC-NJ.

7. _Severability._ Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date first above written.

EVERY PENNY COUNTS, INC. (NJ CORPORATION)

By: Bertram V. Burke
Title: Chairman, CEO

EVERY PENNY COUNTS, INC (DE CORPORATION)

By: Bertram V. Burke
Title: Chairman, CEO

-3-

JS 44   (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

BANK OF AMERICA, N.A.

## DEFENDANTS

SIP ASSETS, LLC and
EVERY PENNY COUNTS, INC.

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street, P.O. Box 951
Wilmington, DE  19899-0951

Attorneys (If Known)

## II. BASIS OF JURISDICTION     (Place an "X" in One Box Only)

- [ ] 1. U.S. Government Plaintiff
- [x] 3. Federal Question (U.S. Government Not a Party)
- [ ] 2. U.S. Government Defendant
- [ ] 4. Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT     (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 610 Agriculture | 422 Appeal 28 USC 158 | 400 State Reapportionment |
| 120 Marine | 310 Airplane | 362 Personal Injury— | 620 Other Food & Drug | | 410 Antitrust |
| 130 Miller Act | 315 Airplane Product | Med. Malpractice | 625 Drug Related Seizure | 423 Withdrawal | 430 Banks and Banking |
| 140 Negotiable Instrument | Liability | 365 Personal Injury — | of Property 21 USC | 28 USC 157 | 450 Commerce/ICC Rates/etc. |
| 150 Recovery of Overpayment | 320 Assault, Libel & | Product Liability | 630 Liquor Laws | | 460 Deportation |
| & Enforcement of Judgment | Slander | 368 Asbestos Personal | 640 R.R. & Truck | **PROPERTY RIGHTS** | 470 Racketeer Influenced and |
| 151 Medicare Act | 330 Federal Employers' | Injury Product | 650 Airline Regs. | 820 Copyrights | Corrupt Organizations |
| 152 Recovery of Defaulted | Liability | Liability | 660 Occupational | [x] 830 Patent | 810 Selective Service |
| Student Loans | 340 Marine | **PERSONAL PROPERTY** | Safety/Health | 840 Trademark | 850 Securities/Commodities/ |
| (Excl. Veterans) | 345 Marine Product | 370 Other Fraud | 690 Other | | Exchange |
| 153 Recovery of Overpayment | Liability | 371 Truth in Lending | | **SOCIAL SECURITY** | 875 Customer Challenge |
| of Veteran's Benefits | 350 Motor Vehicle | 380 Other Personal | **LABOR** | 861 HIA (1395ff) | 12 USC 3410 |
| 160 Stockholders' Suits | 355 Motor Vehicle | Property Damage | 710 Fair Labor Standards | 862 Black Lung (923) | 891 Agricultural Acts |
| 190 Other Contract | Product Liability | 385 Property Damage | Act | 863 DIWC/DIWW (405(g)) | 892 Economic Stabilization Act |
| 195 Contract Product Liability | 360 Other Personal Injury | Product Liability | 720 Labor/Mgmt. Relations | 864 SSID Title XVI | 893 Environmental Matters |
| | | | | 865 RSI (405(g)) | 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 730 Labor/Mgmt.Reporting | | 895 Freedom of |
| 210 Land Condemnation | 441 Voting | 510 Motions to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | Information Act |
| 220 Foreclosure | 442 Employment | Sentence | 740 Railway Labor Act | 870 Taxes (U.S. Plaintiff | 900 Appeal of Fee Determination |
| 230 Rent Lease & Ejectment | 443 Housing/ | Habeas Corpus: | | or Defendant) | Under Equal Access to |
| 240 Torts to Land | Accommodations | 530 General | 790 Other Labor Litigation | | Justice |
| 245 Tort Product Liability | 444 Welfare | 535 Death Penalty | | 871 IRS—Third Party | 950 Constitutionality of |
| 290 All Other Real Property | 440 Other Civil Rights | 540 Mandamus & Other | 791 Empl. Ret. Inc. | 26 USC 7609 | State Statutes |
| | | 550 Civil Rights | Security Act | | 890 Other Statutory Actions |
| | | 555 Prison Condition | | | |

## V. ORIGIN     (PLACE AN "X" IN ONE BOX ONLY)

- [x] 1. Original Proceeding
- [ ] 2. Removed from State Court
- [ ] 3. Remanded from Appellate Court
- [ ] 4. Reinstated or Reopened
- [ ] 5. Transferred from another district (specify)
- [ ] 6. Multidistrict Litigation
- [ ] 7. Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

35 U.S.C § 1 at seq., for patent infringement and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:

JURY DEMAND:  [ ] Yes  [x] No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____      DOCKET NUMBER _____

DATE
03/20/2007

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse (Rev. 12/96)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.    (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b.) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States, are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No.   0 7 - 1 5 9

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____2_____ COPIES OF AO FORM 85.

MAR 2 0 2007

_____                    _____
(Date forms issued)                        (Signature of Party or their Representative)


                                           _____Shane Handlin_____
                                           (Printed name of Party or their Representative)


Note: Completed receipt will be filed in the Civil Action