## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BANK OF AMERICA, N.A.      )
       Plaintiff       )
                )
v.                )      C.A. NO. 07-159 GMS
                )
SIP ASSETS, LLC AND       )
EVERY PENNY COUNTS, INC.    )
       Defendants     )

### OPENING BRIEF OF EVERY PENNY COUNTS, INC. IN SUPPORT OF ITS MOTION TO DISMISS, TRANSFER VENUE OR STAY

David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766

**Attorney for Defendant**
**Every Penny Counts, Inc.**

and

PHELPS DUNBAR LLP
Harvey S. Kauget (FL Bar ID #116254)
Karl J. Brandes (FL Bar ID #0329797)
Brent B. Barriere (LA Bar ID #2818)
David L. Patrón (LA Bar ID #22566)
Harry M. Barton (LA Bar ID #29751)
100 South Ashley Drive
Suite 1900
Tampa, Florida 33602-5311
(813) 472-7550

**Of Counsel for Defendant**
**Every Penny Counts, Inc.**

DATED: May 10, 2007

## TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDING……………………………………1

SUMMARY OF ARGUMENT…………………………………………………………...3

STATEMENT OF FACTS……………………………………………………………..8

ARGUMENT……………………………………………………………………………13

I.     This Action Should Be Dismisses Pursuant to 12(b)(3)……………..………...14

II.    This Action Should Be Transferred to the District Court for the
       Middle District of Florida…………………………………………………………...19

       A.     This Action Could Have Been Brought In Florida………………………19

       B.     The Relevant §1404(a) Considerations Support Transfer to the

              Middle District of  Florida……………………………………………………20

              1.     Interests of Justice and Practical Considerations Related
                     to the Expeditiousness of Trial…………………………………..21

              2.     Local Interest in Deciding Controversy…………………………22

              3.     Parties' Preferences………………………………………………23

              4.     Whether the Claims Arose Elsewhere…………………………...25

              5.     Convenience of the Parties as Indicated By Their Relative
                     Physical and Financial Condition………………………….…..26

              6.     Witness Factors………………………………………………..…27

              7.     The Location of Records and Documents………………….……28

Conclusion………………………………………………………………………………29

# TABLE OF AUTHORITIES

## Cases

*800-Flowers, Inc vs. Int'l Florist, Inc.*, 860 F. Supp. 128 (S.D.N.Y. 1994) ................................................................................. 27

*Affymetrix, Inc. v. Syntenti, Inc.*, 28 F. Supp. 2d 192 (D. Del. 1998) .............................. 23

*Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852 (Fed. Cir. 1999) ................................................................................. 18

*APV N. Am., Inc. v. Sig Simonazzi N. Am., Inc.*, 295 F. Supp. 2d 393 (D. Del. 2002) ......................................................... 22

*Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574 (Fed. Cir. 1991) .................... 4, 16, 17

*Asten, Inc. v. Weavexx Corp.*, No. 99-593 GMS, 2000 WL 1728354, Sleet, J. (D. Del. Feb. 11, 2000) ........................................... 15

*Ballard Med. Prods. v. Concord Labs., Inc.*, 700 F. Supp. 796 (D. Del. 1988) ................................................................................. 19, 21

*Bell Tel. Labs., Inc. v. I.B.M. Corp.*, 630 F. Supp. 373 (D. Del. 1984) ................................................................................. 24

*Brinn v. McCracken Financial Services, Inc.*, No. 95-542-SLR, 1996 WL 79377, Robinson, J. (D. Del. Feb. 20, 1996) ........................................ 23

*Burstein v. Applied Extrusion Techs., Inc.*, 829 F. Supp. 106 (D. Del. 1992) ................................................................................. 25, 26

*Cedars-Sinai Med. Ctr. v. Shalala*, 125 F.3d 765 (9th Cir. 1997) ................................ 3, 14

*Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.*, 265 F. Supp. 2d 445 (D. Del. 2003) ......................................................... 22

*Chrysler Capital Corp. v. Woehling*, 663 F. Supp. 478 (D. Del. 1987) ................................................................................. 24, 25

*Com21, Inc. v. Hybrid Patents Inc. (In re Com21, Inc.)*, 357 B.R. 802 (Bankr. N.D. Cal. 2006) ............................................. 15, 16, 18, 19

*Cont'l Grain Co. v. Barge*, 364 U.S 19 (1960) ................................................................. 21

*Corixa Corp. v. Idec Pharms. Corp.*, No. 01-615-GMS, 2002 WL 265094, Sleet, J. (D. Del. Feb. 25, 2002) ........................................... 21

*Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925 (3d Cir. 1941) ...................................... 14

*Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24 (1923) ...................................................................................... 16

*Dippold-Harmon Enters., Inc. v. Lowes Co. Inc.*, No. 01-532-GMS, 2001 WL 1414868, Sleet, J. (D. Del. Nov. 13, 2001) ............................... 23

*E.I. Dupont de Nemours & Co. v. Rhodia Fiber and Resin Intermediaries, S.A.S.*, 197 F.R.D. 112 (D. Del. 2000) ........................................ 23

*E.I. Dupont de Numours & Co. v. Diamond Shamrock Corp.*, 522 F. Supp. 588 (D. Del. 1981).............................................................. 15, 25

*EEOC v. Univ. of Pa.*, 850 F.2d 969 (3d Cir. 1988) ..................................... 3, 14

*Elecs. Imaging, Inc. v. Coyle*, 394 F.3d 1341 (Fed. Cir. 2005) ..................................... 3, 14

*First City Nat'l Bank and Trust Co. v. Simmons*, 878 F.2d 76 (2d Cir. 1989) ...................................................................................... 3, 14

*In re Yamaha Motor Co.*, No. 518, 1997 WL 575861, Lourie, J. (Fed. Cir. Aug. 27, 1997) .................................................................. 18

*Intellectual Prop. Dev. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333 (Fed. Cir. 2001) ................................................................... 16

*Juarma v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995) ........................ 5, 6, 19, 20, 21

*Kahn v. Gen. Motors Corp.*, 889 F.2d 1078 (Fed. Cir. 1989)...................................... 14, 15

*Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180 (1952) ...................................................................................... 15

*Manuel v. Convergys Corp.*, 430 F.3d 1132 (11th Cir. 2005) ............................................ 14

*Omnicom Group, Inc. v. Employers Reinsurance Corp.*, No. 01-839-GMS, 2002 WL 109346, Sleet, J. (D. Del. Jan. 28, 2002) .................................................................................... 23, 28

*Pall Corp. v. Bentley Labs., Inc.*, 523 F. Supp. 450 (D. Del. 1981) ........................... 22, 25

*Peregrine Corp. v. Peregrine Indus., Inc.*, 769 F. Supp. 169 (E.D. Pa. 1991) ................................................................................... 15

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981)............................................................ 24

*Schering Corp. v. Amgen, Inc.*, 969 F. Supp. 258 (D. Del. 1997) .............................. 15, 24

*Shutte v. Armco Steel Corp.*, 431 F.2d 22 (3d Cir. 1970) ........................................... 23, 24

*Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054
(Fed. Cir. 1995) .................................................................................... 5, 18

*TCW/Camil Holding, L.L.C. v. Fox Haron & Camerini, LLP*, No.
03-1154-SLR, 2004 WL 1043193, Robinson, J. (D. Del.
Apr. 30, 2004) .................................................................................... 24, 25

*Trippe Mfg. Co. v. Am. Power Conversion Corp.*, 46 F.3d 624 (7th
Cir. 1995) .......................................................................................... 3, 14

*Tsoukanelis v. Country Pure Foods, Inc.*, 337 F. Supp. 2d 600 (D.
Del. 2004) .......................................................................................... 6, 21

*Tuff-Torq Corp. v. Hydro-Gear Ltd. P'shp*, 882 F. Supp. 359 (D.
Del. 1994) .......................................................................................... 23

*Van Dusen v. Barrack*, 376 U.S. 612 (1964) ...................................... 25

*VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574
(Fed. Cir. 1990) .................................................................................. 6, 20

## Other Authorites

28 U.S.C. § 1338(a) .......................................................................... 6, 19

28 U.S.C. § 1391(c) .......................................................................... 6, 20

28 U.S.C. § 1400(b) .......................................................................... 20

28 U.S.C. § 1404(a) .......................................................... 5, 13, 19, 20, 21, 29

## NATURE AND STAGE OF THE PROCEEDING

On January 25, 2007, Every Penny Counts, Inc. ("EPC") filed the action styled *Every Penny Counts, Inc. v. Bank of America Corporation and Visa USA, Inc.*, Case No. 2:07-CV-00042-JES (sometimes referred to interchangeably as "the Florida suit" and "EPC's Complaint") in the Middle District of Florida. (Ex. 1, EPC's Compl.)[1] In this Complaint, EPC asserted causes of action against Bank of America Corporation ("BAC") and Visa USA, Inc. ("Visa") for knowing and willful infringement of Unites States Patent No. 6,112,191 ("the '191 patent"). EPC's Complaint sets forth that the Keep the Change program ("KTC") infringes on the '191 patent. On March 21, 2007, EPC filed its First Amended Complaint and added Bank of America, N.A. ("BANA") as a defendant in the Florida suit. (Ex. 2, EPC's First Am. Compl.)

As described more fully below, several substantive pleadings have been filed by EPC, BAC, BANA and Visa in the Florida suit. On April 25, 2007, Magistrate Judge Sheri Polster Chappell issued a Case Management and Scheduling Order setting an aggressive pace for litigation of that case. (Ex. 3, Case Mgmt. and Scheduling Order.) The Order sets a discovery deadline of December 31, 2007; requires the submission of dispositive *Daubert*, and *Markman* motions on or before January 31, 2008; sets a mediation deadline of April 1, 2008; and schedules the trial term (the estimated length is 5 days) to begin on June 2, 2008, less than 13 months from EPC's filing of the present pleading. (*Id.*)

On March 20, 2007, BANA - in an apparent response to EPC's Complaint - filed the instant action in this Court seeking a declaratory judgment of non-infringement and

---

[1] All exhibits to EPC's Opening Brief are contained in the Compendium of Exhibits, filed in conjunction herewith.

invalidity regarding the '191 patent. BANA also seeks a declaration of ownership related to the '191 patent and alleges that SIP Assets, LLC ("SIP"), the other defendant in this action, has an ownership interest in the '191 patent. On April 11, 2007 BANA filed an amended complaint seeking identical declaratory relief and setting forth minimal additional factual information.

SIP filed an answer to BANA's complaint on April 26, 2007. (D.I. 11.) Throughout SIP's answer it repeatedly denies having an interest in the subject matter of this litigation, stating that "SIP does not currently have any license or ownership rights to the '191 patent and SIP does not intend to assert any claims against plaintiff regarding the '191 patent." (*Id*. ¶¶ 4, 9, 13, 15, 18, 22, and Affirmative Defense B.) On May 4, 2007, SIP verified the statements set forth in its answer through an affidavit and filed a motion to dismiss for lack of subject matter jurisdiction. (D.I. 12, Verification & D.I. 14, SIP's Mot. to Dismiss.) The affidavit verifying SIP's answer binds SIP to the statements quoted above, and the motion to dismiss echoes this point, stating that :

> SIP never had any ownership in the '191 patent, it has never threatened to sue BOA for infringement of the '191 patent, and it has expressly disclaimed any current licensing or ownership rights to the '191 patent and any intention to bring suit against BOA in connection with the '191 patent.

(D.I. 14, SIP's Mot. to Dismiss 4.) Since SIP's verified answer and motion to dismiss resolve the issues of SIP's ownership of and ability to assert claims regarding the '191 patent, the outstanding issues in the instant suit – validity and infringement of the '191 patent – mirror the issues rapidly progressing toward resolution in the Florida litigation.

## SUMMARY OF ARGUMENT

Defendant, Every Penny Counts, Inc. ("EPC"), respectfully asserts that the Plaintiff, Bank of America, N.A. ("BANA"), filed this action in response to EPC's previously filed suit for patent infringement, which is currently pending in the Middle District of Florida -- EPC's home forum -- and that BANA's filing of this suit constitutes a ham-handed attempt by an multi-national corporation to deprive the true party in interest and a struggling enterprise, EPC, of its chosen forum and should be treated as such with dismissal, transfer or stay.

1.      EPC filed its complaint for infringement of the '191 patent nearly two months in advance of BANA's filing of this suit.  BANA's second-filed action for declaratory judgment involves the same primary parties, EPC and BANA, and an identical subset of the issues progressing toward resolution in the Florida suit, namely, the validity and infringement of the '191 patent.  This overlap of parties and issues between the two suits triggers the application of the first-filed rule which, absent exceptional circumstances, strongly favors resolution of these common issues by the first-filed court, the United States District Court for the Middle District of Florida.  *EEOC v. Univ. of Pa.*, 850 F.2d 969, 971 (3d Cir. 1988); *Elecs. Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1348 (Fed. Cir. 2005).  This preference for the first-filed forum vests this Court with discretion to dismiss, stay or transfer the instant suit.  *Cedars-Sinai Med. Ctr. v. Shalala*, 125 F.3d 765, 769 (9th Cir. 1997); s*ee also First City Nat'l Bank and Trust Co. v. Simmons*, 878 F.2d 76 (2d Cir. 1989); *Trippe Mfg. Co. v. Am. Power Conversion Corp.*, 46 F.3d 624 (7th Cir. 1995).  EPC argues that dismissal is warranted as no exceptional circumstances justify departure from the first-filed rule.

2.     The presence of SIP in this suit does not affect the first-filed rule's application as no actual controversy exists between BANA and SIP because SIP cannot assert any claims against BANA on the '191 patent and has no stake in the ownership of that patent.  SIP's pleadings to date clearly establish this lack of ownership.  In its answer, SIP makes clear that it "does not currently and never has held ownership of any kind in the '191 patent."  (D.I. 11, SIP's Answer ¶ 9.)  SIP verified this statement by affidavit and conclusively stated in its motion to dismiss that "SIP **never** owned the '191 patent."  (D.I. 14, SIP's Mot. to Dismiss 8.)  These declarations indicate that SIP cannot assert claims against BANA on the '191 patent.  A party "seeking to recover money damages for infringement . . . must have held the *legal title* to the patent *during the time of the infringement*."  *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1579 (Fed. Cir. 1991) (emphasis in original).   While SIP did enjoy exclusive licensee rights to the '191 patent at one point in time, that license terminated prior to the launch of the KTC program, the infringement at issue.  In its answer, SIP confirms that "[o]n June 8, 2005, SIP received a written notice from EPC indicating that the License Agreement was terminated, and as a result, SIP claims no current license rights with respect to the '191 patent."  (D.I. 11, SIP's Answer ¶ 9.)  The KTC program did not launch until in or around October 2005.  (*See* Ex. 4, Press Release Introducing the KTC Program.)  Thus, any and all rights SIP enjoyed in the '191 patent terminated prior to the beginning of the KTC program.  Because SIP has held no rights at all in the '191 patent "during the time of the infringement,"  SIP is not entitled to sue for any damages for infringement of the '191 patent by the KTC program.  SIP admits as much in its motion to dismiss.  (D.I. 14, SIP's Mot. to Dismiss 4.)  Accordingly, there is no actual controversy and BANA cannot have

any objectively reasonable apprehension of SIP's bringing an infringement suit when SIP has no right to bring such a suit.

3.      The declarations in SIPS's answer bar it from asserting any claims against BANA for infringement of the '191 patent.  SIP has stated that it "does not intend to assert any claims against plaintiff regarding the '191 patent."  (D.I. 11, SIP's Answer ¶¶ 4, 13, 15, 18.)  SIP verified this statement via affidavit and again confirmed in its motion to dismiss that it has no "intention to bring suit against BOA in connection with the '191 patent."  (D.I. 14, SIP's Mot. to Dismiss 4 & D.I. 12, Verification.)  These sworn statements eliminate any actual controversy between BANA and SIP.  *See Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995) (holding that a patentee defending against an action for declaratory judgment can divest the trial court of jurisdiction over the case by filing as a statement of counsel in its motion papers and briefs a promise not to assert the patent at issue against the putative infringer).  Thus, as SIP is not a proper party to this action, the first-filed rule vests this Court with discretion to dismiss, transfer or stay the instant action.

4.      Alternatively, EPC argues that this Court should transfer this suit to the Middle District of Florida pursuant to 28 U.S.C. § 1404(a).  Section 1404(a) provides that "for the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a); s*ee also Juarma v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995).  When it is determined that an action could have been brought within a district, the Third Circuit directs courts to consider several factors in determining whether

transfer is appropriate.[2]  EPC argues that this suit could have been brought in the Middle District of Florida and that these factors favor transfer.

5.      This action could have been brought in the Middle District of Florida.  The District Court for the Middle District of Florida has federal question jurisdiction over the issues raised in this suit, as it does over the identical issues presented in the first-filed suit currently pending before it, pursuant to 28 U.S.C. § 1338(a).  EPC maintains its principal place of business in Cape Coral, Florida and the Florida court can therefore properly exercise personal jurisdiction over EPC.  (*See* Ex. 5, EPC Aff. ¶ 4.).  The propriety of the Florida court's exertion of personal jurisdiction over EPC also makes venue proper there pursuant to 28 U.S.C. § 1391(c) since EPC is a corporate entity.  28 U.S.C. § 1391(c); *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1584 (Fed. Cir. 1990).

6.      EPC argues that several of the factors identified in *Juarma* indicate that transfer to the Middle District of Florida is appropriate, namely (i) the interests of justice and practical considerations related to the expeditiousness of trial; (ii) the local interest of Florida in deciding this controversy; (iii) EPC's choice of its home forum for the litigation of the common issues involved in these actions; (iv) Florida's significant connection to acts giving rise to EPC's claims; (v) the convenience of EPC and BANA as

---

[2] In *Juarma* the court provided a list of the relevant factors. Private interests include:  (1) the plaintiffs' forum preference as manifested by the plaintiffs' original forum choice;  (2) the defendant's forum preference;  (3) whether the claim arose elsewhere;  (4) the convenience of the parties as indicated by their relative physical and financial condition;  (5) the convenience of the witnesses-but only to the extent that the witnesses may actually be unavailable for trial in one of the fora;  and (6) the location of the books and records.  Public interests include:  (1) the enforceability of the judgment;  (2) practical considerations that could make the trial easy, expeditious, or inexpensive;  (3) the relative administrative difficulty in the two fora resulting from court congestion;  (4) the local interest in deciding local controversies at home;  and (5) the familiarity of the trial judge with the applicable state law in diversity cases.  *Tsoukanelis v. Country Pure Foods, Inc.*, 337 F. Supp. 2d 600, 603 (D. Del. 2004) (citing *Juarma*, 55 F.3d at 879).

indicated by their relative financial conditions; and (vi) the location of documents and witnesses. EPC argues more fully below that the facts and circumstances surrounding this case, including the existence of the on-going, first-filed litigation in Florida, the vast resources of BANA as compared to those of EPC, the significant factual connections to Florida and the fact that EPC chose its home turf as the forum for litigating the issues presented in BANA's complaint, indicate that these factors favor transfer to the Middle District of Florida pursuant to § 1404, should the Court decline to dismiss under the first-filed rule.

**STATEMENT OF FACTS**

BANA and its holding corporation, Bank of America Corporation ("BAC"), operate one of the largest banking enterprises in the world.  FDIC reports rank BANA as the top commercial bank in terms of domestic deposits, $563,906,844,000.00 as of June 30, 2006.  (Ex. 6, FDIC Report: Top 50 Domestic Banks and Savings Institutions by Total Domestic Deposits.)  The FDIC's most recent financial report on BANA indicates that, as of December 31, 2006, BANA's total assets equaled $1,196,123,794,000.00; that its equity capital equaled $109,526,404,000.00; that it earned a net income of $15,225,166,000.00; and that BANA operated 5,836 domestic offices and 225 foreign offices at the close of 2006.  (Ex. 7, FDIC Financial Report on BANA.).  Similarly, FDIC reports rank BAC as the top bank holding company in terms of its domestic deposits, which, as of June 30, 2006, totaled $590,619,659,000.00.  (Ex. 8, FDIC Report: Top 50 Bank Holding Companies by Total Domestic Deposits.)  The most recent FDIC financial report on BAC indicates that, as of December 31, 2006, BAC's total assets equaled $1,376,138,773,000.00; its equity capital equaled $153,699,619,000.00; and that it has 5 subsidiary banks, the largest of which by far is BANA.  (Ex. 9, FDIC Financial Report on BAC.)  BAC  issued a press release on January 23, 2007 indicating that its "2006 net income rose 28 percent to $21.13 billion from $16.47 billion a year earlier."  (Ex. 10, BAC Press Release of Jan. 23, 2007.)

Despite their formal status as two different entities, an integral relationship exists between BAC and BANA's operations.  BAC's 2006 Annual Report does not make any distinction between the two:

> Bank of America Corporation (NYSE: BAC) is a publicly traded company headquartered in Charlotte, NC, that operates throughout the United States and 44 foreign

> countries. The corporation provides a diversified range of banking and nonbanking financial services and products domestically and internationally.

(Ex. 11, Excerpt from BAC 2006 Annual Report 2.) Further, BAC and BANA share a common president, Kenneth D. Louis. (Ex. 12 & 13, Business Information Reports for BAC and BANA.) Finally, and most importantly, BAC advertises the infringing system – the KTC program – on its website despite previous claims that BANA owns and operates this program. (*See* Ex. 14, http://www.bankofamerica.com/promos/jump/ktc3 (last visited May 1, 2007) (indicating © 2007 Bank of America Corporation) & Ex. 15, BAC/BANA's Mot. to Dismiss 7.)

In stark contrast to BAC and BANA, EPC confines its operations to Cape Coral, Florida and has limited resources at its disposal. EPC's operates due to the efforts of fewer than ten employees. EPC's 2006 Financial Statement indicates that as of December 31, 2006, EPC total assets, along with its total stockholders' equity and liabilities, equaled $217,868. (Ex. 16, EPC 2006 Financial Statement.) EPC's net income for 2006 totaled $31,055, a far cry from the record setting $21.13 billion BAC reported for the same year. (*Id.* & Ex. 10, BAC Press Release of Jan. 23, 2007.) Despite this mismatch of resources, EPC elected to pursue its claims against BAC and BANA and to attempt to enforce its rights in the '191 patent. On January 25, 2007, EPC filed its Complaint in the Middle District of Florida. In this Complaint, EPC asserted causes of action against BAC and Visa USA, Inc. ("Visa") for knowing and willful infringement of the '191 patent. EPC's Complaint sets forth that the KTC program infringes on the '191 patent.

EPC's chosen forum, unlike the District of Delaware, is intimately connected with the subject matter of EPC's Complaint and of the instant action. EPC, despite being

incorporated under Delaware law, maintains its principal place of business within the Middle District of Florida, in Cape Coral, Florida.  (Ex. 5, EPC Aff ¶ 4.)  EPC's President and the inventor of the '191 patent, Bertram Burke, also resides in Cape Coral, Florida. (*Id.*)  EPC also participated in many meetings with Brian Sloan, a BANA V.P., in and around Cape Coral, Florida regarding EPC's proposal to license the '191 patent to BANA. (Ex. 5, EPC Aff. ¶¶ 5,6.)  BAC and BANA also have significant connections to Florida.  BAC maintains a registered agent in Florida and is registered to do business there.  (Ex. 17, BAC Florida Corporate Registration.)  BAC and BANA also operate at least 679 offices in Florida and hold the largest market share of any bank in Florida in terms of deposits.  (Ex. 18, FDIC Summary of BANA Offices & Ex. 19, FDIC Deposit Market Share Report, Florida.)   In contrast, BAC and BANA have no significant connections to Delaware, aside from being incorporated under the laws of the state.  BAC and BANA maintain only 2 branches in the state and do not even rank in the FDIC's Deposit Market Share Report for the state of Delware.  (Ex. 18, FDIC Summary of BANA Offices & Ex. 20, FDIC Deposit Market Share Report, Delaware.)

Despite this attenuated connection to Delaware, nearly two months after EPC filed its Complaint, BANA - in an apparent response to EPC's Complaint - filed the instant action in this Court seeking a declaratory judgment of non-infringement and invalidity regarding the '191 patent.  BANA also seeks a declaration of ownership related to the '191 patent and alleges that SIP, the other defendant in this action, has an ownership interest in the '191 patent.  Aside from the inclusion of SIP, this subsequently filed suit involves issues identical to those presented in EPC's Complaint and pending before the Florida court.

As the Court knows, SIP filed an answer to BANA's complaint on April 26, 2007. (D.I. 11, SIP's Answer.)  Throughout SIP's answer it repeatedly states that "SIP does not currently have any license or ownership rights to the '191 patent and SIP does not intend to assert any claims against plaintiff regarding the '191 patent." (*Id.*  ¶ 4, *see also* ¶¶ 9, 13, 15, 18, 22, and Affirmative Defense B.)  SIP states that its total lack of rights in the '191 patent and lack of its intent or ability to assert any claims against BANA related to the '191 patent eliminate any actual controversy between SIP and BANA, an assertion with which EPC fully agrees.  On May 4, 2007, SIP verified the statements in its answer – swearing to the Court that its above quoted statement is "true and correct" -- with an affidavit attached to the motion to dismiss filed on that date. (D.I. 12, Verification & D.I. 14, SIP's Mot. to Dismiss.)  Throughout the motion to dismiss, SIP frequently disavows ownership of the '191 patent and any ability to assert a claim against BANA related to that patent.  (D.I. 14, SIP's Mot. to Dismiss 1, 3, 4, 6-8.)  Since SIP's pleadings to date resolve the issues of SIP's ownership and ability to assert claims regarding the '191 patent, the outstanding issues in the instant suit – validity and infringement of the '191 patent – mirror the issues presented in the rapidly progressing Florida suit.

On March 21, 2007, EPC filed its First Amended Complaint with the Middle District of Florida naming BANA as a defendant in the Florida suit.  (Ex. 2, EPC's First Am. Compl.)  On April 5, 2007, BAC filed an answer in the Middle District of Florida asserting non-infringement and invalidity related to the '191 patent as affirmative defenses.  On that same day, Visa filed a motion to dismiss.  On April 6, 2007, BAC and BANA also filed a motion to dismiss.  (Ex. 15, BAC/BANA's Mot. to Dismiss.)  EPC filed its opposition to the BAC/BANA motion on April 20, 2007 and the Florida court

denied BAC/BANA's motion for leave to reply to this opposition on May 2, 2007. The BAC/BANA motion remains pending before Judge John E. Steele and Magistrate Judge Sheri Polster Chappell of the Middle District of Florida. On April 23, 2007, Judge Steele entered an order dismissing all claims as to Defendant Visa only, pursuant to EPC's Notice of Voluntary Dismissal.

On April 25, 2007, Magistrate Judge Sheri Polster Chappell issued a Case Management and Scheduling Order setting an aggressive pace for the litigation of the issues raised in EPC's Complaint, and the subset of those issues subsequently brought before this Court in BANA's action. (Ex. 3, Case Mgmt. and Scheduling Order.) The Order sets a discovery deadline of December 31, 2007; requires the submission of dispositive *Daubert*, and *Markman* motions on or before January 31, 2008; sets a mediation deadline of April 1, 2008; and schedules the trial term (the estimated length is 5 days) to begin on June 2, 2008, less than 13 months from EPC's filing of the present pleading. (*Id*.) The Order also required the submission of initial disclosures by April 30, 2007, a deadline with which BAC, BANA, and EPC all complied. The schedule set forth in this Order, and the parties' compliance therewith, will ensure an efficient resolution to the issues of infringement and validity of the '191 raised in the Florida suit and this subsequently filed action.

**ARGUMENT**

BANA's Complaint for declaratory judgment constitutes a transparent effort to divest the Middle District of Florida, EPC's chosen forum, of jurisdiction over this controversy. BANA's Complaint involves identical issues to those pending before the Florida court including the validity and infringement of the '191 patent. The fact that this subsequently filed litigation involves these common issues and the same primary parties -- EPC and BANA -- indicates that the first-filed rule warrants dismissal of this action. BANA's inclusion of SIP in this suit -- a tactic with no apparent purpose other than attempting to affect the venue determination -- does not change the appropriateness of dismissal. As established in SIP's pleadings to date and discussed more fully below, SIP has no ownership interest of any kind in the '191 patent, and, more importantly, SIP cannot and will not assert a claim for damages for infringement of the '191 patent by the KTC program. Therefore, the first-filed rule indicates that the ability to resolve this issue properly belongs to the District Court for the Middle District of Florida.

Further, should the Court decline to dismiss this suit, 28 U.S.C. § 1404(a) supports a transfer of this action to the Middle District of Florida. EPC maintains its principal place of business in Cape Coral, Florida, and, its operator and the inventor of the patent at issue, Bertram Burke, reside there as well. (Ex. 5, EPC Aff. ¶ 4.) The fact that EPC chose to bring the first-filed suit in its home forum weighs in favor of transfer, given the deference for the plaintiff's choice of forum and the greater extent of this deference when a plaintiff chooses its home district as the forum for litigation. The location, size and relative means of the parties also favor transfer. Other key witnesses and evidence are also located in the Middle District of Florida; the same cannot be said for Delaware. These facts indicate the appropriateness of transfer of this suit.

13

Finally, the first-filed rule also vests the Court with the authority to stay the instant suit until the Florida court issues a final judgment. Should the Court see fit to grant neither dismissal or transfer, EPC requests that the Court stay this action until such time.

## I. THIS ACTION SHOULD BE DISMISSED PURSUANT TO RULE 12(B)(3).

The first-filed rule essentially states that "in all cases of federal concurrent jurisdiction, the court which first has possession of the subject must decide it." *EEOC*, 850 F.2d at 971 (quoting *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3d Cir. 1941); *see also Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 (11th Cir. 2005) ("Where two actions involving overlapping issues and parties are pending in two federal courts, there is a strong presumption across the federal circuits that favors the forum of the first-filed suit under the first-filed rule"). Where such an overlap of issues and parties exists between actions "filed in two different districts, the second district court has discretion to transfer, stay or dismiss the second case." *Cedars-Sinai Med. Ctr.*, 125 F.3d at 769; *see also First City Nat'l Bank*, 878 F.2d 76 (holding that district court properly dismissed suit pursuant to discretion afforded by the first-filed rule); *Trippe Mfg. Co.*, 46 F.3d 624. The law of both the Third and Federal Circuit Courts of Appeal view application of the first-filed rule as "the norm, not the exception" and both Courts hold that only "exceptional circumstances" allow a district court to "depart from the first-filed rule." *EEOC*, 122 F.2d at 979; *Elecs. Imaging, Inc.*, 394 F.3d at 1348 ("Our precedent, however, favors the first to file rule in the absence of circumstances making it unjust or inefficient to permit a first-filed action to proceed to judgment"); *Kahn v. Gen. Motors Corp.*, 889 F.2d 1078, 1081 (Fed. Cir. 1989) (stating that "restraint of the first-filed suit is

made only to prevent wrong or injustice"). Thus, the Court may dismiss this suit upon a finding that the first-filed rule applies absent exceptional circumstances.

EPC's filing of the Florida suit on January 25, 2007 clearly precedes BANA's filing of this suit on March 20, 2007. The fact that EPC did not add BANA to the Florida suit until March 21, 2007 does not affect this determination. *See Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 182-84 (1952) (upholding stay of second-filed action even though plaintiff in second suit was not joined as defendant in first-filed action until after second suit was initiated); *Schering Corp. v. Amgen, Inc.*, 969 F. Supp. 258, 267 (D. Del. 1997) (holding that licensee's patent infringement was first-filed even if it lacked standing until it amended the complaint to add the patent holder as a plaintiff after the defendant had filed a declaratory judgment action in another district); *E.I. Dupont de Numours & Co. v. Diamond Shamrock Corp.*, 522 F. Supp. 588 (D. Del. 1981); *Com21, Inc. v. Hybrid Patents Inc. (In re Com21, Inc.)*, 357 B.R. 802, 809 (Bankr. N.D. Cal. 2006) ("In making determination of which action is filed first, the court looks to the filing date of the original complaint")[3]. Thus, "the general requirement that the same parties as well as the same issues are involved in the two actions" remains the only issue for this Court to consider before finding the first-filed rule applicable. *Kahn*, 889 F.2d at 1081 (internal quotation marks and citations omitted). BANA admitted that this "action concerns the same patent as [the Florida] action, and the alleged infringement of the

---

[3] The fact that EPC was served with this action one day in advance of effecting service of the amended complaint on BANA is also irrelevant. *See Asten, Inc. v. Weavexx Corp.*, No. 99-593 GMS, 2000 WL 1728354, WL Op. at *3, Sleet, J. (D. Del. Feb. 11, 2000) ("The only case from this circuit to squarely address the issue concluded that the first-filed rule gives priority to an earlier filed complaint even if a later filed complaint is first served" (citing *Peregrine Corp. v. Peregrine Indus., Inc.*, 769 F. Supp. 169, 171-72 (E.D. Pa. 1991))). (All unreported cases cited in EPC's Opening Brief are attached hereto in alphabetical order.)

'Keep The Change' system is at issue in both actions." (Ex. 15, BAC/BANA's Mot. to Dismiss 12.) The existence of the required overlap of parties is equally apparent as both suits involve BANA and EPC. The presence of dissimilar third parties in either suit does not affect the first-filed rule's applicability. *See Com21, Inc.*, 357 B.R. at 809 (stating that "strict identity is not needed, only substantial similarity . . . courts look to whether the *primary* parties in both actions are the same") (emphasis in original) (citations omitted). The first-filed rule therefore applies and warrants dismissal of this action.

BANA's assertions regarding SIP's claim of ownership of the '191 patent do not affect the appropriateness of dismissal pursuant to the first-filed rule. SIP is not a proper party in this declaratory judgment action, as no actual controversy exists between BANA and SIP. A party "seeking to recover money damages for infringement . . . must have held the *legal title* to the patent *during the time of the infringement*." *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1579 (Fed. Cir. 1991) (emphasis in original) (citing *Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24 (1923)). In its Answer, SIP makes clear that it "does not currently and never has held ownership of any kind in the '191 patent." (D.I. 11, SIP's Answer ¶ 9.) SIP verified this statement to the Court in an affidavit filed in conjunction with its motion to dismiss on May 4, 2007. (D.I. 12, Verification & D.I. 14, SIP's Mot. to Dismiss.) Further, SIP repeatedly disavows ownership of the '191 patent in it motion to dismiss and concludes its argument therein by stating that "SIP **never** owned the '191 patent." (D.I. 14, SIP's Mot. to Dismiss 8 (emphasis in original).) It is true that not just a patent owner, but also an exclusive licensee, may be entitled to damages for patent infringement injuries. *Intellectual Prop. Dev. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1347 (Fed. Cir. 2001). Under

*Arachnid*, however, an exclusive licensee's rights under the patent must be in effect during the time of the infringement to be entitled to seek damages for such infringement. *See* 939 F.2d at 1579.  Here, even though SIP did at one time hold an exclusive license for a limited use under the '191 patent, that license terminated prior to the launch of the KTC program, the infringement at issue.  In its Answer, SIP confirms that "[o]n June 8, 2005, SIP received a written notice from EPC indicating that the License Agreement was terminated, and as a result, SIP claims no current license rights with respect to the '191 patent."  (D.I. 11, SIP's Answer ¶ 9.)  The KTC program did not launch until in or around October 2005.  (*See* Ex. 4, Press Release Introducing the KTC Program.)  That is, any and all rights SIP enjoyed in the '191 patent terminated prior to the beginning of the KTC program.  Because SIP has held no rights at all in the '191 patent "during the time of the infringement,"  SIP is not entitled to sue for any damages for infringement of the '191 patent by the KTC program.  Accordingly, there is no actual controversy.  BANA cannot have any objectively reasonable apprehension of SIP's bringing an infringement suit when SIP has no right to bring such a suit.

Moreover, SIP has stated that it "does not intend to assert any claims against plaintiff regarding the '191 patent."  (D.I. 11, SIP's Answer ¶¶ 4, 13, 15, 18.)  Again, SIP swore to the Court that this statement is "true and correct" in its affidavit filed on May 4, 2007.  (D.I. 12, Verification.)  The motion to dismiss expresses with great frequency this same lack of intent to sue, stating that SIP "has expressly disclaimed any intention to bring suit against BOA in connection with the '191 patent."  (D.I. 14, SIP's Mot. to Dismiss 1, 4, 7.)   This sworn disclaimer eliminates any actual controversy between BANA and SIP.  *See Super Sack Mfg. Corp*, 57 F.3d at 1058 (holding that a patentee

defending against an action for declaratory judgment can divest the trial court of jurisdiction over the case by filing as a statement of counsel in its motion papers and briefs a promise not to assert the patent at issue against the putative infringer); *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 855 (Fed. Cir. 1999)  (holding that promise not to assert against the declaratory plaintiff any infringement claim under the patent with respect to any product previously or currently advertised, manufactured, or sold by the declaratory plaintiff removed any reasonable apprehension of suit); *In re Yamaha Motor Co.*, No. 518, 1997 WL 575861, WL Op. at *3, Lourie, J. (Fed. Cir. Aug. 27, 1997)  (finding that district court erred in denying motion to dismiss declaratory judgment claim where patentee agreed not to sue declaratory plaintiff for infringement). Thus, as there is no actual controversy between BANA and SIP, SIP is not a proper party to this action and the first-filed rule applies.

Even if SIP were a proper party with a colorable claim, any assertions by BANA regarding the Florida Court's jurisdiction over SIP would not justify departure from the first-filed rule.[4]  Indeed, the first-filed rule indicates that the resolution of such issues involving jurisdiction over third parties properly belongs within the discretion of the first-filed court.  *Com21, Inc.*, 357 B.R. at 809  ("In light of the deference to be given to the first-filed case, whether [third parties] can and should be joined in the [first-filed] litigation are issues that, in the first instance, should be considered by the [first-filed] district court").  The ability to resolve this issue properly rests with the court in which the

---

[4] BANA devoted significant effort to such an argument in its Motion to Dismiss, filed with the Middle District of Florida.  (*See* Ex. 15, BAC/BANA's Mot. to Dismiss 8 ("As explained above, only the District Court of Delaware has jurisdiction over all parties in interest, including SIP, and thus only that Court can resolve the threshold issue of who has the right to assert and claim damages for the infringement of the '191 patent.").)

first-filed action lodged and any assertion made by BANA regarding this issue does not warrant an exception to the first-filed rule. *See Com21, Inc.*, 357 B.R. at 809. Thus, the first-filed rule vests this Court with discretion to dismiss the instant action.

## II. THIS ACTION SHOULD BE TRANSFERRED TO THE DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA.

"For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a); s*ee also Juarma*, 55 F.3d at 879. After determining whether an action could properly be brought in a transferee district, courts "consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Juarma*, 55 F.3d at 879 (quoting 15 Wright, Miller & Cooper § 3847); *Ballard Med. Prods. v. Concord Labs., Inc.*, 700 F. Supp. 796, 800 (D. Del. 1988) (stating that "the issue becomes whether transfer is warranted after weighing the 'convenience of the parties and witnesses' and the 'interests of justice' to the venue selected"). Transfer is proper under both of these considerations.

### A. THIS ACTION COULD HAVE BEEN BROUGHT IN FLORIDA.

This action could have been brought in the Middle District of Florida. The District Court for the Middle District of Florida has federal question jurisdiction over the issues raised in this suit, as it does over the identical issues presented in the first-filed suit currently pending before it, pursuant to 28 U.S.C. § 1338(a). EPC maintains its principal place of business in Cape Coral, Florida, and the Florida court can therefore properly exercise personal jurisdiction over EPC. (*See* Ex. 5, EPC Aff. ¶ 4.). The propriety of the Florida court's exertion of personal jurisdiction over EPC also makes venue proper there

pursuant to 28 U.S.C. § 1391(c) since EPC is a corporate entity.  28 U.S.C. § 1391(c); *VE Holding Corp.*, 917 F.2d at 1584.  Additionally, 28 U.S.C. § 1400(b) also supports venue in the Middle District of Florida since  BANA committed acts of infringement there.  28 U.S.C. § 1400(b) .  Further, as explained in Section I *supra*, SIP cannot claim any damages for infringement of the '191 patent by the KTC program, because any and all of SIP's rights in the '191 patent terminated prior to the launch of the KTC program and due to SIP's sworn statement to this Court expressing a lack of intent to bring such a claim against BANA.  Thus, SIP is not a proper party to BANA's action for declaratory judgment as SIP never owned the '191 patent and cannot claim any damages for infringement by the KTC program.

**B.    THE RELEVANT 1404(A) CONSIDERATIONS SUPPORT TRANSFER TO THE MIDDLE DISTRICT OF FLORIDA.**

In determining whether to transfer a case under § 1404(a) "courts have not limited their consideration to the three enumerated factors in § 1404(a) (convenience of parties, convenience of witnesses, or interests of justice)."  *Juarma*, 55 F.3d at 879.  The Third Circuit recognizes that "there is no definitive formula or list of factors to consider."  *Id*. However, in *Juarma* the court provided an illustrative list of the relevant factors:

> Private interests include:    (1) the plaintiffs' forum preference as manifested by the plaintiffs' original forum choice;  (2) the defendant's forum preference;  (3) whether the claim arose elsewhere;  (4) the convenience of the parties as indicated by their relative physical and financial condition;  (5) the convenience of the witnesses-but only to the extent that the witnesses may actually be unavailable for trial in one of the fora;  and (6) the location of the books and records.  Public interests include:  (1) the enforceability of the judgment;  (2) practical considerations that could make the trial easy, expeditious, or inexpensive;  (3) the relative administrative difficulty in the two fora resulting from court congestion;  (4) the local interest in deciding

local controversies at home;  and (5) the familiarity of the
trial judge with the applicable state law in diversity cases.

*Tsoukanelis*, 337 F. Supp. 2d at 603 (citing *Juarma*, 55 F.3d at 879.)  An examination of

the relevant factors indicates that this action properly belongs in the Middle District of

Florida.

### 1.    Interests of Justice and Practical Considerations Related to the Expeditiousness of Trial.

It is well established that in order to "serve the ends of efficient litigation and

justice, the court should litigate all issues arising relating to patents in one place."

*Ballard Med. Prods.*, 700 F. Supp. at 801.  As discussed above, EPC filed the suit

currently pending before the Middle District of Florida which involves identical issues to

those presented in BANA's complaint nearly three months in advance of the

commencement of this action.  "Since both suits raise almost identical issues, permitting

these two actions to proceed in separate districts would produce the waste of time, energy

and money that § 1404(a) was designed to prevent."  *Id.* (citing *Cont'l Grain Co. v.

Barge*, 364 U.S 19, 26 (1960)).  Given the need to avoid the waste of litigating the issues

of infringement and validity of the '191 patent in two different courts and the strong

presumption in favor of the first-filed forum, the interests of justice and efficiency

warrant transfer to the Middle District of Florida.  *See Corixa Corp. v. Idec Pharms.

Corp.*, No. 01-615-GMS, 2002 WL 265094, WL Op. at *1, *4, Sleet, J. (D. Del. Feb. 25,

2002) (stating that the "first-filed doctrine also serves to prevent a multiplicity of actions

and to achieve resolution in a single lawsuit of all disputes arising from common matters"

and noting that the first-filed rule addresses the same concerns as this *Juarma* factor);

*Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.*, 265 F. Supp. 2d 445, 448 (D.

Del. 2003); *Pall Corp. v. Bentley Labs., Inc.*, 523 F. Supp. 450, 453 (D. Del. 1981).

In addition to the first-filed rule indicating that efficiency favors transfer, the progress that the Florida court has made thus far and the schedule established by that court also merit a transfer for the sake of judicial expeditiousness.  As established above, the Florida court has already received multiple substantive pleadings concerning the same issues present in this case.  Further, whereas this Court has yet to issue a scheduling order, the Florida court has established a trial date of June 2, 2008 and mandated that discovery be completed by the end of this calendar year. (Ex. 3, Case Mgmt. and Scheduling Order.)  In light of these developments in the Florida court and the lack of progress made thus far in this forum, the efficiency interests favor transfer.  *See APV N. Am., Inc. v. Sig Simonazzi N. Am., Inc.*, 295 F. Supp. 2d 393, 399 (D. Del. 2002).

## 2.        Local Interest in Deciding the Controversy.

The Florida court's interest in deciding the outcome of this action weighs in favor of transfer.  As discussed above, BAC/BANA holds the largest market share of any bank in Florida in terms of deposits.  (Ex. 19, FDIC Deposit Market Share Report, Florida.) BAC/BANA also operates 679 branches in the state, causing Florida to rank second only to California in terms of the number of BAC/BANA branches in a single state.  (Ex. 18, FDIC Summary of BANA Offices.)  BAC is also registered to do business in Florida. These facts indicate that Florida has a significant interest in regulating the conduct of BAC and BANA, particularly when their conduct harms its residents.  EPC maintains its principal place of business in Florida and its President and inventor of the '191 patent is a citizen of the state, thus, BAC and BANA's continued infringement of the '191 patent causes continued harm to a resident of Florida and Florida's interest in regulating such conduct is substantial.  Further, since EPC met with a BANA representative, Brian Sloan,

to discuss a potential license agreement between BANA and EPC regarding the '191 patent, events giving rise to EPC's willful infringement claim occurred in Florida. Clearly, the local interest of the Florida court in deciding this case weighs in favor of transfer. *Omnicom Group, Inc. v. Employers Reinsurance Corp.*, No. 01-839-GMS, 2002 WL 109346, at *4 (Sleet, J.) (D. Del. Jan. 28, 2002).

### 3.    Parties' Preferences.[5]

The Third Circuit recognizes that "[i]t is black letter law that a plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that choice should not be disturbed lightly." *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970). The weight afforded to a plaintiff's choice of forum increases substantially "where, as here, plaintiff has brought suit on his 'home turf.'" *Brinn v. McCracken Financial Services, Inc.*, No. 95-542-SLR, 1996 WL 79377, WL Op. at *6, Robinson, J. (D. Del. Feb. 20, 1996) (quoting *Tuff-Torq Corp. v. Hydro-Gear Ltd. P'shp*, 882 F. Supp. 359, 363 (D. Del. 1994)); *see also E.I. Dupont de Nemours & Co. v. Rhodia Fiber and Resin Intermediaries, S.A.S.*, 197 F.R.D. 112, 125 (D. Del. 2000) ("The plaintiff's choice of forum should rarely be disturbed and where the plaintiff brings suit in its home forum, that choice deserves an even higher degree of deference." (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981))). Under Delaware law, the fact that a corporate plaintiff incorporated itself in Delaware does not make the state its home turf, rather, this determination hinges on the location of the principal place of business. *See*

---

[5] EPC recognizes that this court often declines to separately consider these factors in evaluating transfers. *Affymetrix, Inc. v. Syntenti, Inc.*, 28 F. Supp. 2d 192 (D. Del. 1998); *Dippold-Harmon Enters., Inc. v. Lowes Co. Inc.*, No. 01-532-GMS, 2001 WL 1414868, Sleet, J. (D. Del. Nov. 13, 2001); *Omnicom*, WL Op. at *2 n.4. However, EPC believes that its arguments under these factors strongly support transfer and illustrate the inequitable intent surrounding BANA's decision to file suit in this district.

*Chrysler Capital Corp. v. Woehling*, 663 F. Supp. 478, 482 (D. Del. 1987) ("Chrysler is a Delaware corporation but that alone is not sufficient to make Delaware its home turf. Chrysler's principal place of business is Greenwich, Connecticut, and it was the Connecticut office that conducted all of the activities which are subject of this suit.") (citations omitted); *TCW/Camil Holding, L.L.C. v. Fox Haron & Camerini, LLP*, No. 03-1154-SLR, 2004 WL 1043193, WL Op. at *2, Robinson, J. (D. Del. Apr. 30, 2004) ("[T]he District of Delaware is not plaintiff's 'home turf,' since it maintains its principal place of business in New York").  Thus, EPC's home turf is the Middle District of Florida, since it maintains its principal place of business there and BAC/BANA's home turf is in Charlotte, North Carolina, the location of its principal place of business.

EPC acknowledges that, superficially, BANA appears to be the plaintiff and the party entitled to the aforementioned deference, however, Delaware courts recognize that the first-filed rule dictates that the plaintiff in the first-filed suit is actually the party whose forum choice is entitled to this deference.  *See Schering*, 969 F. Supp. at 268 ("[The first-filing plaintiff] filed the original complaint; as the plaintiff, its choice of forum is 'a paramount consideration' and 'should not be lightly disturbed.'" (quoting *Schutte*, 431 F.2d at 25)); *Bell Tel. Labs., Inc. v. I.B.M. Corp.*, 630 F. Supp. 373, 377 (D. Del. 1984) ("[The second-filing plaintiff] thus had ample opportunity to become aware of the [first-filed] action before it filed in Delaware but instead it brought a new action in a forum that has little, if any, connection with the subject matter of this litigation.  Under these circumstances, the balance of equities favors awarding [the first-filing plaintiff], as the first to file, its choice of forum.").  Thus, the fact that EPC first filed the suit raising the issues brought before this Court in BANA's action entitles EPC's choice of its home

forum to the deference recognized by the Third Circuit and the Supreme Court. BANA's filing of this suit constitutes mere parlor games designed to deprive EPC of this choice and the deference associated therewith. The Supreme Court has made it clear that this tactic is unacceptable. *Van Dusen v. Barrack*, 376 U.S. 612, 624 (1964) ("The power to defeat a transfer to the convenient forum should derive from the rights and privileges conferred by federal law and not from the deliberate conduct of a party favoring trial in an inconvenient forum"). Thus, EPC's preference of its home forum weighs in favor of transfer.[6]

### 4.    Whether the Claims Arose Elsewhere.

None of the operative facts giving rise to the claims related to BANA's infringement of the '191 patent through the KTC program occurred in or near Delaware. In the BANA Motion to Dismiss, BANA admits that it administers the KTC program from Charlotte, North Carolina. (Ex. 15, BAC/BANA's Mot. to Dismiss 2, 3.) Where Delaware's connection to the acts giving rise to a lawsuit are this insubstantial, transfer is warranted. *See Burstein v. Applied Extrusion Techs., Inc.*, 829 F. Supp. 106 (D. Del. 1992). On the other hand, several connections between BANA's infringement of the

---

[6] To the extent that the Court does not acknowledge EPC as the party whose choice of forum is entitled to deference, EPC argues that any deference granted to BANA's choice of forum must be severely limited. First, as *Chrysler*, 663 F. Supp. at 482, and *TCW/Camil Holding*, 2004 WL 1043193, at *2, illustrate, Delaware is not BANA's 'home turf' and, therefore, its choice to litigate in Delaware is entitled to less deference. *Pall*, 523 F. Supp. at 452. Second, the fact that BANA's action is the second-filed suit also lessens the deference the court should afford to its chosen forum. *See E.I. Dupont*, 522 F. Supp at 591-92 ("The plaintiff's choice of forum carries greater weight when it will not result in duplicative litigation than it does here, where the [first-filed court] will hear testimony concerning the validity and infringement of the very patents here in suit. Dupont filed this action after Hooker filed its complaint in New York, and after Diamond initiated proceedings in Oklahoma. It plainly chose its own convenience in preference to entering into two lawsuits already pending in federal court").

'191 patent and Florida exist. As established above, EPC maintains its principal place of business in Cape Coral, Florida. (Ex. 5, EPC Aff. ¶ 4.). EPC's President, Bertram Burke, resides in Cape Coral, Florida as well. (*Id*) This means that the damages for each act of infringement are felt in Florida. Additionally, many of EPC's meetings regarding licensing of the '191 patent to BANA took place in and around Cape Coral, Florida with Brian Sloan, a BANA V.P. and EPC's corporate account manager. (Ex. 5, EPC Aff. ¶¶ 5, 6.) These meetings establish BANA's knowledge of the '191 patent and therefore relate to the issue of willful infringement of that patent. Finally, BANA operates over 600 branches in Florida, as opposed to two BANA branches located within Delaware. (Ex. 18, FDIC Summary of BANA Offices.) These facts demonstrate that the events related to BANA's infringement of the '191 patent hold a more significant connection to the Middle District of Florida than to Delaware and indicate the propriety of transfer.

### 5. Convenience of the Parties as Indicated By Their Relative Physical and Financial Condition.

The relative conditions of the parties favor transfer of this action to the Middle District of Florida, EPC's home and chosen forum for the first-filed suit. As established above, BANA does business throughout the country and world and enjoys the benefit of vast resources whereas EPC's operations are confined to Cape Coral, Florida and, largely as a result of BANA's actions, its resources are limited. BANA operates many branches in Florida and conducts regular business there. Given these facts and BANA's resources, it would experience little to no inconvenience as a result of transfer. Indeed, BANA has already engaged counsel to litigate the Florida suit and has filed numerous pleadings. In contrast, EPC would face great inconvenience in litigating in Delaware as it conducts none of its operations in Delaware and is engaged in prosecuting its infringement claims

in Florida, its home and the forum it chose when it brought the first-filed suit. In this situation, the disparity of the means between these parties favors transfer. *See 800-Flowers, Inc vs. Int'l Florist, Inc.*, 860 F. Supp. 128, 135 (S.D.N.Y. 1994).

**6.    Witness Factors**

At least two key EPC witnesses reside in Florida. Bertram Burke, the inventor of the '191 patent and operator of EPC, resides in Cape Coral, Florida. (Ex. 5, EPC Aff. ¶ 4.). Mr. Burke's testimony regarding (i) EPC's licensing efforts related to the '191 patent; (ii) BANA's knowledge of the '191 patent; and (iii) the harm suffered by EPC as a result of BANA's willful infringement of the '191 patent, constitutes key testimony. Further Brian Sloan maintains an office at 13099 U.S. Highway 41, Suite 400, Fort Myers, FL 33907 and was Mr. Burke's primary contact for presentations concerning a potential license agreement between EPC and BANA regarding the '191 patent. (*See* Ex. 5, EPC Aff. ¶¶ 5, 6.) The fact that these witnesses reside within the Middle District of Florida indicates that transfer is favored. This is particularly true since, thus far, BANA has failed to identify any witnesses located in Delaware. In BANA's Initial Disclosures filed in the Florida suit, it identifies only members of the Leo Stanger firm, the firm that assisted Mr. Burke in prosecuting the '191 patent, in New Jersey; various BANA employees which EPC believes to be located in or around Charlotte, North Carolina[7]; and employees of SIP in New York as potential witnesses. (Ex. 22, BANA Initial Disclosures 2-3.) In light of these facts, the location of witnesses supports transfer.

---

[7] BANA's initial disclosures did not list locations for many of the individuals identified as potential witnesses, but rather, offered only the contact information of its counsel. EPC researched the location of these individuals and attaches a summary of what it believes in good faith to be an accurate reporting of these individuals' locations. (Ex. 21, Summary of Locations of BANA Witnesses Identified in Initial Disclosures.)

Additionally, the fact that these witnesses will have to travel to Florida to testify in that litigation further indicates the appropriateness of transfer based on this factor, as forcing these parties to also testify in Delaware in this duplicative litigation certainly increases the burden on them. *Omnicom Group, Inc*, WL Op. at *3.

**7.    The Location of the Records and Documents.**

The location of the records and documents further supports transfer to the Middle District of Florida. BANA's Initial Disclosures in the Florida suit indicate the documents in its possession which relate to the KTC program are in Charlotte, North Carolina and not Delaware. (Ex. 22, BANA Initial Disclosures 4.) In contrast, as EPC maintains its principal place of business in Cape Coral, Florida, the documents that it will produce are located in the Middle District of Florida. Since BANA will need to transport its documents across a distance to either forum and EPC will only face this burden as a result of litigating in Delaware, this factor favors transfer. Additionally, the increased burden of requiring the parties to transport documents to Delaware, in addition to Florida, that would result from duplicative litigation also indicates that transfer should be granted. *Omnicom Group, Inc*, WL Op. at *3.

**CONCLUSION**

BANA clearly filed the instant action in response to EPC's Complaint filed in the Middle District of Florida in an attempt to divest EPC of its chosen forum for litigating its claims related to infringement of the '191 patent. Under these circumstances, the first-filed rule allows this Court to dismiss BANA's suit in favor of the first-filed action. Should the Court decline to dismiss this action, the first-filed rule and § 1404(a) also support a transfer of this action to the Middle District of Florida.

WHEREFORE, for the foregoing reasons, EPC respectfully requests that this Court dismiss or transfer this action. In the event that the Court sees fit to grant neither of these remedies, EPC requests this Court stay this action until the Florida litigation reaches its conclusion.

Dated: May 10, 2007

Respectfully submitted,


/s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE  19801-1155
(302) 884-6766

Attorney for Defendant
Every Penny Counts, Inc.

and

PHELPS DUNBAR LLP
Harvey S. Kauget (FL Bar ID #116254)
Karl J. Brandes (FL Bar ID #0329797)
Brent B. Barriere (LA Bar ID #2818)
David L. Patron (LA Bar ID #22566)
Harry M. Barton (LA Bar ID #29751)
100 South Ashley Drive
Suite 1900
Tampa, Florida 33602-5311
(813) 472-7550

Of Counsel for Defendant
Every Penny Counts, Inc.

<u>CERTIFICATE OF SERVICE</u>

I, David L. Finger, hereby certify that on this 10th day of May, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send electronic notification to the following counsel of record:

**Richard L. Horwitz, Esq.**
Potter Anderson & Corroon, LLP
1313 N. Market St., Hercules Plaza, 6th Fl.
P.O. Box 951
Wilmington, DE 19899-0951

**Kurt M. Heyman, Esq.**
Proctor Heyman LLP
1116 West Street
Wilmington, DE 19801

/s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE  19801-1155
(302) 884-6766

Westlaw.

Asten Inc. v. Weavexx Corp.
D.Del.,2000.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
ASTEN INC., Plaintiff,
v.
WEAVEXX CORPORATION, Defendant.
No. 99-593 GMS.

Feb. 11, 2000.

George H. Seitz, III, Seitz, Van Ogtrop & Green,
P.A., Wilmington, for Asten Inc., plaintiffs.
Thomas C. Grimm, Morris, Nichols, Arsht &
Tunnell, Wilmington, for Weavexx Corporation,
defendants.

ORDER

SLEET, J.

I. INTRODUCTION

**\*1** On September 3, 1999, Plaintiff Asten, Inc.
("Asten") filed a complaint alleging patent
infringement by Defendant Weavexx Corp.
("Weavexx"). The complaint was not served until
September 24, 1999. In the interim, on September 10,
1999, Weavexx filed and served a "mirror image"
action in the United States District Court for the
Eastern District of North Carolina. In that action,
Weavexx seeks a declaration that Asten's patent is
invalid and/or not infringed by Weavexx.

Before the court is Weavexx's motion to transfer this
case to the Eastern District of North Carolina, or in
the alternative, to stay proceedings here pending
resolution of the North Carolina declaratory
judgment action. Weavexx argues that the case
should be transferred pursuant to the "first filed" rule,
or, alternatively, pursuant to 28 U.S.C. § 1404.[FN1]
For the reasons that follow, the court will deny
Weavexx's motion.

> FN1. Weavexx's motion requests a transfer
> pursuant to § 1404 or a stay pursuant to the
> first-filed rule. *See* Mot. to Transfer or Stay,
> at 1. In its briefing, however, Weavexx
> appears to request only a transfer, pursuant

to either § 1404 or the first-filed rule. *See*
Opening Br. at 2, 5, 18. As discussed below,
the court has concluded that the first-filed
rule does not operate in Weavexx's favor.
The rule, therefore, provides no more basis
for a stay than it does for a transfer.

II. BACKGROUND

Asten and Weavexx both design and manufacture
certain fabrics used on papermaking machines. Both
companies are incorporated in Delaware, but neither
company maintains a physical presence in this state.
Asten is headquartered in Charleston, South Carolina
and maintains its primary manufacturing facility in
Appleton, Wisconsin. Weavexx is headquartered and
maintains a major manufacturing facility in Wake
Forest, North Carolina. It also has manufacturing
facilities in several other southern states and in
Canada,[FN2] and sells its products in the United
States, Canada, and Mexico.

> FN2. In addition to its Wake Forest location,
> Weavexx maintains U.S. manufacturing
> facilities in Florida, Tennessee, Mississippi
> and Virginia, and Canadian facilities in
> Ontario (administrative offices), Nova
> Scotia and Quebec. *See* Opp'n Br. at Ex. B.

Asten is the assignee of U.S. Patent No. 5,025,839
("the '839 patent"), entitled "Two-Ply Papermakers
Forming Fabric with Zig-Zagging MD Yarns." Asten
contends that Weavexx's "Design 2895" forming
fabrics infringe the '839 patent. Weavexx states that it
"principally designed" these fabrics at its Wake
Forest plant, and that it markets and sells these
products out of that facility. The products are
manufactured, however, by a "sister-company" of
Weavexx that is located in Brazil.

The inventor of the '839 patent, Walter Wright, is
employed by Asten at its Appleton, Wisconsin
facility. Asten manufactures its "Style 866" forming
fabric, based on the '839 patent, at the Appleton
plant. The documents relating to the design and
development of the '839 patent are also located in
Appleton.

III. DISCUSSION

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 2
Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

As previously noted, Weavexx seeks to transfer this action pursuant to the "first-filed" rule, or, alternatively, pursuant to 28 U.S.C. § 1404(a).

### A. The First-Filed Rule

The first-filed rule is a judicially created doctrine that is designed to avoid concurrent litigation of the same issues, between the same parties, in more than one federal court. *See EEOC v. University of Pennsylvania,* 850 F.2d 969, 971-72 (3d Cir.1988). As its name implies, the rule generally provides that a later filed action should be stayed pending resolution of an earlier filed action, or transferred to the court in which the earlier filed action is pending. *See Peregrine Corp. v. Peregrine Indus., Inc.,* 769 F.Supp. 169 (E.D.Pa.1991).

**\*2** Since Asten filed its complaint in this court seven days before Weavexx filed its federal declaratory judgment action in North Carolina, the rule would not seem to provide a basis for transfer. Weavexx, however, claims that in the Third Circuit, the "first-filed" rule would more accurately be described as the "first-served" rule. It contends that under Third Circuit case law, "the 'first-filed' of two parallel actions is the one in which the district court first obtains jurisdiction of the parties and issues." Opening Br. at 6. Weavexx argues that in Delaware, personal jurisdiction over a defendant does not arise until a complaint is served. Consequently, Weavexx contends that the earlier-*served* North Carolina action should have priority over this earlier-*filed* Delaware action. The court disagrees.

Weavexx correctly notes that the Third Circuit Court of Appeals has never focused on the dates that complaints were served, or, more generally, the dates on which personal jurisdiction was established. In this court's view, the "parties and issues" language just quoted was merely intended to signify that the first-filed rule should only apply when the competing actions involve the same parties and issues. *See University of Pennsylvania,* 850 F.2d at 971-72 (noting that the rule gives a court the power to enjoin the "subsequent prosecution of *proceedings involving the same parties and the same issues* already before

another district court" (emphasis added)).

Indeed, the rule is often articulated without language that might suggest a focus on personal jurisdiction. For example, the rule has been described as giving priority to "the court which first has possession *of the subject.* " *University of Pennsylvania,* 850 F.2d at 971 (emphasis added) (citing *Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 929 (3d Cir.1941)). In first adopting the rule, the Third Circuit explained that the party who "first *brings a controversy into a court of competent jurisdiction* for adjudication should ... be free from the vexation of subsequent litigation over the same subject matter." *Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 930 (3d Cir.1941) (emphasis added). The *Hazeltine* court, therefore, concluded that the lower court had erred in refusing to enjoin later-filed patent infringement actions in the Southern District of Ohio, "when the *jurisdiction of the district court of Delaware has already been invoked* to determine the validity and infringement of all of these patents." *Id.* at 930 (emphasis added). These articulations suggest that the inquiry should focus on the date on which the jurisdiction *of the court* is invoked-i.e., through the filing of a complaint-rather than the date on which personal jurisdiction over the parties is perfected.

**\*3** The only case from this circuit to squarely address the issue concluded that the first-filed rule gives priority to an earlier filed complaint even if a later filed complaint is first served. *See Peregrine Corp. v. Peregrine Indus., Inc.,* 769 F.Supp. 169, 171-72 (E.D.Pa.1991); *but see Osteotech, Inc. v. Gensci Regeneration Sciences, Inc.,* 6 F.Supp.2d 349, 357 n. 4 (D.N.J.1998) (stating, *in dicta,* that a "persuasive argument can be made" that a later filed but first served complaint takes priority in this circuit). [FN3] This court agrees with the conclusion reached in *Peregrine,* which also appears to be the majority view in other circuits.[FN4]

> FN3. Though not addressing the "first-filed" vs. "first-served" issue, the court in *Jefferson Ward Stores, Inc. v. Doody Co.,* 560 F.Supp. 35 (E.D.Pa.1983), also placed great emphasis on the "first obtaining jurisdiction of the parties and the issues" language quoted above. *See id. at 36-37.* That court permitted a later filed Pennsylvania action to proceed because personal jurisdiction was being contested in an earlier filed Ohio action. Because the district court in Ohio had not yet ruled on a

Not Reported in F.Supp.2d                                                                                            Page 3
Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

motion to dismiss for lack of personal jurisdiction, the district court in Pennsylvania concluded that the Ohio court had not yet "obtained jurisdiction of the parties." *See id.* The Pennsylvania court did, however, note that it would reconsider the question of transfer if the Ohio court were to rule that it did have jurisdiction over the parties. *Id.*

Despite its focus on personal jurisdiction, however, *Jefferson Ward* is not helpful to Weavexx's position. In Weavexx's declaratory judgment action in North Carolina, Asten moved for dismissal based on, *inter alia,* lack of personal jurisdiction. As that motion is still outstanding, it might be said that the district court in North Carolina has not yet "obtained jurisdiction" over the parties. Because personal jurisdiction is not contested in the instant action, transfer might be inappropriate even if the court were to construe the rule as focusing on the time at which personal jurisdiction is established.

FN4. *See, e.g., Pacesetter Sys., Inc. v. Medtronic, Inc.,* 678 F.2d 93, 96 n. 3 (9th Cir.1982), *Hospah Coal Co. v. Chaco Energy Co.,* 673 F.2d 1161, 1163 (10th Cir.1982); *Barber-Greene Co. v. Blaw-Knox Co.,* 239 F.2d 774, 778 (6th Cir.1957); *Med-Tec Iowa, Inc. v. Nomos Corp.,* 1999 WL 1084253, at *6 (N.D.Iowa 1999); *Fat Possum Records Ltd. v. Capricorn Records, Inc.,* 909 F.Supp. 442, 446 (N.D.Miss.1995); *but see Northwest Airlines, Inc. v. Astraea Aviation Serv., Inc.,* 930 F.Supp. 1317, 1327 n. 9 (suggesting that first-served action may take priority).

In the present case, this conclusion is fully consistent with the concerns that gave rise to the rule. In *University of Pennsylvania,* the court noted that the rule "encourages sound judicial administration and promotes comity among federal courts of equal rank." 850 F.2d at 971. In Weavexx's declaratory judgment action in North Carolina, the district court recently granted Asten's motion to stay proceedings pending this court's consideration of the instant motion. In so doing, the court stated: "Moreover, the Delaware complaint was filed, if not served, first. This Court sees no reason why the Delaware Court should not be allowed to determine whether to retain jurisdiction before the instant action is allowed to proceed." In light of that ruling, allowing this case to proceed in Delaware would not result in duplicative litigation, and would not undermine comity between federal courts of equal rank.

Finally, it should be noted that in response to the court's inquiry, counsel for Weavexx conceded that at the time Weavexx filed its declaratory judgment action in North Carolina, it was aware that Asten had already filed its complaint here in Delaware. Weavexx offers no explanation as to what function its declaratory judgment action could serve that a counterclaim in the instant action could not. Under these circumstances, the court concludes that the first-filed rule does not provide a basis for staying these proceedings or transferring this case to the Eastern District of North Carolina.

B. Transfer Pursuant to 28 U.S.C. § 1404

The first-filed rule does not, of course, preclude Weavexx's motion for transfer pursuant to 28 U.S.C. § 1404. That section provides as follows:
For the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it may have been brought.

Although the decision to transfer a case is subject to the court's discretion, a plaintiff's choice of forum is a "paramount" consideration that is not to be "lightly disturbed." *Schutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970); *see also Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879-80 (3d Cir.1995). As such, Weavexx has a heavy burden to carry. The court should not grant a transfer unless the "balance of convenience" weighs strongly in favor of transfer. *See Schutte,* 431 F.2d at 25.[FN5]

FN5. Weavexx attempts to incorporate its position regarding the first-filed rule into its § 1404 analysis, arguing that Asten has the burden of establishing that the balance of convenience strongly favors Delaware. Opening Br. at 9. Since the court has already rejected Weavexx's position that the North Carolina action was "first-filed," it need not decide whether a contrary conclusion would have reversed the burden of persuasion in a § 1404 analysis, as Weavexx contends. The court does note, however, that the case Weavexx cites for that proposition, *Ballard Medical Products v. Concord Lab., Inc.,* 700 F.Supp. 796 (D.Del.1988), does not support

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 4
Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Weavexx's view. Rather, the earlier filed action in *Ballard* was simply considered as a factor favoring transfer-it did not reverse the burden of persuasion. *See id.* at 800-01.

**\*4** In *Jumara,* the Third Circuit Court of Appeals identified a nonexclusive list of factors that have been used to guide courts in the exercise of their discretion in ruling on requests for transfer. *See Jumara,* 55 F.3d at 879-80; *see also Affymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192, 196-97 (D.Del.1998). The factors most relevant to this case are discussed below.[FN6]

> FN6. As a threshold matter, this action could have been brought in the Eastern District of North Carolina. *See* 28 U.S.C. § § 1391(b), 1400(b). The court can, therefore, proceed to weighing the factors for and against transfer.

### 1. The Convenience of the Parties

Litigating this case in North Carolina would be more convenient for Weavexx. Weavexx is headquartered in Wake Forest, which is within the Eastern District of North Carolina. Weavexx has identified six employees likely to testify at trial, each of whom resides within the Eastern District. The accused product was designed in Wake Forest, and Weavexx contends that the vast majority of its documents and records relating to the accused product are maintained at its Wake Forest headquarters.

Weavexx also claims that litigating this case in North Carolina would be more convenient for Asten. The entirety of Weavexx's "proof" in this regard is the fact that Asten is headquartered in Charleston, South Carolina. Asten does not vigorously contend, however, that Delaware is more convenient. Although Asten notes that its relevant documents and at least one of its testifying employees are located in Appleton, Wisconsin, it has done little to establish that these facts make Delaware any less inconvenient than North Carolina.

The court, therefore, concludes that North Carolina would be more convenient than Delaware for Weavexx, and no more inconvenient than Delaware for Asten. While this factor therefore favors transfer, it does so only slightly. Weavexx concedes that it is financially able to shoulder the expense of litigating this case in Delaware. Further, Weavexx has not established that its business would be disrupted if the employees that are expected to testify at trial must do

so in Delaware. Weavexx maintains manufacturing facilities in several southern states and in Canada. It is likely that the six employees Weavexx identifies-upper level management including the company's president and three vice-presidents-are sometimes called upon to travel for company business. Finally, Weavexx has managed to survive two previous lawsuits filed in Delaware *by Weavexx* against Asten.

### 2. The Convenience and Availability of the Witnesses

The convenience of witnesses is often an important factor in a transfer inquiry. *See* 15 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION AND RELATED MATTERS § 3851, at 415 (2d ed.1986) [hereinafter WRIGHT & MILLER] (describing this factor as "[p]robably the most important factor, and the factor most frequently mentioned, in passing on a motion to transfer"). The convenience of witnesses is only considered, however, "to the extent that the witnesses may actually be unavailable for trial in one of the fora." *Jumara,* 55 F.3d at 879 (citing WRIGHT & MILLER § 3851, at 420-22). Thus, for example, the convenience of witnesses that are employees of a party carries no weight because the parties are obligated to procure their attendance at trial. *See Affymetrix,* 28 F.Supp.2d at 203.

**\*5** Weavexx claims that North Carolina is a more convenient forum than Delaware for most of both parties' witnesses. But Weavexx has failed to sufficiently identify any witnesses that "may actually be unavailable for trial" in Delaware. Indeed, the six "primary anticipated fact witnesses" that Weavexx identifies are all upper level Weavexx employees. As such, Weavexx should be able to assure their attendance at trial.[FN7]

> FN7. Weavexx appears to contend that one of its employee witnesses-the inventor of the accused product-should be treated as a non-party witness because he is scheduled to retire from Weavexx before the anticipated trial date. Opening Br. at 11. Weavexx, however, provides no information-by affidavit or otherwise-to suggest that this witness may be unavailable for trial in Delaware (or, for that matter, that he plans to remain within the subpoena power of the Eastern District of North Carolina after his

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

retirement). The court is, therefore, not persuaded that this employee's anticipated retirement should have a significant impact on the transfer inquiry.

Weavexx also claims that three of the four "major domestic manufacturers of papermaking fabric" are headquartered in either North or South Carolina. Therefore, it asserts that "it is clearly more likely that witnesses having knowledge regarding relevant prior art would be within the subpoena power of the North Carolina Court." Opening Br. at 11. While this may or may not be a reasonable assumption,[FN8] such unsupported speculation about unspecified witnesses does not carry much weight in a transfer analysis. *Affymetrix,* 28 F.Supp.2d at 205. Further, two of the three "major domestic manufacturers" headquartered in the Carolinas are Asten and Weavexx themselves. As already noted, the convenience of party witnesses generally receives no weight in a transfer analysis. *Id.* at 203.

> **FN8.** For example, although Asten is headquartered in South Carolina, its employee that is apparently most knowledgeable about the prior art of the '839 patent is located at Asten's manufacturing facility in Appleton, Wisconsin.

As such, to the extent that the convenience and availability of witnesses weighs at all in favor of transfer, it does so only slightly.

### 3. Other Factors

Although Weavexx principally relies on the two factors discussed above, it recites several other factors that supposedly favor transfer. For example, Weavexx notes that since 1996, the average time from filing to trial for civil actions is 19.3 months in Delaware as compared to 16.5 months in North Carolina. But for the most recent period-the year ending June 30, 1999-Weavexx's statistics show that the average time to trial was one month longer in North Carolina than in Delaware. Virtually all of the other statistics provided by Weavexx (but not cited in its brief) suggest that court congestion is actually worse in the Eastern District of North Carolina than in the District of Delaware. Moreover, Magistrate Judge Thynge of this district served as a mediator in both of the prior Delaware actions between the parties. Judge Thynge will again be available in the present action. It appears, therefore, that

administrative considerations and judicial economy actually weigh against transfer.[FN9]

> **FN9.** As already noted, the district court in North Carolina has granted Asten's motion to stay proceedings in the declaratory judgment action pending this court's decision on Weavexx's motion to transfer. Therefore, there does not appear to be a risk of duplicative litigation if this motion is denied.

Next, Weavexx attempts to characterize this action as a "local controversy" that should be decided close to home. *See Jumara,* 55 F.3d at 879. The court fails to see how a patent infringement action involving two large companies that (1) are incorporated in Delaware; (2) are headquartered in different states; and (3) maintain manufacturing facilities in various states and Canada can be considered a "local" North Carolina controversy. Such characterization seems particularly inappropriate where, as here, the competing products at issue are manufactured in Wisconsin and Brazil.

**\*6** The court finds that the other factors referred to by Weavexx, including those not discussed herein, do not weigh significantly, if at all, in favor of transfer.

### 4. Weighing of Factors

The court recognizes that the ties between this litigation and the state of Delaware are not substantial. Nevertheless, Asten's choice of this forum is a "paramount" consideration that is not to be "lightly disturbed." *Schutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970). After weighing the factors discussed above, the court finds that Weavexx has failed to meet its heavy burden of establishing that the "balance of convenience" tips strongly in favor of transfer. As such, Weavexx has failed to establish that transfer is appropriate pursuant to 28 U.S.C. § 1404.

### IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Weavexx's motion to transfer this case to the United States District Court for the Eastern District of North Carolina is DENIED; and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 6
Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

2. Weavexx's alternative request to stay these proceedings pending resolution of Weavexx's declaratory judgment action in the Eastern District of North Carolina is DENIED.

D.Del.,2000.
Asten Inc. v. Weavexx Corp.
Not Reported in F.Supp.2d, 2000 WL 1728354 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                      Page 1
Not Reported in F.Supp., 1996 WL 79377 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

Brinn v. McCracken Financial Services, Inc.
D.Del.,1996.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Cyrus M. BRINN, Plaintiff,
v.
MCCRACKEN FINANCIAL SERVICES, INC.,
Frank McCracken, and Noel Webster, Defendants.
**No. Civ. A. 95-542-SLR.**

Feb. 20, 1996.

David Staats, Wilmington, for plaintiff.
Steven J. Balick and Christopher S. Sontchi, of
Ashby & Geddes, Wilmington, for defendants, of
counsel: Richard J. Levin and Edward H. Seksay of
Heller, Borreliz & Levin, P.C., Boston,
Massachusetts.

MEMORANDUM OPINION
ROBINSON, District Judge.

I. INTRODUCTION

**\*1** Plaintiff Cyrus Brinn, a resident of Delaware and
a former employee of defendant corporation
McCracken Financial Services filed this suit seeking
payment of commissions which he claims defendants,
all residents of Massachusetts, owe to him pursuant
to their employment contract and Massachusetts and
Delaware wage statutes. Defendants have moved for
dismissal based on lack of personal jurisdiction, or in
the alternative, for a change of venue. Because the
court concludes that it does have personal jurisdiction
over all of the defendants, and that the balance of
convenience and the interests of justice do not
warrant transfer, both motions will be denied.

II. BACKGROUND

For the purposes of these motions, the court must
view the facts in the light most favorable to the
nonmoving party. The court, therefore, finds the
following facts relevant to this inquiry:

Plaintiff Cyrus Brinn is a Delaware resident who was
employed by defendant corporation McCracken
Financial between January 1991 and June 1995. (D.I.

17 at 5-6; D.I. 20 at 4) McCracken Financial is a
Massachusetts corporation with its principal offices
located in Bedford, Massachusetts. (D.I. 17 at 4)
Defendant Frank McCracken, President and
controlling shareholder of McCracken Financial, and
defendant Noel Webster, Executive Vice President of
the company, reside in Massachusetts. (D.I. 17 at 4-5;
D.I. 20 at 7) None of the defendants owns any
property or derives any revenue from the State of
Delaware. (D.I. 17 at 4-5)

According to the employment agreement provided by
plaintiff, defendants assigned plaintiff to a sales
territory that included the State of Delaware, and
agreed to rent office space for plaintiff in
Wilmington. (D.I. 20 at Appendix A) In December
1990, before plaintiff began working for defendants,
Frank McCracken signed a lease for this agreed-upon
office space on behalf of the company. (D.I. 20 at
Appendix B) The company, again authorized by
Frank McCracken, rented a second office suite in
Newark, Delaware, beginning in January 1995. (D.I.
20 at Appendix D) During plaintiff's tenure with the
company, defendants hired two additional employees
to work with plaintiff in the Delaware offices. (D.I.
17 at 6)

The company designated its Delaware location as its
"National Sales and Marketing Office." (D.I. 20 at
Appendix E) All sales leads were channeled through
the Delaware office, and the company's entire
prospective customer database was housed there.
(D.I. 20 at 6) The company maintained a postal
permit in Wilmington, and solicited sales by mail
from Delaware. (D.I. 20 at Appendix G) As part of
his sales work for the company, plaintiff solicited
business from several large financial institutions in
Delaware as well as institutions in other states, and
made a major sales presentation in Delaware for an
out-of-state customer. (D.I. 20 at 4-6) In the course of
running the Delaware offices, plaintiff also dealt with
several Delaware vendors on behalf of the company.
(D.I. 20 at 6) Each of the individual defendants have
traveled to Delaware at least once on company
business, and both were in active contact, via
telephone, mail, and telefax, with plaintiff during his
employment with the company. (D.I. 20 at 7-8)

**\*2** In June 1995, plaintiff resigned his position with
the company. (D.I. 17 at 6) Subsequently, the
company closed its Delaware offices and currently

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1996 WL 79377 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

has no employees and no active office in Delaware.
(D.I. 17 at 6-7)

### III. DISCUSSION

### A. Personal Jurisdiction

Defendants contend that this court lacks personal
jurisdiction over them and accordingly moves for
dismissal under Fed. R. Civ. P. 12(b)(2).

To defeat defendants' 12(b)(2) motion to dismiss,
plaintiff bears the burden of demonstrating through
sworn affidavits or other competent evidence that
jurisdiction exists. *Patterson v. FBI,* 893 F.2d 595,
603-04 (3d Cir.), *cert. denied,* 498 U.S. 82 (1990),
*citing Time Share Vacation Club v. Atlantic Resorts,
Ltd.,* 735 F.2d 61, 67 n. 9 (3d Cir. 1984). Once
plaintiff has made out a prima facie case, the burden
passes to defendants to "present a compelling case
that the presence of some other consideration would
render jurisdiction unreasonable." *Grand
Entertainment Group v. Star Media Sales,* 988 F.2d
476, 483 (3d Cir. 1993), *citing Carteret Sav. Bank
F.A. v. Shushan,* 954 F.2d 141, 150 (3d Cir.), *cert.
denied,* 113 S.Ct. 61 (1992) (citations omitted). As
this court has held, "personal jurisdiction can be
asserted over a defendant on the basis of a single act
related to the state, if the claim has its basis in the
asserted transaction." *Blue Ball Properties, Inc. v.
McClain,* 658 F. Supp. 1310, 1316 (D. Del. 1987).

When sitting in diversity, the court may assert
personal jurisdiction to the extent permitted under the
Delaware long arm statute, Delaware Code Ann. Title
10, Section 3104 (1978), *Max Daetwyler Corp. v. R.
Meyer,* 762 F.2d 290, 293 (3d Cir.), *cert. denied,* 474
U.S. 980 (1985), and the due process clause of the
Fourteenth Amendment. *Jeffreys v. Exten,* 784 F.
Supp. 146 (D. Del. 1992). In determining whether
jurisdiction lies the court must apply a two step
analysis: "First, [the] court must determine whether
the alleged conduct of a defendant comes within one
of the provisions of the long arm statute .... [[[T]hen
the court must proceed to consider whether the
exercise of jurisdiction over a particular defendant
violates due process interests." *Blue Ball Properties,*
658 F. Supp. at 1315.

Defendants argue that their contacts with Delaware
are insufficient to meet the requirements of either the
Delaware long arm statute or due process. Therefore,

they conclude, the exercise of jurisdiction over them
is improper. Defendants have also argued that the
actions taken by the individual defendants in their
official capacity should not be considered in
determining whether the court has jurisdiction over
them. The court will address this "fiduciary shield"
theory separately.

### 1. 10 Del. Code. § 3104(c)

Plaintiff alleges that personal jurisdiction over
defendants is proper under Section 3104 subsections
(c)(1) and (c)(3). As this court has held, this section
is to be construed liberally, favoring the exercise of
jurisdiction "to the 'maximum perimeters of the due
process clause.'" *Mobil Oil Corp. v. Advanced Envtl.
Recycling Technologies,* 833 F. Supp. 437 (D. Del.
1993), *quoting Transportes Aereos de Angola v.
Ronair, Inc.,* 544 F. Supp. 858, 864 (D. Del. 1982).
Section 3104(c)(1) provides that personal jurisdiction
may be exercised over a nonresident "who in person
or through an agent [] (1) [t]ransacts any business or
performs any character of work or service in the State
...." 10 Del. C. § 3104(c)(1) (emphasis added). This
grant of "specific jurisdiction" is limited to those
actions that arise from the particular transactions
upon which jurisdiction is based. 10 Del. Code §
3104(c). Thus, plaintiff must establish a nexus
between his cause of action and the business which
he claims defendants transacted within the State.
*Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F.
Supp. 1458, 1466 (D. Del. 1991).

**\*3** As defendants correctly point out, this court held
in *Applied Biosystems* that for § 3104(c)(1) to apply,
"some act must have actually occurred in Delaware."
*Id.* However, as the statute explicitly states, and as
noted by this court, "[t]hese acts may be those of an
agent that are attributed to the defendant." *Id.;* 10
Del. Code § 3104(c). The affidavit and other
materials provided by plaintiff indicate that the
company did transact business in the State of
Delaware. Through its agent (plaintiff) and with the
authorization of the individual defendants, the
company was present in Delaware and engaged in the
business of selling computer software. Defendants do
not deny that they included Delaware in plaintiff's
sales territory or that plaintiff actually solicited
Delaware clients and made sales presentations in the
State. The present dispute arose from plaintiff's
agreement with defendants to act as the company's
sales agent in an area that explicitly included
Delaware, out of an office located in Delaware.[FN1]
Although none of the individual sales on which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 3
Not Reported in F.Supp., 1996 WL 79377 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

plaintiff claims commissions are due were made to Delaware residents, the sales were part of a larger agreement which included the State of Delaware. In light of the broad construction of the long arm statute which our precedent requires, the court is satisfied that a sufficient nexus exists between the business transacted in Delaware by defendants through their agent and the present suit.

Defendants also contend that the Company's employment relationship with plaintiff cannot form the basis for jurisdiction under the specific jurisdiction provision because all of the significant aspects of the negotiation and performance of the employment agreement occurred outside of Delaware. Defendants claim that they did not seek out a Delaware resident to employ, that plaintiff traveled to Massachusetts at his own expense to interview for the position, that the company opened offices in Delaware solely for the convenience of plaintiff, and that it hired additional employees at his request. Defendants further claim that neither party to the employment contract substantially performed "in any real sense" within Delaware, because defendants paid plaintiff from Massachusetts and plaintiff traveled outside of Delaware to make sales presentations. (D.I. 17 at 12)

Plaintiff convincingly counters that although he traveled outside the State to solicit business, he performed his daily duties at the Delaware offices, solicited business with several clients in Delaware, made major sales presentations in Delaware, and dealt extensively with Delaware vendors in his capacity as an agent of the company. (D.I. 20 at Appendix 1) Looking at the employment relationship as a whole, the court concludes that Delaware's long arm statute confers personal jurisdiction over these defendants.

### 2. Due Process

The Supreme Court of the United States set forth the relevant due process requirements in it *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945):
**\*4** [D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Milliken v. Meyer,* 311 U.S. 457 ....

In *Hanson v. Denckla,* 357 U.S. 235, 253 (1958), the

Supreme Court noted further:[I]t is essential that in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

In addition, the "defendant's conduct and connection with the forum State [[[must be] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980).By requiring that individuals have "fair warning" that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," ... the Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit."

*Burger King Corp.,* 471 U.S. at 472 (citations omitted). In a case such as the present,[w]here a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, th[e] "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum, ... and the litigation results from alleged injuries that "arise out of or relate to those activities ...."

*Id.* at 472-73 (citations omitted).

It is true, as defendants point out, that the mere existence of a contract with a resident of the forum State does not form a sufficient basis for personal jurisdiction. *Id.* at 478; *Vetrotex CertainTeed Corp. v. Consolidated Fiber Glass Products Co.,* No. 94-2058, 1996 WL 29314 (3d Cir. Jan. 26, 1996). This is not an instance, however, where defendants' contacts with the forum State are merely "random," "fortuitous," "attenuated," or the result of "unilateral activity of another party or a third person." *Id.* at 475, *citing Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774 (1984) and *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 417 (1984). Defendants' activities in Delaware extended far enough beyond their contract with the plaintiff to justify the exercise of personal jurisdiction over them.

Plaintiff contends, and defendants do not deny, that during the period of his employment, the company frequently solicited potential customers in Delaware. Defendants respond that none of their past or present clients resides in Delaware and, therefore, the company has not benefitted from plaintiff's presence

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4
Not Reported in F.Supp., 1996 WL 79377 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

here. The court finds the company's degree of success in soliciting Delaware-based clients irrelevant to the present inquiry. By entering Delaware through its agents, *i.e.*, its employees in the State, and soliciting business from corporations that are Delaware residents, defendants purposefully availed themselves of the privileges offered by the State.[FN2]

**\*5** Defendants employed three people and rented two offices in Delaware. These actions, regardless of their motivation for taking them, put defendants squarely on notice of the possibility of being "haled into court" in this forum. Defendants argue that were it not for their relationship with plaintiff, they never would have had any contacts with the State of Delaware. This assertion may be true, but it serves only to highlight the fact that, through their relationship with plaintiff, defendants did purposely establish a presence in the State sufficient to meet the minimum contacts requirement of the Due Process Clause.[FN3]

### 3. Jurisdiction over Individual Defendants

Defendants argue that the court cannot exercise jurisdiction over the individual defendants because their actions were taken solely in their official capacity. This court has previously heard and rejected this "fiduciary shield" theory, concluding that "[s]uch a construction would run counter to the expansive interpretation that Delaware courts have consistently applied to Delaware's long arm statute." *Mobil Oil v. Advanced Environmental Recycling Technologies, Inc.,* 833 F. Supp. 437, 442-43. In addition, under both Delaware and Massachusetts law, an individual who has management responsibility for a corporation and who causes the corporation to violate the wage payment statute is considered an employer and is liable to the same extent as the corporation. 19 Del. C. § 1101(b); Mass. Gen L. ch. 149, § 148. Therefore, all contacts on the part of each individual defendant with the forum State, even those taken in their official capacity, must be considered in determining whether jurisdiction may be exercised.

In *Mobil Oil,* this court exercised jurisdiction over an individual defendant who had authorized, in his official capacity, the corporate act that was the subject of plaintiff's suit. The individual defendant in that case had been physically present in Delaware only once, but his presence in the State was related to the matter that gave rise to the suit. Jurisdiction was held proper despite the fact that the defendant was not physically present in Delaware when he

authorized the corporate act in question. *Id.* at 444-45. Similarly, the individual defendants in this case authorized the acts of the company with respect to plaintiff. It is irrelevant here, as in *Mobil Oil,* that the actual decisions were made outside the State. It is true that both individual defendants were physically present in Delaware for reasons only peripherally related to their employment relationship with plaintiff. However, their other contacts with the State, including telephone calls, mail, and telefaxes directing and supervising plaintiff's activities in Delaware, combined with their authorization of corporate actions that constitute the transaction of business in Delaware, viewed as a whole, are sufficient to subject the individual defendants to this court's jurisdiction.

### B. Transfer of Venue

**\*6** Defendants have argued that venue is improper in this district because they are not subject to personal jurisdiction here. The court's conclusion as to the existence of personal jurisdiction over these defendants moots this argument. Alternatively, defendants have urged the court to transfer the case to the District of Massachusetts.

Title 28, Section 1404(a) provides:
For the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Congress intended through § 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice. *Stewart Organization, Inc. v. Ricoh Corp.,* 487 U.S. 22, 29 (1988). "The standard under which transfer applications are considered requires district courts to consider the convenience of parties and witnesses, the interest of justice, and whether the action could have been brought in the transferee court." *SportsMEDIA Technology Corp. v. Upchurch,* 839 F. Supp. 8, 9 (D. Del. 1993).

Defendants contend, and plaintiff does not dispute, that this action could have been brought in Massachusetts. Defendants are incorrect, however, in their assertion that "[a] plaintiff's choice of forum prevails if, and only if, the burden placed on each of the parties by litigating there is comparable." (D.I. 17 at 20) As a general rule, "[b]ecause plaintiff['s] choice of forum is accorded substantial weight, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 5
Not Reported in F.Supp., 1996 WL 79377 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

burden is on the defendants to establish that the balance of convenience of the parties and witnesses strongly favors the defendants. *Bergman v. Brainin,* 512 F. Supp. 972, 973 (D. Del. 1981) (citing *Shutte v. Armco Steel Corp.,* 431 F.2d 22,25 (3d Cir. 1970), *cert denied,* 401 U.S. 910 (1971)) (emphasis added). Plaintiff's choice of forum is "paramount." *E.g., Wesley-Jessen Corp. v. Pilkington Visioncare,* 157 F.R.D. 215, 216 (D. Del 1993). The deference granted to a plaintiff's choice of forum is particularly great where, as here, plaintiff has brought the suit on his "home turf." *See, e.g., Tuff-Torg Corp. v. Hydro-Gear Ltd. Partnership,* 882 F. Supp. 359, 362 (D. Del. 1994) (deference is given to plaintiff's choice of forum even when it is not his "home turf" as long as he has some legitimate reason for his choice).

### 1. Convenience of Parties and Witnesses

Defendants contend that because plaintiff has traveled to Massachusetts "when it suits his needs," and has worked for two Massachusetts-based companies, he would not be inconvenienced by litigating this case in Massachusetts. (D.I. 17 at 21) Defendants, on the other hand, would suffer the inconvenience of having to transport themselves, their employee-witnesses, and their records to Delaware if the case were not transferred. (D.I. 17 at 21) Given the ready availability of transportation into and out of Delaware, the court concludes that defendants have not established a unique or unexpected burden of the sort that would justify transfer. As this court has noted previously:
**\*7** [T]echnological advances have substantially reduced the burden of having to litigate in a distant forum .... These technologies have shortened the time it takes to transfer information, reduced the bulk or size of documents or things on which information is recorded and can be transferred and have lowered the cost of moving that information from one place to another.

*Wesley-Jessen,* 157 F.R.D. at 218.

### 2. Interests of Justice

Defendants argue that a transfer is warranted in the interests of justice. In analyzing this claim, the court must consider judicial resources, cost to the parties, access to proof, and the availability of compulsory process. *Critikon,* 821 F. Supp. at 966. Neither party contends that a transfer would have any impact on judicial resources or cost to the parties.

Addressing compulsory process and access to proof, defendants maintain that several important witnesses reside outside the reach of the court's subpoena power. The court addressed an analogous contention in *Critikon,* 821 F. Supp. at 967. In that case, the defendant had
not represented to the [c]ourt that [the third party witness] would be unwilling to testify at trial voluntarily. Because [the witness] is a former employee of [defendant], ... the [c]ourt must assume that he would be willing to testify absent a subpoena.

Similarly, defendants have made no claims that any of the witnesses in question would refuse to testify voluntarily. This factor, therefore, does not weigh in favor of transfer.

Based on the record as it presently stands, defendants have failed to demonstrate that the interests of justice dictate transferring this action.

### IV. CONCLUSION

For the forgoing reasons, defendants' motion to dismiss for lack of personal jurisdiction will be denied; defendants' motion to transfer the case to the District of Massachusetts will also be denied. An order consistent with this opinion shall issue.

FN1.     Defendants make much of their contention that they authorized the opening of the Delaware offices only for the convenience of plaintiff. (D.I. 17 at 5, 15, 17; D.I 29 at 4) The court finds this factor, even if true, to be irrelevant. Defendants purposefully opened, furnished and operated offices in the State of Delaware and accepted the benefits, including the benefit of plaintiff's services, of having those offices in this State. Defendants cannot now hide behind their former employee and escape jurisdiction through their allegedly altruistic motive.

FN2.     In *Romann v. Geissenberger Mfg. Corp.,* 865 F. Supp. 255, 261 (E.D. Pa. 1994), upon which defendants rely heavily, the court ruled that the company in question did not have the substantial contacts with the forum state required by Pennsylvania's general jurisdiction statute. This conclusion hinged substantially on the fact that although

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 6
Not Reported in F.Supp., 1996 WL 79377 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

the company derived revenue from customers in Pennsylvania, the company did not advertise or otherwise solicit business there.

FN3.    Plaintiff has also provided documentation of the company's activities in Delaware: 1) a copy of the employment agreement between plaintiff and the company, signed by defendant Webster, which lists the State of Delaware among plaintiff's assigned sales territories; 2) leases for office space in Wilmington and Newark, Delaware; 3) copies of promotional materials which encourage potential customers to contact the company's "National Sales and Marketing office" at a Delaware address and telephone number; and 4) an envelope showing the company's postal permit from Wilmington, Delaware. (D.I. 20 at Appendices B-G) Defendants have not contested the authenticity of any of these documents.

D.Del.,1996.
Brinn v. McCracken Financial Services, Inc.
Not Reported in F.Supp., 1996 WL 79377 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

▶

Corixa Corp. v. IDEC Pharmaceuticals Corp.
D.Del.,2002.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
CORIXA CORPORATION, a Delaware corporation,
et al., Plaintiffs,
v.
IDEC PHARMACEUTICALS CORPORATION, a
Delaware corporation, Defendant.
No. CIV.A.01-615-GMS.

Feb. 25, 2002.

MEMORANDUM AND ORDER
SLEET, District J.

I. INTRODUCTION

*1 On September 10, 2001, IDEC Pharmaceutical
Corporation ("IDEC") filed a complaint in the
Southern District of California against Coulter
Pharmaceutical Inc. ("Coulter"), Corixa Corporation
("Corixa"), and the Regents of the University of
Michigan ("Michigan"). In its complaint, IDEC seeks
a declaratory judgment of non-infringement and/or
invalidity of five patents. On September 11, 2001, the
Oncologic Drugs Advisory Committee ("ODAC")
indicated that it would recommend a limited FDA
approval of IDEC's drug Zevalin. On September 12,
2001, at approximately 8:33 A.M. PST, IDEC filed a
first amended complaint which included a sixth
patent.

On September 12, 2001, at 12:07 P.M. EST, Corixa,
Coulter, and GlaxoSmithKline (GSK) (collectively
"Corixa") filed the above-captioned action against
IDEC.[FN1] Corixa alleges that IDEC is infringing U.S.
Patent Nos. 6,015,542, ("the '542 patent"), 6,090,365
("the '365 patent"), and 5,595,721 ("the '721 patent").
These patents are three of the patents involved in the
California declaratory judgment action.

FN1. On September 28, 2001, Michigan was
added as a plaintiff in this action.

Presently before the court is IDEC's motion to stay
the proceedings, or alternatively, to dismiss or
transfer this action to the Southern District of
California.[FN2] For the reasons that follow, the court
will grant IDEC's motion to transfer.

FN2. IDEC sought to stay the proceedings
pending a ruling from the California court
on a motion to dismiss. On January 30,
2002, the California court denied the motion
to dismiss. IDEC's current motion to stay is
therefore moot.

II. BACKGROUND

IDEC is a Delaware corporation with its sole place of
business in the San Diego area. Coulter is a Delaware
corporation with its principle place of business in the
San Francisco Bay area. Corixa is a Delaware
corporation based in Seattle, Washington. GSK is a
Pennsylvania corporation with its principle place of
business in Philadelphia, Pennsylvania. The
University of Michigan is a constitutional corporation
of the State of Michigan, located in Ann Arbor,
Michigan.

The patents at issue involve technology for the
treatment of lymphoma using targeted
radioimmunotherapy. Coulter and Michigan are co-
owners of the '542, '365, and '721 patents. Corixa and
GSK are the licensees of these patents. Both IDEC
and Corixa are currently seeking FDA approval for a
commercial embodiment of their respective
inventions for the treatment of lymphoma using
radioimmunotherapy.

With these facts in mind, the court will now turn to
the motion presently before it.

III. DISCUSSION

A. The "First-Filed" Rule

Where two patent lawsuits involving the same claims
are filed in different jurisdictions, the Federal Circuit
requires that the first-filed action be given preference
absent special circumstances. See Genentech v. Eli
Lilly & Co., 998 F.2d 931, 937 (Fed.Cir.1993). The
first-filed doctrine also serves to prevent a
multiplicity of actions and to achieve resolution in a
single lawsuit of all disputes arising from common

Not Reported in F.Supp.2d                                                                                                                Page 2
Not Reported in F.Supp.2d, 2002 WL 265094 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

matters. See *id.* at 937. This doctrine applies equally well where the first-filed action is one for a declaratory judgment. See *id.* at 938 (noting that, where the declaratory action can resolve the various issues, a first-filed declaratory action is entitled to precedence as against a later-filed patent infringement action.)

**\*2** Applying the first-filed rule, IDEC argues that the present case should be transferred to the Southern District of California. Notwithstanding that the cases at issue are "mirror image" cases where the court is asked to construe the same patents, Corixa argues that the first-filed rule is inapplicable to the present situation.

Corixa first argues that GSK has not been joined in the California litigation. The record before the court indicates that GSK is Coulter's licensee. It is unclear whether GSK is an exclusive licensee. However, even were the court to accept Corixa's argument that GSK is an exclusive licensee, that alone does not indicate that GSK is a necessary party to this litigation. Corixa concedes that GSK is a licensee with fewer than all substantial rights. As such, GSK, while likely a proper party to the California lawsuit, is not a necessary party. See *Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.,* 248 F.3d 1333, 1348 (Fed.Cir.2001) (holding that an exclusive licensee possessing fewer than all substantial rights may not sue in its own name without joinder of the patent owner.) Finally, to the extent that the parties believe that GSK is a necessary party, GSK may request permission to join the California litigation.[FN3]

FN3. Corixa expresses concern over whether the California court has subject-matter jurisdiction over an action between IDEC and GSK. As it is not the court's province to determine another court's subject matter jurisdiction, the court expresses no opinion on this.

Corixa next argues that the first-filed rule is inapplicable to the present situation because IDEC improperly "raced to the courthouse" in order to file its motion in California. In support of this contention, Corixa points out that its right to file an infringement suit against IDEC did not ripen until after ODAC recommended that the FDA approve Zevalin. However, before ODAC publicly recommended approval, but after IDEC had reason to believe they would do so, IDEC "raced" to file its declaratory

judgment action.

The court acknowledges that IDEC's filing seems providential since ODAC's recommendation became public the day after IDEC filed its suit. In its November 6, 2001 Order, however, the California court specifically found that IDEC possessed a reasonable apprehension of suit when it filed its declaratory judgment action. The California court continued by stating that, "an actual controversy existed when IDEC filed the complaint under consideration. Consequently the [c]ourt finds that IDEC's filing suit was not motivated by "forum shopping alone," but rather was a legitimate exercise of its opportunity under the Declaratory Judgment Act ...." This court sees no reason to disagree with the California court's findings.

Given the information presently before it, the court concludes that having two separate trials in mirror image cases would defeat the purposes of the first-filed rule, namely, sound judicial administration and comity among federal courts of equal rank. See *EEOC v. University of Pennsylvania,* 850 F.2d 969, 971 (3d Cir.1988). Accordingly, the court finds that the application of the rule weighs heavily in favor of transferring this case to the Southern District of California.

### B. Section 1404(a)

**\*3** Transfer to the Southern District of California is also mandated under a section 1404(a) analysis. Section 1404(a) provides that "[f]or the convenience of [the] parties and [the] witnesses, in the interest of justice," the court may transfer this action to "any other district where it might have been brought." 28 U.S.C. § 1404(a). There is no dispute that this action could have been filed in the Southern District of California. The court will, therefore, move on with inquiry as directed by the Third Circuit. See *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995).

In *Jumara,* the Third Circuit provided a list of factors to assist the district courts in determining "whether, on balance, the litigation would more conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum." *Id.* These factors include six private and five public interests which the court may consider. See *id.*

### 1. The Private Interests

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 265094 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

The private interests most relevant to this case include: (1) the convenience of the parties as indicated by their relative physical and financial position; (2) the convenience of the witnesses, but only to the extent that they may be unavailable for trial in one of the fora; and (3) the location of records and other documents, again, only to the extent that these files cannot be produced in the alternate forum.[FN4]

> [FN4.] For the reasons the court discussed in a previous opinion, it will not afford any weight to the first three *Jumara* factors, specifically, the plaintiff's initial choice of forum, the defendant's preferred venue, and whether the claim arose elsewhere. *See Affymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192, 197-201 (D.Del.1998). In not affording weight to these factors, the court avoids the risk of double-counting these interests and thereby throwing off the transfer analysis. *See id.* Instead, the court will consider whether the Southern District of California is a more convenient forum for the parties and the witnesses, while also serving the interests of justice. *See* 28 U.S.C. § 1404(a).

### a. The Convenience of the Parties

Geographically, California is not more inconvenient for the parties than Delaware. Michigan must travel whether the suit is in California or Delaware. GSK is one of the world's largest pharmaceutical companies, and cannot complain about location. The remainder of the parties are based on the West Coast. Furthermore, transfer to California would reduce the overall inconvenience to all parties involved. The parties must already be prepared to litigate the related case currently pending in the Southern District of California. Bringing witnesses and relevant documents to only one location, here California, minimizes the level of disruption caused to all parties by the litigation. This is certainly a more economical and efficient result than having each party moving witnesses and documents between two states, depending on which of these related actions is being litigated at that time. Thus, this factor weighs in favor of transfer.

### b. The Convenience of Witnesses

Party witnesses or witnesses who are employed by a party carry no weight in the "balance of convenience" analysis since each party is able, indeed obligated, to procure the attendance of its own employees for trial. *See Affymeytrix,* 28 F.Supp.2d at 203. Expert witnesses or witnesses who are retained by a party to testify carry little weight in determining where the "balance of convenience" lies because they are "usually selected [on the basis] of their reputation and special knowledge without regard to their residences and are presumably well compensated for their attendance, labor and inconvenience, if any." *See id.* (internalcitations omitted). Fact witnesses who possess first-hand knowledge of the events giving rise to the lawsuit, however, have traditionally weighed quite heavily in the "balance of convenience" analysis. *See id.*

**\*4** There is no evidence on the record that would indicate that Delaware would be an inconvenient forum for potential non-party witnesses. However, the court notes that all the material witnesses in this dispute, party or otherwise, will be in California already to litigate the related matter now pending in the Southern District of California. Requiring that they come to Delaware to litigate this action separately cannot be considered convenient and in the interest of justice. However, as there is no clear evidence that a non-party witness will be unable to attend trial in Delaware, this factor must weigh against transfer.

### c. The Location of Records and Other Documents

The technological advances of recent years have significantly reduced the weight of this factor in the "balance of convenience" analysis. *See id.* at 205. There is no indication that either party would be unable to produce the relevant records and documents in Delaware. Thus, because this factor is relevant only insofar as the documents would be unavailable in one forum, the court finds that this factor must weigh against transfer.

From a practical standpoint, however, the court notes that any relevant documents will already be in California for the litigation of that case. The court sees no need to require that the parties move the same documents across the country. Rather, it would be much more efficient to litigate these related actions in one location. However, these considerations are more relevant to the first factor discussed *supra.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 4
Not Reported in F.Supp.2d, 2002 WL 265094 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

### 2. The Public Factors

As other courts have noted, depending on the circumstances of the case, some of the "public interest" factors listed in *Jumara* may play no role in the "balance of convenience." *See id.* at 205. The court thus elects to discuss only the factors most relevant to the pending case.

#### a. Practical Considerations Making Trial Easy, Expeditious or Inexpensive

This factor appears to substantially repeat the "first-filed" analysis advanced by IDEC, and accepted by the court, in Section III .A, *supra.* As such, the court declines to further address this issue here, since it has already taken this argument into consideration.

#### b. Delaware's Interest in this Controversy

Three of the parties in this action are Delaware corporations. However, while the court is mindful of Delaware's interest, that alone will not tip the "balance of convenience" in its favor. This is so because the court can hardly describe the patents as a local controversy unique to Delaware. *See Affymetrix, 28 F.Supp.2d at 207.* Instead, the patents deal with the treatment of lymphoma. This clearly has far-reaching implications. Accordingly, this factor does not weigh against transferring this case to California.

#### c. Collective Travel Time and Cost

A mirror image action is currently pending in California. Thus, to require the parties to simultaneously litigate virtually the same case on different coasts would certainly increase the collective travel time and cost. Thus, this factor weighs in favor of transfer.

### IV. CONCLUSION

**\*5** The court concludes that the "balance of convenience" tips strongly in favor of transferring this action to the Southern District of California.

For these reasons, IT IS HEREBY ORDERED that:
1. IDEC's alternative motion to transfer this action to the Southern District of California (D.I.8) is GRANTED.
2. The above-captioned matter is hereby

TRANSFERRED to the United States District Court for the Southern District of California.


D.Del.,2002.
Corixa Corp. v. IDEC Pharmaceuticals Corp.
Not Reported in F.Supp.2d, 2002 WL 265094 (D.Del.)

END OF DOCUMENT



Dippold-Harmon Enterprises, Inc. v. Lowe's
Companies, Inc.
D.Del.,2001.
Only the Westlaw citation is currently available.
        United States District Court, D. Delaware.
        DIPPOLD-HARMON ENTERPRISES, INC.,
                          Plaintiff,
                              v.
        LOWE'S COMPANIES, INC., Defendant.
                    **No. 01-532-GMS.**

                     Nov. 13, 2001.


              MEMORANDUM AND ORDER
SLEET, District J.

              I. INTRODUCTION

**\*1** On May 23, 2001, Lowe's Home Centers, Inc.
("Home Centers"), filed a complaint against the
defendant    Dippold-Harmon    Enterprises,    Inc.
("Dippld-Harmon") in the General Court of Justice,
Superior Court Division, located in North Carolina.
On July 27, 2001, Dippold-Harmon removed that
action to the United States District Court for the
Western District of North Carolina. On August 8,
2001, Dippold-Harmon filed the above-captioned
action against Lowe's Companies, Inc. ("Lowe's"),
the parent corporation of Home Centers, in Delaware.

Before the court is Lowe's' motion to dismiss, or
alternatively, to transfer this case to the Western
District of North Carolina, or to stay this case
pending the outcome of that litigation. Lowe's argues
that the court should dismiss this action because the
court lacks personal jurisdiction over it. It further
argues that, should the court not dismiss this action,
the case should be transferred to North Carolina
pursuant to the "first-filed" rule and 28 U.S.C. §
1404(a). For the reasons that follow, the court will
deny Lowe's motion to dismiss for lack of personal
jurisdiction, but will grant Lowe's motion to transfer.

              II. BACKGROUND

Dippold-Harmon is a Delaware corporation, with its
principle place of business in Delaware. Lowe's is a
North Carolina corporation with its principal place of
business in North Carolina. It is the world's second
largest home improvement retailer, serving more than
five million customers weekly. Lowe's maintains that
it is not, and has never been, registered or qualified to
do business in Delaware. It further asserts that it does
not have a registered agent for the service of process
in Delaware.

Home Centers is a wholly-owned subsidiary
corporation of Lowe's. It is a North Carolina
corporation registered to conduct business in
Delaware, although its principle place of business is
in North Carolina. Lowe's maintains significant
control over its subsidiary. Lowe's sends its corporate
representatives to its retail stores, including Home
Centers, and then directs the stores to take certain
actions in accordance with Lowe's policies. Other
Lowe's high-level executives admit that they
"supervise" and "oversee" the retail stores and travel
to these stores on almost a daily basis. Furthermore,
in Lowe's advertising materials, it proudly announces
that *it* has more than six-hundred and fifty store in
forty states, including four in Delaware. In actuality,
the four stores in Delaware are its subsidiary Home
Centers.

On April 3, 1998, Home Centers entered into a
written contract with Dippold-Harmon. The contract
specified that Dippold-Harmon would install granite
countertops for Home Centers' customers. In
approximately 1998, Lowe's also hired Dippold-
Harmon as a vendor for the sale and installation of
granite kitchen countertops. At that time, Dippold-
Harmon was one of several vendors that Lowe's
utilized for the installation of these countertops. As
Lowe's continued to open additional stores, it was
faced with the costly proposition of installing
countertop displays at each of these new stores. To
ensure that the countertop displays were properly
installed in a uniform manner, Lowe's representatives
sought to hire a single vendor to install these
displays. It also sought to hire a single vendor to
install countertops for its individual customers.

**\*2** Dippold-Harmon maintains that the parties
engaged in subsequent telephone negotiations aimed
at making Dippold-Harmon the exclusive vendor for
the installation of Lowe's countertop displays, as well
as for countertops it sold to individual customers.
Some of these discussions were initiated by Lowe's
and were directed to Dippold-Harmon in Delaware.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

At a December 20, 1999 meeting with Dippold-Harmon, Lowe's executives Michael Gettler and Tammy Edson purportedly offered to make Dippold-Harmon its exclusive national vendor for the installation of granite countertops. Dippold-Harmon contends that, during the meeting, it accepted Lowe's' offer and entered into an oral "Exclusivity Agreement." The two companies also exchanged numerous letters and e-mails during this time concerning their vendor agreement.

On May 23, 2001, Home Centers filed the North Carolina complaint against Dippold-Harmon. In its complaint, Home Centers alleges that Dippold-Harmon breached their April 3, 1998 written contract. Specifically, Home Centers contended that Dippold-Harmon failed to comply with their written contract's standards in the installation of countertops in the homes of individual customers.

Dippold-Harmon filed this action against Lowe's on August 8, 2001, alleging that Lowe's breached their Exclusivity Agreement and acted fraudulently and with bad faith.

Because the court concludes that exercising personal jurisdiction over Lowe's in this instance comports with traditional notions of fair play and substantial justice as required by the Due Process Clause, and that Lowe's falls within the reach of Delaware's long-arm statute, the court will deny Lowe's' motion to dismiss. *See International Shoe Co. v. Washington,* 326 U.S. 310 (1945); DEL. CODE. ANN. tit. 10 § 3104(c) (2001). However, because the "balance of convenience" tips in favor of Lowe's, the court will grant its motion to transfer.


### III. DISCUSSION

#### A. Jurisdiction


The essence of Lowe's' argument is that, since it has not purposefully directed its activities to Delaware, the assertion of personal jurisdiction by the courts of this forum would violate the Due Process Clause. Lowe's further contends that its activities do not bring it within the reach of Delaware's long-arm statute. While Lowe's correctly frames the inquiry the court must make, the court disagrees with its analysis and reaches a different conclusion.

### 1. Due Process

The Due Process Clause requires that, in order to subject a defendant who is "not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party "ha[s] certain minimum contacts with [the forum] state such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' ' *International Shoe* 326 U.S. at 316 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)). In order to give non-residents "fair warning" that a particular activity may subject them to litigation within the forum, these "minimum contacts" must be purposeful. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985). In other words, the defendant's contacts must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980). Finally, "even if the requisite minimum contacts have been found through an application of the stream of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that jurisdiction be denied." *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1568 (Fed.Cir.1994).

**\*3** Lowe's argues that its only contacts with Delaware are through Dippold-Harmon, which is a Delaware corporation. Specifically, Lowes' contends that its Home Centers contract with a Delaware corporation is, by itself, an insufficient basis to establish personal jurisdiction. The court agrees. *See Blue Ball Properties, Inc. v. McClain,* 658 F.Supp. 1310, 1316-17 (D.Del.1987). However, the court finds that Lowe's has many more purposeful contacts with Delaware than it discloses in its brief.

First, with regard to the Exclusivity Agreement in issue, Lowe's communicated regularly with Dippold-Harmon by sending numerous letters and e-mails from North Carolina to Delaware. It also placed telephone calls to Dippold-Harmon in Delaware. These contacts alone would be sufficient to satisfy the minimum contacts analysis. *See Hide Power and Equip. Co. v. Strates Enters., Inc.,* 1993 WL 258701, at *1 (Del.Super. June 15, 1993) (finding jurisdiction over a nonresident defendant based on a single visit to Delaware and two or three letters sent to Delaware.); *see also Mid-Atlantic Mach. & Fabric, Inc. v. Chesapeake Shipbuilding, Inc.,* 492 A.2d 250, 255 (Del.Super.1985) (extending jurisdiction over a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

nonresident defendant where the negotiation and execution of the contract occurred entirely outside of Delaware, and the defendant's contacts with Delaware were limited to "an unspecified number of trips.")

However, in addition to these direct contacts with Dippold-Harmon in Delaware, Lowe's is the world's second largest home improvement retailer. This fact alone would provide a sufficient basis for the court to seriously question the legitimacy of Lowe's' position. However, as previously noted, Lowe's has a wholly-owned subsidiary; that subsidiary, Home Centers, is registered to do business in Delaware, and operates four stores in this jurisdiction. Neither in its advertising material, nor in its internal communications, does Lowe's distinguish between its corporate stores and Home Centers stores. In fact, Lowe's announces the opening of new Home Centers stores as new *Lowe's* locations. Lowe's also maintains strict control over its Home Centers operations. It sends its representatives to the Home Centers stores and then directs those stores not in compliance with Lowe's policies to take certain actions to come into compliance. Such representatives have visited the Delaware stores. Lowe's also publically admits to otherwise "supervising and overseeing" its stores, and sending Lowe's personnel to those stores, including Delaware locations.

These facts support the conclusion that Lowe's should reasonably have anticipated being brought into court here. However, due process requires that the court make one more inquiry.

Notwithstanding the existence of Lowe's purposeful minimum contacts with this forum, the court must consider whether the "minimum requirements inherent in the concept of 'fair play and substantial justice...' defeat the reasonableness of [the assertion of] jurisdiction, even [if] the defendant has purposefully engaged in forum activities." *Asahi Metal Indust. Co. v. Superior Court,* 480 U.S. 102, 116 (1987). This question will only be answered affirmatively if the state's and the plaintiff's interest in having the dispute adjudicated in the forum are so minimal as to be outweighed by the burden imposed by subjecting the defendant to litigation within the forum. *See Beverly Hills Fan,* 21 F.3d at 1568.

**\*4** Here, the answer is plainly, no. Delaware has an interest in this action. Dippold-Harmon is a Delaware corporation. Clearly this forum's interests extend to corporate citizens that have sought the protection of Delaware's laws. Moreover, Delaware has an interest

in addressing those purposeful activities conducted within its borders that result in allegations of injury. That interest extends to breaches of contract, such as that alleged here. Finally, Lowe's clearly has, through its Home Centers subsidiaries, significantly more than minimal contacts with this forum. Accordingly, the court concludes that the burden on Lowe's is not so onerous as to run afoul of traditional notions of fair play and substantial justice.

### 2. Delaware's Long-Arm Statute

The second step in the court's analysis into the propriety of subjecting Lowe's to personal jurisdiction in this forum is the determination of whether any of the provisions of Delaware's long-arm statute apply. *See* DEL. CODE. ANN. tit. 10 § 3104 (2001). While Lowe's contends that it does not fall within the grasp of any of Section 3104's provisions, Dippold-Harmon contends that at least two of the provisions apply here. For purposes of this order, the court need only discuss one.

Under subsection (c)(4), the court may exercise personal jurisdiction over anyone who causes injury either inside or outside of this State "by an act or omission outside of the State" if that individual "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services or things used or consumed in the State." DEL. CODE. ANN. tit. 10, § 3104(c) (2001).[FN1] The court will interpret this language broadly, as reaching the "maximum parameters of the due process clause." *See Jeffreys v. Exten,* 784 F.Supp. 146, 151 (D.Del.1992).

> FN1. This subsection provides general jurisdiction over the nonresident defendant. *See Mendelson v. Delaware River and Bay Auth.,* 56 F.Supp.2d 436, 439 (D.Del.1999). Accordingly, it is immaterial whether the jurisdictional contact is related to the claim. *See id.*

As discussed above, Lowe's directed telephone calls and numerous items of correspondence to Delaware in relation to the disputed Exclusivity Agreement. Through its wholly-owned subsidiary, Home Centers, Lowe's also operated, maintained, and directly supervised four stores in Delaware. Finally, Lowe's has not in any way publically differentiated itself from the Home Centers locations in Delaware. Consequently, it cannot now complain that it should

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 4
Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

not be sued here.

Finding sufficient contacts to subject Lowe's to personal jurisdiction under both the State's long-arm statute and the Due Process Clause, the court will now move to a discussion of whether this action should be transferred to the Western District of North Carolina.[FN2]

> FN2. In its motion to dismiss, Lowe's also alleges that this action should be dismissed for lack of venue and insufficient service of process. However, both of these claims are based solely on its argument that the court lacked personal jurisdiction. As the court has found personal jurisdiction, these arguments too must fail.

### B. Venue

As previously noted, Lowe's seeks to transfer this action pursuant to the "first-filed" rule and 28 U.S.C. § 1404(a).

### 1. The "First-Filed" Rule

The "first-filed" rule is a judicially-created doctrine that is designed to avoid concurrent litigation of the same issues, between the same parties, in more than one federal court. *See EEOC v. University of Pennsylvania, 850 F.2d 969, 971-72 (3d Cir.1988).* As its name implies, the rule generally provides that a later-filed action should be stayed pending the resolution of an earlier filed action, or transferred to the court in which the earlier-filed action is pending. *See Peregrine Corp. v. Peregrine Indus., Inc., 769 F.Supp. 169, 171 (E.D.Pa.1991).*

**\*5** While Dippold-Harmon does not dispute that the North Carolina action was filed first, it argues that this rule should not apply to the present case because different parties and different issues are presented in the Delaware and North Carolina actions. The court finds this argument unpersuasive. First, Dippold-Harmon itself aggressively argued that Lowe's and Home Centers should be considered one and the same party for purposes of establishing personal jurisdiction. The court will not now find that Lowe's and Home Centers are different parties for the purposes of the "first-filed" rule. For the reasons stated in Section A. 1, *supra,* the court is satisfied that Lowe's and Home Centers are effectively the same party.

Second, with regard to Dippold-Harmon's argument that different issues are presented in the Delaware and North Carolina actions, the court again disagrees. The North Carolina action concerns the breach of a written agreement between Home Centers and Dippold-Harmon. The written agreement provided that Dippold-Harmon would install granite countertops for its customers in a certain fashion. The Delaware action concerns the breach of an alleged oral agreement between Lowe's and Dippold-Harmon. This alleged oral agreement provided that Dippold-Harmon would be the exclusive distributor of those granite countertops. Both actions thus concern different facets of the same business relationship between the parties. Specifically, both actions relate to Dippold-Harmon's status as a fabricator and installer of granite countertops for Lowe's and Home Centers' customers. A decision by the North Carolina court on the validity, or breach, of the written agreement will bear directly on the alleged oral agreement concerning the same type of services. To have two separate trials on these issues would defeat the purposes of the "first-filed" rule, namely sound judicial administration and comity among federal courts of equal rank. *See EEOC, 850 F.2d at 971.* Accordingly, the court finds that the application of this rule weighs heavily in favor of transferring this case to North Carolina.

### 2. Section 1404(a)

Transfer to North Carolina is also mandated under a section 1404(a) analysis. Section 1404(a) provides that "[f]or the convenience of [the] parties and [the] witnesses, in the interest of justice," the court may transfer this action to "any other district where it might have been brought." 28 U.S.C. § 1404(a). The parties agree that this action could have been filed in the Western District of North Carolina as a diversity action. The court will, therefore, move on with the inquiry as directed by the Third Circuit. *See Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir.1995).*

In *Jumara,* the Third Circuit provided a list of factors to assist the district courts in determining "whether, on balance, the litigation would more conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum." *Id.* These factors include six private and five public interests which the court should consider. *See id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 5
Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

#### a. The Private Interests

**\*6** The private interests most relevant to this case include: (1) the convenience of the parties as indicated by their relative physical and financial position; (2) the convenience of the witnesses, but only to the extent that they may be unavailable for trial in one of the fora; and (3) the location of records and other documents, again, only to the extent these files cannot be produced in the alternate forum.[FN3] *See id.*

> FN3. For the reasons the court discussed in a previous opinion, it will not afford any weight to the first three *Jumara* factors, specifically, the plaintiff's initial choice of forum, the defendant's preferred venue, and whether the claim arose elsewhere. *See Affymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192, 197-201 (D.Del.1998). In not affording weight to these factors, the court avoids the risk of double-counting these interests and thereby throwing off the transfer analysis. *See id.* Instead, the court will consider whether the Western District of North Carolina is a more convenient forum for the parties and the witnesses, while also serving the interests of justice. *See* 28 U.S.C. § 1404(a).

#### 1. The Convenience of the Parties

Physically, North Carolina is moderately inconvenient for Dippold-Harmon, which is headquartered in Delaware. Thus, in order to litigate this matter in North Carolina, it must travel several hours. However, modern communication and transportation capabilities make this moderate journey far less burdensome than it would have been at one time. *See Beverly Hills Fan,* 21 F.3d at 1569 (noting that it is not unduly burdensome for a defendant organized under the laws of the People's Republic of China to litigate in Virginia.). Because it is a national distributor of granite and stone kitchen fixtures, Dippold-Harmon is also financially capable of shouldering this burden. As such, it is doubtful that litigating in North Carolina would be an undue financial burden.

Furthermore, transfer to North Carolina would reduce the overall inconvenience to all parties involved. Dippold-Harmon must already travel to North Carolina to defend itself in the first-filed action pending in the Western District of North Carolina.

Bringing witnesses and relevant documents to only one location, here North Carolina, minimizes the level of disruption caused to both parties by the litigation. This is certainly a more economical and efficient result than having each party moving witnesses and documents between two states, depending on which of these related actions is being litigated at that time.

#### 2. The Convenience of Witnesses

Party witnesses or witnesses who are employed by a party carry no weight in the "balance of convenience" analysis since each party is able, indeed obligated, to procure the attendance of its own employees for trial. *See Affymetrix,* 28 F.Supp.2d at 203. Expert witnesses or witnesses who are retained by a party to testify carry little weight in determining where the "balance of convenience" lies because they are "usually selected [on the basis] of their reputation and special knowledge without regard to their residences and are presumably well compensated for their attendance, labor and inconvenience, if any. *See id.* (internal citations omitted). Fact witnesses who posses first-hand knowledge of the events giving rise to the lawsuit, however, have traditionally weighed quite heavily in the "balance of convenience" analysis. *See id.*

Dippold-Harmon argues that Lowe's has failed to demonstrate that transfer to North Carolina would be more convenient for potential non-party fact witnesses. The court agrees, and notes that Lowes' bare allegations of witness inconvenience, without more, are insufficient to tip the balance in its favor. However, all the material witnesses in this dispute, party or otherwise, will be in North Carolina already to litigate the first-filed action. Requiring that they then come to Delaware to litigate this action separately cannot be considered convenient and in the interest of justice. Accordingly, the court finds that this factor also weighs in favor of transferring the action to North Carolina.

#### 3. The Location of Records and Other Documents

**\*7** The technological advances of recent years have significantly reduced the weight of this factor in the "balance of convenience" analysis. *See id.* at 205. Furthermore, the relevant documents will already be in North Carolina for the litigation of the first-filed action. The court thus sees no need to require that Lowe's, Home Centers, and Dippold-Harmon move

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 6
Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the same documents from North Carolina to Delaware. Rather, it would be much more efficient to litigate these related actions in one location.

### b. The Public Factors

As other courts have noted, depending on the circumstances of the case, some of the "public interest" factors listed in *Jumara* may play no role in the "balance of convenience." *See id.* at 205. The court thus elects to discuss only the three factors which the parties deem relevant to the pending case.

### 1. Practical Considerations Making Trial Easy, Expeditious, or Inexpensive

This factor appears to substantially repeat the "first-filed" analysis advanced by Lowe's, and accepted by the court, in Section 2 .B, *supra.* As such, the court declines to further address this issue here, since it has already taken this argument into consideration.

### 2. Delaware's Interest in Deciding This Action

Dippold-Harmon claims that Delware has a far stronger interest in resolving this action since Dippold-Harmon is a Delaware corporation. While the court is mindful of Delaware's interest, that alone will not tip the "balance of convenience" in its favor. This is so because the court can hardly describe the alleged Exclusivity Agreement as a local controversy unique to Delaware. *See Affymetrix, 28 F.Supp.2d at 207.* Instead, this alleged agreement concerns Dippold-Harmon's status as Lowe's' exclusive, national distributor. By its very nature then, the agreement is not local and unique to only Delaware, but rather, affects every state included in the alleged Exclusivity Agreement. Furthermore, the court notes that Dippold-Harmon appears to concede that the alleged Exclusivity Agreement was not formed in Delware and would not be governed by Delaware law. Accordingly, this factor does not weigh in favor of denying Lowe's motion to transfer.

### 3. Collective Travel Time and Cost

The final public interest factor identified by Lowe's concerns the time and cost allegedly associated with the potential witnesses' travel time to Delaware. This factor, however, duplicates other factors necessary to the court's transfer analysis, namely the private

factors considering the convenience and availability of witnesses and the location of documents. The court has already rejected these arguments in its earlier discussion of the "private" factors in the "balance of convenience" analysis.

### IV. CONCLUSION

For the foregoing reasons, the court concludes that Lowe's is subject to personal jurisdiction in Delaware, however, the "balance of convenience" tips strongly in favor of transferring this action to the Western District of North Carolina.

**\*8** For these reasons, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that:
1. Lowe's motion to dismiss for lack of personal jurisdiction (D .I. 8) is DENIED, and Lowe's alternative motion to transfer this action to the Western District of North Carolina (D.I.8) is GRANTED; and
2. The above-captioned matter is hereby TRANSFERRED to the United States District Court for the Western District of North Carolina.

D.Del.,2001.
Dippold-Harmon Enterprises, Inc. v. Lowe's Companies, Inc.
Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)

END OF DOCUMENT



C.A.Fed.,1997.
NOTICE: THIS IS AN UNPUBLISHED
OPINION.(The Court's decision is referenced in a
"Table of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI CTAF Rule
47.6 for rules regarding the citation of unpublished
opinions.)
United States Court of Appeals, Federal Circuit.
In re YAMAHA MOTOR COMPANY, INC.,
Petitioner.
No. 518.

Aug. 27, 1997.
Rehearing Denied; Suggestion for Rehearing In Banc
Declined Oct. 3, 1997.
Rehearing Denied; Suggestion for Rehearing In Banc
Declined Oct. 30, 1997.

Before MICHEL, LOURIE, and BRYSON, Circuit
Judges.LOURIE, Circuit Judge.

*ORDER*

**\*1** Yamaha Motor Company, Inc. petitions for a writ
of mandamus to direct the United States District
Court for the District of Minnesota to dismiss
CyberOptics Corporation's declaratory judgment
claims of patent invalidity.   CyberOptics opposes.
Yamaha moves for leave to file a reply, with reply
attached.   CyberOptics opposes.

BACKGROUND

CyberOptics manufactures "LaserAlign" sensors that
interface with "pick-and-place" machines used in
manufacturing complex goods, such as printed circuit
boards.   Yamaha manufactures pick-and-place
machines.   The parties entered into an agreement
whereby CyberOptics agreed to manufacture
modified sensors for use in Yamaha's pick-and-place
machines.

In 1995, CyberOptics sued Yamaha seeking, inter
alia, declaratory judgments that four of Yamaha's
patents, two of which cited a CyberOptics' patent as
prior art, were invalid.   CyberOptics also alleged
various other claims, including a count to correct

inventorship to indicate CyberOptics' employees as
the true inventors of certain of Yamaha's devices.
Yamaha moved to dismiss the declaratory judgment
claims for lack of subject matter jurisdiction.   The
matter was referred to a magistrate judge.

Yamaha argued in its motion that no actual
controversy existed because Yamaha had not
threatened to sue CyberOptics and that CyberOptics
was not manufacturing an infringing product.
CyberOptics contended that Yamaha, through words
and acts, had created a reasonable apprehension that
either CyberOptics or one of its customers would
face a patent infringement suit that would target the
LaserAlign sensor and related technology.   The
magistrate judge concluded that an actual controversy
existed and recommended that Yamaha's motion to
dismiss be denied.   Yamaha filed objections.   The
district court adopted the magistrate judge's Report
and Recommendation and denied Yamaha's motion
to dismiss.

DISCUSSION

Yamaha argues that mandamus relief is appropriate
because the district court is wrongfully exercising
jurisdiction over the declaratory judgment claims.
The remedy of mandamus in available only in
extraordinary situations to correct a clear abuse of
discretion or usurpation of judicial power.   *See In re
Regents of the Univ. of Cal.,* 101 F.3d 1386, 1387
(Fed.Cir.1996), *cert. denied sub nom.   Genentech,
Inc. v. Regents of the Univ. of Cal.,* 117 S.Ct. 1484
(1997).   A party seeking such a writ bears the burden
of proving that it has no means of attaining the relief
desired, *see Mallard v. United States Dist. Court of
the S. Dist. Of Iowa,* 490 U.S. 296, 309 (1989), and
that the right to issuance of the writ is "clear and
indisputable."   *Allied Chem. Corp. v. Daiflon, Inc.,*
449 U.S. 33, 35 (1980).   Mandamus relief is
appropriate in order "to confine an inferior court to a
lawful exercise of its prescribed jurisdiction or to
compel it to exercise its authority when it is its duty
to do so."   *Gulfstream Aerospace Corp. v.
Mayacamus Corp.,* 485 U.S. 271, 289 (1988)
(citation and internal quotation marks omitted).   *See
also United States v. Boe,* 543 F.2d 151, 158 (CCPA
1976) ("However sincere and well-intentioned may
be the judge, an attempt, by any court, to exercise a
nonexistent jurisdiction is an exceptional

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 F.3d 228                                                                                                    Page 2
124 F.3d 228, 1997 WL 575861 (C.A.Fed. (Minn.))
**(Cite as: 124 F.3d 228)**

circumstance of import most grave.").

**\*2** Yamaha contends that no actual controversy exists because it acknowledged that the LaserAlign system does not infringe and promised not to sue CyberOptics concerning Yamaha's existing and future patents. A declaratory judgment action may be brought in order to resolve an "actual controversy" between "interested parties." 28 U.S.C. § 2201(a). The controversy must be "definite and concrete, touching the legal relations of parties having adverse legal interests." Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41 (1937) (citations omitted). The test for evaluating the justiciability of declaratory judgment claim in a patent case is an objective one that requires "(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." BP Chems. Ltd. v. Union Carbide Corp., 4 F.3d 975, 978 (Fed.Cir.1993) (citation omitted). Even when an actual controversy exists, the decision whether to exercise jurisdiction over a declaratory judgment claim is discretionary. See Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 735 n. 6 (Fed.Cir.1988) (citations omitted); 28 U.S.C. § 2201(a).

With regard to the first part of the justiciability test, the magistrate judge evaluated affidavits and declarations offered by the parties and concluded that the threat of foreign patent infringement was sufficient to create a reasonable apprehension of litigation on behalf of CyberOptics. The magistrate judge observed that Yamaha's assurances, at that stage of the proceedings, only that Yamaha had not threatened CyberOptics with litigation did not "mollify [CyberOptics'] foreboding concern, and its showing to that effect, that [Yamaha] had threatened [CyberOptics] and its customers with the prospect of litigation based upon *foreign* patents which are owned or controlled by [Yamaha]." On these grounds, the magistrate judge determined that CyberOptics had satisfied the first part of the justiciability test.

Yamaha in support of its objections to the Report and Recommendation went one step further than assuring the court that it did not threaten CyberOptics with litigation. Yamaha agreed that it will never file any patent infringement suit against CyberOptics for making, using, or selling the LaserAlign sensor. This representation applies not only to all of Yamaha's existing patents, but to all of its future patents as well.

Yamaha thus contended that "[a]s a matter of law, this express covenant not to sue necessarily ends any case or controversy over the validity of Yamaha's patents." CyberOptics argued in response that Yamaha's agreement was insufficient because Yamaha did not promise not to sue CyberOptics' for contributory infringement and did not agree not to sue CyberOptics' customers. The district court adopted the Report and Recommendation without commenting on Yamaha's promise not to sue.

**\*3** "[A] patentee defending against an action for a declaratory judgment of invalidity can divest the trial court of jurisdiction over the case by filing a covenant not to assert the patent at issue against the putative infringer with respect to any of its past, present, and future acts." Super Sack Mfg. Corp. v. Chase Packing Corp., 57 F.3d 1054, 1058 (Fed.Cir.1995) (citation omitted). Here, Yamaha has agreed not to sue CyberOptics for infringement.[FN1] Accordingly, the statement of Yamaha's counsel in the objection estops Yamaha from suing CyberOptics for infringement concerning Yamaha's existing and future patents. See id. at 1059 (promise not to assert patents may be contained in patentee's legal briefs and motions).

> FN1. It appears that Yamaha's agreement not to sue for direct infringement also encompasses an agreement not to sue CyberOptics for contributing to or inducing infringement.

CyberOptics contends that Yamaha's agreement not to sue is insufficient in light of certain statements vis-á-vis CyberOptics' customers that Yamaha intends to enforce its patents. In the absence of a direct litigation threat to CyberOptics, however, the presence vel non of threats to CyberOptics' customers is not relevant because the customers are not parties to this lawsuit. Because no legal interest of CyberOptics is at issue, CyberOptics can have no objectively reasonable apprehension that it will face an infringement suit. Thus, in light of Yamaha's agreement not to sue, the district court erred in denying Yamaha's motion to dismiss. See Spectronics Corp. v. H.B. Fuller Co., 940 F.2d 631, 635-36 (Fed.Cir.1991) (in a declaratory judgment action, district court must consider post-filing events in determining whether jurisdiction continues to exist).

124 F.3d 228                                                                                                    Page 3
124 F.3d 228, 1997 WL 575861 (C.A.Fed. (Minn.))
**(Cite as: 124 F.3d 228)**

Further, the magistrate judge determined that CyberOptics satisfied the second part of the justiciability test based on his view that the LaserAlign sensor would be the putative infringing device in a suit brought by Yamaha.[FN2] In light of Yamaha's agreement that Yamaha will not sue CyberOptics and Yamaha's assurances that the LaserAlign sensor does not infringe Yamaha's patents, this point is moot.

> FN2. The magistrate judge determined that according to CyberOptics, Yamaha had engaged in "patent flooding." That is, Yamaha
> is in the process of smothering [CyberOptics'] LaserAlign technology with encroaching patents, which embody only "minor" and "incremental" differences, and that the enveloping process will progressively stifle the marketability of [CyberOptics'] technology unless [CyberOptics] succumbs to cross-licensing overtures. According to [CyberOptics'] scenario, if it chooses not to cross-license, then it will be exposed, or its customers will be exposed, to a raft of infringement suits. In [CyberOptics'] view, the four U.S. patents, that are here at issue, play a role in the patent flood.
> The magistrate judge concluded that "[v]iewed in this context, the infringing product is the LaserAlign itself-together with its related technology-and, therefore, in producing the LaserAlign, [CyberOptics] has satisfied its burden under the second branch of the Federal Circuit's test."

In sum, the district court erred in denying Yamaha's motion to dismiss the declaratory judgment claims for lack of subject matter jurisdiction. Mandamus is appropriate "to confine [a trial] court to a lawful exercise of its prescribed jurisdiction." *Gulfstream, 485 U.S. at 289*.

Accordingly,

IT IS ORDERED THAT.

(1) Yamaha's petition for a writ of mandamus is granted.

(2) Yamaha's motion for leave to file a reply is granted.

C.A.Fed.,1997.
In re Yamaha Motor Co., Inc.
124 F.3d 228, 1997 WL 575861 (C.A.Fed. (Minn.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                        Page 1
Not Reported in F.Supp.2d, 2002 WL 109346 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Omnicom Group, Inc. v. Employers Reinsurance
Corp.
D.Del.,2002.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
OMNICOM GROUP, INC., and Harrison & Star,
Inc., Plaintiffs,
v.
EMPLOYERS REINSURANCE CORPORATION,
Defendant.
**No. Civ.A. 01-839-GMS.**

Jan. 28, 2002.

*MEMORANDUM AND ORDER*
SLEET, J.

## I. INTRODUCTION

*1 On November 8, 2001, Employers Reinsurance
Corporation ("ERC") filed a declaratory judgment
action against Omnicom Group, Inc. ("Omnicom"),
Harrison & Star ("H & S"), and Merck & Co., Inc.
("Merck"), in the New York State Supreme Court,
New York County. On November 15, 2001,
Omnicom and H & S filed a declaratory judgment
action against ERC in the Delaware Superior Court.
ERC removed the Delaware Superior Court action to
the United States District Court for the District of
Delaware on December 17, 2001.

Presently before the court is ERC's motion to dismiss,
or alternatively, to transfer this case to the Southern
District of New York, or to stay this case pending the
outcome of the state court litigation in New York
County. ERC argues that the court should dismiss or
stay this action because a concurrent similar action
exists in a New York state court. It further argues
that, should the court not dismiss or stay this action,
the case should be transferred to New York pursuant
to 28 U.S.C. § 1404(a). For the reasons that follow,
the court will grant ERC's motion to transfer.[FN1]

> FN1. The court cannot transfer this case to
> the New York state court. Rather, it must
> transfer it to the Southern District of New
> York. The court recognizes that such an
> action will not alleviate the burden of having

two identical cases being tried by two
courts. However, the court remains
convinced that it is less costly, and more
convenient, to try the cases in one district,
rather than across state lines. Moreover,
while the court expresses no opinion on the
propriety of such an action, remand of the
case from the Southern District of New
York to the New York State Supreme Court,
New York County, will now be an option.

## II. BACKGROUND

Omnicom is incorporated under the laws of the State
of New York, with its principle place of business in
New York. It is a holding corporation for a number of
other corporations, including its wholly-owned
subsidiary, H & S. H & S provides marketing and
advertising consultation and services. It is also
incorporated under the laws of the State of New
York, with its principle place of business in New
York. The defendant insurer, ERC, is incorporated in
the State of Missouri, and is licenced to do business
in New York.

In May 1996, ERC issued an insurance policy (the
"policy") in favor of Omnicom as the named insured.
ERC also provided coverage to H & S under
Omnicom's policy.

In January 1998, Omnicom notified ERC that "Jane
Doe" had filed a lawsuit against Merck and H & S in
the New York State Supreme Court, Suffolk County
(the "Suffolk County action"). The complaint alleged
various causes of action for libel, fraud, civil rights
violations and intentional infliction of emotional
distress. On September 21, 2001, the jury returned a
verdict awarding Jane Doe compensatory and
punitive damages.

On November 8, 2001, ERC filed a declaratory
judgment action in the New York State Supreme
Court, New York County, against Omnicom, Merck,
H & S and Jane Doe.[FN2] In the complaint, ERC
sought a declaratory judgment that it is not obligated
to pay any portion of the punitive damages award
against the named defendants in the Suffolk County
action.

> FN2. Jane Doe is a nominal defendant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2002 WL 109346 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

against whom no relief is sought.

Subsequently, on November 15, 2001, Omnicom and H & S filed the present action in the Delaware Superior Court. ERC removed the case to the United States District Court for the District of Delaware on December 17, 2001. In this action, Omnicom and H & S seek a declaratory judgment that ERC is obligated to pay the punitive damages arising from the Suffolk County action.

For the following reasons, the court concludes that the "balance of convenience" tips in favor of granting ERC's motion to transfer. Because it finds that transferring the case is the appropriate outcome, the court need not address the alternative motions to stay or dismiss the Delaware action.

### III. DISCUSSION

*2 ERC seeks to transfer this action pursuant to the "first-filed" rule and 28 U.S.C. § 1404(a). 1.The "First-Filed" Rule

The "first-filed" rule is a judicially-created doctrine that is designed to avoid concurrent litigation of the same issues, between the same parties, in more than one federal court. *See EEOC v. University of Pennsylvania,* 850 F.2d 969, 971-72 (3d Cir.1988). As its name implies, the rule generally provides that a later-filed action should be stayed pending the resolution of an earlier filed action, or transferred to the court in which the earlier-filed action is pending. *See Peregrine Corp. v. Peregrine Indus., Inc.,* 769 F.Supp. 169, 171 (E.D.Pa.1991).

As this rule only applies to related cases filed in different federal courts, it is not applicable to the present situation where one action is pending in state court. Therefore, the court declines to further address the "first-filed" rule as a basis to transfer this action to New York.[FN3]

> FN3. Because the court finds other compelling reasons to transfer this case to New York, it expresses no opinion on whether the first-filed rule should apply to concurrent state and federal cases.

### 2. Section 1404(a)

Transfer to New York is, however, mandated under a section 1404(a) analysis. Section 1404(a) provides

that "[f]or the convenience of [the] parties and [the] witnesses, in the interest of justice," the court may transfer this action to "any other district where it might have been brought." 28 U.S.C. § 1404(a). While Omnicom and H & S do not expressly agree that this action could have been filed in the Southern District of New York as a diversity action, there can be little dispute that this is so. The plaintiffs are incorporated in New York, with their principle places of business in the Southern District of New York. The defendant is a Missouri corporation. Further, the amount in controversy is approximately $250,000. Accordingly, the Southern District of New York is an appropriate venue.

Having satisfied the initial section 1404(a) requirement, the court will, therefore, move on with the inquiry as directed by the Third Circuit. *See Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995).

In *Jumara,* the Third Circuit provided a list of factors to assist the district court in determining "whether, on balance, the litigation would conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum." *Id.* These factors include six private and five public interests which the court may consider. *See id.*

### a. The Private Interests

The private interests most relevant to this case include: (1) the convenience of the parties as indicated by their relative physical and financial position; (2) the convenience of the witnesses, but only to the extent that they may be unavailable for trial in one of the fora; and (3) the location of records and other documents, again, only to the extent these files cannot be produced in the alternate forum.[FN4] *See id.*

> FN4. For the reasons the court discussed in a previous opinion, it will not afford any weight to the first three *Jumara* factors, specifically, the plaintiff's initial choice of forum, the defendant's preferred venue, and whether the claim arose elsewhere. *See Affymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192, 197-201 (D.Del.1998). In not affording weight to these factors, the court avoids the risk of double-counting these interests and thereby throwing off the transfer analysis. *See id.* Instead, the court

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2002 WL 109346 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

will consider whether the Western District of North Carolina is a more convenient forum for the parties and the witnesses, while also serving the interests of justice. *See* 28 U.S.C. § 1404(a).

### 1. The Convenience of the Parties

Geographically, New York is not inconvenient for Omnicom and H & S, both of which are incorporated and headquartered in New York. Furthermore, transfer to New York would reduce the overall inconvenience to all parties involved. The parties must already be prepared to litigate the related case pending in the New York Supreme Court. Bringing witnesses and relevant documents to only one location, here New York, minimizes the level of disruption caused to both parties by the litigation. This is certainly a more economical and efficient result than having each party moving witnesses and documents between two states, depending on which of these related actions is being litigated at that time. Thus, this factor weighs in favor of transfer.

### 2. The Convenience of Witnesses

**\*3** Party witnesses or witnesses who are employed by a party carry no weight in the "balance of convenience" analysis since each party is able, indeed obligated, to procure the attendance of its own employees for trial. *See Affymeytrix,* 28 F.Supp.2d at 203. Expert witnesses or witnesses who are retained by a party to testify carry little weight in determining where the "balance of convenience" lies because they are "usually selected [on the basis] of their reputation and special knowledge without regard to their residences and are presumably well compensated for their attendance, labor and inconvenience, if any." *See id.* (internal citations omitted). Fact witnesses who possess first-hand knowledge of the events giving rise to the lawsuit, however, have traditionally weighed quite heavily in the "balance of convenience" analysis. *See id.*

Omnicom and H & S argue that ERC has failed to demonstrate that Delaware will be an inconvenient forum for potential non-party witnesses. The court agrees, and notes that ERC's bare allegations of witness inconvenience, without more, are insufficient to tip the balance in its favor. The court notes that all the material witnesses in this dispute, party or otherwise, will be in New York already to litigate the related state court case now pending in New York County. Requiring that they come to Delaware to

litigate this action separately cannot be considered convenient and in the interest of justice. However, as there is no clear evidence that a non-party witness will be unable to attend trial in Delaware, this factor must weigh against transfer.

### 3. The Location of Records and Other Documents

The technological advances of recent years have significantly reduced the weight of this factor in the "balance of convenience" analysis. *See id.* at 205. Neither party argues that the records and documents are voluminous in this case. Thus, neither party can claim one forum is better than another forum in this regard. However, because this factor is relevant only insofar as the documents would be unavailable in one forum, the court finds that this factor must weigh against transfer.

From a practical standpoint, however, the court notes that any relevant documents will already be in New York for the litigation of the state court case. The court sees no need to require that Omnicom, H & S and ERC move the same documents from state to state. Rather, it would be much more efficient to litigate these related actions in one location. However, these considerations are more relevant to the first factor discussed *supra.*

### b. The Public Factors

As other courts have noted, depending on the circumstances of the case, some of the "public interest" factors listed in *Jumara* may play no role in the "balance of convenience." *See id.* at 205. The court thus elects to discuss only the factors most relevant to the pending case.

### 1. Administrative Difficulty

Omnicom and H & S argue that the Southern District of New York has many more case filings than the District of Delaware. Moreover, in 2000, Delaware had seventy civil cases that were over three years old, whereas the Southern District had over one-thousand. Thus, they argue that the Delaware court would be more able to expeditiously address this action.

**\*4** The court is mindful of the court congestion that concerns Omnicom and H & S. It thus finds that Delaware's lighter caseload weighs in favor of denying the transfer to New York. However, this is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 109346 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

but one factor in the analysis and is not alone determinative of the issue.

### 2. Public Policies of the Fora

The next relevant factor concerns New York and Delaware's public policies. Delaware public policy favors the insurability of punitive damages. *See Whalen v. On-Deck, 514 A.2d 1072, 1074 (Del.1986).* New York's policy favors the uninsurability of punitive damages. *See Home Ins. Co. v. American Home Products Corp., 75 N.Y.2d 196, 200 (N.Y.1990).*

In this action, a New York insured seeks to enforce its insurance policy against an insurer with its principle place of business in New York, for coverage based on a cause of action arising within New York's borders. New York could thus make a compelling argument that its policy should be applied. Likewise, Omnicom and H & S are within their rights to argue that Delaware's policy should be applied because the insurance policy was allegedly issued in Delaware. However, where the policy was actually issued is a disputed fact and not for the court to decide on this motion. Accordingly, the court finds that, given the equally important policies of the states, and the conflicting evidence regarding the policy in question, this factor must remain neutral.

### 3. Practical Considerations Making Trial Easy, Expeditious or Inexpensive

The parties do not dispute that the issue presented in both of the cases is identical. Specifically, the issue is whether ERC is obligated to insure Omnicom and H & S against punitive damages awards. To have courts in two different states each deciding this issue would not be in the interest of sound judicial administration. Nor would such a result be the most expeditious and inexpensive method of determining the parties' rights and liabilities. The parties are already located in New York, both to litigate the pending case in the New York Supreme Court, and to conduct their daily business.

Accordingly, the court finds that this factor weighs heavily in favor of transferring this case to New York.

### 4. Local Interest in Deciding This Action

Finally, the court finds that Omnicom and H & S have failed to articulate any clear interest that Delaware has in this case. Rather, they briefly allude to the possibility that the insurance contract may have been issued in Delaware. The court finds that this disputed factual issue alone is not enough to conclude that Delaware has a significant interest in this action.

In contrast, New York has a great interest in the outcome of this action. The parties are either New York corporations, or are licensed to do business in New York. Further, the insurance coverage dispute emanates from Jane Doe's original Suffolk County action. As such, the causes of action in the two cases currently at issue arise from alleged wrongful acts in the State of New York.

**\*5** Thus, this factor also weighs heavily in favor of transferring this case to New York.

### IV. CONCLUSION

The court is mindful that there are several factors weighing against transferring this case to New York. However, there are an equal number of factors weighing in favor of transfer that the court finds are deserving of more significant weight. Particularly persuasive are the following facts. Delaware has no clear connection to this case. However, all the parties have significant connections to New York, the underlying action arose in New York, and the identical case is currently pending in a New York court. Thus, the court concludes that the "balance of convenience" tips in favor of transferring this action to the Southern District of New York.

For these reasons, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that:
1. Employers Reinsurance Corporation's alternative motion to transfer this action to the Southern District of New York (D.I.2) is GRANTED.
2. The above-captioned matter is hereby TRANSFERRED to the United States District Court for the Southern District of New York.
3. Omnicom Group, Inc. and Harrison and Star, Inc.'s Motion For Leave to File a Sur-Reply Brief (D.I.13) is declared MOOT.

D.Del.,2002.
Omnicom Group, Inc. v. Employers Reinsurance Corp.
Not Reported in F.Supp.2d, 2002 WL 109346 (D.Del.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2002 WL 109346 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**


END OF DOCUMENT

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d, 2004 WL 1043193 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

In re TCW/Camil Holding L.L.C.
D.Del.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
In re: TCW/CAMIL HOLDING L.L.C., Debtor.
TCW/CAMIL HOLDING L.L.C., Plaintiff,
v.
FOX HARON & CAMERINI LLP, Defendant.
**No. 03-10717, 03-53929, 03-1154-SLR.**

April 30, 2004.

MEMORANDUM ORDER
ROBINSON, J.
**\*1** At Wilmington this 30th day of April, 2004, having reviewed defendant's motion to transfer venue and the papers submitted in connection therewith;

IT IS ORDERED that defendant's motion (D.I.18) is denied, for the reasons that follow:

1. On June 17, 2003, plaintiff filed an adversary complaint in the United States Bankruptcy Court for the District of Delaware where plaintiff's bankruptcy case is presently pending. Plaintiff alleges that defendant, who served as its former attorneys, committed legal malpractice in the course of providing legal representation and advice during a pre-bankruptcy International Chamber of Commerce arbitration proceeding arising from a failed joint venture to acquire control of the largest Brazilian producer of rice, Josapar S.A.. FN1 (D.I. 1, ex. A at ¶ 1) Plaintiff specifically complains that defendant's actions during the arbitration caused it to be responsible under joint and several liability when it otherwise would not have been subjected to this form of liability. FN2 (*Id.* at 3) On December 19, 2003, defendant moved to withdraw the reference of the adversary proceeding from Bankruptcy Court. (*Id.* at 1) The court granted this motion on January 21, 2004. (D.I.6) Trial is scheduled for November 2004. (D.I.14)

FN1. Plaintiff and IRHE Holdings ("IRHE") funded the amounts of $58.75 million and $10.4 million, respectively, into Camil Holding, LLC as part of a joint venture. (D.I. 19, ex. A at 2) Camil is owned by

plaintiff and Garial S.A. ("Garial"). (*Id.*) Through Camil, plaintiff, IRHE, and Garial sought to obtain a majority interest in Josepar S.A.. (D.I. 19 at 3) When the joint venture failed to obtain this interest, IRHE filed the arbitration to force Camil to unwind its $10.4 million investment. (D.I. 1, ex. A at 3)

FN2. In the arbitration proceedings, IRHE obtained a full judgment in its favor, and plaintiff alleges that defendant stipulated to joint and several liability for it, Camil, and Garial. (*Id.*) IRHE decided to collect judgment from plaintiff alone. As a result, plaintiff asserts that it was forced to file for Chapter 11 bankruptcy protection to preserve its assets.

2. Plaintiff is a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York. Defendant is a limited liability partnership registered in the State of New York with offices in New York City.

3. Defendant moves the court to transfer this matter pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the Southern District of New York. Section 1404(a) provides: "For the convenience of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a) (2003). A plaintiff's choice of forum is to be accorded substantial weight and courts should only transfer venue if the defendant is truly regional in character. *See Bergman v. Brainin, 512 F.Supp. 972, 973 (D.Del.1981)* (citing *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970)). A defendant has the burden of establishing that "the balance of convenience of the parties and witnesses strongly favors" transfer. *Id.* Accordingly, "defendants brought into suit in Delaware must prove that litigating in Delaware would pose a 'unique or unusual burden' on their operations" for a Delaware court to transfer venue. *See Wesley-Jessen Corp. V. Pilkington Visioncare, Inc.,* 157 F.R.D. 215 (D.Del.1993). A motion to transfer venue may also be granted if there is a related case which has been first filed or otherwise is the more appropriate vehicle to litigate the issues between the parties. *See American Bio Medica Corp. v. Peninsula Drug*

Not Reported in F.Supp.2d, 2004 WL 1043193 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

*Analysis Co., Inc., 1999 WL 615175, \*5 (D.Del.1999).*

4. In reviewing a motion to transfer venue, courts have not limited their consideration to the three factors enumerated in § 1404(a) (i.e., convenience of parties, convenience of witnesses, and interests of justice). Rather, courts have considered "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir.1995)* (internal quotations and citation omitted). The Third Circuit, in fact, has provided a list of factors to assist district courts in determining "whether, on balance, the litigation would more conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum." *Id.* These factors entail six private and five public interests. Private interests include: (1) the plaintiff's forum preference as manifested by the plaintiff's original forum choice; (2) the defendant's forum preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of the books and records to the extent that the files could not be produced in the alternative forum. *Id.* Public interests include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; and (5) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.*

**\*2** 5. In considering the private interest factors under *Jumara,* the court, consistent with Third Circuit precedent, adheres to the notion that transfer is not to be liberally granted and plaintiffs' choice of forum is a paramount consideration. Venue is proper in Delaware as plaintiff is incorporated under the laws of the State of Delaware. Nevertheless, the District of Delaware is not plaintiff's "home turf," since it maintains its principal place of business in New York. In this sense, it appears to be more convenient to both the plaintiff and defendant to try the instant litigation in the Southern District of New York. Indeed, this court previously recognized that "when the plaintiff has chosen to bring suit in a district that is not plaintiff's 'home turf' and that has no connection to any acts giving rise to the lawsuit,

convenience to the plaintiff is not as great as it would be were plaintiff litigating at or near plaintiff's principal place of business or at the site of activities at issue in the lawsuit." *Burstein v. Applied Extrusion Techs. Inc.,* 829 F.Supp. 8 (D.Del.1992). Moreover, the locus of the alleged legal malpractice occurred in New York because the underlying arbitration was conducted there. The majority of the witnesses with discoverable information also are located in New York, though the court notes that Wilmington, Delaware is only 130 miles from New York City and is easily accessible by plane, train, or automobile. *See Praxair, Inc. v. ATMI, Inc., 2004 WL 883395, \*2 (D.Del.2004)* (discussing proximity, transportation, and hotel options between New York City, New York and Wilmington, Delaware). On this basis, the court concludes that the private factors under *Jumara* weigh in favor of transferring the case at bar to the United States District Court for the Southern District of New York.

6. In considering the public interest factors under *Jumara,* the court is strongly persuaded by the fact that defendant argued to both the Bankruptcy Court and this court when it moved to withdraw the reference that the District of Delaware was the most efficient and expeditious forum in which to litigate this matter. Defendant, in fact, stated: "Considerations of judicial economy, expeditiousness of the proceeding, and preservation of debtors' and creditors' resources also support withdrawal of reference [to the District of Delaware]." (D.I. 1 at 7) Given its prior contention, defendant now cannot attempt to turn the table and argue for a transfer to the United States District Court for the Southern District of New York. Additionally, the parties have taken significant steps to advance the instant litigation in the District of Delaware. Defendant answered the complaint and filed a motion to dismiss and a motion for judgment on the pleadings prior to filing the motion at bar. The parties likewise exchanged initial disclosures and are set to explore settlement with the magistrate judge. Also, trial is set to occur in six months. Transfer of venue to the United States District Court for the Southern District of New York inevitably will delay this litigation, since that court is one of the largest and busiest courts in the federal system. Furthermore, the court finds that venue in the District of Delaware will facilitate the pending bankruptcy proceeding. The court, therefore, concludes that the public interest factors under *Jumara* favor maintaining venue in the District of Delaware.

**\*3** 7. On balance, the court finds that the public

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2004 WL 1043193 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

interest factors outweigh the private interest factors. The court, as a result, concludes that defendant fails to prove that litigating in the District of Delaware would pose a unique or unusual burden to merit transfer of venue.

D.Del.,2004.
In re TCW/Camil Holding L.L.C.
Not Reported in F.Supp.2d, 2004 WL 1043193 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.