## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BANK OF AMERICA, N.A.         )
                                   )
          Plaintiff,          )
                                   )
         v.                )     C.A. No. 07-159 (GMS)
                                   )
SIP ASSETS, LLC AND         )
EVERY PENNY COUNTS, INC.     )
                                   )
          Defendants.       )

### BANK OF AMERICA, N.A.'S BRIEF IN RESPONSE AND OPPOSITION TO DEFENDANT S.I.P. ASSETS, LLC'S MOTION TO DISMISS

OF COUNSEL:

Steven C. Cherny
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834
Tel: (212) 906-1200
Fax: (212) 751-4864

David A. Nelson
Amanda J. Hollis
Jennifer Travers
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
Chicago, IL 60606
Tel: (312) 876-7700
Fax: (312) 993-9767

Dated: May 18, 2007
796456 / 31292

Richard L. Horwitz (#2246)
Kenneth L. Dorsney (#3726)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6027
Fax: (302) 658-1192
rhorwitz@potteranderson.com
kdorsney@potteranderson.com

*Attorneys for Plaintiff Bank of America, N.A.*

## **TABLE OF CONTENTS**

TABLE OF CITATIONS .................................................................................. ii

I.    STATEMENT OF THE NATURE AND STAGE OF THE
      PROCEEDING .................................................................................. 1

II.   SUMMARY OF ARGUMENT ....................................................... 1

III.  STATEMENT OF FACTS ................................................................ 2

IV.   ARGUMENT.................................................................................... 6

      A.   Legal Standard ..................................................................... 6

           1.   Burden of Establishing Jurisdiction is Light.................... 6

           2.   Burden of Establishing Jurisdiction Is Even Lower Where
                Jurisdictional and Substantive Facts Are Intertwined................ 6

      B.   SIP's Motion Is Entirely Predicated On Bad Law ................... 7

      C.   SIP Has Raised Neither A Facial Nor A Factual Challenge To
           Jurisdiction........................................................................... 9

           1.   No Facial Challenge................................................... 9

           2.   No Factual Challenge................................................. 9

      D.   Subject Matter Jurisdiction Exists Under the Correct Standard ........... 11

           1.   The Correct Standard for Declaratory Judgment
                Jurisdiction........................................................... 11

           2.   This Court Enjoys Subject Matter Jurisdiction Under the
                Correct Standard .................................................... 12

           3.   SIP's Unsupported Allegations Do Not Affect The
                Analysis................................................................ 13

           4.   Recent Facts Further Confirm A Justiciable Controversy
                Exists.................................................................... 13

      E.   At Minimum, The Complaint Should Not Be Dismissed At This
           Time .................................................................................. 15

V.    CONCLUSION.............................................................................. 16

# TABLE OF CITATIONS

## CASES

*Cedars-Sinai Medical Center v. Watkins,*
    11 F.3d 1573 (Fed. Cir. 1993)..................................................................................9

*Genentech, Inc. v. Eli Lilly and Co.,*
    998 F.2d 931 (Fed. Cir. 1993)..................................................................................3

*Gould Electronics Inc. v. United States,*
    220 F.3d 169 (3d Cir. 2000)..................................................................................6, 9

*Independent Wireless Telegraph Co. v. Radio Corporation of America,*
    269 U.S. 459, 46 S. Ct. 166 (1926)..........................................................................5

*Kulick v. Pocono Downs Racing Ass'n,*
    816 F.2d 895 (3d Cir. 1987)................................................................................6, 13

*MedImmune, Inc. v. Genentech, Inc.,*
    ___ U.S. ___, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007)...............................*passim*

*Mortensen v. First Fed. Sav. & Loan Ass'n,*
    549 F.2d 884 (3d Cir. 1977).................................................................................*passim*

*Paradise Creations, Inc. v. UV Sales, Inc.,*
    315 F.3d 1304 (Fed. Cir. 2003)...............................................................................7

*Quantum Corp. v. Sony Corp.,*
    16 U.S.P.Q. 2d 1447 (N.D. Cal. 1990) ....................................................................7

*Sandisk Corp. v. STMicroelectronics, Inc.,*
    480 F.3d 1372 (Fed. Cir. 2007)..............................................................1, 8, 11, 13

*Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corp.,*
    482 F.3d 1330 (Fed. Cir. 2007)...........................................................................*passim*

*Turicentro, S.A. v. American Airlines Inc.,*
    303 F.3d 293 (3d. Cir. 2002)..................................................................................9

*UD Technology Corp. v. Phenomenex, Inc.,*
    C.A. No. 05-842-GMS, 2007 WL 28295 (D. Del. Jan. 4, 2007)...............................6

*USM Corp. v. SPS Technologies, Inc.,*
    770 F.2d 1035 (Fed. Cir. 1985)..............................................................................13

**STATUTES & RULES**

28 U.S.C. § 2201 ........................................................................................................................11

28 U.S.C. § 2201(a) ...................................................................................................................11

28 U.S.C. § 2202 ........................................................................................................................11

Fed. R. Civ. P. 26(b)(1) ......................................................................................................1, 6, 9

## I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Bank of America, N.A. ("BANA" or "Plaintiff") filed a complaint on March 20, 2007

seeking a declaratory judgment that its Keep the Change ("KTC") banking program does not

infringe U.S. Pat. No. 6,112,191 ("the '191 patent") and a determination concerning who owns,

has owned and is entitled to enforce the '191 patent. (D.I. 1). BANA's complaint names two

Delaware corporations as defendants, SIP Assets, Inc. ("SIP") and Every Penny Counts, Inc.

("EPC"). At the time BANA filed its complaint SIP's corporate status had been voided for

delinquent tax status. BANA amended its complaint on April 11, 2007 to reflect the fact that

SIP, on or about March 30, 2007, reinstated itself as a Delaware corporation in good standing.

(D.I. 8). SIP answered the First Amended Complaint on April 26, 2007. SIP then moved to

dismiss this action under Rule 12(b)(1) of the Federal Rules of Civil Procedure alleging this

Court lacks subject matter jurisdiction. (D.I. 14) ("SIP Mem.").

## II.    SUMMARY OF ARGUMENT

The sole argument SIP makes for dismissal is that BANA has no "reasonable

apprehension" that SIP will sue it for infringement of the '191 patent. The "reasonable

apprehension" test, however, has been expressly overruled by the United States Supreme Court

in *MedImmune v. Genentech*, ___ U.S. ___, 127 S. Ct. 764, 774 n. 11, 166 L. Ed. 2d 604 (2007).

Notably, SIP never even discusses the correct test for declaratory judgment jurisdiction set forth

in *MedImmune* or the recent Federal Circuit cases interpreting *MedImmune – Sandisk Corp. v.*

*STMicroelectronics, Inc.*, 480 F.3d 1372 (Fed. Cir. 2007), and *Teva Pharmaceuticals USA, Inc.*

*v. Novartis Pharmaceuticals Corp.*, 482 F.3d 1330 (Fed. Cir. 2007). SIP simply ignores the

controlling precedent in favor of a string of overruled cases from different districts.

The ***controlling*** test does not require a "reasonable apprehension" or even a substantial

probability of suit. Rather, declaratory judgment jurisdiction exists where there is a "definite and

concrete" dispute which "touches the legal relations of parties having adverse legal interests,"

*MedImmune*, 127 S. Ct. at 771, and where a declaratory judgment would "settle the legal

relations in dispute and afford relief from uncertainty or insecurity," *Teva Pharms. USA, Inc.*, 482 F.3d at 1383.

These are precisely the circumstances here. SIP's co-defendant, EPC, recently sued BANA's parent holding company for infringement of the '191 patent and claimed to be the owner of that patent. SIP, however, previously approached BANA with a proposal to practice the '191 patent and represented that *it* had "fully acquired" the rights to that patent. Furthermore, countless inconsistencies concerning the chain of title to the '191 patent and the nature and extent of EPC's and SIP's rights to that patent have become apparent since EPC filed suit. As a result, there is substantial uncertainty surrounding who has and had what rights to the '191 patent, and a resulting risk that if EPC and BANA litigate EPC's infringement claims without SIP, BANA could be subjected to a multiplicity of suits and inconsistent judgments. These ownership questions go to the heart of numerous substantive issues such as EPC's standing to sue, damages, willfulness and BANA's equitable estoppel and laches defenses. A declaratory judgment that 1) binds all the entities that have approached BANA and claimed ownership of the '191 patent, and 2) declares who is entitled to enforce the '191 patent and when they had those rights will offer the relief that is needed from the present state of tangible uncertainty created by SIP's and EPC's inconsistent ownership claims. Resolving such uncertainty affecting tangible legal interests is the very purpose of the Declaratory Judgment statute.

## III.    STATEMENT OF FACTS

In the fall of 2004, Defendant SIP made a presentation to Plaintiff proposing that Plaintiff practice and commercialize certain SIP "patented business methods." *See* SIP Presentation (Ex. A) at 17. This presentation included the slides that are attached to this brief as Ex. A. SIP represented that its "patented business methods" were covered by several patent applications and issued patents, including the '191 patent. *Id.* at 2. SIP further represented in its "proposal" that it had "*fully acquired* all of the Patents," *including the '191 patent*, and was "represented on contingency by both Fish and Neave, LLP[] and Kaye, Scholer, LLP two of the Top IP law firms in the country." *Id.* at 3.

2

Recently, Defendant EPC sued Bank of America Corporation ("BAC") in the United States District Court for the Middle District of Florida for infringement of the '191 patent, the very same patent Defendant SIP had "fully acquired." *See* EPC First Am. Compl. (Ex. B). That case is pending before the Honorable Judge John E. Steele.[1] Defendant EPC's Florida complaint alleges that a banking product, Keep the Change ("KTC"), infringes the '191 patent. *See id.* at ¶¶ 16, 17. EPC also alleges that it acquired the '191 patent on June 29, 2005 from that patent's original assignee, a New Jersey based, New Jersey corporation that it calls "Old EPC." *Id.* at ¶ 3. There is, however, no record of any such assignment to EPC in the United States Patent and Trademark Office. *See* United States Patent and Trademark Office Assignments on the Web (Ex. C) (identifying only one assignment of the '191 patent, dated March 31, 1997, from the named inventor to "Every Penny Counts, Inc." of "Navesink, New Jersey"). EPC also alleges that on September 2, 2004, Old EPC "reformed" as EPC -- approximately nine months prior to EPC's alleged acquisition of the '191 patent from Old EPC. Ex. B, at ¶ 2. EPC does not explain how or why Old EPC assigned the '191 patent to EPC *nine months after Old EPC allegedly was "reformed."*[2] EPC's complaint makes no mention of SIP, the entity that represented to Plaintiff that it had "fully acquired" the '191 patent. Instead, EPC contends that it met with Plaintiff regarding the '191 patent "[i]n or about November 2004, and for several months thereafter," Ex. B at ¶ 5. *Yet the only entity that met with Plaintiff about the '191 patent at that time was Defendant SIP.* One of those meetings between SIP and Plaintiff is memorialized in Exhibit A.

---

[1] SIP is not a party to the Florida action because the District Court for the Middle District of Florida does not have personal jurisdiction over SIP. BANA has moved to transfer the Florida action to this Court on the main ground that this is the only Court that has jurisdiction over all of the necessary and desirable parties. *See Genentech, Inc. v. Eli Lilly and Co.*, 998 F.2d 931, 938 (Fed. Cir. 1993) (citing "the absence of jurisdiction over all necessary or desirable parties" as one "reason that would make it unjust or inefficient to continue the first-filed action").

[2] Investigation has revealed that a New Jersey entity by the name of "Every Penny Counts, Inc." still exists in good standing. *See* State of New Jersey Department of Treasury Short Form Standing Certificate (Ex. D). This suggests that Old EPC did not in fact "reform" as EPC.

BAC, the entity EPC sued in Florida, is a holding company that is not licensed to do banking and thus cannot operate or practice the accused KTC program. BANA, the Plaintiff in this action and a nationally chartered bank, is the entity that operates the KTC program. The assertion that the KTC program infringed the '191 patent gave rise to an immediate and concrete dispute regarding the infringement, validity and enforceability of the '191 patent that BANA, the actual operator of KTC, could not ignore. In addition, EPC and SIP's recent and inconsistent assertions regarding who had "acquired" the '191 patent created an unacceptable risk of a multiplicity of actions under the '191 patent, raised a real concern that the resolution of the Florida action would not finally resolve all disputes relating to the '191 patent and gave rise to uncertainty relating to the ownership of rights under the '191 patent. BANA was put in the position of defending its KTC program from a patent that: 1) the PTO database says is assigned to Old EPC – a corporation that apparently still exists; 2) has been asserted against a related Bank of America holding company in Florida by EPC; and 3) a mere two years before, SIP had represented it had "fully acquired." In order to resolve this unacceptable and uncertain situation BANA commenced an action under the Declaratory Judgment Act.

BANA filed this action in Delaware because both Defendants are Delaware corporations and Delaware was the only jurisdiction that clearly had personal jurisdiction over both EPC and SIP as well as the power to adjudge all of the parties' rights relating to the '191 patent. An adjudication of ownership of rights under the '191 patent is a threshold issue that must be determined before an assessment of infringement or validity of that patent can occur. It is also a threshold determination that must be made before any damages under the '191 patent can be assessed. Furthermore, BANA alleges that claims under the '191 patent are barred by laches and estoppel, ***based at least in part on SIP's 2004 presentation regarding the '191 patent.*** BANA cannot fairly prove these defenses relating to allegations that the owner of rights under the '191 patent sat on those rights if it remains unclear who had rights under the '191 patent. Likewise, EPC relies in its Florida complaint (apparently in support of a charge of willfulness) on an alleged communication it made to BAC regarding the '191 patent in the fall of 2004. *See* Ex. B

4

at ¶ 5. ***But Defendant SIP is the only entity that made any communication in the fall of 2004 (and even that was to BANA, not BAC)***, as evidenced by the attached slides. *See* Ex. A. BANA's reasonableness can only be adjudged under the totality of the circumstances of that meeting and the other presentations made by SIP to which SIP frankly admits. *See* SIP Mem. at 3.

Apart from the uncertainty raised by these (and other) inconsistencies regarding ownership of the '191 patent and the need for a forum with jurisdiction over ***all*** parties to enter judgment regarding the current and historical rights of the parties, there is a need for a forum that can compel SIP to show up at trial of this action. Regardless of its "current" professed indifference to the '191 patent, SIP plainly is an important part of the story of the '191 patent and BANA. SIP does not want to be involved in litigation regarding the '191 patent ***now***, but two years ago it had no hesitation to show up at BANA ***claiming it had acquired the '191 patent and aggressively advertising that it was represented by major patent litigation firms on a contingent fee basis***.

In answer to BANA's complaint, SIP admitted that it approached Plaintiff in the fall of 2004 regarding the '191 patent and that it prepared a presentation for Plaintiff. SIP Answer, ¶ 9 (D.I. 11). SIP also did not deny that it represented to BANA that it had "fully acquired" the rights to the '191 patent.[3] Instead SIP merely contended that it was an exclusive licensee of the '191 patent pursuant to a License Agreement it entered into with EPC in April 2004 (attached as Ex. A to SIP's Answer).[4] None of the parties disputes that an exclusive licensee can have standing to sue for infringement. *See* EPC's Memorandum in Support of Mot. to Dismiss, at 16

---

[3] With respect to this allegation, SIP stated that "to the extent that the allegations of this paragraph differ in substance or context from the contents of the referenced SIP presentation, same are denied, and SIP respectfully refers the Court to the SIP presentation for an accurate statement of its contents." Answer at ¶ 9 (D.I. 11).

[4] The fact that SIP alleges it was only an exclusive licensee that had acquired "full rights" to '191 patent does not change anything. As the United States Supreme Court recognized in *Indep. Wireless Telegraph Co. v. Radio Corp. of Am.*, 269 U.S. 459, 466, 46 S. Ct. 166, 168 (1926), "both the owner and the exclusive licensee are generally necessary parties in the action in equity.

(D.I. 15). Regardless of how SIP "fully acquired" the rights to the '191 patent, as recently as its motion to dismiss SIP expressly *reserved* all rights it had acquired relating to the '191 patent. There are now two companies, EPC and SIP that claim and reserve rights under that patent and it is irrelevant that only one "currently" seeks to exercise those rights.

On May 4, 2007, SIP moved to dismiss BANA's complaint for lack of declaratory judgment jurisdiction. (D.I. 13). The *sole* basis for SIP's motion is its allegation that "BOA cannot be in reasonable apprehension of a suit by SIP over the '191 patent." SIP Mem. at 6. The "reasonable apprehension" test has been overruled by the Supreme Court and the Federal Circuit and SIP's motion relying on that overruled test must be denied.

## IV.   ARGUMENT

### A.   Legal Standard

#### 1.   *Burden of Establishing Jurisdiction is Light*

Although the plaintiff has the burden of persuading the court it has jurisdiction, that burden is "relatively light." *UD Tech. Corp. v. Phenomenex, Inc.*, C.A. No. 05-842-GMS, 2007 WL 28295, at *2 (D. Del. Jan. 4, 2007) (slip copy) (Ex. E). The Supreme Court determined that dismissal for lack of jurisdiction is only appropriate where "the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy.'" *Kulick v. Pocono Downs Racing Ass'n*, 816 F.2d 895, 899 (3d Cir. 1987) (quoting *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666 (1974)). Similarly, the Court of Appeals for the Third Circuit explained that "[a] claim may be dismissed under Rule 12(b)(1) only if it 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction' or is 'wholly insubstantial and frivolous.'" *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000).

#### 2.   *Burden of Establishing Jurisdiction Is Even Lower Where Jurisdictional and Substantive Facts Are Intertwined*

Where questions of jurisdiction and the merits of the case are intertwined, courts demand even less jurisdictional proof for a plaintiff to survive a Rule 12(b)(1) challenge. *Gould Elecs.*

*Inc.*, 220 F.3d at 178.  For example, in *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884 (3d Cir. 1977), the Court of Appeals for the Third Circuit considered whether the district court erred in dismissing plaintiff's complaint alleging a violation of the Sherman Act for lack of subject matter jurisdiction because the plaintiffs had not established a nexus of interstate commerce at the time of the motion to dismiss. *Id.* at 890.  The Court held that "the trial court erred in its premature dismissal of plaintiff's claim, particularly because the nexus of interstate commerce necessary to sustain jurisdiction is inextricably related to the interstate effects plaintiffs will have to establish to succeed on the merits of this tying claim brought ... under Sherman §§ 1 and 2." *Id.*  It explained that it was "incumbent upon the trial judge to demand less in the way of jurisdictional proof than would be appropriate at the trial stage" because a more stringent jurisdictional proof requirement could "unfairly preclude Sherman Act plaintiffs from reaching the merits of their cases." *Id.* at 892.

Similar principles have been applied in the context of patent cases.  *See Quantum Corp. v. Sony Corp.*, 16 U.S.P.Q. 2d 1447, 1449-50 (N.D. Cal. 1990) (holding subject matter jurisdiction existed over patent infringement claim despite defendant's allegations that no infringing conduct had yet occurred, because contested jurisdictional fact and merits of the case were "intertwined").  Here, the challenged jurisdictional facts relate to the ownership of the asserted patent and ownership is the most fundamental substantive fact that must be established *before* infringement or validity can be assessed.  *See, e.g., Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003) ("[T]his court has determined that in order to assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title to the patent at the inception of the lawsuit.").  It is hard to imagine an issue more "intertwined" with assertion of a property right than ownership.

### B.    SIP's Motion Is Entirely Predicated On Bad Law

Inexplicably, SIP bases its motion to dismiss on the *wrong legal standard* for declaratory judgment jurisdiction.  SIP begins by citing an unpublished case from the Middle District of Pennsylvania for the proposition that *"[i]n order for a plaintiff in a patent dispute to show an*

7

*actual controversy, it must show* 'both 1) *an explicit threat or other action by the patentee,*

*which creates a reasonable apprehension on the part of the declaratory plaintiff that it will*

*face an infringement suit*, and 2) present activity which could constitute infringement or

concrete steps taken with the intent to conduct such activity.'" SIP Mem. at 5 (quoting *Noble*

*Fiber Techs., LLC v. Argentum Med., LLC*, 2006 WL 1793219, at *4 (M.D. Pa. June 27, 2006)).[5]

Throughout its brief, SIP argues that its motion should be granted because this "reasonable

apprehension" test is not met. For example, SIP argues that:

> *BOA simply cannot be in reasonable apprehension of a suit by*
> *SIP over the '191 patent*, because SIP has never threatened to sue
> BOA over the '191 patent and has expressly disclaimed any intent
> to do so. Courts have found such communications to remove any
> reasonable apprehension of suit in the mind of a plaintiff.....*SIP's*
> *similar representations should lead to a finding that there is no*
> *reasonable apprehension of suit* and that there are no adverse
> interests between BOA and SIP regarding the '191 patent.

SIP Mem. at 7 (emphasis added). The "reasonable apprehension" test however has been

explicitly overruled by both the Supreme Court and the Federal Circuit. SIP's motion relies on

indisputably bad law.

    The United States Supreme Court recently decided *MedImmune, Inc. v. Genentech, Inc.*,

___ U.S. ___, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007), and held that the "reasonable

apprehension of imminent suit" test for declaratory judgment jurisdiction cited by SIP

"contradicts" and "conflicts with" previous Supreme Court precedent. *Id.* at 774, n. 11.

Therefore, as the recent Federal Circuit decisions interpreting *MedImmune* make clear, the

"reasonable apprehension test" relied upon by SIP has been "overruled" and no longer is good

law. *See Teva Pharms. USA, Inc.*, 482 F.3d at 1339 ("[B]ecause the Supreme Court in

*MedImmune* cautioned that our declaratory judgment 'reasonable[-]apprehension-of-suit' test

'contradict[s]' and 'conflicts' with its precedent, these Federal Circuit tests have been 'overruled

by…an intervening …Supreme Court decision."); *Sandisk Corp.*, 480 F.3d at 1380 ("*The*

---

[5] SIP only contends that the first prong of this test is not met. It does not even allege that the
second prong has not been satisfied.

*Supreme Court's opinion in MedImmune represents a rejection of our reasonable apprehension of suit test.*"). SIP fails to mention any of these controlling cases in its motion and instead hinges its argument on a pre-*MedImmune* legal standard that the Supreme Court and the Federal Circuit have explicitly overruled.[6]

### C.    SIP Has Raised Neither A Facial Nor A Factual Challenge To Jurisdiction

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges the jurisdiction of the Court to address the merits of a plaintiff's complaint. Such challenges may be one of two types: "facial" or "factual." *E.g.*, *Mortensen*, 549 F.2d at 891. Facial attacks "contest the sufficiency of the pleadings." *E.g.*, *Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 300 (3d Cir. 2002). In contrast, a factual attack occurs when the movant presents evidence that challenges the pleader's factual basis for jurisdiction. *See Gould Elecs. Inc.*, 220 F.3d at 177; *Cedars-Sinai Med. Center v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993). Importantly, "[a] factual jurisdictional proceeding cannot occur until plaintiff's allegations have been controverted." *Mortensen*, 549 F.3d at 892, n. 17. SIP's motion to dismiss fails to raise either challenge to jurisdiction.

### 1.    No Facial Challenge

SIP does not allege that the facts presented in the First Amended Complaint are insufficient to support this Court's subject matter jurisdiction. *See* SIP Mem., *et seq.* SIP, therefore is not pursuing a facial challenge. Rather, SIP alleges additional facts in its motion and bases it jurisdictional challenge on those facts. *See, e.g.,* SIP Mem. at 3.

### 2.    No Factual Challenge

SIP claims to raise a "factual challenge" to this Court's jurisdiction. But SIP does not deny or controvert any of the jurisdictional facts pleaded in BANA's complaint as required to

---

[6] Moreover, in a number of the overruled cases SIP cites, the declaratory defendant had unequivocally disclaimed any and all rights under the intellectual property at issue. In contrast, SIP has not disclaimed any interest in the '191 patent, but has expressly reserved and "retains all rights and privileges that arose during the time that it was a licensee of EPC." SIP Mem. at 1, n. 1.

raise a factual challenge. *Mortensen*, 549 F.3d at 892, n. 17. Instead, SIP ***admits*** the allegations in the complaint that "SIP approached plaintiff in the fall of 2004 regarding the '191 patent and that SIP prepared a presentation for plaintiff," and does not deny that it "represented that it had 'fully acquired' the '191 patent." *Compare* First Am. Compl. ¶ 9 (D.I. 8) *to* SIP Answer to First Am. Compl. ¶ 9 (D.I. 11).

At one point in its brief, SIP argues that "to the extent that it may have suggested in one [of its multiple presentations to BANA] that it had any ownership interest in the '191 patent, it has now unambiguously clarified that it does not." SIP Mem. at n. 4. As a preliminary matter, SIP's assertion is irrelevant because it does not "controvert" any pleaded facts. *See Mortensen*, 549 F.3d at 892, n. 17. SIP's position is that it did represent to BANA that it had "fully acquired" the '191 patent, but those representations in its 2004 presentation were false. SIP cannot raise a factual challenge ***by agreeing with the facts pleaded by Plaintiff*** and then contending that it lied to Plaintiff in 2004. SIP appears to be raising a "factual challenge" to its own historical presentation, not to Plaintiff's Complaint.

Finally, to the extent SIP simply seeks to downplay its representations that it owned the '191 patent by suggesting that it "only happened once," SIP's argument is makeweight. Aside from its explicit statement that it had fully acquired the '191 patent,[7] SIP made a variety of representations throughout its presentation to BANA indicating SIP had full rights to the '191 patent. For example, SIP (1) referred to the business methods it asked BANA to adopt as the "***SIP Patent Pending*** business process," *see* Ex. A, at 59 (emphasis added), (2) suggested that it had been negotiating with other banks concerning the patented business methods and had even signed a letter of intent with CitiGroup, *id.* ("As an FYI an LOI was signed with CitiGroup on 6/14, contractual negotiations are in process"), and (3) proposed that it could give Bank of America "control [of] the SIP Patent pending business process roll-out to the Retail channel." *Id.* SIP's presentation makes no mention of any other party whose agreement or approval would be

---

[7] SIP's attempt to characterize its explicit statement that it had "fully acquired" the '191 patent as a mere "suggestion" that it had an ownership interest is not credible.

necessary to practice or control the "SIP Patent Pending business process," and never mentions EPC at all, although it now claims EPC was the true owner of the '191 patent at that time. SIP's presentation instead explicitly stated that it was represented by two well known patent litigation firms on a contingent fee basis in a thinly-veiled attempt to convey its willingness to enforce its patent rights. *See* Ex. A at 3.

### D.    Subject Matter Jurisdiction Exists Under the Correct Standard

#### 1.    *The Correct Standard for Declaratory Judgment Jurisdiction*

BANA seeks relief "under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202," and seeks a judgment declaring "who owns and is entitled to sue for infringement of the '191 patent since its issuance." First Am. Compl. ¶¶ 4, 22. The Declaratory Judgment Act provides that "any court of the United States…may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The "only limitation" on federal courts' jurisdiction under this Act is the requirement in Article III for an "actual controversy." *See Teva Pharms. USA*, 482 F.3d at 1338.[8] The Supreme Court overruled the "reasonable apprehension of imminent suit" test and

> re-affirmed in *MedImmune* that an 'actual controversy' requires only that a dispute be definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts.

*See Teva Pharms. USA*, 482 F.3d at 1339 (internal quotations omitted).

In one of the few cases that have determined whether an "actual controversy" exists since *MedImmune* was decided, the Federal Circuit explained that "a 'controversy' is 'ripe' if the question presented is 'fit for judicial review,' meaning it is entirely or substantially a question of

---

[8] "Although a district court is given the discretion, in declaratory judgment actions, to dismiss the case, there are boundaries to that discretion. When there is an actual controversy and a declaratory judgment would settle the legal relations in dispute and afford relief from uncertainty or insecurity, in the usual circumstance the declaratory judgment is not subject to dismissal." *Sandisk*, 480 F.3d at 1383 (internal citations omitted).

law and postponing a decision would work a substantial hardship on the challenging party." *Id.*
at 1337.

In *Teva* the Federal Circuit held that a justiciable declaratory judgment controversy
existed, based in part on "the possibility of future litigation." Thus, "regardless of whether Teva
w[on] or los[t] the '937 infringement suit,…the possibility that [it would] be subject to multiple
infringement suits …based on the submission of a single ANDA [*i.e.*, an application to market a
drug product] …is an injury relevant to finding a justiciable controversy." *Id.* at 1345.

### 2. *This Court Enjoys Subject Matter Jurisdiction Under the Correct Standard*

The controlling test for declaratory judgment jurisdiction is satisfied by the facts of this
case. Substantial uncertainty exists as to who has and had rights to the '191 patent, what rights
the various parties had and when those parties had the rights. Specifically, SIP has at various
times represented it had "full rights" to the '191 patent, that it was an exclusive licensee of that
patent, and that EPC had full rights to the '191 patent. Consequently, there is a risk that if SIP is
not a party to any judgment resolving claims under the '191 patent, BANA will be subjected to
multiple infringement suits and potentially inconsistent judgments.

Ownership of rights to the '191 patent is a threshold issue that must be resolved before
EPC's infringement and damages claims as well as BANA's laches and equitable estoppel
defenses can be adjudicated. Under these circumstances, there is an actual controversy that
warrants declaratory relief. The issue of whether SIP owns or has ever owned or been entitled to
enforce the '191 patent is "definite and concrete" and "touch[es] the legal relations of" BANA
and SIP, who have "adverse legal interests" concerning the right to accuse the KTC program of
infringement of the '191 patent. *MedImmune*, 127 S. Ct. at 771. Moreover, SIP and BANA's
controversy can be resolved by "specific relief through a decree of conclusive character," *id.*,
namely a declaration as to who is entitled to enforce the '191 patent which would bind SIP,
BANA, and EPC. Therefore, "a declaratory judgment would settle the legal relations in dispute

and afford relief from uncertainty or insecurity in the usual circumstance." *Sandisk*, 480 F.3d at 1383.

### 3. SIP's Unsupported Allegations Do Not Affect The Analysis

The fact that SIP has stated in its motion that it has no "current" intent to sue BANA for infringement of the '191 patent and that it allegedly is only a former licensee of the '191 patent is of no moment. As discussed above, the standard for declaratory judgment jurisdiction announced in *MedImmune* is not grounded in a party's intent to sue or another party's apprehension of suit. Furthermore, SIP provides no evidence supporting these assertions. The *only evidence* before the Court is SIP's 2004 presentation to BANA in which it represented to BANA that it had acquired the "full rights" to the '191 patent and SIP's admission to the same effect.

Regardless, even if SIP was an exclusive licensee, *as it now* contends, SIP only alleges that it *currently* has no intent to sue BANA on the '191 patent and that it "*currently*" has no license to the '191 patent. Yet SIP expressly reserves and "retains its rights and privileges that arose during the time that it was a licensee of EPC." SIP Mem. at 1, n. 1. Moreover, regardless of whether SIP will actually sue BANA, SIP's contradictory representations to BANA give rise to current uncertainty regarding the validity of and title to the '191 patent. BANA is entitled to obtain a judgment that would resolve that uncertainty. Certainly, SIP's current unsupported representations that admittedly conflict with its past representations do not suggest that this right is "'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy.'" *Kulick*, 816 F.2d at 899.

### 4. Recent Facts Further Confirm A Justiciable Controversy Exists

Although declaratory judgment jurisdiction is determined at the time the complaint was filed, *USM Corp. v. SPS Techs., Inc.*, 770 F.2d 1035, 1037 (Fed. Cir. 1985), it is worth noting that the uncertainty regarding the parties' rights to the '191 patent actually has increased since this action began. Ever since BANA raised the question of who has rights to the '191 patent in its complaint, a volley of inconsistent representations concerning EPC's and SIP's respective

rights to the patent has ensued. For example, almost immediately after BANA initiated this action, EPC's CEO made announcements to the press that SIP had "no claim" to the '191 patent and that the only agreement between EPC and SIP was a "marketing agreement." *See* Will Boyce, "Inventor Wants Credit for BofA's Savings Program," Charlotte Bus. J. (March 30, 2007) (Ex. F). But both EPC and SIP now admit that is not true. After these remarks were published and once BANA filed this action, SIP wrote to EPC and stated its intention to "disclose the existence and execution date of [a license agreement SIP and EPC entered into in April 2004 ("License Agreement")] as well as terms contained therein relating to 'EPC Licensed Patents.'" *See Apr. 4, 2007 Corresp. fr. E. Grau to B. Burke* (Ex. G). SIP attached the License Agreement to its Answer to BANA's First Amended Complaint, and alleged that, as a result of the agreement, SIP acquired "exclusive rights to the '191 patent." SIP Answer, ¶ 9 (D.I. 11). Notably, although SIP referred to multiple amendments to the License Agreement in its correspondence with EPC, SIP did not attach any of these "subsequent Amendments to said Agreement." Ex. G.

Faced with disclosure of the license, EPC had no choice but to again revise its story. In its next submission to the Florida Court, EPC conceded the existence of the License Agreement but claimed that all of SIP's rights to the '191 patent had terminated in May 2005. But, SIP contends differently. In its current motion to dismiss, SIP alleges that the License Agreement was terminated on June 8, 2005. SIP Mem., at 3. It is notable that these two parties cannot even get their stories straight as to when SIP's exclusive license allegedly was terminated.

There is also a question as to whether the License Agreement was ever terminated. The License Agreement states that it was entered into on April 20, 2004. According to EPC's First Amended Complaint, the '191 patent was owned at that time by Old EPC. *See* Ex. B at ¶¶ 1, 2; Ex. A to SIP Answer, at 1. However, both SIP and EPC allege that the License Agreement was terminated by letter from the CEO of *EPC*. Old EPC allegedly had been "reformed" during the interim, in September 2004, yet the records show OLD EPC still exists. *See* Ex. D. So if SIP's agreement was with Old EPC and Old EPC still exists, there is a significant question of whether

14

EPC, an admittedly separate corporation, could terminate SIP's rights under a License Agreement to which it never was a party.[9]  The answer is especially important given that, if in fact termination was not proper, then SIP has current rights to the '191 patent and any disclaimer of any intent to take action against BANA could determine this case.  Far from being a reason to dismiss this action, the uncertainty regarding whether SIP still has rights is an additional need for a judgment that would bind SIP to its disclaimer.[10]

### E.    At Minimum, The Complaint Should Not Be Dismissed At This Time

This Court's subject matter jurisdiction may be challenged at any time in the proceedings. BANA has presented substantial evidence that there are numerous questions and factual disputes surrounding threshold issues concerning rights under the '191 patent.   In contrast, SIP has raised no colorable question as to jurisdiction, much less presented any evidence controverting BANA's allegations.  Under these circumstances, BANA should at least be afforded the opportunity to take discovery relating to jurisdictional facts.  This is especially so given that the jurisdictional facts at issue here are intertwined with the facts that go directly to the merits of this case—*i.e.*, whether EPC has standing to sue for infringement and collect damages.  Like the tying claims at issue in *Mortensen*, dismissal of BANA's claims would be premature at this stage because the issue of when and whether SIP has rights under the '191 patent is "inextricably related to the [issue of standing] plaintiff[] will have to establish to succeed on the merits."

---

[9]  Notably, this question likely will depend on an application of Delaware law, as the June 29, 2005 assignment agreement between Old EPC and EPC states that it is to be interpreted under Delaware law. *See* Asset Acquisition Agreement (Ex. H) at 3.

[10]  SIP argues that "BOA's apparent rationale for this suit is to obtain discovery in aid of the Florida Action" and it "could simply take discovery in the Florida Action" concerning the chain of title of the '191 patent.  SIP Mem. at 7-8.  This is not true.  BANA's purpose for filing this action is to obtain a judgment that will bind all of the interested parties and reduce the substantial uncertainty surrounding the rights to the '191 patent.  BANA could not have obtained this through "discovery in the Florida Action."  At best, BANA could obtain third party discovery from SIP in the Florida action, but it cannot force SIP to show up at trial there and, because the Florida action will not bind SIP, nothing would prevent SIP from initiating a duplicative action against BANA that would risk inconsistent judgments.

## V.    CONCLUSION

For the foregoing reasons, BANA respectfully requests that this Court deny SIP's motion to dismiss.

OF COUNSEL:                                              POTTER ANDERSON & CORROON LLP

Steven C. Cherny
LATHAM & WATKINS LLP                      By: */s/ Richard L. Horwitz*
885 Third Avenue, Suite 1000                          Richard L. Horwitz (#2246)
New York, NY 10022-4834                               Kenneth L. Dorsney (#3726)
Tel:  (212) 906-1200                                         Hercules Plaza, 6th Floor
Fax: (212) 751-4864                                         1313 N. Market Street
                                                                      Wilmington, DE 19801
David A. Nelson                                             Tel:  (302) 984-6027
Amanda J. Hollis                                           Fax: (302) 658-1192
Jennifer Travers                                            rhorwitz@potteranderson.com
LATHAM & WATKINS LLP                            kdorsney@potteranderson.com
Sears Tower, Suite 5800
Chicago, IL 60606                                         *Attorneys for Plaintiff Bank of America, N.A.*
Tel:  (312) 876-7700
Fax: (312) 993-9767

Dated:  May 18, 2007
796456 / 31292

16

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on May 18, 2007, the attached document was

hand delivered to the following persons and was electronically filed with the Clerk of the Court

using CM/ECF which will send notification to the registered attorney(s) of record that the

document has been filed and is available for viewing and downloading:

David L. Finger
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801
dfinger@delawgroup.com

Kurt M. Heyman
Patricia L. Enerio
Proctor Heyman LLP
1116 West Street
Wilmington, DE 19801
kheyman@proctorheyman.com
penerio@proctorheyman.com

/s/ Richard L Horwitz
Richard L. Horwitz
Kenneth L. Dorsney
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
kdorsney@potteranderson.com

788394 / 31292

# EXHIBIT A



# Notice To:  Client and Designated Readers

No part of this presentation may be reproduced by any means or transmitted without the prior written permission of SIP Assets, LLC (SIP) except with respect to copies made or transmitted internally by Client for the purpose of evaluating this presentation and opportunity.  The information contained herein is confidential and the business methods described herein are **published, issued and/or patent pending (including USPO# 10/068.542, US Patent 6,112,191,  PCT# 96/06055) both domestically and/or internationally.**  The use or release of the information contained in this proposal for purposes other than an evaluation of its contents as a basis for business discussions with SIP is prohibited.  All copies of this proposal (or any portion hereof) and any accompanying electronic copies should, at SIP's option, be returned to SIP or destroyed at the end of any business discussions which fail to produce business actions, contractual discussions or transactions..

Neither submission by SIP nor acceptance by Client of this proposal, in whole or in part, constitutes acceptance by SIP of any contractual terms and shall not form a binding agreement between the parties.  Such an agreement shall only exist upon the execution of a mutually acceptable contract by both Client and SIP.

**SIP Assets, LLC.**

# An Idea Born ?

**SIP** was invented and designed by two brothers, Bo and Cash Claridge. ( No, we really didn't make this up! )They are the poster children for the Wal-Mart demographic. They were hard-working children in a large family that lived in central Missouri. They worked from 8 to 5, and tried to stretch every penny they earned – they shopped at Wal-Mart, ate at McDonalds, and spent Saturdays loading groceries at Sam's Club. From time to time, they bought Lottery tickets, hoping for the brass ring that never came. Bo and Cash realized that stores and modern marketing gimmicks made it very easy for plain folks to spend money, especially on things they didn't really need such as candy bars, Lotto tickets, or gossip magazines at the check-out stand. In fact, the stores made it possible for people to spend even more, by giving them cash back at check-out . **And that's when the light bulb went on.**

What was missing was an equally convenient way to put money to work toward your retirement or college tuition, rather than taking it out and spending it. The brothers invented SIP and applied for a Patent on the concept with the US Patent and Trademark Office. This was how SIP was born. Subsequently based on the Patent Approval process with the USPTO only two other similar Patents were discovered. Since then SIP has fully acquired all of the Patents and is represented on contingency by both Fish and Neave, LLP. and Kaye, Scholer, LLP two of the Top IP law firms in the country.

# A $600 Billion Demographic?



The Underserved Americans
(ie; those who need to be saving but can't afford the cost of entry or aren't proactive enough)

They are:

- "Wal-Martians" (22 ethnic representations)
- Urban Afro-Americans
- Urban Hispanics
- Urban Asian, Indian, Native Americans et al...
- Migratory Workers
- The Unbanked

*Sources: Business Week 11/14/03*

# The American Dream?



**The Dream: A lifetime of dedication and hard work will lead to a comfortable and carefree retirement**

**The Reality: It is estimated that the cost of retirement for a median income middle-American is $29k annually, 61% of Americans have no retirement savings account.**

*The Cost: $580k (20yrs @ $29k)!*

*Sources: Congressional Research Report*

# The American Dream?



**The Dream: A good parent can afford to send their children to college and help assure them a better life.**

**The Reality: 35% of parents have no specific savings program designated for their child's tuition. College tuition expenses have tripled over the last 10 years. Estimated costs for a state college are $38k per year.**

***The Cost: $300k (2 children/@ $150k)!***

*Sources: Kiplinger Report*



# The Dream, Unfulfilled

Over 65% of Americans say they do not believe that investment institutions are interested in working with them. They also believe that participating in financial plans is time consuming and confusing.

The same 65% also say they have a desire to save - but find it difficult to start, and don't feel like there is an advocate for the "common man", in this regard.

*Sources: ICI Institute*



# Consumer Investing

- Consumers have $310 billion in personal savings and $236 billion in mutual fund shares (Q1'03)

- Yet only 39% of Americans actually invest

- The Haves vs. the Have Nots:

  *61% with no investments!*

# Why They Don't Invest



## The Most Common Excuses for Not Investing:

- Putting it off until later in life
- Think that the process is too difficult to get started
- Can't budget for it effectively
- Think they can't afford the *initial* investment
- Don't feel they have enough to invest to interest a broker or financial planner

*Sources: ICI Institute*

# The Opportunity



- Middle and lower middle-class Americans represent a $120 billion annual investment opportunity (at 5% of household income as investment).

- The target group has an untapped need for several types of bank products including:

  - IRAs – Roth or traditional
  - Children's 529 College Plan(s)

- An institution that could *simplify* and *automate* the investment process could become a leading product option for this group

*Sources: US Census Data*

# They have "Disposable" Income...





This demographic spends over $120 billion a year going out for fast food

$9 billion a year is spent on going out to the movies

Over $1 Billion a year is spent at the retail counter just on gossip rags like "The National Enquirer"

$49 Billion was spent nationwide during 2003 on lottery tickets alone!

*Sources: USDA, USA Today, Lottery Insider*



# Retail Spontaneous Purchasing Behavior



- On "big" shopping trips consumers tend to make proportionately more unplanned purchases than on a "fill-in" trip: 54% unplanned for fill-ins, 68% for big trips

- *Products displayed at the checkout counter boost unplanned purchases to 64% of shoppers*

- More unplanned purchases are made by shoppers who tend to take advantage of deals, younger households and women shoppers.

- $200 Billion "unplanned" is spent at POS annually

## *Bottom Line:* *Spontaneity Works!*

*Source: Inman & Winer study, for Point of Purchase Institute, "A model of In-store Consumer Decision Making". Includes analysis of 30,000 purchases in 14 cities with 4,200 consumers*

# The Power of SIP...

**American Dream Meets Convenience and Personal Behavior:**

## Spontaneous Investment Protocol



 +  = **SIP**

**Desire to Save    Ease of Use    Spontaneity**

**KEY POINT : "*Protect Consumer from Thyself*"**

# So What is SIP ?

SIP is the ability for a customer to make small, manageable ($5, $10, $20 etc...) contributions to a qualified plan (IRA or 529B) at a retailer's POS (point of sale) or ATM spontaneously during the course of regular buying/transaction activities.




# SIP

## SIP Process

**At Registration: (@ Retailer, Bank, Member Drive)**

- Customer signs up with institution for Acct/Debit Card and SIP enablement

- Question asked "Does customer have a IRA or 529 plan already set up?

- If No, associate sets up one or both.

- If Yes, collects info and registers SIP sweep to acct.

- Ask Customer if they want auto transaction debit with a fixed amount or customer controlled amount at the time of POS



# SIP

## SIP Process

**At Point of Sale:**

1. Customer slides card at transaction.

2. Card either auto debits a fixed amount ($5) or allows customer amount control ($5-$20).

3. Amount is debited from customer's account and aggregated into holding funds.

4. Upon reaching $100, total contribution amount is swept into the proper financial instrument (e.g., bank CD, mutual fund family).

5. During holding stage, amount cannot be touched and customer gets no interest.



# SIP

## A Patented Business Method

- Eliminates excuses and objections to the current investment climate

- Increase the number of IRA' and Mutual Funds sold in the United States by 30% over the next five years

- Inventive method potentially worth billions in revenue over the next ten years

- Being there first assures significant market share

- Business Model Patent Application filed *and published* with the U.S. Patent and Trademark Office

# SIP

## 5 Year SIP Financial Model

| Year | Number of cards | Market Share | SIP Participants | Transaction & Operating Costs | Total User Savings/Year | Annual Float Value | Annual Fee Value | SIP Total Annual Revenue | SIP Net Revenue |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 150,000,000 | 1% | 1,250,000 | $ 13,953,000 | $ 91,666,667 | $ 106,563 | $ 5,000,000 | $ 5,106,563 | $ (8,846,438) |
| 2 | 150,000,000 | 6% | 8,250,000 | $ 118,644,000 | $ 2,090,000,000 | $ 3,580,500 | $ 165,500,000 | $ 169,080,500 | $ 50,436,500 |
| 3 | 150,000,000 | 9% | 13,500,000 | $ 214,934,727 | $ 4,785,000,000 | $ 7,416,750 | $ 348,000,000 | $ 355,416,750 | $ 140,482,023 |
| 4 | 150,000,000 | 15% | 21,750,000 | $ 399,743,727 | $ 7,755,000,000 | $ 12,020,250 | $ 564,000,000 | $ 576,020,250 | $ 176,276,523 |
| 5 | 150,000,000 | 18% | 26,500,000 | $ 559,314,082 | $ 10,615,000,000 | $ 16,453,250 | $ 772,000,000 | $ 788,453,250 | $ 229,139,168 |

Total: $ 1,894,077,313          $ 587,487,776

**Basic Assumptions:**

- Over 150 million debit cards issued

- The average debit card holder would conduct 44 retail counter transactions per year per card (non-ATM & non-internet)

- Annual fee per card would be $24 per year (Collected as $2/month via auto debit)

- Consumer would contribute $10 per transaction to the program

- Float revenue could be tapped as the basis for funding a "loyalty program" such as "matched contribution"

- No revenue has been accounted for as a result of Asset Management Fees



# SIP

## Validating the Concept

The SIP Management Team commissioned a research company to conduct quantitative & qualitative research to validate the SIP Concept with consumers:



- **Chose Decision Insight Corporation (KC, MO) because:**

  - Had over 20+ years of consumer research experience with 80% of that experience in the target marketplace (recommended to us by trusted relationship at H&R Block Marketing Group)

  - Had a reference able "Blue Chip" client list which included Procter & Gamble, H&R Block, Taco Bell, PepsiCo, Home Depot, Wal-Mart & Pizza Hut (All references checked out Very Good to Excellent)

  - Had a proven, documented methodology for creating multiple channels of input (on-line, mail, in-person and focus groups) driving up into an aggregated view

  - Had Banking experience via UMB Bank ($9.5B), Mercantile Bank ($80B now US Bank Corp), Boatmen's Bank ($92B now BofA) and Signet Bank (via their secured Card Products Group)

  - Have a specialty group led by Kathy Allin that focuses on "New Product Litmus Testing and Roll-Out"

# SIP

## Validating the Concept



- Decision Insight Recommended a plan that would synthesize three distinct channels into one consumer understanding:

  - Channel One: On-line surveys

  - Channel Two: Site surveys with personal interviews

  - Channel Three: Audio & Video recorded focus groups



# Validating the Concept

- **Proprietary quantitative research study commissioned:**

  - **Quantitative concept research**

    - A third party research company (Decision Insight Corporation) conducted the quantitative study using a proprietary web-based survey system. 250 respondents completed an on-line evaluation of the S.I.P. concept. Each respondent was exposed to the concept and asked about likelihood of registering for such a service.



## SIP

## Validating the Concept

**Respondents were screened to meet the following demographic / socio-economic criteria:**



- Male or female, ages 20-60.

- Must have shopped at Wal-Mart, K-Mart, Target or other discount retailers in the past 4 weeks.

- Must have household income of $20,000 - $75,000, and have a bank checking account.

- Must use an ATM or Debit card at least once per month.

- Must not be a sophisticated investor (i.e. does not have professional financial advisor, does not regularly invest in IRA or 529 Plan).

**Interviews were conducted from May 7 – May 9, 2003.**

SIP

Validating the Concept

The majority (88%) of targeted consumers say they "don't save any" or "don't save enough" for retirement or their children's education.

Q. Thinking about saving money for retirement or your children's education, do you...?

SIP

Validating the Concept

Most of the targeted consumers admit they need help with financial planning, but don't feel like the appropriate solution is available specifically for them.

Q. Which of the following statements MOST closely fits with your opinions about financial planning?

# SIP

## Validating the Concept

The majority do their banking at an FDIC insured bank.



Savings and Loan
3%

Credit Union
26%

FDIC insured bank
71%

Figure 15

Q. Where do you do the majority of your banking activities?

# SIP

## Validating the Concept

45% admit to "often" or "always" succumbing to impulse purchases at the store.



Q. How often do you buy something at the check-out counter of a store that you were not planning on buying when you originally went to that store?



# SIP

## Gauging the Level of Interest

- **Among targeted consumers:  Reaction to the S.I.P. concept is very promising:**

  - Intent to register for the service, 38% say they "probably" or "definitely would."

  - Another 34% are neutral, or "might" register.

- **With a very brief product description, 72% of respondents said they might, probably, or definitely would register for SIP**

# Intent to Register



How likely would you be to register for the service to contribute money to an IRA or College Savings Plan through your ATM or Debit card?

38% probably or definitely would register for S.I.P. Another 34% might or might not.



# SIP

## Using SIP

**Also:**

- A significantly higher percentage of consumers who regularly use the "cash back" feature when making purchases with an ATM or Debit card would register for S.I.P. vs. those who do NOT use the feature

- A significantly higher percentage of consumers with children under 18 would register vs. those with no children under 18

% who probably or definitely would

Using SIP

SIP

How likely would you be to register for the service to contribute money to an IRA or College Savings Plan through your ATM or Debit card?

# SJP

## Banking Activities

One in three use the "cash back" feature when using an ATM or Debit Card for purchases.

Q. Where do you most often get cash?



# SIP

## Contribution per Transaction

*Average (Median):*
*$10 each time.*

These
consumers
would
contribute, on
average, $10
each time.

Q. On average, what
amount would you
typically put into your
IRA and College Savings
Plan each time you
make a contribution?

# SIP

## SIP Fees

- 47% of the consumers would expect to pay a fee for the service and on average believed $3-5 per month was fair

- Consumers preferred overwhelmingly to pay a monthly or yearly fee versus a "per transaction" fee

# SIP

## Fee Preference

**Of the consumers who would pay a small fee, most would prefer to pay it on an annual basis.**



Per Transaction 17%

One-time, yearly 57%

Monthly 26%

Would Pay Fee 48%

Would NOT Pay Fee 52%

**Q. If this service required a small fee, which would you prefer?**

# SIP

## Fee Preference

**Of the consumers who would pay a small fee, how much would they pay monthly for the benefits of SIP**



Price Sensitivity Peaks

Average (Median) Expected to Pay Fee: $3-5

$3 47%

$10 + 1%

$6-10 2%

$5 9%

$4 19%

$2 or less 22%

**Q. How much would you expect to pay each month for the ability to use this service?**

# SIP

## Preferred Investment Option



**Among *all targeted consumers* who are neutral or likely to register, most would choose an IRA as opposed to a college plan**

Q. Which investment would you choose?



# Preferred Investment Option



**Among consumers with children under 18 who are neutral or likely to register, more would prefer a College Savings Plan.**

Q. Which investment would you choose?

# SIP

## Validating the Concept

**The 80+ Site Survey Respondents were screened to meet the following demographic / socio-economic criteria on-site at either a Target, Wal-Mart, Sam's Club or CostCo store location:**

- Male or female, ages 20-60.

- Must have shopped at Wal-Mart, K-Mart, Target or other discount retailers in the past 4 weeks other than the day of interview.

- Must have household income of $20,000 - $75,000, and have a bank checking account.

- Must use an ATM or Debit card at least once per month.

- Must not be a sophisticated investor (i.e. does not have professional financial advisor, does not regularly invest in IRA or 529 Plan).

**Interviews were conducted from May 1 – June 19, 2003.**

# SIP

## Validating the Concept

- The Site surveys followed the focus group methodology except in a more compact form. The results of the site surveys closely followed the focus group findings, further strengthening the results, with the following key points:

  - Consumers wanted/needed to save and felt that they had no way to EASILY save a little at a time (many piggy bank & cookie jar references)

  - Consumers felt extremely UNDERSERVED and "left alone" by traditional FSI providers (many minorities felt "abandoned")

  - Consumers felt that they needed a savings vehicle to PROTECT THEM "from easy access to their savings with penalties for access"

  - Consumers wanted a program they provide an ADVOCACY for them around financial decision making, advice and education (interestingly they most often cited AARP, H&R Block, Consumer Reports and USAA as analogous examples)

  - For these benefits they would be willing to pay a fee of $3-5 a month
  - 28% of respondents WOULD switch banks to get SIP if they had to

  Note:    Respondents were given a $10 gift card for the store from which they were exiting for participating in the survey



# SIP

## Validating the Concept



- **Proprietary qualitative research study commissioned:**

  - **Focus Groups**

    - Third party research company conducted focus groups to gain probing qualitative feedback on the SIP concept.
    - Follow CASRO research guidelines
    - Conducted August 18, 2003

# SIP

## Focus Group Results

- How comfortable are you with your savings?





"I save a little but not enough."

"I could always save more."

"I have no savings and I'm not comfortable with that at all!"

# SIP

## Focus Group Results

- How comfortable are you with your savings?

  - "I don't always have enough from my payroll check."









  - "I work for a small company – there is no 401k."

# SIP

## Focus Group Results

### Anything else that prohibits you from saving?

- "The amount."





- "Willpower…"
- "Convenience…"







# Focus Group Results

- ## Introducing SIP – a new concept



# SIP

## Focus Group Results

### Initial reactions to SIP



- "Convenient...with my debit card..."
- "No other paperwork..."
- "No one else needs to know about my financial situation."



# SIP

## Focus Group Results



### Fees for SIP? How much per month?

- "Monthly fee is okay..."
- "Not per transaction..."
- "$10 per month too high - $5 seems reasonable..."

# SIP

## Focus Group Results

### How much per week would you save?



"It depends on the week... sometimes $5 or if it's a good week $30 or $40..."

# SIP

## Focus Group Results

- Would you save for yourself (retirement) or child' college?

"Both...."



# SIP

## Focus Group Results

- Would you open a new/second bank account to get the SIP benefits?



- "I have no problem switching banks."

- "I would open a second debit card account for this feature."

- "There's no law against having more than one bank account."



# SIP

## Loyalty Program



Incorporating the retailer loyalty program into the concept significantly boosts the number of consumers interested. – especially those with children under 18.

Intent to use the service jumps from 38% to 56% with the loyalty program described in the survey (the retailer would match 5-10% of your total purchase into your SIP contribution if you spend at least $100 at the store).

Among consumers with children under 18, intent jumps to 65% (vs. 50% among those with no children under 18).

# SIP

## Value of Loyalty Program

% who probably or definitely would

Incorporating the retailer loyalty program into the concept significantly boosts the number of consumers interested.

S.I.P. Concept

S.I.P. Concept WITH Retailer Loyalty Program

Q. How likely would you be to register for the service to contribute money to an IRA or College Savings Plan through your ATM or Debit card?

Q. If the retailer offered to match your contribution when you purchase a certain amount from the store. For example, if you buy at least $100 from the store, the store would match 5-10% of your total purchase into your SIP contribution to your IRA or college savings plan. How likely…?

# SIP

## Loyalty Program

### How would it work?

- Branded loyalty program matches 5% of the transactions as SIP contribution for total purchase of $100 or more. Matches 10% if the purchase is over $250

- Attaches special seasonal promotions as spiffs to the loyalty program such as "Back to School" or "Christmas"

- Increases share of customers wallet – true loyalty program
- Retailer contribution is offset by more frequent and larger customer purchases

- Can turn matching program "off or on" based on retailer objectives



# SIP

## Loyalty Program

- Projected financials for loyalty program:

| | Without SIP | With SIP |
|---|---|---|
| Customer Monthly Visits | 3 | 3 |
| Average Expenditures per Visit | $60.00 | $100.00 |
| Monthly Expenditures | $180.00 | $300 |
| Annual Transactions | 36 | 36 |
| Annual Contribution to Sip | $0 | $180.00 |
| Annual Gross Revenue Per Customer | $1,960.00 | *$3,420.00 |

*Includes SIP Contribution

# SIP

## Focus Group Results

- Would a SIP loyalty program change you're shopping behavior (especially Christmas and Back-to-School)?



- "That would probably sway my decision...."
- As long as the prices were still comparable."



# SIP

## Focus Group Results

### Extra time at checkout counter?



- "I'm fine with that..."
- "I have to wait for that person who doesn't have their checkbook ready anyway..."

# SIP

## Focus Group Results

- How would you describe SIP to a friend?



- "A neat way to save money..."
- "Like that it's geared toward the blue collar worker like I am..."
- "Convenient – do it on the run like we do everything else..."



# SIP

## Summary



- This has never been done before (Two US Patents Issued & One Patent Pending)

- Can target the largest Untapped money source in US

- Represents a "Billion+" Revenue Opportunity over Five Year Plan

- Incredible social & community impact/influence opportunity with tons of mileage



# Bank One and SIP Opportunity

- Bank One can be the first institution to utilize this innovative SIP Patent Pending business process (As an FYI an LOI was signed with CitiGroup on 6/14, contractual negotiations are in process)

- Bank One can be the first institution to bring this concept to the marketplace and control SIP's roll-out to all other institutions garnering a revenue share on each of them

- Bank One could utilize the SIP Patent Pending process to cross-sell its many investment and savings products on its Debit & ATM network

- Bank One could control the SIP Patent Pending business process roll-out to the Retail channel (ie; WalMart, Target, Kroger, Safeway, Rite Aid, etc.)

# SIP

## Representation:





**FISH & NEAVE**


*Stifel, Nicolaus*
& Company, Incorporated


**MPS** Marks Paneth & Shron LLP

## Thank you

**Ray Edwards**
**President & CEO**
**SIP Assets, LLC.**
**Phone (816) 309-6981**



# EXHIBIT B

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | | |
|---|---|---|
| EVERY PENNY COUNTS, INC.<br>**Plaintiff** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CASE NO: 2:07-CV-42-FTM-29SPC** |
| | ) | |
| BANK OF AMERICA CORPORATION,<br>BANK OF AMERICA, N.A.,<br>AND VISA U.S.A., INC.<br>**Defendants** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |

FIRST AMENDED COMPLAINT SEEKING DAMAGES AND
PERMANENT INJUNCTIVE RELIEF FOR PATENT INFRINGEMENT

NOW INTO COURT, through undersigned counsel, come Plaintiff, Every Penny Counts,

Inc., and for its first amended complaint seeking damages and permanent injunctive relief against

Defendants, Bank of America Corporation, Bank of America, N.A., and VISA U.S.A., Inc.

respectfully represents as follows:

## I. INTRODUCTION.

This is an action seeking the recovery of the significant damages sustained by Plaintiff,

Every Penny Counts, Inc. ("EPC") as a direct result of the knowing and willful infringement of

its patent by Defendants, Bank of America Corporation, Bank of America, N.A., and VISA

USA, Inc. As more fully detailed below, EPC is holder of United States Patent Number

6,112,191 commonly known as the "Rounder Patent." For a period of several years, Defendants

TA.156136.1

were approached by EPC, or its predecessor in interest, concerning licensing agreement for the

Rounder Patent. Defendants obtained information concerning the Rounder Patent, and its

potential, now realized, for generating significant new accounts and profits for Defendants.

Rather than entering into a licensing agreement, Defendants knowingly and intentionally

infringed upon the Rounder Patent causing significant damage to EPC. EPC now seeks recovery

of those damages together with treble damages, attorney's fees and permanent injunctive relief.

## II. PARTIES, THE COURT'S JURISDICTION AND VENUE.

1.

Plaintiff, EPC, a corporation organized and existing under the laws of the State of

Delaware, with its principal place of business in Cape Coral, Lee County, Florida.

2.

Defendant, Bank of America Corporation ("BOA") is a corporation organized and

existing under the laws of the State of Delaware, with its principal place of business in Charlotte,

North Carolina. BOA maintains one or more offices within this judicial district, and engages in

systematic activities in this judicial district.

3.

Defendant, Bank of America, N.A. ("BOA, N.A.") is a corporation organized and

existing under the laws of the State of Delaware, with its principal place of business in Charlotte,

North Carolina. BOA, N.A. maintains one or more offices within this judicial district, and

engages in systematic activities in this judicial district.

4.

Defendant, VISA, U.S.A., Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, California.

5.

VISA engaged in systematic activities within this judicial district. This Court enjoys subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States. This Court also enjoys jurisdiction pursuant to 28 U.S.C. § 1338(a).

6.

This Court has venue pursuant to 28 U.S.C. § 1391(b) as BOA, BOA, N.A., and VISA are subject to personal jurisdiction in this judicial district. Alternatively, venue is proper pursuant to 28 U.S.C. § 1400(b) because all of the Defendants have committed acts of infringement within this judicial district and have regular and established places of business within this judicial district.

## III. STATEMENT OF GROUNDS FOR RELIEF.

1.

In August of 2000, United States Patent Number 6,112,191 (the "Rounder Patent") was duly and regularly issued to Every Penny Counts, Inc., a corporation formed under the laws of the State of New Jersey ("OLD EPC"). A copy of the patent is attached hereto and made a part hereof as Exhibit "A."

2.

On September 2, 2004, OLD EPC reformed as EPC, the Plaintiff in this action.

3.

On June 29, 2005, EPC became the sole owner of the Rounder Patent all as more fully set forth in Exhibit "B" attached hereto and made a part hereof.

4.

At least as early as December 2001, OLD EPC contacted BOA to describe the Rounder Patent and to inquire of BOA's interest in entering into a licensing agreement.

5.

In or about November 2004, and for several months thereafter, EPC had written communications and discussions with BOA about the Rounder Patent and a possible licensing agreement.

6.

At least as early as February 2001, OLD EPC contacted VISA about the Rounder Patent.

7.

In June 2004, EPC contacted VISA concerning the Rounder Patent and proposed a licensing agreement for other business arrangements between VISA and EPC.

8.

Discussions between EPC and BOA concerning the Rounder Patent and a possible licensing agreement continued into the Spring of 2005. BOA ceased further communications at that time. It apparently did so upon concluding that rather than entering into a licensing agreement with EPC, BOA would establish its own program modeled on the Rounder Patent, but without compensation to EPC. Consistent with that strategy, in or about October, 2005, BOA launched the "Keep the Change Program."

9.

The "Keep the Change Program" utilizes systems that falls within the scope of at least one claim of the Rounder Patent.

10.

Upon information and belief, prior to institution of the "Keep the Change Program," BOA was aware of the Rounder Patent, knew that EPC is the lawful owner of the Rounder Patent, and knew or should have known that the "Keep the Change Program" would infringe on the Rounder Patent.

11.

Upon information and belief, prior to institution of the "Keep the Change Program," BOA, N.A. was aware of the Rounder Patent, knew that EPC is the lawful owner of the Rounder Patent, and knew or should have known that the "Keep the Change Program" would infringe on the Rounder Patent.

12.

Upon information and belief, prior to institution of the "Keep the Change Program," VISA was aware of the Rounder Patent, knew that EPC is the lawful owner of the Rounder Patent, and knew or should have known that the "Keep the Change Program" would infringe on the Rounder Patent.

13.

On August 2, 2005, United States Patent Application Number 11/161,418, "Automatic Savings Program," was filed with the United States Patent and Trademark Office.

14.

On August 10, 2005, the 11/161,418 applicant submitted to the United States Patent and

Trademark Office an Information Disclosure Statement disclosing the Rounder patent as relevant

prior art. A copy of this Information Disclosure Statement is attached hereto and made a part

hereof as Exhibit "C."

15.

On February 8, 2007, the 11/161,418 application was published as Publication Number

US 2007/0033134 A1.   On the face of this publication, BOA was named as assignee. A copy of

this publication is attached hereto and made a part hereof as Exhibit "D."

16.

As the "Keep the Change Program" employs systems that fall within the scope of the

Rounder Patent, BOA's actions constituted an infringement on the Rounder Patent.

17.

As the "Keep the Change Program" employs systems that fall within the scope of the

Rounder Patent, BOA, N.A.'s actions constituted an infringement on the Rounder Patent.

18.

As the "Keep the Change Program" employs systems that fall within the scope of the

Rounder Patent, VISA's actions constituted an infringement on the Rounder Patent.

19.

BOA willfully infringed, and continues to infringe willfully, knowingly and intentionally,

upon EPC's Rounder Patent.

20.

BOA, N.A. willfully infringed, and continues to infringe willfully, knowingly and intentionally, upon EPC's Rounder Patent.

21.

VISA willfully infringed, and continues to infringe willfully, knowingly and intentionally, upon EPC's Rounder Patent.

22.

As a result of the infringing acts committed by BOA, EPC has suffered and continues to suffer damages which will continue unless this Court enjoins such acts of infringement.

23.

As a result of the infringing acts committed by BOA, N.A., EPC has suffered and continues to suffer damages which will continue unless this Court enjoins such acts of infringement.

24.

As a result of the infringing acts committed by VISA, EPC has suffered and continues to suffer damages which will continue unless this Court enjoins such acts of infringement.

25.

EPC demands a trial by jury.

WHEREFORE, Every Penny Counts, Inc. respectfully prays that, after due proceedings,

there be judgment in its favor and against Defendants, Bank of America Corporation, Bank of

America, N.A., and VISA, U.S.A., Inc. and that Every Penny Counts be granted the following

relief:

      (a)     permanent injunctive relief prohibiting the Defendants, their agents, employees, officers, directors, licensees and all of those in privity with either Defendants from continuing to engage in acts of infringement of the Rounder Patent;

      (b)     an award of all damages recoverable under the United States Patent laws;

      (c)     an award of treble damages for the Defendants' willful infringement;

      (d)     an award of interest, costs and reasonable attorneys' fees; and

      (e)     such other relief as may be just and equitable.

Respectfully submitted,

PHELPS DUNBAR LLP

HARVEY S. KAUGET (#116254)
KARL J. BRANDES (#0329797)
100 South Ashley Drive, Suite 1900
Tampa, Florida 33602-5311
Telephone: (813) 472-7550
Telecopy: (813) 472-7570
E-mail: kaugeth@phelps.com
E-mail: brandesk@phelps.com

and

PHELPS DUNBAR LLP
Brent B. Barriere (#2818)
David L. Patron (#22566)
Harry M. Barton (#29751)
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130
Telephone: (504) 566-1311
Telecopy: (504) 568-9130
E-mail: barrierb@phelps.com
E-mail: patrond@phelps.com
E-mail: bartonh@phelps.com

COUNSEL FOR EVERY PENNY COUNTS, INC.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of March, 2007, I electronically filed the

foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of

electronic filing to all counsel of record. In addition, the First Amended Complaint will be

properly served on Defendant Bank of America, N.A.

Harvey S. Kauget

# EXHIBIT C

USPTO Assignments on the Web



## United States Patent and Trademark Office

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



Assignments on the Web > **Patent Query**

## Patent Assignment Details

### *NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.*

**Reel/Frame:** 008477/0595                                                                                                      **Pages:** 3

**Recorded:** 03/31/1997

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

### Total properties: 1

**1**  **Patent #:** 6112191   **Issue Dt:** 08/29/2000   **Application #:** 08429758   **Filing Dt:** 04/27/1995

**Title:** METHOD AND SYSTEM TO CREATE AND DISTRIBUTE EXCESS FUNDS FROM CONSUMER SPENDING TRANSACTIONS

### Assignor

**1**  BURKE, BERTRAM V.                                                              **Exec Dt:** 03/27/1997

### Assignee

**1**  EVERY PENNY COUNTS, INC.
       500 HGWY 36
       NAVESINK, NEW JERSEY 07752

### Correspondence name and address

LEO STANGER
382 SPRINGFIELD AVENUE
SUMMIT, NEW JERSEY 07901

Search Results as of: 04/05/2007 12:57 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350.
Web interface last modified: February 22, 2007 v.2.0

| HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT |

# EXHIBIT D

STATE OF NEW JERSEY
DEPARTMENT OF TREASURY
SHORT FORM STANDING

EVERY PENNY COUNTS, INC.
0100541981

I, the Treasurer of the State of New Jersey, do
hereby certify that the above-named
New Jersey Domestic Profit Corporation was
registered by this office on January 28, 1993.

As of the date of this certificate, said business
continues as an active business in the State of New
Jersey.  Annual Reports are outstanding for the
following year(s):
2005
2006

I further certify that the registered agent and
registered office are:

Bertram V Burke
1526 Ocean Ave
Sea Bright, NJ 99999

*Continued on next page . . .*



STATE OF NEW JERSEY
DEPARTMENT OF TREASURY
SHORT FORM STANDING

EVERY PENNY COUNTS, INC.



IN TESTIMONY WHEREOF, I have
hereunto set my hand and
affixed my Official Seal
at Trenton, this
27th day of April, 2007

*Bradley Abelow*

Bradley  Abelow
State Treasurer

# EXHIBIT E



Slip Copy
Slip Copy, 2007 WL 28295 (D.Del.)
**(Cite as: 2007 WL 28295 (D.Del.))**

Page 1

¢

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
UD TECHNOLOGY CORPORATION, Plaintiff,
v.
PHENOMENEX, INC., Defendant.
**C.A. No. 05-842-GMS.**

Jan. 4, 2007.
Michael P. Kelly, McCarter & English, LLP,
Wilmington, DE, for Plaintiff.

John W. Shaw, Young, Conaway, Stargatt & Taylor,
Chad Michael Shandler, Richards, Layton & Finger,
Wilmington, DE, for Defendant.

*MEMORANDUM*

GREGORY M. SLEET, United States District
Judge.

**I. INTRODUCTION**

*1 The plaintiff, UD Technology Corporation
("UDTC"), filed the above captioned suit, against
Defendants Phenomenex, Inc. ("Phenomenex") and
Research Corporation Technologies ("RCT"),
alleging patent infringement, breach of contract,
violation of the covenant of good faith and fair
dealing, misappropriation of trade secrets, violation
of the Uniform Deceptive Trade Practices Act, unjust
enrichment, and conversion. On July 21, 2006,
UDTC filed a stipulation of dismissal, dismissing
RCT from the case, with prejudice. (D.I.37.)
Presently before the court is Phenomenex's motion to
dismiss UDTC's complaint pursuant to Federal Rules
of Civil Procedure 12(b)(6) and 12(b)(1), and
UDTC's motion to amend its complaint. For the
reasons set forth below, the court will (1) grant-in-
part and deny-in-part Phenomenex's motion to
dismiss and (2) grant-in-part and deny-in-part
UDTC's motion to amend.

**II. BACKGROUND**

In March of 1990, the University of Delaware (the
"University") entered into a contract with RCT for
"Disclosure, Evaluation and Commercialization of

Inventions" (the "DECI"). (D.I.26, Ex. A.) In the
DECI contract, the University granted RCT certain
rights to market and promote the University's
proprietary technologies. *Id.*

In or around 1991, Drs. Mary Wirth and Hafeez O.
Fatunmbi were working in the Department of
Chemistry and Biochemistry at the University on the
study of surface chemistries relating to substrates
such as silica beads used in chromatographic
processes. (D.I.1, Compl.¶ ¶ 12, 14.) This work
culminated in an application for a patent. (D.I.1,
Compl.¶¶ 14-15.) On June 17, 1992, RCT filed U.S.
Patent Application No. 900,215 (the "Application")
to protect Drs. Wirth and Fatunmbi's research. *Id* .

In August 1992, RCT and Phenomenex entered into
the "Materials Treatment Agreement," which allowed
Phenomenex to submit certain materials for treatment
according to the technology in the Application, and
an opportunity to use the treated materials for
noncommercial research purposes. (D.I.26, Ex. B.)
According to the Materials Treatment Agreement,
Drs. Wirth and Fatunmbi (the "Inventors") had
assigned the Application to RCT. *Id.*

In March 1993, RCT and Phenomenex entered into
the "Evaluation License Agreement," in which RCT
granted Phenomenex a license to make and use
products, and to practice processes, using the
technology in the Application, for evaluation of the
"invention" described in the Application. (D.I.26, Ex.
C.)

During RCT's ownership of the Application and
claimed technology, U.S. Patent No. 5,599,625 ("the
'625 patent"), entitled "Products Having Multiple-
Substituted Polysiloxane Monolayer," issued to Drs.
Wirth and Fatunmbi (the "Inventors"), on February 4,
1997. (D.I.1, Compl.¶ 27.) On August 10, 2001,
RCT assigned to the University its "entire right, title
and interest" in the ' 625 patent. (D.I.26, Ex. E.) This
assignment was pursuant to an "Agreement to
Assign" between RCT and the University, effective
July 24, 2001. *Id.*

*2 Plaintiff UDTC owns and manages intellectual
property developed through the University's scientific
research and doctorate programs. (D.I.1, Compl.¶ 1.)

**III. STANDARDS OF REVIEW**

Slip Copy                                                                                          Page 2
Slip Copy, 2007 WL 28295 (D.Del.)
**(Cite as: 2007 WL 28295 (D.Del.))**

### A. Rule 12(b)(1) Standard

A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of the court to address the merits of a plaintiff's complaint. A motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction can take two forms: it can attack the complaint on its face (facial attack), or it can attack the existence of subject matter jurisdiction in fact (factual attack). *Mortensen v. First Federal Savings and Loan,* 549 F.2d 884, 891 (3d Cir.1977). When reviewing a facial attack, the court must consider the allegations of the complaint as true, making all reasonable inferences in the plaintiff's favor. *Id.*

When reviewing a factual attack, however, the court is free to weigh evidence outside the pleadings to resolve factual issues bearing on jurisdiction and to satisfy itself as to the existence of its power to hear the case. *Mortensen,* 549 F.2d at 891. Therefore, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the court from evaluating the merits of jurisdictional claims for itself. *Id.* The plaintiff bears the burden to prove that jurisdiction does in fact exist. *Id.* However, the plaintiff's burden is relatively light, since "dismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit as to not involve a federal controversy.' " *Kulick v. Pocono Downs Racing Ass'n,* 816 F.2d 895, 899 (3d Cir.1987) (quoting *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 666 (1974)).

### B. Rule 12(b)(6) Standard

In ruling on a motion to dismiss for failure to state a claim, the factual allegations of the complaint must be accepted as true. *See Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997); *Nami v.. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). Moreover, a court must view all reasonable inferences that may be drawn from the complaint in the light most favorable to the non-moving party. *See Jenkins v. McKeithen,* 395 U.S. 411, 421 (1969); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991). A court should dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See Graves,* 117 F.3d at 726; *Nami,* 82 F.3d at 65 (both *citing Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

### C. Motion to Amend Standard

Leave to amend a pleading should be "freely given when justice so requires." Fed.R.Civ.P. 15(a). The court has discretion to deny leave to amend when there exists undue delay, bad faith, dilatory motive or undue prejudice to the opposing party, or when the amendment would be futile. *See Foman v. Davis,* 371 U.S. 178, 182 (1962); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997).

### IV. DISCUSSION

**\*3** "When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot." *In Re Corestates Trust Fee Litig.,* 837 F.Supp. 104, 105 (E.D.Pa.1993), aff'd 39 F.3d 61 (3d Cir.1994). Therefore, the court will first turn its attention to the 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.

### A. Patent Infringement (Count I)

UDTC first contends that Phenomenex has infringed and continues to infringe one or more claims of the '625 patent by its offer of sale and sale of certain Phenomenex products, including products marketed under the name Jupiter. (D.I.1, Compl.¶ 28.) Phenomenex argues that UDTC lacks standing to assert a claim for patent infringement arising prior to 2001 because UDTC does not allege that UDTC was transferred the right to sue for past infringement, and its right to sue for post-2001 patent infringement is insufficiently pled.

Standing to sue for infringement has traditionally been confined to those with an ownership interest in the patent at the time of the infringement. *Arachnid, Inc. v. Merit Indus., Inc.,* 939 F.2d 1574, 1579 (Fed.Cir.1991) ( "The general rule is that one seeking to recover money damages for infringement of a United States patent (an action 'at law') must have held the legal title to the patent during the time of the infringement."). Where a plaintiff, who is not the inventor, seeks to sue for infringement, both past and present, the plaintiff must have obtained an assignment of the patent, coupled with an assignment of a right of action for past infringements. *Id.* The latter assignment must be express, and cannot be inferred from an assignment of the patent itself. *Id.* (citing *Moore v. Marsh,* 74 U.S. (7 Wall.) 515, 522

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 28295 (D.Del.)
(Cite as: 2007 WL 28295 (D.Del.))

(1868)). Applying these principles to the facts alleged in UDTC's complaint and the contracts available for the court's review, the court concludes that UDTC does not demonstrate standing to sue for any period of infringement of the '625 patent.

UDTC's complaint alleges two assignments from the University to UDTC (D.I.1, Compl.¶ 8), but does not identify any time frame or relate such assignments chronologically with an alleged assignment from RCT to the University on July 24, 2001 (D.I.1, Compl.¶ 30). UDTC cites to RCT's Answer to UDTC's original complaint as support for its claim that RCT assigned its rights to the '625 patent and all related contractual interests to the University. (D.I. 26 at 11, Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss.) UDTC not only argues that RCT admits UDTC's allegation of a complete transfer of rights, but UDTC also points out that RCT asserts no rights under the '625 patent in this action. Id. Nevertheless, RCT's Answer to UDTC's complaint bears no weight or relevance as to the propriety and sufficiency of UDTC's complaint against Phenomenex.

**\*4** Even if RCT's Answer was arguably relevant to the issue of the sufficiency of UDTC's complaint, the substance of the cited portion of RCT's Answer does not help UDTC. Indeed, it does nothing more than admit the averments of paragraph 30 of the Complaint. Paragraph 30 alleges that, pursuant to a July 24, 2001 Agreement to Assign, RCT assigned all of its right, title, and interest in and to the '625 Patent and the inventions described therein to the University on August 10, 2001. This "admission" does not address the issue of whether UDTC has the right to sue for past infringement. Likewise, it offers no insight into the question of when or by what instrument UDTC was assigned all of the University's "past, present and/or future right, title and interest in and to the technology and any agreements, causes of action and/or third party beneficiary rights associated with the '625 Patent to UDTC." (D.I .1, Compl.¶ 8.)

*1. Right to Sue for Past Infringement, Prior to August 10, 2001*

In its opposition brief, UDTC cites to *Minco, Inc. v. Combustion Engineering, Inc.* [FN2] for the proposition that "the intent of the parties control." (D.I. 26 at 12, Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss.) This assertion, however, misconstrues the holding in *Minco*. The Federal Circuit did indeed affirm the trial court's decision that the plaintiff could recover damages for infringement occurring before the date of the assignment to the plaintiff, but the

Federal Circuit did so by analyzing whether *"the assignment agreement manifests an intent"* to transfer the right to sue for prior infringement. *Minco*, 95 F.3d at 1117 (emphasis added). In other words, in *Minco*, the Court of Appeals found clear intent from the words of the assignment itself. *Id.* ("The express reference to past infringement in the MAC assignment expanded the scope of the term 'right, title, and interest' to encompass the right to sue for prior infringement.").

FN2. 95 F.3d 1109, 117 (Fed.Cir.1996).

*Chisum* has aptly summarized a long line of Supreme Court and Federal Circuit cases as holding that if ownership of the patent is transferred, the transferor retains the right to sue for pre-transfer infringements unless that right is expressly relinquished in the transfer. CHISUM § 21.03[2][g][I]. In spite of this well-settled federal law, UDTC urges the court to apply Delaware and Arizona state law regarding the interpretation of contract language to "fix the scope and breadth of [the] assignment ." (D.I. 26 at 12.) Determining whether the right to sue for prior infringement has been transferred turns on the proper construction of the assignment agreements, which is a matter of state contract law. *Minco*, 95 F.3d at 1117. The Delaware and Arizona cases to which UDTC directs the court's attention, however, concern contracts with ambiguous terms. None of these cases permit resort to extrinsic evidence for unambiguous contract language, as in the case here. Further, the court has not found any Arizona or Delaware case law that sanctions the contract interpretation UDTC asks the court to adopt under the facts of this case.

**\*5** Moreover, the agreements that the court has in its possession and to which the court must confine its analysis, in the absence of any other evidence from UDTC, do not manifest any intent to confer a right to sue for past infringement. In the absence of an express provision to sue for past damages, as is the case here, the court cannot confer standing on UDTC to pursue damages for alleged patent infringement that occurred before it was assigned the '625 patent.

Additionally, UDTC directs the court's attention to the litigation conduct of RCT as a reason to infer a provision not expressed in the assignment. Specifically, UDTC suggests that because RCT did not file a cross-claim, counter-claim, or otherwise assert an affirmative defense, the totality of circumstances indicates that RCT conveyed to the University any rights it had to sue for past

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 28295 (D.Del.)
(Cite as: 2007 WL 28295 (D.Del.))

infringement. (D.I. 26 at 13.) Simply put, the conduct of third-party RCT in litigation is not evidence from which the court can now conclude that UDTC was assigned a right to sue for past infringement.

The court therefore rejects UDTC's contention that it has sufficiently alleged a right to sue for past infringement. Moreover, the court is left wondering whether UDTC indeed possesses the right to sue for patent infringement alleged to have occurred during any period.

### 2. Right to Sue for Infringement After August 10, 2001 Assignment

The court notes that UDTC does not even attach as an exhibit to its complaint, responsive briefs, or amended complaint, the instrument that purportedly conferred to UDTC the rights to bring this lawsuit. The party asserting the existence of subject matter jurisdiction bears the burden of proof when contesting a Rule 12(b)(1) motion. *See, e.g. Mortensen, 549 F.2d at 891 n. 16 (3d Cir.1977).* Here, UDTC states that "[a]t such time as it becomes necessary (because it is not now in the context of a motion to dismiss), UDTC will adequately evidence the assignment from the University to UDTC." (D.I. 26 at 9.) Unfortunately, for UDTC, as the saying goes, there is no time like the present. More specifically, the necessary time was immediately after subject matter jurisdiction was challenged, i.e. when UDTC filed its opposition to Phenomenex's motion to dismiss. *See Cedars-Sinai Medical Center v. Watkins, 11 F.3d 1573, 1584 (Fed.Cir.1993)* ("Once challenged, allegations alone are insufficient to meet the complainant's burden [to support its contention regarding the court's jurisdiction].").

In Phenomenex's Opening Brief in Support of its Motion to Dismiss, Phenomenex states that "UDTC's claims are insufficient as pled and must be dismissed, insofar as UDTC has failed to state claims upon which relief can be granted and improperly alleged subject matter jurisdiction for its claim of patent infringement." (D.I. 23 at 1, Def.'s Br. ISO Mot. to Dismiss.) In apparent deference to UDTC's conclusory allegation that the University assigned its rights in the '625 patent to UDTC, Phenomenex appears to retreat from its initial argument as to UDTC's lack of standing to pursue post-2001 patent infringement. *See Def.'s Reply Br. ISO Mot. to Dismiss (D.I. 32 at 2).* The court will not, however, cover Phenomenex's withdrawal. *See Mennen Co. v. Atlantic Mt. Ins. Co., 147 F.3d 287 (3d Cir.1998)* ("A party may not confer or defeat jurisdiction by mere

pleading. Subject matter jurisdiction depends upon facts, and *when any question arises as to the existence of jurisdiction, a federal court is obligated to make an independent determination of those facts.").*

**\*6** Phenomenex has raised a colorable question as to whether this court has jurisdiction to hear UDTC's pre-2001 patent infringement claims. The court agrees with Phenomenex that UDTC cannot pursue its claim for past infringement of the '625 patent before this forum. Fulfilling its obligation to make an independent determination, the court also finds proof of subject-matter jurisdiction lacking for UDTC's post-2001 patent infringement claims. The court will, however, give UDTC another opportunity to demonstrate that it has the right to pursue post-2001 infringement claims, as set forth in the accompanying order.

### B. Contract Claims (Counts II-V) [FN3]

> FN3. Counts IX-X were also contract-related counts against RCT. Since RCT has been dismissed from this action, the court will not address counts IX-X, as they are moot.

### 1. Breach of Contract

UDTC alleges that Phenomenex has breached the Materials Agreement between RCT and Phenomenex and the Evaluation License Agreement between the same parties. Neither UDTC or the University of Delaware contend they were parties to either contract. Phenomenex argues that UDTC has not pled facts sufficient to confer standing to assert claims for breaches of the Materials Treatment and Evaluation License Agreements. The court agrees.

A fundamental principle of contract law provides that only those entities that are parties to a contract or conferred rights to or under a contract have standing to enforce it. *See Insituform of North America, Inc. v. Chandler, 534 A.2d 257 (Del. Ch.1987)* ("Analysis of the standing issue begins with recognition of the general rule that strangers to a contract ordinarily acquire no rights under it unless it is the intention of the promisee to confer a benefit upon such third party."). *See generally 2 Williston on Contracts § 356 (1959); 4 Corbin on Contracts § 772, 774 (1951).* The developed law has characterized persons who, while not being parties to a contract, nonetheless benefit from its performance in one of three ways: as donee beneficiaries, as creditor

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

beneficiaries, or as incidental beneficiaries. <u>Restatement of Contracts § 133 (1932);</u> *see generally* <u>Restatement of Contracts (Second) § 302 (1979)</u>. Where a contract only incidentally or remotely benefits a third party, but is not expressly made for the benefit of the party, that party cannot recover thereon. <u>*Fobes v. Blue Cross and Blue Shield of Arizona, Inc.,* 861 P.2d 692, 696 (Ariz.Ct.App.1993); see also German Alliance Ins. Co. v. Home Water Supply Co.,</u> 226 U.S. 220, 230 (1912) ("Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement to which he is not a party, he must, at least, show that it was intended for his direct benefit.").

As a threshold matter, the court finds the factual allegations in the complaint facially deficient. *See* <u>Fed.R.Civ.P. 8(a)</u> and <u>9(f)</u>. <u>Rule 8(a)</u> requires a claimant to set forth (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim *showing that the pleader is entitled to relief,* and (3) a demand for judgment for the relief the pleader seeks. <u>Rule 9(f)</u> states: "For the purpose of testing the sufficiency of a pleading, *averments of time and place are material* and shall be considered like all other averments of material matter." <u>[FN4]</u>

> FN4. "Whether or not statements in a pleading of time and place are required is determined by the substantive nature of the suit ... A specific statement of time has been required in numerous types of cases. For example, in pleading claims based on a written contract or promissory note, it usually is necessary to allege the time it was signed ... because this helps identify the document that is the subject matter of the dispute." <u>5A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1309 (2d ed.1995).</u>

*7 Notably, UDTC's complaint fails to specifically allege that it possesses rights to enforce the Materials Treatment and Evaluation License Agreements. The closest averment the court can find within the complaint is the conclusory allegation of paragraph 8, which alleges two unidentified assignments from the University to UDTC. (D .I.1, Compl.¶ 8.) As noted above, however, neither the University nor UDTC are parties to the agreements UDTC is attempting to enforce. Additionally, the alleged assignments of

paragraph 8 of the complaint provide no temporal context. That is, the averment does not identify either contract by name or time frame, nor does it relate either assignment contextually and chronologically with an alleged assignment from RCT to the University on August 10, 2001. *See* Compl. ¶ 30. (D.I.1.) Moreover, the alleged assignment from RCT to the University averred in paragraph 30, does not confer an assignment of contractual rights, only prospective ownership rights to the ' 625 patent. *Id.*

In response to Phenomenex's challenge to UDTC's standing, UDTC states that it has alleged "rights to pursue its claims as (i) a party (either as a principal to its agent RCT or directly), (ii) as a disclosed and intended third party beneficiary thereto, and (iii) as previously stated, via total assignment of rights. (D.I.1-Compl.¶ ¶ 7-8)." (D.I. 26 at 13-14). First, the only contracts the court has in its possession clearly show that UDTC was not a party. Phenomenex correctly points out that UDTC did not plead agency and cannot defeat a motion to dismiss by now advancing the theory that RCT, originally a defendant in this action, was an agent for UDTC.

Second, UDTC did not plead that it was an intended third party beneficiary and the Materials Treatment and Evaluation License Agreements don't disclose it as such. [FN5] Furthermore, the Evaluation License Agreement contains the following language: *"No Third-Party Beneficiaries.* None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any third party." While not as explicit as the Evaluation License Agreement, the Materials Treatment Agreement contains no mention of UDTC and only passively refers to the University of Delaware in further identifying the Inventors of what has become the '625 patent. *See* D.I. 26, Ex. B ("Drs. M.J. Wirth and H.O. Fatunmbi ("INVENTORS") of the University of Delaware have invented a Multiple-Substituted Polysiloxane Monolayer ('INVENTION') as described in U.S. Patent Application No. 900,215, filed 06/17/92 ('APPLICATION')."). This passing reference gives no indication that the University was an intended third party beneficiary. Furthermore, the Materials Treatment Agreement itself states that the Inventors assigned the technology at issue to RCT.

> FN5. The court need not engage the purely academic exercise of determining whether, under Arizona or Delaware law, UDTC qualifies as an intended third party beneficiary as it fails to plead third-party beneficiary status.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 28295 (D.Del.)
(Cite as: 2007 WL 28295 (D.Del.))

Finally, UDTC offers no support for its allegation that RCT assigned any contractual rights to the University. Given Phenomenex's subject-matter jurisdictional challenge, UDTC must first establish that RCT assigned both agreements to the University, before it can rely on an alleged assignment of those rights from the University to UDTC. Instead, UDTC alleged that RCT retained contractual rights to "police and monitor all third party use of the Licensed Technology." (D.I.1, Compl.¶ 34.) This allegation formed part of the basis for UDTC's now-dismissed suit against RCT. At the time of the complaint, UDTC claimed that RCT was still responsible for monitoring the Licensed Technology. (D.I.1, Compl.¶ 33) ("Pursuant to the Marketing Agreement, RCT was *and is* responsible for monitoring the Licensed Technology...."). These allegations, which find support in the Marketing Agreement, the July 2001 Agreement to Assign, and the accompanying August 2001 Deed of Assignment, contradict UDTC's argument that it can pursue its contract claims pursuant to "total assignment" of rights. For these reasons, UDTC's breach of contract claims must be dismissed.

### 2. Breach of the Covenant of Good Faith & Fair Dealing

**\*8** The court agrees with Phenomenex's contention that UDTC does not have standing to pursue an alleged breach of the covenant of good faith and fair dealing,. See *Leal v. Allstate Ins. Co.,* 17 P.3d 95, 99 (Ariz.Ct.App.2000) ( "Courts imply a covenant of good faith and fair dealing in every contract. The duty to act in good faith arises by virtue of a contractual relationship. Thus, a third-party claimant, a stranger to the contract, cannot sue the insurer for tortious breach of the duty of good faith."); *Superior Vision Servs. v. Reliastar Life Ins. Co.,* 2006 Del. Ch. LEXIS 160 (Del. Ch., Aug. 25, 2006, Decided) ("[I]mposing an obligation on a contracting party through the covenant of good faith and fair dealing is a cautious enterprise and instances should be rare."). The court can find no grounds upon which to impose a duty of good faith and fair dealing flowing from Phenomenex to UDTC. In the absence of any evidence demonstrating an assignment of contractual rights to UDTC, [FN6] the court concludes that UDTC's contract-related claims must be dismissed.

> FN6. The court acknowledges that Phenomenex has set forth additional grounds for the dismissal of UDTC's contract claims, however, the court has concluded that UDTC lacks standing and

therefore, the court will not reach the merits of Phenomenex's additional arguments.

### 3. Misappropriation of Trade Secrets

In Counts IV and V of its complaint, UDTC alleges that Phenomenex willfully misappropriated the University's trade secrets, in violation of Ariz.Rev.Stat. Sec. 44 and 6 Del. C. Sec.2001. According to paragraphs 60 and 68 of its complaint, UDTC predicates its claims of trade secret misappropriation on an agreement between Phenomenex and RCT that allegedly required Phenomenex to keep the University's secrets. (D.I.1, Compl.¶ ¶ 60, 68.) Where the duty to keep a divulged trade secret arises from a contract, it follows that only those parties to the contract have standing to pursue a claim of trade secret misappropriation based on a breach of that contract. For the reasons previously stated, the court concludes that UDTC does not have standing to pursue contract-based claims against Phenomenex. Therefore, UDTC's trade secret misappropriation claim must be dismissed.

### C. Claims for Violation of the Uniform Deceptive Trade Practices, Unjust Enrichment, and Conversion (Count VI-VIII)

In Count VI of its complaint, UDTC alleges that Phenomenex engaged in conduct designed "to deceive the public to whom Phenomenex markets such that it represents expertise, experience and product design *that are the result of secret misappropriation of the Licensed Technology and the '625 Patent.*" (D.I.1, Compl.¶ 73) (Emphasis added). In Count VII, UDTC alleges that Phenomenex benefited from "Phenomenex's unauthorized use of the Licensed Technology and '625 Patent." (D.I.1, Compl.¶ 79.) UDTC's allegations of trade secret misappropriation preempt its claims of deceptive trade practices and unjust enrichment. This is so because the latter claims are based expressly upon the alleged misappropriation of trade secrets. The misappropriation is alleged to stem from Phenomenex's alleged use of and benefit from the University's confidential information. See *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH,* 386 F.3d 1122, 1146 (Fed.Cir.2004); *Ethypharm S.A. v. Bentley Pharm., Inc.,* 388 F.Supp.2d 426, 433 (D.Del.2005) (granting motion to dismiss fraud and unjust enrichment claims as preempted). Since no additional facts, independent of those alleged in support of its trade secret misappropriation claim, have been averred to support these claims, UDTC's deceptive trade practice and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 28295 (D.Del.)
(Cite as: 2007 WL 28295 (D.Del.))

unjust enrichment claims are therefore dismissed, as preempted.

*9 The eighth count of the complaint alleges conversion. (D.I.1, Compl.¶ 82.) The extent to which UDTC's conversion action is predicated only on the same facts upon which it bases its deceptive trade practice and unjust enrichment claims, the conversion claim is clearly preempted. *Ethypharm,* 388 F.Supp.2d at 433.

It is conceivable that UDTC also presents a claim for conversion of tangible property in addition to its claim of conversion of intellectual property. In its complaint, UDTC refers to "other property" (D.I.1, Compl.¶ 82) ("Phenomenex, by exercising control and dominion over the Licensed Technologies and the '625 Patent and *other property* in an unauthorized manner, systematically and secretly deprived UDTC of its interest in its intellectual property.") (emphasis added). UDTC later defines Licensed Technology to include "other technology, including any trade secrets and/or know how associated therewith, that is encompassed by any of the Marketing Agreement, the Materials Agreement and the Evaluation Agreement, including Licensed products and Licensed Processes as defined in those Agreements." (D.I.1, Compl. ¶ 35.) In its opposition brief, however, UDTC resolves any ambiguity in its conversion claim by stating what it believes to be the elements of its conversion claim: "(i) UDTC has a *property interest in the confidential information, trade secrets and patents;* (ii) that UDTC had right to prevent others from using such information, trade secrets and patents; and (iii) that UDTC has sustained damages. *See Facciolo Constr. Co. v. Bank of Del.,* 514 A.2d 413 (Del.1986); *Goodrich v. E.F. Hutton Group, Inc.,* 542 A.2d 1200, 1203 (Del. Ch.1988)." (D.I. 26 at 32.) Aside from the fact that UDTC cites the *Facciolo* and *Goodrich* cases, which involve tangible property and do not discuss the interplay between conversion and claims concerning intellectual property, UDTC's listing of the necessary elements of its conversion claim makes no mention of tangible property. Where UDTC makes no claim of conversion of tangible property, the court sees no obligation to preserve this otherwise potentially viable, albeit narrow, subset of its conversion claim.

For at least these reasons, Count VIII of UDTC's complaint for conversion must be dismissed.

**D. Claims for Relief (Count XI-XII)**

In Counts XI and XII of its complaint, UDTC does

not state a claim for relief, but rather incorporates the allegations of its previous ten claims, and requests additional remedies. In Count XI, UDTC demands that "Phenomenex provide to it an accounting of all past, present and future uses of the Licensed Technology and the '625 Patent and account for all revenues, benefits or otherwise accrued from such use." (D.I. 1, Compl. at 24.) In Count XII, UDTC asks the court to impose a constructive trust for the benefit of UDTC "in an amount to be determined at the time of trial." (D.I. 1, Compl. at 26.) As these counts do not allege any different claims for which relief can be granted, other than claims previously alleged, the court will treat these counts as an additional prayer for relief. Counts XI and XII are therefore dismissed.

**E. Motion to Amend**

*10 Recognizing that motions to amend shall be granted freely, the court views this motion differently than the typical motion to amend. First, in its terse motion, UDTC states that the reasons for its motion are "in the interest of judicial economy" in light of the fact that the "dismissal [of RCT] made extraneous certain allegations of the Complaint." (D.I. 38, Pl.'s Mot. to Amend at 1.) In its reply brief, UDTC states that its motion to amend the complaint was an effort "to simplify the pleadings for the Court." (D.I. 43, Pl.'s Reply Br. at 1.) The court finds these stated reasons curious in light of UDTC's letter of July 21, 2006 (D.I.39), and the actual proposed amendments to the complaint, which also attempt to bolster the standing deficiencies. [FN7] UDTC's July 21st letter states that the motion to amend and presumably, the proposed amendments, "reflect[s] that UDTC no longer seeks to prosecute such claims [against RCT]." *Id.* While UDTC's proposed amendments do eliminate Counts IX-X against RCT, they also remove contextual background necessary for the standing analysis of the remaining counts, found in paragraphs 16-17 and 33-34 of the original complaint.

> FN7. The court is also in receipt of UDTC's May 15, 2006 letter (D.I .36), in which UDTC makes reference to a "Clarification" that would be presented to the court, rendering moot RCT's Motion to Dismiss. According to UDTC, the "Clarification" would be a stipulation that would restate prior assignments and "for the avoidance of any further doubt, assign any such right, title and interest as RCT still may have to UDTC." To date, the court has not received

Slip Copy                                    Page 8
Slip Copy, 2007 WL 28295 (D.Del.)
(Cite as: 2007 WL 28295 (D.Del.))

the aforementioned "Clarification." Even if the court was in receipt of such a "Clarification," the court is not inclined to accept assignments that post-date the civil action upon which the lawsuit relies. "As a general matter, parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue. Parties could justify the premature initiation of an action by averring to the court that their standing through assignment is imminent. Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignments in order to expand their arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day." *Gaia Technologies, Inc. v. Reconversion Technologies, Inc., 93 F.3d 774, 780 (Fed.Cir.1996), as amended on rehearing, 104 F.3d 1296 (Fed.Cir.1996).*

Further, UDTC's proposed amendments add substance to the complaint, which would only serve to bolster arguments made in its Opposition to Phenomenex's Motion to Dismiss. For example, UDTC seeks to change paragraph 7 of the original complaint to add that RCT acted "on behalf of" the University instead of "agreed with the" University to market intellectual property. This change would appear to lend support to the later-argued, but not alternatively pled, position that RCT acted as an agent for the University. UDTC also seeks to add a new paragraph asserting that "At all times relevant, University was the owner of the intellectual property at issue herein, including the right to sue for past, present and future infringement, and to pursue contract damages pursuant to the contracts identified herein, between RCT and Phenomenex." (D.I.38, Ex. B.)

Even if the court were to allow these substantive amendments, the amendments would be futile, in that Phenomenex has asserted factual challenges to subject matter jurisdiction and UDTC's standing. UDTC's proposed additions are nothing more than conclusory and bald assertions, which the court is not obliged to credit. *See United States v. Vespe, 868 F.2d 1328, 1340 (3d Cir.1989)* (stating conclusory

statements need not be credited).

Insofar as UDTC's amended complaint seeks to make substantive changes that either remove necessary context or add further conclusory allegations regarding ownership or standing, and such amendments do not change the outcome of Phenomenex's motion to dismiss, those amendments are denied. The court will permit UDTC to amend its complaint to remove Counts IX-X.

***ORDER***
IT IS HEREBY ORDERED that:
  1. Phenomenex's Motion to Dismiss (D.I.22) is GRANTED IN PART and DENIED IN PART.
  **\*11** (a) UDTC's claim for patent infringement alleged to have occurred prior to August 10, 2001, is dismissed.
  (b) UDTC's claim for patent infringement alleged to have occurred after August 10, 2001, is conditionally dismissed. The court will grant UDTC leave to provide a more definite statement, including evidence of an assignment from the University of Delaware to UDTC for alleged patent infringement occurring after August 10, 2001, within 30 days of this Order.
  (c) Counts II-XII are dismissed.
  2. UDTC's Motion to Amend (D.I.38) is GRANTED IN PART and DENIED IN PART.

Slip Copy, 2007 WL 28295 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

# Inventor wants credit for BofA's savings program

**Lawsuit claims bank infringed on patent with "Keep the Change"**

Charlotte Business Journal - March 30, 2007
by Will Boye
Staff writer

A Florida inventor is suing Bank of America Corp. over its Keep the Change program, saying the bank infringed on his patent after he offered to license it to BofA as early as 2001.

Every Penny Counts Inc., a Cape Coral, Fla.-based intellectual-property company, filed an amended complaint in federal court last week, naming BofA and Visa USA Inc. as defendants and seeking unspecified damages.

In 2000, company-owner Bertram Burke obtained his "rounder patent" from the U.S. Patent and Trademark Office. The patent outlines a system for consumers to save or donate money any time they spend it by rounding up the amount of the transaction and transferring the excess funds to a designated account.

In the suit, Every Penny Counts claims it contacted BofA in December 2001 to gauge the bank's interest in a licensing agreement that would allow it to use the system to generate new accounts. In November 2004 and for several months after, the firm had written communications and discussions with BofA about a potential agreement, the suit says.

Those conversations continued until the spring of 2005, when the bank broke off discussions.

Patent disputes

In October 2005, BofA launched Keep the Change. In that program, customers who make purchases with their BofA Visa check cards have their transactions rounded up to the nearest dollar.

The difference is transferred from the customer's checking account to a savings account. For example, for a sandwich that costs $4.50, the sum will be rounded up to $5, and 50 cents will be moved to a savings account.

BofA has 4.3 million accounts in the program, and BofA customers have saved more than $400 million since its launch, according to a company spokeswoman. She declines to comment on the suit.

A few months before Keep the Change was launched, BofA filed its own patent application for an "automatic savings program."

In its application, the bank says customers could also use the program to make contributions to other accounts such as a charity, a grandchild's savings account or a 529 college-savings plan. That patent application is pending.

"Those who make less than the median-income level, or are raising families, or are new immigrants, find it particularly challenging to put money away for emergencies -- a child's education, or a special purchase," the application says. "Even affluent consumers who do have the means to save money often feel that they could save more."

In the bank's information-disclosure statement, a form filed with its application that lists other patents or relevant material to the proposed invention, BofA lists three of Burke's patents, including his rounder patent.

Burke says he has reviewed BofA's patent application and thinks it will be denied because of his existing patent.

Before moving to Florida, Burke was a clinical psychologist in New Jersey but also did management-consulting work for banks such as Summit Bancorp.

He retired in the early 1990s and says he came up with the rounding concept in 1993, when he first filed his patent application and formed his company.

Burke, who has never filed suit over a patent before, says he was initially upset when the bank launched Keep the Change but now has a sense of humor about the situation.

"If the No. 1 (retail) bank in the country is looking at this thing and saying it's theirs, then it must be damn well pretty good," he says, "because why would they do it unless they believe in it?"

Further complications
The case became more complicated last week when BofA filed a suit in federal court in Delaware against Every Penny Counts and a company called SIP Assets. The bank says SIP claimed it held the rounder patent in 2004, but records show Every Penny Counts is the patent holder.

In its complaint, BofA says it "is in real apprehension" that SIP might also subject the bank to a "multiplicity of suits" over the patent infringement. The bank is seeking a declaratory judgment from the court saying it did not infringe.

According to Burke, SIP is a firm that previously had a marketing agreement with Every Penny Counts but has no claim to his patent.

BofA has about two weeks to respond to Burke's claim.

In the meantime, Burke says he has had discussions with other banks such as Citigroup Inc., Washington Mutual Inc. and Wachovia Corp. about licensing the patent for programs similar to Keep the Change.

QUICKINFO
**KEEP THE CHANGE**

**Launched:** October 2005

**What it does:** Account holders who sign up have transactions on check cards rounded up to nearest dollar with difference deposited in savings.

**Results:** BofA has 4.3 million accounts in the program, and BofA customers have saved more than $400 million since its launch.

# EXHIBIT G



-----Original Message-----
**From:** Edward Grau [mailto:sipisit@yahoo.com]
**Sent:** Wednesday, April 04, 2007 11:40 AM
**To:** bvburke@everypennycounts.com
**Cc:** Bebert Azran; Thierry Wizman; Howard Jahre; Rich Kronthal
**Subject:** Bank of America, N.A. v. SIP Assets, LLC and Every Penny Counts, Inc., Case No. 07-159

Mr. Burke,

SIP Assets LLC (SIP) was served on March 20, 2007 as a defendant in the District of Delaware case *Bank of America, N.A. v. SIP Assets, LLC and Every Penny Counts, Inc.*, Case No. 07-159 (the Case). The Directors of SIP were notified of the serving by our Corporation Service Company via telephone and courier service on March 30, 2007.

In order to defend itself against the complaints and subsequent relief sought therein, SIP is required to respond to the Plaintiff's Attorney and the Clerk of the United States District Court in the District of Delaware on or before April 9, 2007.

Based on the surviving Confidentiality terms of the License Agreement executed on April 20, 2004 (the Agreement) between SIP and Every Penny Counts, Inc. (EPC), SIP is required to provide EPC with prompt notice of all of the confidential information needed to be disclosed prior to respectfully responding to the complaint of the Plaintiff's Attorney and the Clerk of the United States District Court in the District of Delaware.

In its defense, SIP will disclose the existence and execution date of the Agreement as well as terms contained therein relating to "EPC Licensed Patents" and "Field of Use".

SIP will also disclose that it ceased having protection from, or rights to, any EPC patents in any form as indicated in EPC's written notice termination of the Agreement and all subsequent Amendments to said Agreement.

In the absence of a protective order or other remedy protecting SIP from the complaints and requirements to respond as set forth in the Case, SIP will be filing a response on or before April 9, 2007.


Edward Grau
(646) 662-2366

--
No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.446 / Virus Database: 268.18.25/745 - Release Date: 4/3/2007 12:48 PM

# EXHIBIT H

**EVERY PENNY COUNTS, INC. (A NEW JERSEY CORPORATION)**

**AND**

**EVERY PENNY COUNTS, INC. (A DELAWARE CORPORATION)**

## ASSET ACQUISITION AGREEMENT

This Asset Acquisition Agreement ("Agreement") is made and entered into on this 29th day of June. 2005 ("Effective Date") by and between Every Penny Counts, Inc. a New Jersey corporation ("EPC-NJ"). and Every Penny Counts, Inc., a Delaware corporation ("EPC-DE") (together with EPC-NJ, the "Parties").

WHEREAS. EPC-NJ desires to transfer and convey all of the assets, rights, and obligations of EPC-NJ to EPC-DE; and

WHEREAS. EPC-DE desires to accept and assume all of the assets, rights, and obligations of EPC-NJ:

NOW THEREFORE, in consideration of the premises. mutual promises and covenants contained herein. the Parties agree as follows:

1.   Purchase and Sale of Acquired Assets.  EPC-NJ agrees to transfer, give, grant, set over. assign, convey, release, confirm. and deliver unto EPC-DE, and EPC-DE agrees to accept and assume from EPC-NJ, subject to and upon the terms and conditions contained herein. subject to all existing and contingent obligations, liens, encumbrances and liabilities, all of the properties and assets of EPC-NJ (collectively, the "Acquired Assets"), including the following:

    a.   all real property. improvements, fixtures and fittings thereon. easements, rights-of-way, and other appurtenant rights thereto;

    b.   all tangible personal property (such as machinery, equipment. inventories, raw materials, supplies, manufactured and purchased parts. furniture. automobiles, and trucks);

    c.   all rights with respect to leasehold interests and subleases and rights thereunder relating to the real and personal property:

    d.   all rights of EPC-NJ under all licenses, permits. authorizations, orders, registrations, certificates, variances, approvals. consents and franchises used or useful in connection with the operation of the business of EPC-NJ or any pending applications relating to any of the foregoing;



EXHIBIT

E

e.    all intellectual property, including, but not limited to, rig...ts in and to any and all
patents, trademarks, copyrights, applications therefor, goodwill associated therewith,
licenses and sublicenses granted in respect thereto and rights thereunder, remedies
against infringements thereof and rights to protection of interest therein;

f.    all rights of EPC-NJ under any contracts, indentures, mortgages, instruments, liens,
guaranties, or other agreements relating to the business of EPC-NJ;

g.    all claims, deposits, prepayments, refunds, causes of action, chooses in action, rights
of recovery, rights of set off and rights of recoupment;

h.    all rights in and with respect to the insurance policies and contracts;

i.    all of EPC-NJ's rights to the use of the name "Every Penny Counts, Inc." and any
variations thereof;

j.    all accounts receivable, notes receivable, cash, cash equivalents, securities, prepaid
expenses, and other current assets of EPC-NJ;

k.    all business and financial records, books, ledgers, files, plans, documents,
correspondence, lists, plats, architectural plans, drawings, notebooks, specifications,
creative materials, advertising and promotional materials, marketing materials,
studies, reports, equipment repair, maintenance, or service records relating to EPC-
NJ whether written or electronically stored or otherwise recorded;

l.    all rights in and with respect to the assets associated with all employee benefit plans;

m.    all other assets of EPC-NJ of every kind and description, tangible or intangible,
pertaining to or used in the operations of EPC-NJ.

EPC-NJ further agrees that if for any reason any portion of the Acquired Assets cannot be or
are not fully transferred to EPC-DE, EPC-NJ will use good faith efforts to obtain any needed
consents and shall undertake any and all such actions and execute and deliver any and all such
documents as may be reasonably necessary to complete the transfer and assignment of the Acquired
Assets to EPC-DE.

2.    Consideration for the Acquired Assets.  In consideration of the transfer of the Acquired
Assets, EPC-DE will assume and satisfy or perform when due all debts, obligations, and
other liabilities of EPC-NJ ("Assumed Liabilities"), known and unknown, whenever arising,
including but not limited to all current liabilities of EPC-NJ required in accordance with
generally accepted accounting principles to be set forth on the face of the most recent
balance sheet of EPC-NJ. Any value of the Acquired Assets in excess of the Assumed
Liabilities is intended to be a donation to EPC-DE by EPC-NJ for all purposes.

3.  <u>Closing</u>. Closing shall take place contemporaneously with the execution of this Agreement on the Effective Date. The Acquired Assets shall be deemed as transferred from EPC-NJ to EPC-DE as of the Effective Date.

4.  <u>Headings</u>. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

5.  <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the domestic laws of the Delaware without giving effect to any choice or conflict of law provision or rule (whether of the Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the Delaware.

6.  <u>Amendments and Waivers</u>. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by EPC-DE and EPC-NJ.

7.  <u>Severability</u>. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

   IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date first above written.


                              EVERY PENNY COUNTS, INC. (NJ CORPORATION)


                              By:  Bertram V. Burke
                              Title: Chairman, CEO



                              EVERY PENNY COUNTS, INC (DE CORPORATION)


                              By:  Bertram V. Burke
                              Title: Chairman, CEO


-3-