IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BANK OF AMERICA, N.A., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 07-159-GMS |
| | : | |
| S.I.P. ASSETS, LLC and | : | |
| EVERY PENNY COUNTS, INC., | : | |
| | : | |
| Defendants. | : | |

**REPLY BRIEF IN SUPPORT OF**
**DEFENDANT S.I.P ASSETS, LLC'S MOTION TO DISMISS**

PROCTOR HEYMAN LLP
Kurt M. Heyman (# 3054)
E-mail:  kheyman@proctorheyman.com
Patricia L. Enerio (# 3728)
E-mail:  penerio@proctorheyman.com
Aimee M. Czachorowski (# 4670)
E-mail:  aczachorowski@proctorheyman.com
1116 West Street
Wilmington, DE 19801
(302) 472-7300

Attorneys for Defendant S.I.P. Assets, LLC

DATED:     May 29, 2007

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ............................................................................................................................. 3

   A.   Legal Standard ............................................................................................................. 4

   B.   Even Under the *Medimmune* Standard, No Case or Controversy Exists ............................ 4

   C.   The Mootness Cases Cited in SIP's Opening Brief are Unaffected by the
      *Medimmune* Decision ...................................................................................................... 9

CONCLUSION ......................................................................................................................... 12

# TABLE OF AUTHORITIES

CASES

*Foster v. David*, No. 04-4829, 2006 WL 2371976 (E.D. Pa. Aug. 11, 2006) .............................. 10

*Lucien Lelong, Inc. v. Dana Perfumes, Inc.*, 138 F. Supp. 575 (D.C. Ill. 1955) ......................... 10

*Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270 (1941) ............................................................. 4

*Medimmune, Inc. v. Genentech, Inc.*, ____ U.S. _____, 127 S. Ct. 764 (2007).................... passim

*Nordica USA Corp. v. Ole Sorensen*, 475 F. Supp. 2d 128 (D.N.H. 2007)................................... 5

*Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corp.*, 482 F.3d 1330
    (Fed. Cir. 2007).................................................................................................................... 4, 5, 9

*W.L. Gore & Associates, Inc. v Oak Materials Group, Inc.*, 424 F. Supp. 700
    (D. Del. 1976) ............................................................................................................................ 10

*Watershed Treatment Programs, Inc. v. United Healthcare Insurance Co., Inc.*,
    No. 07-80091, 2007 WL 1099124 (S.D. Fla. Apr. 10, 2007) ......................................... 5, 6

Defendant S.I.P. Assets, Inc. ("SIP") respectfully submits this reply brief in further support of its Motion to Dismiss (D.I. 13), and in response to Bank of America, N.A.'s ("BOA") Brief in Response and Opposition to Defendant S.I.P. Assets, LLC's Motion to Dismiss. ("BOA Br.") (D.I. 18).

SIP relies on and hereby incorporates the arguments in the opening brief filed by Defendant Every Penny Counts, Inc. ("EPC") in support of its own motion to dismiss on May 10, 2007. ("EPC Br.") (D.I. 16).

**PRELIMINARY STATEMENT**

BOA filed this action seeking declaratory and other relief relating to the ownership and validity of a certain patent (the "'191 patent"). This action essentially seeks mirror image relief to that sought in a prior-filed action in Florida by the owner of the patent, EPC, against a BOA affiliate (the "Florida Action"). The only difference between the two actions is that SIP is named as a party in this action, but not in the Florida Action.

As set forth in the Opening Brief in Support of SIP's Motion to Dismiss ("Opening Brief" or "Op. Br.") (D.I. 14), SIP has expressly disclaimed any interest in the outcome of this action, any ownership interest in the '191 patent, or any intention to sue BOA in connection with the '191 patent. SIP's only status with respect to the '191 patent is that of a former licensee pursuant to a License Agreement with EPC that has been terminated. EPC, the actual owner of the patent, concurs with all of these facts.

Notwithstanding the foregoing disclaimers by SIP and the concurrence of both parties to the SIP-EPC relationship, BOA argues that SIP nevertheless poses some future litigation risk and is a necessary party to this dispute. BOA goes so far as to suggest that the License Agreement

between EPC and SIP -- to which BOA was not even a party -- might not have been terminated properly.

BOA's overreaching (and unduly shrill) arguments demonstrate that the only reason it is fighting so desperately to keep SIP in this action is its desire to litigate this dispute in Delaware instead of Florida. That desire, however, does not overcome the requirement that there be a justiciable controversy between BOA and SIP, which there is not.

## ARGUMENT

### There is No Case or Controversy Between BOA and SIP

In its Opening Brief, SIP relied on two distinct lines of cases to establish that there is no controversy between BOA and SIP: a line of cases decided under the "reasonable apprehension of suit" test that had been specifically applied in patent cases; and a line of cases holding that moot controversies do not satisfy the general standard to establish a case or controversy under the Declaratory Judgment Act.

BOA spills much ink arguing that the "reasonable apprehension of suit" test was overruled by the Supreme Court's recent decision in *Medimmune, Inc. v. Genentech, Inc.*, ____ U.S. ____, 127 S. Ct. 764 (2007). (BOA Br. at 1, 7-9, 11, 12). What BOA fails to demonstrate, however, is that there is a case or controversy between itself and SIP even under the *Medimmune* standard. As set forth in Argument B, below, there is not.

Moreover, BOA disingenuously asserts that **all** of SIP's authorities rely on the "reasonable apprehension of suit" test and can therefore be disregarded under *Medimmune*. (BOA Br. at 1, 7-9). In fact, *Medimmune* did nothing to alter the requirement that a dispute must not be moot in order to establish a case or controversy under the Declaratory Judgment Act. As set forth in Argument C, below, SIP's Opening Brief cited a number of valid cases holding that a party who disclaims any interest in the underlying property at issue in an action renders a declaratory plaintiff's claims moot, thereby destroying any controversy between the parties and divesting the court of subject matter jurisdiction. BOA's brief simply fails to address these authorities.

A.    Legal Standard

The Supreme Court, in *Medimmune*, "re-affirmed the correct standard for determining a justiciable declaratory judgment action: 'Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment action.'" *Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corp.*, 482 F.3d 1330, 1337 (Fed. Cir. 2007) (citing *Medimmune* and quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

"[B]ased on the same constitutional 'controversy' requirement is the Court's prohibition against advisory opinions. . . . [F]ederal courts are to decide only 'actual controversies by judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions . . . .'" *Teva*, 482 F.3d at 1337-38 (citation omitted).

In sum, a plaintiff in a declaratory judgment action must still establish an actual controversy (by showing substantial controversy, between the parties having adverse legal interests), and a defendant can still divest the court of jurisdiction by showing that the claims are moot.

B.    Even Under the *Medimmune* Standard, No Case or Controversy Exists

As set forth above, in order for there to be a case or controversy under *Medimmune*, there must be (1) a substantial controversy, and (2) between parties having adverse legal interests. BOA fails to satisfy this standard because there is **no** controversy (let alone a "substantial" one) between BOA and SIP relating to the '191 patent, and SIP has **no** legal interests in the '191 patent that are adverse to BOA.

BOA argues that its situation is similar to the situation in *Teva* because it faces the "possibility of future litigation." (BOA Br. at 12). Putting aside numerous factual distinctions between *Teva* and this case, the short response is that there is no possibility of future patent infringement litigation between SIP and BOA relating to the '191 patent, because SIP has expressly disclaimed any and all intentions to sue BOA with respect to the '191 patent. Nor is there any risk of BOA being subjected to multiple infringement suits if SIP is not a party to any judgment resolving claims under the '191 patent. SIP is not a party to (and is not seeking to intervene in) the Florida Action, which will resolve any rights regarding the '191 patent, and SIP has no intention of initiating any other suit against BOA relating to the '191 patent.

In the short period of time since *Medimmune* was decided, two cases have, citing *Medimmune*, dismissed declaratory judgment actions where the defendant had no interest in the patent at issue: *Nordica USA Corp. v. Ole Sorensen*, 475 F. Supp. 2d 128 (D.N.H. 2007); and *Watershed Treatment Programs, Inc. v. United Healthcare Insurance Co., Inc.*, No. 07-80091, 2007 WL 1099124 (S.D. Fla. Apr. 10, 2007) (Ex. A hereto).

In *Nordica*, the plaintiffs sought a declaratory judgment as to the validity of a patent. The court found that the plaintiffs had failed to state a case against one of the defendants because he no longer had any interest in the patent at issue. Citing *Medimmune*, the court found that "Plaintiffs' dispute is with the validity of the '184 patent. Based on the undisputed facts submitted [defendant] no longer holds any ownership interest in or rights to the '184 patent . . . There is simply no actual or substantial controversy which might be resolved in this declaratory judgment action." *Nordica*, 475 F. Supp. 2d at 139. The same language applies with equal force here.

Similarly, in *Watershed*, the plaintiff sought a declaratory judgment as to its license rights. After citing the *Medimmune* standard, the court found that the defendant had no legal interest in the license rights. The court thus dismissed the declaratory judgment count for lack of jurisdiction, saying "Here the parties do not appear to have adverse legal interests, as Defendants do not themselves have a legal interest in the Plaintiff's license rights. . . . Therefore, jurisdiction over Plaintiff's specific request for declaratory relief is lacking." *Watershed*, 2007 WL 1099124, at *6. This reasoning also applies to this case.

In addition to making erroneous legal arguments, BOA also makes borderline frivolous factual and equitable arguments in a desperate effort to fashion a hook capable of keeping SIP in this case. For the reasons set forth below, all of these arguments fail.

For example, BOA weakly urges that it has a case or controversy against SIP because SIP is "an important part of the story of the '191 patent," based upon its having made presentations in an effort to market the underlying technology to BOA. (BOA Br. at 5, 13). Being "part of the story" is simply not a justification for SIP to remain as a defendant in this action. The way for BOA to get SIP's "part of the story" is through third party discovery in the Florida Action. BOA complains that if it is required to seek third party discovery from SIP in the Florida Action, "it cannot force SIP to show up at trial there" (BOA Br. at 15 n.10), but that is always the case with respect to third party discovery, and it does not provide a basis for turning a fact witness into a defendant. Moreover, even if BOA was to take third party discovery from SIP in the Florida Action, such discovery would not change or add to SIP's "part of the story" as already disclosed in connection with this motion.

BOA also falsely asserts that SIP has provided no evidence that it has no current interest in the '191 patent. (BOA Br. at 13). SIP, in addition to making sworn and binding

representations before this Court that it has no legal ownership, has attached the License Agreement between itself and EPC and the letter confirming termination of that Agreement as exhibits to its verified Answer. (D.I. 11, 12). EPC has also submitted sworn evidence supporting this position. (D.I. 17 Exs. 5(A)-(C)). This uncontroverted evidence is more than sufficient to establish that SIP has no rights to assert against BOA regarding the '191 patent.

In an unbelievable stretch, BOA attempts to circumvent this evidence (and to assert that it continues to faces risk of suit by SIP) by speculating about whether the termination of the License Agreement was effective (BOA Br. at 14-15), when both of the parties to that Agreement have submitted sworn evidence showing that it was. (Op. Br. at 3; EPC Br. at 4). BOA also splits hairs by suggesting that there is disagreement between SIP and EPC as to when the License Agreement was terminated. (BOA Br. at 14). The May 2005 date referenced by EPC was when the Agreement was terminated, while the June 8, 2005 date referenced by SIP was the date that EPC confirmed the termination by letter. In any event, even if there were a minor discrepancy between SIP and EPC's positions regarding the termination date, BOA fails to explain why it would be significant when either date would have cut off any continuing rights that SIP had in the '191 patent long before now, and when BOA does not contend that anything significant occurred between May and June 2005. More to the point, BOA fails to explain how it even has standing to raise these makeweight arguments when it was not a party to the License Agreement.[1]

BOA also resorts to a deliberate misconstruction of SIP's express disclaimer of rights with regards to the '191 patent in its Opening Brief. BOA asserts that SIP's statement that "it

---

[1]    Grasping for straws, BOA also suggests that SIP may be hiding something because it did not attach the amendments to the License Agreement to its Answer. (BOA Br. at 14). Those amendments merely constituted extensions that were made prior to the time that the License Agreement was terminated, and they therefore have no relevance to the present analysis. For whatever the amendments are worth, however, they are attached as Exhibit B hereto.

has expressly disclaimed any **current** licensing or ownership rights to the '191 patent and any intention to bring suit against BOA in connection with the '191 patent" (Op. Br. at 4) is actually an express reservation of "all rights it had acquired relating to the '191 patent." (BOA Br. at 6). This assertion is both false and disingenuous. As BOA points out in its brief, SIP made clear that it was reserving only "rights and privileges that arose during the time that it was a licensee of EPC." (BOA Br. at 9 n.6; Op. Br. at 1 n.1). Any rights that SIP may have relating to the '191 patent could only be asserted through its License Agreement with EPC, to which (as noted above) BOA was not a party. It therefore stands to reason that the **only** party against which SIP may assert any rights pursuant to the License Agreement is **EPC**, and to clarify any doubt on this score, SIP has affirmatively sworn that it has no intention of suing BOA in connection with the '191 patent. BOA's continued hair splitting is designed to distract the Court from the real issue -- the fact that SIP does not belong in this litigation because it has no interest in the '191 patent.

Finally, BOA vastly overstates the significance of certain statements made (or not made) by SIP in its presentations to BOA. BOA relies heavily on the statement in SIP's presentation that it "fully acquired" the '191 patent as creating the possibility of an ownership interest in SIP. (BOA Br. at 2, 13-14). BOA assumes that the phrase "fully acquired" must mean the purchase and assignment of the '191 patent itself, as opposed to the acquisition of the licensing rights in the '191 patent. In fact, pursuant to the License Agreement, SIP had "fully acquired" all of the licensing rights to the '191 patent (within the applicable Field of Use), so the most that could be said is that the SIP presentation was not clear about **what** SIP had acquired -- *i.e.*, ownership or licensing rights in the '191 patent. That is a far cry from saying that SIP affirmatively misrepresented that it owned the '191 patent. Moreover, it is difficult to see why the distinction between ownership and licensing rights would have made a difference at the time that SIP made

the presentation if SIP in fact had the exclusive rights to present opportunities for use of the '191 patent to BOA (which it did).

For similar reasons, BOA's assertion that SIP's "presentation makes no mention of any other party whose agreement or approval would be necessary" (BOA Br. at 10-11) also fails to establish the possibility of an ownership interest in SIP. Because SIP held the exclusive licensing rights to the '191 patent pursuant to its License Agreement with EPC, no third party approval was necessary. Additionally, as noted above, to the extent that any statements (or omissions) in the presentation suggest any ownership interest in the '191 patent on the part of SIP, SIP has now unambiguously clarified under oath that it **never** had any such ownership interest -- a fact with which the actual owner, EPC, agrees (EPC Br. at 4), and which the patent title search conducted by BOA confirms. (BOA Br. Ex. C).

C.     The Mootness Cases Cited in SIP's Opening Brief are Unaffected by the *Medimmune* Decision

As discussed above, under the standards applicable to declaratory judgment actions, "federal courts are to decide only actual controversies . . . **and not to give opinions upon moot questions** . . . ." *Teva*, 482 F.3d at 1337-38 (emphasis added; citation omitted).

In its Opening Brief, SIP relied on cases showing that a defendant's statement that it has no interest in the underlying patent can render a declaratory suit moot. (Op. Br. at 6-7). Contrary to BOA's assertions (BOA Br. at 1, 7-9), these cases did not rely on the "reasonable apprehension of suit" test, and they are therefore unaffected by the *Medimmune* decision. Indeed, *Medimmune* reinforced the Declaratory Judgment Act's case or controversy requirement as a prerequisite to subject matter jurisdiction in a declaratory judgment action, under which mootness remains an important consideration. *Medimmune*, 127 S. Ct. at 770-771; *Teva*, 482 F.3d at 1336-38.

For example, in *W.L. Gore & Associates, Inc. v Oak Materials Group, Inc.*, 424 F. Supp. 700 (D. Del. 1976), one of the cases cited by SIP, after the plaintiff brought an infringement suit, the defendant made counterclaims, including a request for a declaratory judgment as to the validity of the patent at issue.  While the suit was in litigation, the plaintiff disclaimed all rights to the patent.  This Court found that "[a]s plaintiff has formally disclaimed all claims of the patent, there is no longer a justiciable case or controversy before the Court with respect to the validity of any of those claims. . . . The Court, therefore, no longer has any jurisdiction with respect to the validity or invalidity of the patent." *Id.* at 702.  At no point did the Court mention the "reasonable apprehension of suit" test.

Similarly, in *Lucien Lelong, Inc. v. Dana Perfumes, Inc.*, 138 F. Supp. 575 (D.C. Ill. 1955), the court found the plaintiff's declaratory judgment request to be moot after the trademark holder abandoned its interests in the trademark. The defendant made a counterclaim seeking a declaratory judgment that it had the right to use the term that the plaintiff asserted was trademarked.  In the midst of the suit, the plaintiff abandoned the term as a trademark. After the plaintiff abandoned the trademark, the court found that "the prayer in the counterclaim for a declaratory judgment . . . appears to be moot at this time.  Lelong has abandoned 'Solid' as a trademark, and has sold its business.  In the trial before this court and in its brief Lelong disclaimed any interest in the words 'solid cologne.'  There is no longer any controversy between the parties over the use of the words. . . . The issue is accordingly moot." *Id.* at 582.  Once again, the court made no mention of the "reasonable apprehension of suit" test.

BOA never even cites or addresses these cases, and it should therefore be deemed to have waived any argument contrary to their holdings.  *See Foster v. David*, No. 04-4829, 2006 WL 2371976, *12 n.28 (E.D. Pa. Aug. 11, 2006) (Ex. C hereto).

\* \* \*

SIP has no ownership or current licensing interests in the '191 patent. Both SIP and EPC have made representations in this action that SIP has never had an ownership interest in the '191 patent and that, although SIP and EPC formerly had a license agreement that allowed SIP exclusive licensing rights to the '191 patent (within a Field of Use), that license agreement was terminated in May of 2005, and a notification of termination confirmed this in June of 2005. (Op. Br. at 3; EPC Br. at 4). Both SIP and EPC have provided sworn evidence supporting these facts and are bound by the representations they have made to this Court. BOA has simply failed to set forth any facts that would overcome these clear and unequivocal representations. Indeed, BOA's own patent title search supports the absence of ownership by SIP. (BOA Br. Ex. C). Further, BOA has failed to set forth any facts to indicate that SIP has any interests adverse to BOA with respect to the '191 patent, and because SIP has repeatedly disclaimed any interest in the '191 patent, BOA's claims are moot. The claims against SIP should therefore be dismissed for lack of subject matter jurisdiction.

## **CONCLUSION**

For the foregoing reasons, SIP respectfully requests that the Court grant its Motion to Dismiss the Amended Complaint.

PROCTOR HEYMAN LLP

*/s/ Kurt M. Heyman*
_____
Kurt M. Heyman (# 3054)
E-mail: kheyman@proctorheyman.com
Patricia L. Enerio (# 3728)
E-mail: penerio@proctorheyman.com
Aimee M. Czachorowski (# 4670)
E-mail: aczachorowski@proctorheyman.com
1116 West Street
Wilmington, DE 19801
(302) 472-7300

Attorneys for Defendant S.I.P. Assets, LLC

DATED:      May 29, 2007

## CERTIFICATE OF SERVICE

Kurt M. Heyman, Esquire, hereby certifies that on May 29, 2007, copies of the foregoing

Reply Brief in Support of Defendant S.I.P. Assets, LLC's Motion to Dismiss were served

electronically upon the following counsel:

Richard L. Horowitz, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
Wilmington, DE 19801


David L. Finger, Esquire
Finger & Slanina, LLC
Once Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801


*/s/ Kurt M. Heyman*
Kurt M. Heyman (# 3054)

# EXHIBIT A

**To Reply Brief In Support Of
Defendant S.I.P Assets, LLC's Motion To Dismiss**

Westlaw.

Slip Copy                                                                                              Page 1
Slip Copy, 2007 WL 1099124 (S.D.Fla.), 20 Fla. L. Weekly Fed. D 705
(Cite as: Slip Copy)

Watershed Treatment Programs, Inc. v. United
Healthcare Ins. Co., Inc.
S.D.Fla.,2007.

United States District Court,S.D. Florida.
The WATERSHED TREATMENT PROGRAMS,
INC., a Florida Corporation, Plaintiff,
v.
UNITED HEALTHCARE INSURANCE
COMPANY, INC., a Connecticut Corporation,
United Behavioral Health, Inc., a California
Corporation, and Ingenix, Inc., a Delaware
Corporation, Defendants.
No. 07-80091 CIV.

April 10, 2007.

Eileen Lynskey Parsons, Jason Seth Mazer, Meredith
Ann McCardle, Ver Ploeg & Lumpkin, Miami, FL,
for Plaintiff.
Dorothy Patricia Wallace, Kenneth Eugene White,
Steven M. Ziegler PA, Hollywood, FL, for
Defendants.

### ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS

DONALD M. MIDDLEBROOKS, United States
District Judge.
**\*1** This Cause comes before the Court on Defendants'
Motion to Dismiss (DE 12), filed March 12, 2007.
The Court has reviewed the record and is fully
advised in the premises.

Plaintiff filed its complaint on January 30, 2007,
stating causes of action for breach of implied-in-fact
contract, promissory estoppel, fraudulent
misrepresentation, civil conspiracy and declaratory
judgment. Defendants have responded by filing the
instant motion to dismiss.

### I. Plaintiff's Complaint[FN1]

> FN1. All factual allegations in this section
> are drawn from Plaintiff's complaint and
> accepted as true for the purpose of this
> motion to dismiss.

Plaintiff The Watershed Treatment Programs, Inc.
("The Watershed") is a substance abuse treatment
facility headquartered in Boynton Beach, FL, with
other treatment facilities located in Boca Raton, FL,
and Clearlake, Texas. Defendant United Healthcare
Insurance Company, Inc., ("UHIC") is a Connecticut
stock company that offers health insurance.
Defendant United Behavioral Health, ("UBH") is a
third party administrator of health plans and does not
itself provide health insurance.[FN2] Defendant Ingenix
performs reviews of medical records for claims
administered by UBH on behalf of UHIC and its
affiliates.

> FN2. Plaintiff's Complaint refers to UHIC
> and UBH collectively as "UHC." Defendant
> objects to this classification, noting that the
> two companies are distinct entities. For
> purposes of this motion to dismiss only, I
> will utilize the terminology from Plaintiff's
> complaint.

The Watershed alleges that it had a course of dealing
with UHC over a period of years, where UHC
administered and paid The Watershed's substance
abuse and treatment claims in a consistent manner.
Plaintiff states that UHC routinely preauthorized and
certified treatment at The Watershed's facilities for all
levels of care and treatment.

Plaintiff alleges that in early 2005, UHC embarked
on an overall scheme to reduce paid claims and
increase profits by implementing a new procedure to
process non-network substance abuse treatment
claims. To carry out this procedure, UHC turned to
Defendant Ingenix. The Watershed claims that all the
Defendants conspired to deny, delay or diminish
payment to Plaintiff.

As part of the alleged conspiracy, UHC continued to
pre-authorize or certify certain treatment at The
Watershed's facilities, and agreed or otherwise
promised to reimburse The Watershed for treatment
services rendered, when it knew it had no intention to
actually pay.

Plaintiff contends that these actions are deliberate and
malicious, and that they are intended to (1)
inappropriately reduce the length of stay or level of
care provided to UHC insureds, (2) eliminate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1099124 (S.D.Fla.), 20 Fla. L. Weekly Fed. D 705
**(Cite as: Slip Copy)**

clinically necessary levels of care, (3) force The Watershed to join UHC's provider network, and/or (4) cease treatment to UHC insureds.

## II. Legal Analysis

A motion to dismiss is appropriate when it is demonstrated "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). For the purpose of the motion to dismiss, the complaint is construed in the light most favorable to the plaintiff, and all facts alleged by the plaintiff are accepted as true. *Hishon v. King & Spaulding,* 467 U.S. 69, 73 (1984). Regardless of the alleged facts, however, a court may dismiss a complaint on a dispositive issue of law. *Marshall County Bd. of Educ. v. Marshall County Gas Dist.,* 992 F.2d 1171, 1174 (11th Cir.1993). "Conclusory allegations in the complaint need not be taken as true and the plaintiff must allege sufficient facts to support his allegations." *Marine Coatings of Alabama, Inc. v. United States,* 792 F.2d 1565, 1568 (11th Cir.1986).

**\*2** Defendants move for dismissal of the counts for breach of implied in fact contract, promissory estoppel, fraudulent misrepresentation and civil conspiracy, arguing that Plaintiff has failed to plead sufficient facts to support the claims. Defendants also argue that this Court lacks jurisdiction to rule on Plaintiff's claim for declaratory relief. Finally, Defendants argue that the complaint as a whole represents impermissible "shotgun pleading." I will address these arguments in turn.

## A. Count for Breach of Implied in Fact Contract

In analyzing Plaintiff's state law claims, I must apply the substantive laws of Florida, the forum state. *See Peoples Bank of Polk County v. Roberts,* 779 F.2d 1544, 1545 (11th Cir.1986), *citing Erie Railroad Co. v. Tompkins,* 304 U.S. 64 (1938).

Florida courts have described contracts implied in fact as follows:
A contract implied in fact is one form of an enforceable contract; it is based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words. Where an agreement is arrived at by words, oral or written, the contract is said to be express. A contract implied in fact is not put into promissory words with

sufficient clarity, so a fact finder must examine and interpret the parties' conduct to give definition to their unspoken agreement. It is to this process of defining an enforceable agreement that Florida courts have referred when they have indicated that contracts implied in fact rest upon the assent of the parties.

*Commerce P'ship 8098 Ltd. P'ship v. Equity Contr. Co.,* 695 So.2d 383, 385 (Fla. 4th DCA 1997) (internal citations omitted).

As a basis for its implied in fact contract claim, Plaintiff alleges that its communication with Defendants seeking preauthorization for services to particular patients constitutes an offer to provide those services at a specific price. When the Defendants respond to this communication by providing a preauthorization or certification code, Plaintiff alleges that this constitutes acceptance of its offer to provide services. *See* Pl. Comp. ¶ ¶ 41-42. However, none of the documents sent to Defendants in this initial communication contained specific prices. Instead, the documents contain revenue codes. *See* Pl.Ex. A.

The Watershed contends that Defendants assent to be bound by this implied contract in several ways. After Defendants provide the preauthorization code, The Watershed faxes an acknowledgment of the level of treatment to be provided, length of stay, and revenue code for payment, and this fax requires UHC to notify Plaintiff if the terms of the agreement are incorrect. *See* Pl. Comp. ¶ ¶ 43-45, *see* Pl.Ex. A. Additionally, The Watershed alleges that once a patient has been admitted, it undertakes concurrent reviews with a UHC care manager to ensure that the patient is receiving appropriate care. *See Id.,* ¶ ¶ 49-51.

Defendants argue that this course of conduct is insufficient to constitute an implied in fact contract, as there is no way to infer from Defendants' conduct that they intended to be bound by Plaintiff's alleged offer. However, this argument essentially attacks the merits of Plaintiff's claim, and this is inappropriate at the motion to dismiss stage. As the court noted in *Commerce P'ship 8098 Ltd. P'ship,* examination of the parties conduct is a fact-based inquiry, something that cannot be resolved in a motion to dismiss.

**\*3** The Defendants also argue that since no specific prices are mentioned, it is unreasonable to assume that they intended to enter into any contractual arrangement by preauthorizing services. However, given the Parties' prior course of dealing, I cannot say

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 3
Slip Copy, 2007 WL 1099124 (S.D.Fla.), 20 Fla. L. Weekly Fed. D 705
**(Cite as: Slip Copy)**

at this stage that Plaintiff could not prove any set of facts to support its assertion that a contract existed even without the mention of a specific price for the services. At this stage of the proceedings, the Plaintiff has plead sufficient facts to sustain its claim for breach of implied contract, as the threshold of sufficiency that a complaint must meet is exceedingly low. *See Ancata v. Prison Health Servs. Inc., 769 F.2d 700, 703 (11th Cir.1985); Jackson v. Okaloosa County, Fla., 21 F.3d 1531, 1534 (11th Cir.1994).*

Defendant also contends that the Employee Retirement Income Security Act ("ERISA") preempts the Plaintiff's breach of implied contract claim. ERISA § 514(a) preempts all state laws insofar as they "relate to" any employee benefit plan covered by the Act. *29 U.S.C. § 1144(a) (1988). Lordmann Enters. v. Equicor, Inc., 32 F.3d 1529, 1532-1533 (11th Cir.1994).* State law "relates to" an ERISA plan "if it has a connection with or reference to such a plan ." *Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97 (1983).* However, some state law may affect an ERISA plan in "too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Id.*

Defendants' ERISA preemption argument is premature at this stage, as Plaintiff is not claiming an assignment of rights or benefits from insured individuals. Therefore, there is no need to analyze whether the law here "relates to" to the plans at issue.

**B. Promissory Estoppel Count**

The Florida Supreme Court defined promissory estoppel and its elements as follows:
A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.
The promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice. Satisfaction of the latter requirement may depend on the reasonableness of the promisee's reliance ...

*W.R. Grace & Co. v. Geodata Services, Inc., 547 So.2d 919, 924 (Fla.1989).*

The Watershed contends that UHC's act of providing a preauthorization or certification code represents a promise to pay for Plaintiff's services. On the issue of reasonable inducement, Plaintiff argues that

Defendants could have reasonably expected that The Watershed would perform the services in question after receiving preauthorization from UHC. The Watershed also states that it relied on UHC's promise when it treated patients that had received preauthorization for services. Finally, Plaintiff states that it has suffered losses from treating patients in reliance on UHC's promise.

\*4 In response, Defendants argue that insurance cannot be created or extended by estoppel, unless the failure to enforce a promise would result in other injustice. *See Crown Life Insurance Co. v. McBride, 517 So.2d 660, 662 (Fla.1987); State Farm Mut. Auto. Ins. Co. v. Hinestrosa, 614 So.2d 633, 636 (Fla. 4th DCA 1993).* While Defendants are correct that estoppel cannot create insurance coverage where none exists, that is simply not the claim Plaintiff is making in its complaint. Rather, Plaintiff argues that Defendants did in fact authorize coverage of The Watershed's patients and promise to pay, The Watershed relied on the promise in treating the patients, and then Defendants refused to pay for the services Plaintiff provided.

Defendant also argues that Plaintiff's allegations could not constitute reasonable inducement, one of the key elements of a promissory estoppel claim. However, as mentioned earlier, an analysis of what constitutes reasonable inducement is improper at the motion to dismiss stage. Here the Plaintiff has plead the necessary elements to support a claim for promissory estoppel, and that is all that is required to survive a motion to dismiss.

**C. Count for Fraudulent Misrepresentation**

The elements necessary to establish a cause of action for fraudulent misrepresentation are: (1) a false statement or misrepresentation of a material fact; (2) the representor's knowledge at the time the misrepresentation is made that such statement is false; (3) such misrepresentation was intended to induce another to act in reliance thereon; (4) action in justifiable reliance on the representation; and (5) resulting damage or injury to the party so acting. *See Thor Bear, Inc. v. Crocker Mizner Park, 648 So.2d 168, 172 (Fla. 4th DCA 1994), citing Johnson v. Davis, 480 So.2d 625, 627 (Fla.1985).*

Plaintiff herein has adequately plead the elements necessary to sustain a claim for fraudulent misrepresentation at the motion to dismiss stage. The Watershed alleges that Defendants made false

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 4
Slip Copy, 2007 WL 1099124 (S.D.Fla.), 20 Fla. L. Weekly Fed. D 705
**(Cite as: Slip Copy)**

statements preauthorizing care when they had no intention of making any payments for those services to Plaintiff. Plaintiff then states that the preauthorization was intended to induce The Watershed to undertake the treatments for which it was seeking authorization. The Watershed also argues that it justifiably relied on the alleged misrepresentations, and that it suffered damages when Defendants refused to make any payments.

Defendants' arguments again attack the merits of the Plaintiff's allegations. While they may have a strong argument that no fraudulent misrepresentation occurred, an examination of the merits is inappropriate here.

### D. Civil Conspiracy Count

The elements of a civil conspiracy in Florida are: (1) a conspiracy between two or more parties, (2) to do an unlawful act or to do a lawful act by unlawful means, (3) the doing of some overt act in pursuance of the conspiracy, and (4) damage to plaintiff as a result of the acts performed pursuant to the conspiracy. *See Walters v. Blankenship*, 931 So.2d 137, 140 (Fla. 5th DCA 2006).

**\*5** An actionable conspiracy generally requires an actionable underlying tort or wrong. *See Id.* However, an alternative basis for a civil conspiracy claim exists where the plaintiff can show some "peculiar power of coercion" possessed by the conspirators by virtue of their combination, which an individual acting alone does not possess. *See Churruca v. Miami Jai-Alai, Inc.*, 353 So.2d 547 (Fla.1977) (jai-alai players stated claim for conspiracy against jai-alai fronton owners who allegedly conspired to prevent players from getting jobs in arenas after a players strike); *Snipes v. West Flagler Kennel Club, Inc.*, 105 So.2d 164 (Fla.1958) (claim for conspiracy was stated against five kennel club owners who refused the plaintiff greyhound racer privileges at their tracks and used intimidation to drive the plaintiff out of business); *Margolin v. Morton F. Plant Hospital Ass 'n., Inc.*, 342 So.2d 1090 (Fla. 2d DCA 1977) (physician stated a claim for conspiracy against a group of anesthesiologists who refused to provide their services to plaintiff's patients, depriving him of his hospital privileges, and thereby driving him out of his practice).

This form of civil conspiracy is known as the "force of numbers exception," whereby a conspiracy may exist without the underlying tort or wrong. *Kee v.*

*National Reserve Life Ins. Co.*, 918 F.2d 1538, 1542 (11th Cir.1990). However, a showing of mere malice is not enough, and the "force of numbers" exception is intended to be a narrow one. *Id., citing Liappas v. Augoustis*, 47 So.2d 582, 583 (Fla.1950).

Plaintiff herein relies on the force of numbers exception, as it does not allege a distinct, underlying and actionable tort or wrong. Rather, Plaintiff argues that the Defendants have combined to use their economic power to coerce The Watershed into (1) inappropriately reducing length of patient stays; (2) providing treatment at reduced, unsound levels; and (3) treating patients properly without receiving compensation. *See* Pl. Comp. ¶ ¶ 151-152.

Although the Plaintiff's complaint makes repeated references to the Defendants' numbers and economic power, the alleged conspiracy here does not find support in existing Florida case law. In *Churruca, Snipes,* and *Margolin* the alleged conspirators all stood in a like relation to the Plaintiff, as noted above. They were independent entities that made independent choices to join the conspiracies and damage the respective plaintiffs. None of the individual defendants in those three cases could have committed the same harm to the pertinent plaintiff by acting alone.

Here the three Defendants do not all stand in a like relationship to The Watershed. This is not an alleged conspiracy by a group of insurers who are colluding in an attempt to disrupt the Plaintiff's business. There is only one insurer (UHIC) and its sister entities, rather than a group of similarly situated defendants.

The facts of this case are very similar to the situation in *Buckner v. Lower Fla. Keys Hosp. Dist.*, 403 So.2d 1025 (Fla. 3rd DCA 1981). There the plaintiff physician alleged a conspiracy involving a hospital, two separate boards of trustees of the hospital, two hospital administrators, and the hospital's medical staff for not renewing his staff privileges. *See Id.* at 1026. The Florida appellate court found that the relationship of the respective defendants did not support a civil conspiracy claim under the force of numbers exception. A combination of separate economic groups or forces did not exist, because the respective defendants acted as a single entity. *See Id.* at 1029.

**\*6** That situation is analogous to the present case. Here Defendant UHIC is the actual insurer, Defendant UBH administers UHIC's health plans, and Defendant Ingenix performs reviews of medical

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                   Page 5
Slip Copy, 2007 WL 1099124 (S.D.Fla.), 20 Fla. L. Weekly Fed. D 705
**(Cite as: Slip Copy)**

records for claims administered by UBH on behalf of UHIC. These three Defendants do not possess greater power by acting in conjunction with one another, as there is only one insurer that could make payments for services to the Plaintiff. This case is more an example of an alleged vertical conspiracy amongst sister entities, rather than a horizontal conspiracy of entities all identically situated to a plaintiff, as in *Churruca, Snipes,* and *Margolin.* Florida case law does not support this construction of a force of numbers conspiracy, and Plaintiff's civil conspiracy claim fails as a matter of law.

### V. Declaratory Relief Count

Defendant argues that Plaintiff's declaratory relief count must be dismissed because it is outside the jurisdiction of this Court. The Supreme Court has laid out the test for jurisdiction over declaratory judgment actions as follows: the dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests; and it must be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.,* 127 S.Ct. 764, 771 (2007)(internal citations omitted).

Here the Parties do not appear to have adverse legal interests, as Defendants do not themselves have a legal interest in the Plaintiff's license rights. The instant litigation is not based off of the Plaintiff's license rights, rather it is founded on the alleged failure of Defendants to keep their promises or contractual obligations and pay Plaintiff for services that it rendered. Therefore, jurisdiction over Plaintiff's specific request for declaratory relief is lacking.

Even if jurisdiction over this count were found to exist, I would utilize my discretion to decline to decide the matter. The Declaratory Judgment Act provides that a court "may declare the rights and other legal relations of any interested party," 28 U.S.C. § 2201(a), not that it must do so. This text has long been understood "to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Id.* at 776, *citing Wilton v. Seven Falls Co.,* 515 U.S. 277, 286 (1995). The determination of Plaintiff's licensure rights is best left to the state agencies that issued and administer the licenses. I shall therefore dismiss Plaintiff's count for declaratory relief.

Accordingly, it is

ORDERED AND ADJUDGED that Defendants' Motion to Dismiss is GRANTED IN PART. COUNTS IV AND V ONLY are DISMISSED WITH PREJUDICE.

DONE AND ORDERED.

S.D.Fla.,2007.
Watershed Treatment Programs, Inc. v. United Healthcare Ins. Co., Inc.
Slip Copy, 2007 WL 1099124 (S.D.Fla.), 20 Fla. L. Weekly Fed. D 705

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

**To Reply Brief In Support Of**
**Defendant S.I.P Assets, LLC's Motion To Dismiss**

10/18/2004  00:29    7324502428                EPCNET                                    PAGE  02

CONFIDENTIAL

## AMENDMENT TO LICENSE AGREEMENT

This Amendment ("**Amendment**") to the License Agreement ("**License Agreement**"), dated effective April 20, 2004, is by and between Every Penny Counts, Inc., (a Delaware Corporation) having a principal place of business at 1434 SW 51st Lane, Cape Coral, Florida 33914 ("EPC"), and S.I.P. Assets LLC, having a principal place of business at 4741 Central Avenue, #230 Kansas City, MO 64112 ("SIP").

**WHEREAS**, SIP wishes to amend the payment schedule set forth in Section 5.2 of the License Agreement, and EPC wishes to accommodate SIP's request for such modification, the parties agree to modify the License Agreement on the terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the payments set forth, EPC and SIP hereby agree as follows:

Section 5.2 of the License Agreement shall be replaced with the following provision:

5.2    *Payment Upon Equity Funding.* SIP shall pay to EPC the non-refundable amount of $855,000. Of this amount, $750,000 shall represent an advancement of royalty payments to be made pursuant to Section 5.3 below, and shall be credited against such royalty payments commencing with the first dollar of royalty payments so due. SIP shall make the following installment payments to EPC against the non-refundable amount of $855,000 by wire transfer to "Every Penny Counts, Inc." (Bank of America; Wire Transfer Routing # 026009593; Checking Account # 3769258776): $50,000 is acknowledged as having been paid on September 30, 2004; $5,000 shall be paid on or before October 22, 2004, 5:00PM EST; $200,000 shall be paid on or before October 29, 2004, 5:00PM EST; $100,000 shall be paid on or before December 31, 2004, 2:00PM EST; $50,000 shall be paid on or before January 31, 2005, 2:00PM EST; $50,000 shall be paid on or before February 28, 2005, 2:00PM EST and $400,000 shall be paid on or before March 31, 2005, 2:00PM EST. In the event that SIP closes its cumulative equity operational funding prior to March 31, 2005, SIP shall pay any of the outstanding installment payments within 30 days of such closing, but in no event after the due dates set forth above. In the event that SIP does not pay any of the above installments by their due dates (regardless of whether the closing of cumulative equity operational funding occurred), this Agreement shall expire by its terms, all rights to the EPC Licensed Patents conveyed to SIP shall expire and EPC shall be free thereafter to use the EPC Licensed Patents in the Field of Use to its absolute discretion and without any obligation on the part of EPC to SIP.

This Amendment shall not be construed to modify any other provision of the License Agreement.

**IN WITNESS WHEREOF,** the persons signing below warrant that they are duly authorized to sign for and on behalf of, the respective parties.  This Agreement has been executed in duplicate originals.

**AGREED AND ACCEPTED AS ABOVE:**

Every Penny Counts, Inc.
By:

Bertram V. Burke
Chairman & CEO

*10-19-04*
Date

S.I.P. Assets LLC
By:

Ray Edwards
President

*10/20/04*
Date

2

**CONFIDENTIAL**

<u>**AMENDMENT TO LICENSE AGREEMENT**</u>

This Amendment ("**Amendment**") to the License Agreement ("**License Agreement**"), dated effective April 20, 2004, is by and between Every Penny Counts, Inc., (a Delaware Corporation) having a principal place of business at 1434 SW 51st Lane, Cape Coral, Florida 33914 ("EPC"), and S.I.P. Assets LLC, having a principal place of business at 4741 Central Avenue, #230 Kansas City, MO 64112 ("SIP").

**WHEREAS,** SIP wishes to amend the payment schedule set forth in Section 5.2 of the License Agreement, and EPC wishes to accommodate SIP's request for such modification, the parties agree to modify the License Agreement on the terms and conditions set forth herein;

**NOW, THEREFORE,** in consideration of the payments set forth, EPC and SIP hereby agree as follows:

Section 5.2 of the License Agreement shall be replaced with the following provision:

> 5.2 *Payment Upon Equity Funding.* SIP shall pay to EPC the non-refundable amount of $875,000. Of this amount, $750,000 shall represent an advancement of royalty payments to be made pursuant to Section 5.3 below, and shall be credited against such royalty payments commencing with the first dollar of royalty payments so due. SIP shall make the following installment payments to EPC against the non-refundable amount of $875,000 by wire transfer to "Every Penny Counts, Inc." (Bank of America; Wire Transfer Routing # 026009593; Checking Account # 3769258776): $50,000 is acknowledged as having been paid on September 30, 2004; $5,000 shall be paid on or before October 22, 2004, 5:00PM EST; $200,000 shall be paid on or before October 29, 2004, 5:00PM EST; $20,000 shall be paid on or before December 31, 2004, 2:00PM EST; $150,000 shall be paid on or before January 31, 2005, 2:00PM EST; $50,000 shall be paid on or before February 28, 2005, 2:00PM EST and $400,000 shall be paid on or before March 31, 2005, 2:00PM EST. In the event that SIP closes its cumulative equity operational funding prior to March 31, 2005, SIP shall pay any of the outstanding installment payments within 30 days of such closing, but in no event after the due dates set forth above. In the event that SIP does not pay any of the above installments by their due dates (regardless of whether the closing of cumulative equity operational funding occurred), this Agreement shall expire by its terms, all rights to the EPC Licensed Patents conveyed to SIP shall expire and EPC shall be free thereafter to use the EPC Licensed Patents in the Field of Use to its absolute discretion and without any obligation on the part of EPC to SIP.

This Amendment shall not be construed to modify any other provision of the License Agreement.

**IN WITNESS WHEREOF,** the persons signing below warrant that they are duly authorized to sign for and on behalf of, the respective parties. This Agreement has been executed in duplicate originals.

**AGREED AND ACCEPTED AS ABOVE:**

Every Penny Counts, Inc.
By:

Bertram V. Burke
Chairman & CEO

12 -30-04
Date

S.I.P. Assets LLC
By:

Ray Edwards
President

12-30-04
Date

2

Feb 18 05 01:44p     Ray Edwards                                    404-916-7138              p.1
          02/16/2005  10:22   7324582428              EPCNET                    PAGE  01

CONFIDENTIAL

## AMENDMENT TO LICENSE AGREEMENT

This Amendment ("Amendment") to the License Agreement ("License Agreement"), dated effective April 20, 2004, is by and between Every Penny Counts, Inc., (a Delaware Corporation) having a principal place of business at 1434 SW 51st Lane, Cape Coral, Florida 33914 ("EPC"), and S.I.P. Assets LLC, having a principal place of business at 4741 Central Avenue, #230 Kansas City, MO 64112 ("SIP").

WHEREAS, SIP wishes to amend the payment schedule set forth in Section 5.2 of the License Agreement, and EPC wishes to accommodate SIP's request for such modification, the parties agree to modify the License Agreement on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the payments set forth and other good and valuable consideration, EPC and SIP hereby agree as follows:

Section 5.2 of the License Agreement shall be replaced with the following provision:

5.2    *Payment Upon Equity Funding.* SIP shall pay to EPC the non-refundable amount of $895,000. Of this amount, $750,000 shall represent an advancement of royalty payments to be made pursuant to Section 5.3 below, and shall be credited against such royalty payments commencing with the first dollar of royalty payments so due. SIP shall make the following installment payments to EPC against the non-refundable amount of $895,000 by wire transfer to "Every Penny Counts, Inc." (Bank of America; Wire Transfer Routing # 026009593; Checking Account # 3769258776): $50,000 is acknowledged as having been paid on September 30, 2004; $5,000 is acknowledged as having been paid on October 22, 2004; $200,000 is acknowledged as having been paid on October 29, 2004; $20,000 is acknowledged as having been paid on December 31, 2004; $10,000 shall be paid on or before February 18, 2005, 2:00PM EST; $10,000 shall be paid on or before March 15, 2005, 2:00PM EST; $150,000 shall be paid on or before April 15, 2005, 2:00PM EST; $50,000 shall be paid on or before May 15, 2005; $400,000 shall be paid on or before June 15, 2005. In the event that SIP closes its cumulative equity operational funding prior to June 15, 2005, SIP shall pay any of the outstanding installment payments within 30 days of such closing, but in no event after the due dates set forth above. In the event that SIP does not pay any of the above installments by their due dates (regardless of whether the closing of cumulative equity operational funding occurred), this Agreement shall expire by its terms, all rights to the EPC Licensed Patents conveyed to SIP shall expire and EPC shall be free thereafter to use the EPC Licensed Patents in the Field of Use to its absolute discretion and without any obligation on the part of EPC to SIP.

Feb 18 05 01:44p    Ray Edwards                                    404-916-7138              p.2
        02/16/2005  10:22    7324502428           EPCNET                        PAGE  02

Section 6.2 of the License Agreement shall be replaced with the following provision:

6.2     For purposes of payments to be made pursuant to Section 5 and Section 6.1, references to "quarter" refer to each three (3) month period of time, commencing upon the Effective Date.  Year 1 of this Agreement shall refer to the one (1) year period of time commencing upon the Effective Date.  Year 2 of this Agreement shall commence on October 1, 2005, with the first quarter of Year 2 commencing the same day (i.e., the second quarter of Year 2 commences on January 1, 2006, etc.).

The following provision shall be added as Section 2.5:

2.5     SIP shall provide to EPC for review any business-descriptive document SIP intends to distribute to a third party.  EPC shall provide its opinion within five (5) business days of receipt of the business-descriptive document, after which time no objection shall be deemed if no written decision has been provided.  A business-descriptive document shall include, but is not limited to, any hardcopy or electronic versions of SIP's business plan, a business summary, a marketing presentation, a promotional document, a meeting outlines/agenda, and any other material that in any way describes SIP's business.

The following provision shall be added as Section 2.6:

2.6     SIP shall invite EPC to every meeting or presentation, conducted either in person or telephonically, with prospective licensees.  SIP shall provide EPC with five (5) business days notice prior to such meetings.  Under no circumstances is either party to openly dispute points in the presence of third parties.  All disagreements or discussion points contrary to third party demands are to be discussed in confidence between parties.  All discussions with third parties are restricted to matters within the Field of Use outlined in Section 1.3.  Under no circumstances does this section allow for direct discussions regarding matters within the Field of Use outlined in Section 1.3 with a third party introduced by the other party, unless written consent for such discussions is granted by the other party.   Any disruption or damage to third party discussions due to breach of these terms will cause irreparable harm and damage, which may not be recovered by any remedy available in law.  The parties agree that remedies for breach of the terms in Section 2.6 may include injunctive relief and any other relief available, whether in law or in equity.

This Amendment shall not be construed to modify any other provision of the License Agreement.

2

IN WITNESS WHEREOF, the persons signing below warrant that they are duly authorized to sign for and on behalf of, the respective parties. This Agreement has been executed in duplicate originals.

**AGREED AND ACCEPTED AS ABOVE:**

Every Penny Counts, Inc.                    S.I.P. Assets LLC
By:                                         By:

Bartus V. Burke                             Ray Edwards
Chairman & CEO                              President

February 17, 2005                           2/18/05
Date                                        Date

3

# EXHIBIT C

**To Reply Brief In Support Of**
**Defendant S.I.P Assets, LLC's Motion To Dismiss**

Westlaw

Slip Copy
Slip Copy, 2006 WL 2371976 (E.D.Pa.)
(Cite as: Slip Copy)

Page 1

Foster v. David
E.D.Pa.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Charles FOSTER and Katherine Foster, Plaintiffs,
v.
Darren DAVID, et al., Defendants.
**Civil Action No. 04-4829.**

Aug. 11, 2006.

Brian K. Wiley, Penglase & Wiley, Doylestown, PA,
Kevin T. Birley, Ostriakbirley, LLC, Philadelphia,
PA, Plaintiffs.
Beth Anne Smith, Office of Attorney General,
Philadelphia, PA, for Defendants.

### *MEMORANDUM*
MICHAEL M. BAYLSON, U.S.D.J.

### I. Introduction

*1 Plaintiffs, pursuant to 42 U.S.C § 1983, seeks
damages for alleged violations of constitutional rights
from a search of their property in October 2002.
Defendants contend that no rights were violated and
that they are entitled to qualified immunity.

Before the Court is Defendant's Motion for Summary
Judgment (Doc. No. 25). For the reasons that follow,
the Court will grant summary judgment on all claims.

### II. Factual Background

The parties' Statements of Undisputed Facts show
that most operative facts are not in dispute. However,
the Court will consider the facts in the light most
favorable to Plaintiffs. *Anderson v. Liberty Lobby,
Inc.,* 477 U.S. 242, 255 (1986).

On October 20, 2002, during his patrol, defendant
Matthew Visosky ("Visosky") of the Pennsylvania
Fish and Boat Commission [FN1] discovered a large
quantity of trash in the back corner of an access road.
Visosky Dep. at 33-35, 91-92. The trash included an
antler-less deer, deer entrails, and mail bearing the
addresses of 408A and 408B Seneca Street which
was addressed to either "Resident" or "Rose Foster,"

respectively. Charles Foster Dep. at 38-39; Visosky
Dep. at 36. The deer appeared to have just been
slaughtered, and it was not properly tagged. *Id.* After
photographing the scene, Visosky called Defendants
Darren David ("David") and George Hinkle
("Hinkle") of the Pennsylvania Game Commission,
neither of whom were immediately available. *Id.* at
46, 49-50, 59.

> FN1. For the sake of clarity, the Court notes
> at the outset that the officer Defendants in
> this case were employed by multiple
> agencies, including the Pennsylvania Fish
> and Boat Commission, the Pennsylvania
> Game Commission, and the Tinicum Police
> Department.

Visosky drove to Plaintiff's residence and spoke with
Plaintiff Charles Foster ("Charles"). *Id.* at 59-60.
Visosky noticed a dark stain on Charles' pants that
appeared to him to be blood. Charles Foster Dep. at
54. Charles asserted that the stain was grease;
Katherine claimed it was mud. *Id.;* Katherine Foster
Dep. at 26-27. Charles denied any knowledge of the
trash or the deer. Visosky Dep. at 69. Visosky left the
residence to prepare an affidavit of probable cause
for a search warrant with David while McCafferty
and Hinkle were dispatched to sit outside the
residence. *Id.* at 74-75; David Dep. at 146. David and
Visosky prepared the affidavit based upon the
information Visosky had collected at the scene.
Visosky Dep. at 75. After reviewing the papers,
District Judge McKeon signed the search warrant. *Id.*
The warrant authorized seizure of any items with
blood stains, including clothing, any firearm or bow
and arrows, leaf and yard clippings, and any hunting
licenses.

David accompanied Visosky to the residence, where
Charles was presented with the warrant. *Id.* at 79, 83;
Charles Foster Dep. at 49. After searching Plaintiffs'
van and seeing no signs of blood, the officers entered
the house. Visosky Dep. at 85-86. The parties present
inside the house, in addition to the officer
Defendants, included Plaintiffs Katherine Foster
("Katherine"), Charles Foster, Tara Urban (who is
now Tara Foster) ("Tara"), and several children. *Id.*
at 86. David indicated to Charles that the officers
needed to examine a stain on his pants and suggested
that the two of them go upstairs since several other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

family members were present. *Id.* at 93-95; Tara Foster Dep. at 67, 70; Katherine Foster Dep. at 28. Charles requested that he remove the pants while alone. Katherine Foster Dep. at 28, Tara Foster Dep. at 67, 70. David would not let Charles do that. Charles Foster Dep. at 137; Katherine Foster Dep. at 30. In his deposition, David stated that he did not agree because he feared that Charles might destroy evidence or obtain a weapon. David Dep. at 158. Charles refused to cooperate, and David instructed that if he did not he would be handcuffed and assisted. Visosky Dep. at 97. Refusing to leave the presence of family, Charles voluntarily removed his pants, while continuing to wear boxer shorts, socks, and a shirt. *Id.* at 98, 103; Charles Foster Dep. at 137-38; Tara Foster Dep. at 71. Upon closer examination, the officers agreed the stain was not blood and, according to Tara, the officers returned Charles' pants within roughly fifteen minutes. Charles Foster Dep. at 123; Tara Foster Dep. at 72.

*2 The officers continued their search of the house and did not instruct the plaintiffs that they were either free to leave or needed to stay. Pl's Br. at 8; Tara Foster Dep. at 63; Visosky Dep. at 108-110, 139. David removed a shotgun from the attic; after Tara stated that the weapon was hers, David took it to his vehicle. Charles Foster Dep. at 85. The officers searched for blood-stained clothing, though they did not search clothing drawers. Visosky Dep. at 143. Visosky did find a pair of boots with what he testified appeared to him to be blood and a deer hair. *Id.* at 112-113. While David and Visosky took this evidence to the vehicle, David looked through the garage window and saw what appeared to be hunting boots, a compound bow, and a quiver with arrows. *Id.* at 113, 116-17. However, Katherine insisted that the garage was part of her apartment, 408B, a separate residence for which the officers did not have a warrant. Charles also told the officers that he did not reside at 408B. Charles Foster Dep. At 60; Visosky Dep. at 33, 48, 117.

Based on these assertions from Charles and Katherine, the officers did not enter unit 408B until after they acquired an amended warrant from Judge McKeon to include unit 408B. *Id.* When David returned with the amended search warrant, Katherine physically blocked the door. *Id.* at 119, 123. After Officer Fife, who had arrived on the scene, showed her the warrant,[FN2] David asked her to move and she refused. *Id.* at 123. She was pushed to the side[FN3], and David and Hinkle entered the garage and retrieved as evidence the items they had seen through the window, as well as a knife that appeared to have

blood on it. Charles Foster Dep. at 94-95. Katherine's actual apartment was not searched, and the Fosters were given receipts for certain seized items.[FN4] *Id.* at 188; Charles Foster Dep. at 97.[FN5] The officers also returned to the location of the deer carcass, where they took samples and discovered more discarded mail. Visosky Dep. at 37-38. The entire search incident lasted approximately one and a half hours. *Id.* at 143.

> FN2. *See* Statement of Undisputed Fact No. 73. Katherine questions whether she was shown the warrant and, if so, by whom. Charles Foster Dep. at 91. It appears that David did not want to show the amended search warrant to Plaintiffs, but was forced to by Officer Fife, of the Tinicum Police Department, who had become concerned about the conduct of the search and demanded that David display the amended warrant. Visosky Dep. at 119-23. The Court does not find this dispute to be so material as to preclude summary judgment.

> FN3. There is a dispute over which officer pushed Katherine. Defendants claim it was Officer Fife; Plaintiffs claim it was Officer Visosky. This dispute is immaterial to any of the claims in this case. The Court also notes that although the parties had somewhat consistently used the term "pushed" in various briefing in this case to refer to the action taken against Katherine, Plaintiffs used the term "hit" in their Second Amended Statement of Undisputed Facts. *See* Statement of Undisputed Facts No. 77; Charles Foster Dep. at 94-95.

> FN4. These included a bow and quiver, arrows in the quiver that appeared to have blood on them, a pair of boots that appeared to have blood on them, a bag of clothes that was on a table, and a small lock blade knife that appeared to have blood on it. Visosky Dep. at 124.

> FN5. Charles claims that he was not given a receipt for one additional item that was taken-a "deer stand." Charles Foster Dep. at 97.

Charles later received multiple citations by mail. Charles Foster Dep. at 225-26, 318. Visosky charged Charles with littering, and David cited Charles for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 3
Slip Copy, 2006 WL 2371976 (E.D.Pa.)
**(Cite as: Slip Copy)**

unlawful possession of wildlife or game, unlawful retrieval and disposition of killed or wounded game, and unlawfully failing to tag and report a big game kill.[FN6] *Id.* at 225-26; Visosky Dep. at 137.

> FN6. All charges were either dismissed or overturned on appeal. Visosky Dep. at 138-39; Charles Foster Dep. at 205.

In the course of their original search, the officers found a hunting license belonging to Tara. When the officers asked her about whether she had taken the hunting safety course required by law for the purchase of a hunting license, Tara indicated that she did not know what the officers were talking about. McCafferty Dep. at 87-88. In November 2003, David contacted Defendant Carbon County Wildlife Conservation Officer Merluzzi ("Merluzzi"), requesting that he file a charge against Tara for purchasing a hunting license without completing the safety course. Merluzzi Dec. at ¶ 3. Merluzzi investigated the matter and determined that there was indeed no record that Tara had completed a hunting safety course, and, accordingly, he filed a charge against Tara on March 12, 2004.[FN7] *Id.* at ¶ 4.

> FN7. Tara was found guilty but the conviction was overturned on appeal. Merluzzi Dec. at ¶ 7.

*3 On April 9, 2004, Charles attended a Pennsylvania Game Commission Public Meeting, at which each person was allowed to comment for five minutes, so long as the comments were related to the published agenda. Charles Foster Dep. at 283-84, 318. After speaking for a period of time [FN8], Charles was cut off after referring to David as a "terrorist" who was like "Osama bin Laden." *Id.* Defendant Commissioner Schleiden ("Schleiden") then asked Charles to step down but invited him to discuss his concerns with the Commissioners after the meeting. Schleiden Dec. at ¶ ¶ 8-9. In response, Charles said "thank you," and stepped down. *Id.* at ¶ 9. Charles later said "I guess I got a little excited." *Id.* at ¶ 10. He did not speak with the Commissioners after the meeting. *Id.* at ¶ 10.

> FN8. There is a dispute of fact over exactly how long Charles spoke, but the Court does not find it to be material to the extent that it would preclude summary judgement.

At the time of the search of the Foster residence, David's immediate supervisor was Gordon Couillard. David Dep. at 192-93, 195. Couillard's superior was the Regional Director, Defendant Barry Moore ("Moore"). *Id.* All Wildlife Conservation Officers were initially trained for fifty weeks, with periodic training continuing throughout their employment. Moore Dec. at ¶ 4. The Game Commission's Training Division, located in Harrisburg, conducts annual training on established search and seizure procedures and any changes in law affecting those procedures. *Id.* at ¶ 7. Moore was the individual who directed the Regional Supervisors to conduct additional training if he learned or concluded that there was an area of deficiency in the existing training. *Id.* at ¶ 5. Moore was never notified by Couillard that any officers, including David, were not following commission search and seizure procedures or established law. *Id.* at ¶ 8. The only concern Moore had about David's job performance related to his brusque approach to the public that Moore attributed to his being a former Marine officer. *Id.* at ¶ 10. There was no history of David violating the rights of individuals. *Id.* at ¶ 11. Indeed, the only complaint lodged against David through the Game Commission's complaint tracking system involved unlawful possession of a squirrel. *Id.*

### III. Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson,* 477 U.S. at 248. A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it s believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*4 Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2371976 (E.D.Pa.)
**(Cite as: Slip Copy)**

Page 4

to support the non-moving party's case." _Id._ at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." _Celotex,_ 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. _Anderson,_ 477 U.S. at 255.

### IV. Discussion

Plaintiffs' claims are brought pursuant to 42 U.S.C. § 1983, which provides a remedy against any person who, under color of law,[FN9] deprives another of his constitutional rights. Plaintiffs [FN10] bring numerous claims which all allege, generally speaking, that Defendants violated both Plaintiffs' Fourth Amendment and First Amendment rights.[FN11] In response, Defendants contend that they are entitled to summary judgment on all claims because (1) as a matter of law, no constitutional rights have been violated by any Defendant and (2) Defendants are entitled to qualified immunity. The specific causes of action still advanced by Plaintiffs encompass the following claims:

> FN9. The parties do not dispute that Defendants at all times were acting under color of state law.

> FN10. The Court notes that by voluntary agreement of the parties, pursuant to Fed.R.Civ.P. 41(a)(1), the claims of former Plaintiffs Tara Foster and her minor children Jane Doe, Josephine Doe, and John Doe were dismissed with prejudice on March 24, 2006. Only Charles and Katherine remain as Plaintiffs in the this action.

> FN11. Because Plaintiffs did not file a Pretrial Memorandum, it is not entirely clear to the Court how many of the claims stated in the Complaint that Plaintiffs actually intended to pursue at trial. For this reason, the Court will address all of Plaintiffs' claims in this Memorandum.

(1) Violation of Fourth Amendment rights by illegal and/or unreasonable search (brought by Charles and Katherine against David, Hinkle, Visosky, and McCafferty).

(2) Violation of Fourth Amendment rights by use of excessive force (brought by Katherine against David and Visosky).

(3) Violation of Fourth Amendment rights by use of an illegal strip search (brought by Charles against David).

(4) Violation of First Amendment rights by retaliation (brought by Charles against David).

(5) Violation of Fourth Amendment rights by malicious prosecution (brought by Charles against David and Merluzzi).

(6) Violation of Fourth Amendment rights by false arrest and/or violation of right to substantive due process of law (brought by Charles and Katherine against David, Hinkle, Visosky, and McCafferty).

(7) Violation of First Amendment rights by denial of right to speech and petition (brought by Charles against Schleiden).

(8) Failure to implement municipal policies to avoid constitutional deprivations and failure to train and supervise employees under color of state law (brought by Charles and Katherine against Moore).

The Court will address each of Plaintiffs' claims in turn.

### A. Defendants did not conduct an illegal or unreasonable search in violation of the Fourth Amendment.

Charles and Katherine, pursuant to 42 U.S.C. § 1983, allege that Defendants David, Hinkle, Visosky, and McCafferty conducted an unreasonable search of their residences in violation of the Fourth Amendment. They allege that (1) there was insufficient probable cause for the search warrant and amendment, (2) the warrant amendment permitting search of 408B was invalid and (3) the warrant was exercised in an unreasonable manner, by excessive use of force and an illegal strip search of Charles. Defendants contend that the warrant and amendment are both valid and that the search was exercised reasonably under the circumstances.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                   Page 5
Slip Copy, 2006 WL 2371976 (E.D.Pa.)
(Cite as: Slip Copy)

**1. Defendants had probable cause to support the warrant for the search of the Foster residences and for citing Charles for violations of Pennsylvania game and littering laws, and the warrant was properly amended to include unit 408B.**

*5 The Fourth Amendment provides in part that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause must be assessed in light of the "totality of the circumstances" known to the magistrate, not by rigid formulation. _United States v. Martiez-Zayas,_ 658 F.Supp. 79, 82 (E.D.Pa.1987) (citing _Illinois v. Gates,_ 462 U.S. 213, 230-31 (1983)). The probable cause standard is a "practical, non-technical conception." _Martinez,_ 658 F.Supp. at 82 (citing _Gates,_ 462 U.S. at 231). The issuing magistrate must simply make a practical, common sense decision whether, given the circumstances described in the affidavit, there is a fair probability that contraband or evidence of a crime will be found at that place.[FN12] _Id._ The reviewing court should afford the magistrate's decision "great deference" rather than reviewing the determination of probable cause de novo. _Id._ The court must simply ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. _Id._ (quoting _Jones v. United States,_ 362 U.S. 257, 271 (1960)). "[D]oubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." _Id._ (citing _Gates,_ 462 U.S. at 237 n. 10).[FN13]

FN12. As an initial matter, Plaintiffs' argument that there was no probable cause because the citations were ultimately dismissed or overturned lacks merit. Probable cause does not require that an officer prove guilt beyond a reasonable doubt. _Orsatti v. N.J. State Police,_ 71 F.3d 480, 482-83 (3d Cir.1995). Rather, probable cause merely requires that a reasonable police officer, under the circumstances, would believe that the accused had committed or was committing an offense. _Gerstein v. Pugh,_ 420 U.S. 103, 111 (1975); _Sharrar v. Felsing,_ 128 F.3d 810, 817 (3d Cir.1997). In this case, Judge McKeon determined that the deer carcass and mail

established sufficient probable cause for the warrant. It is irrelevant that Charles was ultimately found not guilty of the summary offenses.

FN13. Even if the magistrate lacked a substantial basis for his decision that there was probable cause for searching the Fosters' property, the officers' good faith reliance on this facially valid warrant is justified. The Third Circuit has only found reliance on a facially valid warrant unreasonable when either (1) the issuing judge issued the warrant in reliance on a deliberately or recklessly false affidavit, (2) the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function, (3) the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,' or (4) the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized. _United States v. Barnes,_ 2005 WL 1863213, at *5 (E.D.Pa. Aug. 3, 2005) (citing _United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars,_ 307 F.3d 137, 146 (3d Cir.2002)).
Plaintiffs have provided no evidence that the Affidavit of Probable Cause was deliberately or recklessly false, that the magistrate judge abandoned his judicial role, that the affidavit was lacking in indicia of probable cause, or that the warrant was facially deficient. In fact, Charles is unable to identify any material falsehood in the affidavit that would vitiate probable cause. Def.'s Br. 6.

Defendant argues that the discarded deer carcass and mail addressed to Plaintiffs provided sufficient probable cause for the warrant and search. Def.'s Br. 4. Plaintiffs contend that the assertions that formed the basis of the warrant were false. Pl.'s Resp. 6. However, Plaintiffs provide no factual basis for this contention, nor do they dispute that Visosky found deer remains alongside the mail addressed to Plaintiffs. Plaintiffs also argue that the original search warrant for 408A was improperly altered. Plaintiffs appear to suggest that the amendment did not actually have the magistrate's approval, however absolutely no evidentiary basis is offered for such assertion. Pl.'s Resp. 12.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2371976 (E.D.Pa.)
(Cite as: Slip Copy)

The law is clear that where a building is divided into separate apartments, probable cause must be shown for searching each apartment unless the evidence shows the entire building is actually being used as a single unit. _Maryland v. Garrison,_ 480 U.S. 79 (1987); _United States v. Ritter,_ 416 F.3d 256 (3d Cir.2005) (holding that once officers knew or should have known that there were multiple units, they were obliged to stop the search and could no longer rely on the warrant to justify their search of the entire building); _United States v. White,_ 416 F.3d 634 (7th Cir.2005) (holding that, first, the defendant needs to establish that the warrant failed to describe the home with particularity, and if that succeeds, then the defendant must show that the police knew or should have known, based on the available information at the time the warrant was issued that, where there were multiple units, a warrant for a single address was overbroad).

**\*6** Here, since the material facts are not in dispute and deference is to be afforded to issuing magistrates in determining whether or not there is sufficient probable cause to issue a warrant, there is no persuasive reason for this Court to find fault with the judgment of Judge McKeon in this case. The Court concludes that there was probable cause to justify issuance of a search warrant for both 408A and 408B.

The determinative factor for this claim concerning the allegedly illegal amendment of the search warrant to include unit 408B is Judge McKeon's declaration that he, not Defendant David, personally amended the warrant. Pl.'s Reply 3; Exhibit A. Because Plaintiff has only made unsubstantiated assertions that something different occurred, there is no dispute of material fact concerning the validity of the amendment to search 408B. The Court finds that the officers properly stopped before searching unit 408B and did not rely on the original warrant to justify their search of the entire property.[FN14] Rather, they sought and obtained an amended warrant specifically denoted unit 408B. The amendment by Judge McKeon was based on probable cause-i.e., what was observed during the initial search-and, therefore, there was a valid amended warrant authorizing the search of 408B.[FN15]

FN14. Plaintiffs also argue in passing that the amended search warrant was invalid because it did not adhere to Rule 206 of the Pennsylvania Rules of Criminal Procedure, which requires the magistrate to designate the time and date of issuance, time and date

of expiration, whether it is a day or night search, and so forth. However, an alleged violation of state law does not state a claim under Section 1983. _Elkin v. Fauver,_ 969 F.2d 48, 52 (3d Cir.1992). What matters is whether the amended warrant met the requirements of the Fourth Amendment. Here, it did.

FN15. Plaintiffs also argue briefly that Hinkle's alleged search of Charles' van prior to the arrival of the search warrant was unlawful. However, "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more." _Pennsylvania v. Labron,_ 518 U.S. 938, 940 (1996). Here, Charles' van was readily mobile and, as demonstrated by the warrant and as discussed above, there was probable cause to search the van. Therefore, even prior to the arrival of the warrant, Hinkle's alleged search of the van was reasonable under the Fourth Amendment.

Accordingly, the Court will grant summary judgment on the probable cause and illegal search claim.

### 2. The officers did not use excessive force.

Katherine contends that Defendant David [FN16] used excessive force in conducting his search, in violation of the Fourth Amendment, by pushing her aside during the search of unit 408B. David argues that (1) it was Officer Fife,[FN17] rather than David, that moved Katherine from the doorway, and (2) even if David did move Katherine, the minimal force used was objectively reasonable, particularly because, at the time, she was physically blocking the unit that the officers were legally authorized to search. At oral argument, Plaintiffs' supplemented their excessive force claim to include the officers' use of their weapons during the search.

FN16. This claim was originally brought by Katherine and Tara against Defendants David and Visosky, alleging that David moved Katherine from the doorway and Visosky physically held back Tara from also blocking the doorway. Def.'s Br. 6-7. Since Tara was dismissed from this case and there is no evidence or allegations by Katherine

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

against Visosky, this claim against Visosky should clearly be dismissed. The Court will therefore grant summary judgment in favor of Defendant Visosky on this claim.

FN17. Officer Fife is not a named defendant.

Under the Fourth Amendment, the "reasonableness" of force used must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham v. Connor,* 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Id.* at 396-97. The "reasonableness" test is whether, under to totality of the facts and circumstances, the officers' actions are "objectively reasonable," without regard to their underlying intent or motivation. *Id.* at 397. Although reasonableness under the Fourth Amendment is usually a question for a jury, summary judgment is appropriate if the court concludes, after resolving factual disputes in favor of the plaintiff, that the officer's use of force was objective under the circumstances. *Estate of Smith v.. Marasco,* 318 F.3d 497, 515-16 (3d Cir.2003).

*7 In assessing the objective reasonableness of the force used, the court must recognize that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. *Graham,* 490 U.S. at 396. The force used must rise above a *de minimis* level for a constitutional claim to arise. *Ingraham v. Wright,* 430 U.S. 651, 674 (1977). Indeed, courts have repeatedly granted summary judgment on Fourth Amendment claims where the force used by officers was *de minimis. See, e.g., Nolin v. Isbell,* 207 F.3d 1253, 1258 (11th Cir.2000) (holding that *de minimis* force does not support a claim for Fourth Amendment excessive force); *Nardini v. Hackett,* 2001 WL 1175130, at *6 (E.D.Pa. Sept. 19, 2001) (granting summary judgment where only *de minimis* force was used); *Garcia v. County of Bucks,* 2001 WL 311253 (E.D.Pa. Mar. 27, 2001) (finding as a matter of law that grabbing plaintiffs coat and arms and handcuffing in the course of arrest constituted *de minimis* force and did not violate Fourth Amendment); *Bensinger v. Mullen,* 2000 WL 1100781 (E.D. Pa. Aug 4, 2000) (granting summary judgment and finding as a matter of law that grabbing plaintiff and bringing him to the ground was *de*

*minimis* force).

Unholstering a gun during a search is not an excessive use of force in and of itself. Indeed, even pointing a gun during a warranted search may be justified under particular circumstances. *Torres v. United States,* 200 F.3d 179, 185-86 (3d Cir.1999). Where the officers had reason to believe that there may be firearms in the house, even pointing loaded guns at persons who were not actively resisting would not violate the Fourth Amendment. *Mellott v. Heemer,* 161 F.3d 117, 122-23 (3d Cir.1998). This is so even if the crime for which the individuals are being investigated in not severe. *Id.* The Court can not find any case, and Defendants do not cite to any case, where an officer's act of simply unholstering or drawing his weapon without pointing it at the plaintiff amounted to excessive force.[FN18]

FN18. For this reason alone, Defendants are entitled to qualified immunity on this issue. *See* qualified immunity discussion, *infra.*

In this case, there is no dispute that Katherine physically blocked the doorway to the garage, that an officer pushed her out of the way to exercise the valid amended search warrant,[FN19] and that she was not injured as a result. Def.'s Br. 8-9. Emphasizing the triviality of the offenses under investigation, Katherine argues that any use of physical force whatsoever was excessive and unwarranted. Pl.'s Resp. 14-15. Instead, Katherine suggests that the officers should have merely "written the citations ... and left...." Pl.'s Resp. 15.

FN19. The parties dispute whether David or Officer Fife pushed Katherine from the doorway to search 408B. However, because this Court finds that the force used against Katherine was *de minimis* as a matter of law, this factual dispute is immaterial.

Regardless of the triviality of the offense, however, the Court finds that the officers possessed a valid search warrant and took reasonable actions to exercise it. Precedent suggests that removing an individual from a doorway in a manner that does not cause injury in order to conduct a legal search constitutes *de minimis* force. *See Garcia,* 2001 WL 311253; *Bensinger,* 2000 WL 1100781. Despite counsel's descriptive assertions that this incident involved "excessive force" and a "physical assault," nothing in the record suggests that David took any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 8
Slip Copy, 2006 WL 2371976 (E.D.Pa.)
**(Cite as: Slip Copy)**

physical action beyond the *de minimis* action necessary to lawfully exercise the search warrant without interference. [FN20]

> FN20. Indeed, it is undisputed that Katherine was not injured. Def.'s Br. 8.

*8 Regarding the unholstering of the officers' weapons, the caselaw described *supra* dictates that the officers' action here do not amount to excessive force. Despite the argument of Plaintiffs' counsel, nothing in the record suggests that any of the Defendants pointed their weapons at Plaintiffs at any time before, during, or after the search. The record merely reflects that the officer drew their guns, but did not point them. Charles Foster Dep. at 112; Tara Foster Dep. at 83; Katherine Foster Dep. at 29, 36, 75. As the search warrant reflects (authorizing a search for "[a]ny firearm"), the officers had reason to believe there were firearms in the house. Even Charles concedes this fact. *See* Charles Foster Dep. at 83 ("I'm a hunter, of course I have weapons in my house."). The officers conduct in drawing their weapons but not pointing them at anyone was therefore not excessive or objectively unreasonable.

Summary judgment is therefore appropriate on Plaintiffs' excessive force claim.

### 3. Charles was not subjected to an illegal strip search.

Charles also asserts that Defendant David violated the Fourth Amendment by subjecting him to an illegal "strip-search" when he ordered Foster to "strip" out of his pants. Pl.'s Resp. 7. In response, David contends that examination of Charles' pants was authorized by the warrant and that Foster was not actually "strip-searched." Def.'s Br. 9-10.

While the Third Circuit has not specifically defined what degree of clothing removal is necessary to constitute a "strip-search," this Court finds the Sixth Circuit's explanation to be both obvious and persuasive: "A 'strip search,' though an umbrella term, generally refers to an inspection of a naked individual[.]" *Spears v. Sowders*, 33 F.3d 576, 581 (6th Cir.1994). Here, the parties agree that Charles was never examined naked. Def.'s Br. 9; Pl.'s Resp. 7. Indeed, Plaintiff concedes that he was never deprived of his boxer shorts, shirt, or socks. Pl.'s Resp. 7; Def.'s Br. 9. Only Plaintiff's pants-not his body-were examined. Pl.'s Resp. 7; Def.'s Br. 10. As such, the

Court finds "strip-search" to be an term that is simply not applicable to the events surrounding the examination of Foster's pants.

The issue, therefore, is whether David's request to examine Charles's pants was unreasonable. Importantly, there is no dispute that the pants were stained. Moreover, the warrant specifically included "any item with blood stains, *including clothing*" (emphasis added).[FN21] Pl.'s Resp. 8; Def.'s Br. 10. The Courts finds, therefore, that in these circumstances the request to examine Charles' pants was not objectively unreasonable.

> FN21. Charles argues that David's pants request was unreasonable because Visosky did not examine the pants during his first visit to the house. Pl.'s Resp. 7, 11-12. However, as David indicates, Visosky did not have a warrant during his initial visit. Def.'s Br. 5.

Charles argues further, however, that David's mere *manner* in requesting removal of Charles' pants was unreasonable. Pl.'s Resp. 11-12. In support of this contention, Charles contends that David requested the pants "within ten seconds or [he] would strip them off." Pl.'s Resp. 7. The Court is not persuaded. As discussed, there is no dispute of material fact concerning the circumstances surrounding the pant request. David suggested they go upstairs; Charles wanted to go upstairs unaccompanied by an officer; David refused and suggested handcuffing and assisting him if he did not comply; and Charles then voluntarily removed his pants in the presence of family.[FN22] Pl.'s Resp. 7; Def.'s Br. 10. Charles provides no legal support for the proposition that David's use of what might be referred to by some as a harsh manner during a legal search is a violation of the Fourth Amendment.

> FN22. Charles also suggests that David requested the pants for the sole purpose of embarrassing and harassing him and his family. As support for this point, he cites the fact that Defendants admit they did not search for blood-stained clothing in any clothing drawers. Pl.'s Resp. 8. Defendants indicate, however, that the officers reasonably assumed that only clean clothes would be in the drawers. Regardless, the law requires only that the pants request be "objectively reasonable" without regard to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 9
Slip Copy, 2006 WL 2371976 (E.D.Pa.)
(Cite as: Slip Copy)

underlying intent or motivation. *Graham, 490 U.S. at 397*. David's subjective purpose in requesting the pants is therefore irrelevant.

**\*9** For these reasons, the Court will grant summary judgment for all claims related to the pants search.

### B. Defendant David did not maliciously prosecute or retaliate againts Charles Foster

Charles also claims that in retaliation for his actions, Defendant David maliciously prosecuted him for violations of game laws. Pl.'s Resp. 14. [FN23] David argues that summary judgment is appropriate on this claim because (1) the officers had probable cause and (2) there is no evidence of a "seizure," as the law requires for a malicious prosecution claim. Def.'s Br. 12-13.

> FN23. Initially Tara alleged malicious prosecution against Merluzzi. Since Tara has been dismissed from this case and it is undisputed that Merluzzi did not prosecute Katherine or David Foster, the claim against Merluzzi should clearly be dismissed. The Court will therefore grant summary judgment as to Merluzzi.

To prevail on a *§ 1983* malicious prosecution action, a plaintiff must show: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of a seizure as a consequence of the legal proceeding. *Robinson v. Fetterman, 378 F.Supp.2d 534, 544 (E.D.Pa.2005)* (citing *DiBella v. Borough of Beechwood, 407 F .3d 599, 601 (3d Cir.2005)*).

While it is undisputed that David initiated citations against Charles that ended in Foster's favor, Charles has not provided any basis for fulfillment of the last three requirements of a malicious prosecution claim. Pl.'s Resp. 9. As discussed *supra*, the dead deer, mail, and bloodstained items retrieved from Charles' residence provided David with probable cause for the state game law citations as a matter of law. Furthermore, there is no evidence in the record that David acted maliciously or for any purpose other than bringing Charles to justice. [FN24] Finally, Charles

provides absolutely no evidence that he suffered a deprivation of liberty or seizure as a consequence of the citations. As a matter of law, a summary citation and having to attend one's trial, without more, "is not a government 'seizure' in a *42 U.S.C. § 1983* malicious prosecution action for violation of the Fourth Amendment." *Robinson, 378 F.Supp.2d at 545* (quoting *DiBella, 407 F.3d at 603*). Application of *Robinson* alone is indisputable here: it is undisputed that Plaintiff was not arrested, but rather was issued citations in the mail. Pl.'s Resp. 9; Def.'s Br. 12. Since there is no evidence that there was any legally adequate "seizure" as required for a malicious prosecution claim, the fifth requirement is clearly not met.

> FN24. Charles cites *Hartman v. Moore, 126 S.Ct. 1695, 1702 (2006)* for the proposition that lack of probable cause often indicates malice or retaliation. Pl.'s Resp. 14. While Charles is correct, be unconvincingly argues that probable cause did not exist by relying solely on events that occurred *after* issuance of the search warrant. Pl.'s Resp. 14. These events, while relevant to other individual claims, are irrelevant to probable cause. As a discussed *supra*, the deer carcass amd mail provided probable cause.
> In addition, even a determination that Defendants lacked probable cause does not establish malicious prosecution. Charles fails to directly address whether David acted maliciously in issuing the citations (instead, he attempts to infer malice from lack of probable cause) and do not provide evidence of a "seizure."

Accordingly, the Court will grant summary judgment on the malicious prosecution claim.

### C. Defendants did not falsely arrest Plaintiffs or violate their substantive due process rights.

Charles and Katherine also claim that Defendants David, Visosky, Hinkle, and McCafferty falsely arrested them and/or violated their substantive due process rights during the search of the Foster residence. Those Defendants argue that both claims fail as a matter of law because Charles and Katherine were not deprived of their liberty to leave the premises. Def.'s Br. 13.

**\*10** A successful false arrest claim requires (1) an

arrest, and (2) that the arrest was made without probable cause. *Dowling v. City of Philadelphia,* 855 F.2d 136, 141 (3d Cir.1988). An arrest requires some seizure of the person through application of physical force or, where that is absent, submission to the assertion of authority. *California v. Hodari,* 499 U.S. 621, 624 (1991). "A person is seized for Fourth Amendment purposes only if he is detained by means intentionally applied to terminate his freedom of movement." *Berg v. County of Allegheny,* 219 F.3d 261, 268 (3d Cir.2000).

The parties do not dispute that Charles and Katherine were never formally placed under arrest. Def.'s Br. 14; Pl.'s Resp. 8. Instead, Charles and Katherine merely assert that "none of the defendants informed the plaintiffs ... that they were free to leave or were not under arrest." Pl.'s Resp. 8. However, Charles and Katherine do not assert that they were told they could not leave the residence during the search. Indeed, Tara actually left the residence for fifteen minutes. Def.'s Br. 6. Based on the prevailing law and paltry record support cited by Charles and Katherine, the Court is convinced that (1) their freedom of movement was not restricted by Defendants and (2) their own actions indicate they did not consider their freedom of movement restricted. Accordingly, as a matter of law, Charles and Katherine were not "seized" or "arrested" for Fourth Amendment purposes.[FN25] In addition, as discussed *supra,* probable cause existed for the search and citations.

> FN25. Written citations alone do not constitute "arrest" for purposes of a false arrest claim under § 1983. *Moyer v. Borough of N. Wales,* No. 00-1092, 2001 WL 73428 (E.D.Pa. Jan. 25, 2001).

Because Charles and Katherine were in no way arrested and probable cause existed, the Court will grant summary judgment on the false arrest claims.

Alternatively, Charles and Katherine claim that their Fourteenth Amendment substantive due process rights were violated. The Court rejects this claim. In a series of cases, the Supreme Court has articulated the "most precise claim doctrine," wherein "if a constitutional claim is covered by a specific constitutional provision, it must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *County of Sacramento v. Lewis,* 523 U.S. 833, 843 (1998). *See also Graham,* 490 U.S. at 397 (1989) (holding that claims properly analyzed under the

Fourth Amendment should not be additionally addressed under substantive due process); *Underwood v. Pennsylvania,* No. 05-3452, 2006 WL 1147263 (E.D.Pa. Apr. 26, 2006). Courts within the Third Circuit has similarly avoided using substantive due process theories when other specific and identifiable constitutional claims are extant. *See Khodara Envtl., Inc. ex. rel. Eagle Envtl., L.P. v. Beckman,* 237 F.3d 186, 197-98 (3d Cir.2001); *Walker v. N. Wales Borough,* 395 F.Supp.2d 219, 229 (E.D.Pa.2005); *Assocs. in Obstetrics & Gynecology v. Upper Merion Twp.,* 2004 U.S. Dist. LEXIS 22098, *12 (E.D.Pa.2004).

*11 Accordingly, because Charles and Katherine's claims are more precisely characterized as Fourth Amendment claims (which the Court has resolved, *supra* ), the Court will grant summary judgment as to the substantive due process claims.

### D. Defendant Schleiden did not restrain Charles Foster's speech or curtail his rights to petition in violation of the First Amendment.

Charles claims Defendant Schleiden violated his First Amendment right to free speech by cutting short Charles' public comments before the Pennsylvania Game Commission. Schleiden argues that, as a matter of law, his actions were reasonable under the First Amendment because Foster exceeded the time, place, and manner restrictions of the public meeting.

The Court finds that there are no disputes of material fact concerning what occurred at the relevant public meeting. It is undisputed that Schleiden cut short Charles' comment after Charles became belligerent and referred to Defendant David as a "terrorist" who was like "Osama bin Laden." Moreover, it is undisputed that Charles was not forcibly removed from the microphone; rather, he was simply asked to stop (which he did, along with thanking the Commissioners).

This disposition of this claim is squarely controlled by *Eichenlaub v. Township of Indiana,* 385 F.3d 274. The factual situation in *Eichenlaub* is directly analogous to the instant case: a speaker at the citizen's forum portion of a meeting of a town board of supervisors became "repetitive and truculent" and was removed. Affirming a district court's grant of summary judgment on a First Amendment claim, the *Eichenlaub* Court stated that:
Restricting such behavior is the sort of time, place, and manner regulation that passes muster under the

most stringent scrutiny for a public forum. Indeed, for the presiding officer of a public meeting to allow a speaker to try to hijack the proceedings, or to filibuster them, would impinge on the First Amendment rights of other would-be participants. We have no difficulty sustaining the decision to remove David Eichenlaub on that basis.... To the extent those restrictions were not strictly content-neutral, the chairman's actions served the function of confining the discussion to the purpose of the meeting. As we have observed, speech at a citizen's forum may be limited according to its germaneness to the purpose of the meeting. At any rate, the overwhelming, and wholly sufficient, motive to eject Eichenlaub from the meeting was the perfectly sustainable and content-neutral desire to prevent his badgering ... and disregard for the rules of decorum.

*Eichenlaub,* 385 F.3d at 281.[FN26]

> **FN26.** The Court notes that Plaintiffs completely failed to address *Eichenlaub* in response to Defendants' brief.

We reach the same conclusion here. Charles was allowed to speak on a matter of public concern (*i.e.,* the behavior of law enforcement officials). He was asked to stop only when he became belligerent and disruptive. The Court finds that Schleiden's actions served the dual-and wholly legitimate-purposes of (1) confining the discussion to germane matters and (2) enforcing the rules of decorum. Like the *Eichenlaub* Court, this Court does not read the record to indicate that Schleiden attempted to "muzzle" Charles because he disagreed with his particular viewpoint.[FN27] Schleiden's enforcement of a reasonable time, place and manner restriction simply did not violate Charles' First Amendment rights.

> **FN27.** The Court notes that even if there were some record evidence that Schleiden was personally offended by the content of Foster's outbursts, Schleiden would likely still be entitled to summary judgment. Listeners have a right to be free from "unjustifiable annoyance and obstruction which is likely soon to savor of intimidation." *Hill v. Colorado,* 530 U.S. 703, 716-18 (2000).

**\*12** The Court will therefore grant summary judgment on the First Amendment claim brought against Defendant Schleiden.

**E. Defendants David did not violate Charles' First Amendment rights by retaliating against him.**

Charles claims that Defendant David violated his First Amendment rights by retaliating against him. David argues that (1) Charles has failed to adduce record evidence to support this claim and (2) his actions were taken for a legitimate, non-retaliatory reason.[FN28]

> **FN28.** Charles fails to address this claim in response to Defendants' motion, and has therefore waived opposition to summary judgment. However, for the sake of clarity, the Court will briefly detail the reasons why summary judgment would be appropriate even if Charles had responded.

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983." *McGrath v. Johnson,* 67 F.Supp.2d 499, 512 (E.D.Pa.1999). Therefore, the alleged retaliation need not amount to an independent violation of the plaintiff's constitutional rights in order to maintain a § 1983 action. *See Rauser v. Horn,* 241 F.3d 330, 333 (3d Cir.2001). A plaintiff must prove that the conduct which led to the alleged retaliation was constitutionally protected; that the defendant took adverse action against the plaintiff; and that the plaintiff's constitutionally protected conduct was a substantial or motivating factor in the defendant's action. *Id.* at 333. *See also Figueroa v. Regan,* 2003 U.S. Dist. LEXIS 6593, \*9-\*10 (E.D.Pa.2003).

The Court finds that Charles has not demonstrated the necessary record evidence to support this claim. There are two possible "adverse" actions by David that could provide fodder for Charles' retaliation claim. The first of these is David's execution of the search warrant. However, a retaliation claim predicated upon that action fails the very first prong of the legal test described above, because Charles has not offered the required evidence that he engaged in any protected conduct *prior* to David's actions.

The second possible adverse action on which this claim could be based is David's subsequent citation of Charles for violation of game laws. However, a retaliation claim based upon that action fails the third prong of the legal test, because there is absolutely no record evidence that Charles' public speeches (the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                         Page 12
Slip Copy, 2006 WL 2371976 (E.D.Pa.)
(Cite as: Slip Copy)

only possible protected conduct cited by Charles) were a substantial or motivating factor in David's decision to charge him with a violation of game laws.

Aside from these fatal deficiencies, David is also entitled to summary judgment because the undisputed facts of record demonstrate that he took both of his actions against Charles (the search and the citation) for a legitimate, non-retaliatory reason. The Third Circuit has made it clear that David's burden is "relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse action]; the defendant need not prove that the articulated reason actually motivated the [action]." *Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir.1997)* (quoting *Woodson v. Scott Paper Co., 109 F.3d 913, 920 n. 2 (3d Cir.1997)*). As the Court has discussed *supra*, David had probable cause to obtain and execute the search warrant and to cite Charles for violation of game laws. The existence of probable cause was a legitimate, non-retaliatory reason for David's actions, regardless of whether that reason was his actual motivation. *Edwards v. Kelly, 2005 WL 1349852, *4 (3d Cir.2005)* (retaliation claim fails given existence of probable cause to arrest plaintiff).

**\*13** The Court will therefore grant summary judgment on the First Amendment retaliation claim against Defendant David.

### F. Defendant Moore is entitled to summary judgment on Plaintiff's failure-to-train claim.

Charles and Katherine also claim that Defendant Moore should be held liable for failure to train his employees. Moore contends he is entitled to summary judgment because Charles and Katherine have not adduced record evidence to demonstrate that Moore, in his capacity as supervisor, was deliberately indifferent.

A municipal supervisor or senior official may be subject to liability pursuant to Section 1983 under a failure-to-train theory. *See Foster v. David, 2005 U.S. Dist. LEXIS 18446, *7-*8 (E.D.Pa .2005)* (citing *Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir.1989)*). However, inadequate training may serve as the basis of a Section 1983 claim only where the inadequacies were so obvious that a supervisor's disregard for modifying the training regimen constituted deliberate indifference to the constitutional rights of those who would be affected by the employees' behavior. *Lewis v. City of*

*Philadelphia,* 2004 U.S. Dist. LEXIS 23362, *17-*18 (E.D.Pa .2004) (citing *Board of County Comm. of Bryan County v. Brown, 520 U.S. 397, 407 (1996)*; *City of Canton v. Harris, 489 U.S. 378, 388 (1989)*). A failure-to-train claim may not rest on the activities of just one employee; the failure of a training program must be evidenced by constitutional violations committed by multiple employees. *See Bryan County, 520 U.S. at 408* ("The existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors ... was the 'moving force' behind the alleged violation"). In addition, in the case of supervision of law enforcement officers, a plaintiff must show (1) that the supervisor had contemporaneous knowledge of the offending incident or knew of a prior pattern of similar incidents and (2) circumstances under which the supervisor's actions or inaction communicated a message of approval to the offending subordinates. *Montgomery v. DeSimone, 159 F.3d 120, 127 (3d Cir.1998)*.

The Court finds that Charles and Katherine have not offered required evidence of a *pattern* of violations committed by multiple, inadequately trained employees. In this case, the vast majority of the evidence that Charles and Katherine have put forth is associated with their complaint against one officer-Defendant David. Plaintiffs do not present any evidence that there were repeated complaints against the other officers or that Defendant Moore was aware of any pattern of violations by multiple employees. Indeed, there is not even evidence of *any* other similar incidents involving Defendant David alone. In short, the record indicates that Moore had no knowledge or reason to believe that David (or any other officer) were systematically conducting improper searches and seizures.

**\*14** In addition, nothing in the record suggests that Moore had contemporaneous knowledge of the search of the Fosters' premises, or of the citations. Nor can Charles and Katherine cite to any record evidence that Moore's actions or inaction communicated any message-let alone a message of approval-to David.[FN29] Finally, undisputed facts of record demonstrate that Wildlife Conservation Officers are trained in how to conduct searches and seizures within the bounds of the law.

FN29. Moore was not even David's direct supervisor (that person was Gordon

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 13
Slip Copy, 2006 WL 2371976 (E.D.Pa.)
**(Cite as: Slip Copy)**

Couillard).

For all of these reasons, the Court finds that Defendant Moore is entitled to summary judgment on Plaintiffs' Section 1983 failure-to-train claim.

### G. Defendants McCafferty and Hinkle are not liable for any wrongdoing.

Plaintiffs name Deputy Wildlife Officers McCafferty and Hinkle as Defendants in their claims based on theories of illegal or unreasonable search, false arrest, and violation of substantive due process. While it is not disputed that McCafferty and Hinkle were present during the search of the Foster's property, *see* Def.'s Statement of Facts 5, Defendants contend that there is no evidence that McCafferty and Hinkle participated in-or even acquiesced in-any wrongdoing. Def.'s Br. 25. Charles and Katherine neither respond to this argument nor provide any evidentiary or legal basis for any of the claims against these defendants.

Liability under § 1983 requires personal involvement in the alleged wrongdoing. *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077, 1082 (3d Cir.1976). Personal involvement can be shown through specific and particular allegations of personal direction or of knowledge and acquiescence. *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988). Where the defendant lacks supervisory authority, mere inaction usually does not reasonably give rise to the inference that the defendant acquiesced in the wrongdoing. *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1294 (3d Cir.1997). In short, "a person who fails to act to correct the conduct of someone over whom he or she has no supervisory authority cannot fairly be said to have 'acquiesced' in the latter's conduct." *Id.*

Here, the record does not indicate that McCafferty or Hinkle were personally involved in any wrongdoing. Since it is undisputed that McCafferty and Hinkle had no supervisory authority over David or Visosky, their failure to correct any wrongdoing cannot, as a matter of law, be deemed "acquiescence." Because McCafferty and Hinkle were not personally involved in any wrongdoing, and because they had no obligation to take corrective action (if any were necessary), they cannot be liable under § 1983.

The Court will therefore grant summary judgment on all the claims against Defendants McCafferty and Hinkle.

### H. Qualified Immunity

Defendants also contend that they are also entitled to summary judgment on the separate ground of qualified immunity.[FN30] The court analysis in this situation follows the two-step framework in *Saucier v. Katz,* 533 U.S. 194 (2001). *Douris v. Schweiker,* 2003 U.S. Dist. LEXIS 19514, *33-*35 (E.D. Pa 2003). As threshold matter, a reviewing court must consider whether facts-when viewed favorably toward the apparently harmed party-demonstrate that an officer violated a constitutional right. *Saucier,* 533 U.S. at 201 if a constitutional violation occurred, the court then must resolve whether that constitutional right violated is "clearly established." *Id.* In order to qualify as "clearly established" right, the constitutional rights must be articulate with enough particularity and specificity such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at n. 10. Whether the constitutional right is "clearly established" and whether the officer acted unreasonably given the factual situation are questions of law properly decided by the court. *See, e.g., Bartholomew v. Pennsylvania,* 221 F.3d 425, 428 (3d Cir.2001).[FN31]

> FN30. Charles and Katherine do not address qualified immunity in response to Defendants' motion.

> FN31. Even should Charles and Katherine succeed in demonstrating the violation of a constitutional right, still could qualify for immunity should the officers have "mistakenly but reasonably believed that [their] actions were constitutionally permissible." *Hung v. Watford,* 2002 U.S. Dist. LEXIS 23064, at *9 (E.D.Pa. Dec. 3, 2002).

*15 As discussed, *supra* having now considered the evidence thus far produced, the Court finds that Charles and Katherine have not demonstrated that a genuine issue for trial exists regarding the violation of an established constitutional right. In short, no constitutional violations occurred here. This conclusion entitles all Defendants to qualified immunity.

For purposes of thoroughness, however, the Court also notes its finding that even if a constitutional right were violated here, the Defendants would nonetheless be entitled to qualified immunity. In determining

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                         Page 14
Slip Copy, 2006 WL 2371976 (E.D.Pa.)
**(Cite as: Slip Copy)**

whether to grant qualified immunity as a matter of law, this Court must determine the answer to the objective question of whether a reasonably competent officer or commissioner would have reached the same conclusion as to the lawfulness of their actions as the Defendant officers and commissioner did here. Qualified immunity should be denied only if the unlawfulness of a defendant's actions should have been apparent. _Anderson v. Creighton, 483 U .S. 635, 640 (1987)_. Minor asserted factual disputes-_i.e.,_ those related to the "fringes" of the relevant behavior-are not enough to preclude summary judgment. Routinely sending the question of qualified immunity to the jury was squarely rejected by the Supreme Court in _Hunter v. Bryant, 502 U.S. 224, 228 (1991)._ _See Cox v.. Hackett,_ Civ. No. 05-2260, July 27, 2006 Memorandum at 17-23 (noting that if these types of "fringe" factual disputes required a jury trial, then the doctrine of qualified immunity will hardly ever allow a trial court to dismiss a Fourth Amendment case on summary judgment, because every plaintiff can dispute the arresting officer's credibility and easily raise some factual issues about every situation).

The Court finds that in this case the actions of the Defendants were at all times objectively reasonable in light of existing law. Reasonable officers would have believed it lawful to search the Fosters' premises pursuant to a facially valid warrant (premised on legitimate probable cause). Reasonable officers would have believed it lawful to use _de minimis_ force towards Katherine given her attempt to impede a lawful search. Reasonable officers would have believed it lawful to, based on probable cause, issue citations to Charles for game law violations. A reasonable commissioner would have believed it lawful to ask Charles to stop speaking when he became belligerent. Finally, a reasonable officer supervisor would have believed it lawful to maintain the Commission's existing search and seizure training program.

In summary, because the Defendants' actions did not violate clearly established law, and, moreover, because the Defendants acted reasonably under the existing law, all Defendants are entitled to qualified immunity as a matter of law.

### V. Conclusion

Plaintiffs have not demonstrated the existence of any disputed material facts so as to require a trial on any claim. The Court finds that Defendants are entitled to summary judgment on all claims, based upon both

substantive analysis of the claims and the doctrine of qualified immunity. The Court will therefore grant Defendants motion in its entirety.

**\*16** Despite this result, the Court wishes to note, under any standard, the summary offenses charged against the Plaintiffs are minor at best; however, the amount of law enforcement resources devoted to investigation of those offenses has, in this case, been disproportionately significant. Although the Defendants are entitled to summary judgment as a matter of law, the Court suggests that the Pennsylvania Fish and Boat Commission and the Pennsylvania Game Commission review this entire matter.

E.D.Pa.,2006.
Foster v. David
Slip Copy, 2006 WL 2371976 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.