**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **BANK OF AMERICA, N.A.** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **C.A. NO. 07-159 GMS** |
| | ) | |
| **SIP ASSETS, LLC AND** | ) | |
| **EVERY PENNY COUNTS, INC.** | ) | |
| **Defendants** | ) | |

**EVERY PENNY COUNTS, INC.'S REPLY BRIEF IN SUPPORT OF**

**ITS MOTION TO DISMISS, TRANSFER VENUE OR STAY**

David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE  19801-1155
(302) 884-6766

Attorney for Defendant
Every Penny Counts, Inc.

and

PHELPS DUNBAR LLP
Harvey S. Kauget (FL Bar ID #116254)
Karl J. Brandes (FL Bar ID #0329797)
Brent B. Barriere (LA Bar ID #2818)
David L. Patrón (LA Bar ID #22566)
Harry M. Barton (LA Bar ID #29751)
100 South Ashley Drive
Suite 1900
Tampa, Florida 33602-5311
(813) 472-7550

Of Counsel for Defendant
Every Penny Counts, Inc.

DATED:  June 1, 2007

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ............................................................................................1

II. ARGUMENT...............................................................................................................................4

    A.   *MedImmune, et al.* do not Control this Court's Determination of Subject
Matter Jurisdiction Over SIP ..................................................................................................4

    B.   SIP's Representations Through its Pleadings Foreclose its Ability to Assert
a Claim Against BANA with Respect to the '191 Patent .......................................................7

    C.   The First Filed Rule Applies and Warrants Dismissal, Stay or Transfer of
this Action Regardless of SIP's Presence in this Suit............................................................9

    D.   BANA Misrepresents the Reasons for the Florida Court's Progress to Date .................10

III. CONCLUSION........................................................................................................................12

NO.99786756.2
NO.99786756.2

# TABLE OF AUTHORITIES

## CASES

*Amana Refrigeration, Inc. v. Quad Lux, Inc.*, 172 F.3d 852 (Fed. Cir. 1999) ....................................................................................................4

*British Telecomms. v. McDonnell Douglas Corp.*, No. C-93-0677 MHP, 1993 WL 149860, Patel, J. (N.D. Cal. May 3, 1993) ...................................9

*Citigroup v. Citiholding Co.*, 97 F.Supp.2d 549 (S.D.N.Y. 2000) ....................................9

*Com 21, Inc. v. Hybrid Patents, Inc. (In re Com 21, Inc.)*, 357 B.R. 802 (Bankr. N.D. Cal. 2006) ...............................................................9

*Cross Bow Tech, Inc. v. Y.H. Tech, Inc.*, No. C03-04360, 2007 WL 174422, Illston, J. (N.D. Cal. Jan. 22, 2007) ..............................................7

*Gen-Probe, Inc. v. Vysis, Inc.*, 359 F.3d 1376 (Fed. Cir. 2004) ........................................5

*MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764 (2007).....................................passim

*Merck & Co., Inc. v. Apotex, Inc.*, No. 06-230-GMS, 2007 WL 1407453, Sleet, J. (D. Del. May 21, 2007) ..................................................2, 3, 4, 6, 7

*Sandisk Corporation v. STMicroelectronics, Inc.*, 480 F.3d 1372 (Fed. Cir. 2007) ...................................................................2, 4, 5, 6, 7

*Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed. Cir. 1995) ...................................................................................... passim

*Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corporation*, 482 F.3d 1330 (Fed. Cir. 2007).................................2, 4, 6, 7, 8

*Yamaha Motor Co.*, No. 518, 1997 WL 575861, Laurie, J. (Fed. Cir. Aug. 27, 1997) ....................................................................................................4

## I.  PRELIMINARY STATEMENT

Defendant Every Penny Counts, Inc. ("EPC") sets forth the nature and stage of the proceeding as of May 10, 2007 in its Opening Brief in Support of its Motion to Dismiss, Transfer Venue or Stay filed on that same date.  (D.I. 16) ("EPC Opening Brief").  Plaintiff Bank of America, N.A. ("BANA") filed its Answering Brief in Opposition to EPC's Motion on May 24, 2007.  (D.I. 19).  EPC submits this Reply to BANA's Opposition.

EPC maintains that the arguments set forth in its Opening Brief regarding the first filed rule and transfer under 28 U.S.C. §1404(a) effectively demonstrate EPC's entitlement to the relief sought herein and, pursuant to Local Rule 7.1.3(c)(2), will not burden this Court with a repetition of those assertions.  EPC merely seeks to address certain arguments and/or mischaracterizations set forth in BANA's Opposition, namely (i) the assertion that *MedImmune, et al.* controls this Court's determination of EPC's entitlement to relief; (ii) BANA's argument that SIP Assets, LLC's ("SIP") representations to this Court, *i.e.*, that it has no stake in ownership of the '191 patent and does not intend to assert a claim against BANA or Bank of America Corporation ("BAC") in relation to that patent, have no legal effect; and (iii) the notion that SIP's presence in his suit affects the application of the first filed rule.  EPC also seeks to set forth more fully the facts surrounding the thirty (30) day extension and agreement related thereto which BANA selectively disclosed to the Court in its Opposition.  (D.I. 19 at 18).

BANA asserts that EPC relies on "bad law," *i.e., Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed. Cir. 1995), *et al.*, to support its argument that SIP's representations to this Court eliminate the existence of a case or controversy between SIP and BANA.  (D.I. 19 at 11-14).  BANA claims that the Supreme Court's holding in

*MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764 (2007), along with the Federal Circuit opinions in *Sandisk Corporation v. STMicroelectronics, Inc.*, 480 F.3d 1372 (Fed. Cir. 2007), and *Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corporation*, 482 F.3d 1330 (Fed. Cir. 2007), overrule the proposition for which EPC cites *Super Sack*. BANA plainly overstates the scope of these rulings. The holding in *MedImmune* does not begin to address the issue for which EPC cites *Super Sack, et al.* Similarly, *Teva* and *Sandisk*, while noting the abrogation of the "reasonable apprehension" standard, decline to extend the scope of their holdings -- as BANA seemingly sees fit to do -- to the rule of law established in *Super Sack* and its progeny. Absent an express statement by the courts that these opinions overrule *Super Sack*, the case remains valid law. Further, this Court has already applied *Super Sack* for the proposition cited herein subsequent to the issuance of these allegedly "controlling" opinions that BANA cites. *See Merck & Co., Inc. v. Apotex, Inc.*, No. 06-230-GMS, 2007 WL 1407453, WL Op. at *3-4, Sleet, J. (D. Del. May 21, 2007) (order dismissing plaintiff's complaint). Clearly, *Super Sack* and its progeny support dismissal of SIP from this action due to lack of a case or controversy.

BANA also attempts to attach significance to the wording of SIP's sworn and verified statement that it has no intention to sue BANA, now or at any time, for any claims related to the '191 patent. BANA asserts that this phrasing precludes the applicability of *Super Sack*. (D.I. 19 at 13). This argument lacks merit. SIP also expressly states that it has no claim to ownership of the '191 patent. (D.I. 14 at 6). Given this fact, SIP's covenant not to sue cannot mirror the language of similar statements found to be dispositive in *Super Sack* and *Merck*. Indeed, SIP cannot make "promises" with

regard to property in which it has no interest, *i.e.*, the '191 patent. EPC argues that this unique set of facts presents a novel issue to this Court which the principles announced in *Super Sack, et al.* govern. EPC sets forth more fully below that the specific facts of this case warrant an application of *Super Sack, et al.* and a ruling that no case or controversy between BANA and SIP exists.

EPC also addresses BANA's argument that SIP's presence in this action excepts the application of the first filed rule. In response to this contention, EPC refers to the argument made in EPC's Opening Brief, which BANA conveniently ignores, that the first filed rule provides that the ability to determine whether certain parties are necessary to a proceeding and whether the first filed court can obtain jurisdiction over those parties properly rests with that first filed court. (D.I. 16 at 19). In its attempt to avoid the application of the first filed rule, BANA also states that "EPC itself concedes" that the Florida litigation involves only a subset of the issues presented here. (D.I. 19 at 14). This is a blatant mischaracterization of a statement from EPC's Brief which BANA selectively quotes.[1] EPC takes exception to BANA's mischaracterization and asks that the Court give no weight to an argument advanced through such nefarious means.

EPC submits that none of the arguments and mischaracterizations of fact set forth by BANA in its Opposition in an effort to remove the Court's focus from the controlling law of the first filed rule and *Super Sack* negate the arguments set forth in EPC's Brief.

---

[1] *See* EPC Brief at 12 "On April 25, 2007 Magistrate Judge Sherry Polster Chappelle issued a Case Management Scheduling Order setting an aggressive pace for the litigation of the issues raised in EPC's [Florida] Complaint, **and the subset of those issues subsequently brought before this Court in BANA's action."** (D.I. 16 at 12, emphasis added).

Therefore, EPC remains entitled to the relief sought in its Motion to Dismiss, Stay or Transfer.

## II. ARGUMENT

      A.     ***MedImmune, et al.*** **do not Control this Court's Determination of Subject Matter Jurisdiction Over SIP.**

BANA sets forth that EPC's argument regarding SIP not qualifying as a proper party relies on "bad law."  EPC argues in its Opening Brief that SIP's disavowal of ownership of the '191 patent and the intent or ability to assert claims against BANA related to that patent removes any justiciable case or controversy between BANA and SIP from this action, and relies on *Super Sack MFG Corp.*, 57 F.3d at 1058, *Amana Refrigeration, Inc. v. Quad Lux, Inc.*, 172 F.3d 852, 855 (Fed. Cir. 1999), and *In re Yamaha Motor Co.*, No. 518, 1997 WL 575861 WL Op. at *3, Laurie, J. (Fed. Cir. Aug. 27, 1997), to support this argument.  BANA states in its Opposition that *MedImmune, Teva Pharmaceuticals* and *Sandisk Corporation* overrule the holdings of the cases cited by EPC.[2]  This argument lacks merit because the holdings cited by BANA do not touch upon the effect of a promise not to sue on the existence of a case or controversy, nor do they expressly overrule – or even cite – *Super Sack* or the other cases relied on by EPC. Further, each of the cases cited by BANA are factually inapposite to the present situation. Finally, this Court continues to apply the relevant holding from *Super Sack* under the standard announced in *MedImmune, Sandisk* and *Teva Pharmaceuticals*.  *See Merck*, WL Op. at *3-4  Clearly, the rule of *Super Sack* remains valid law.

---

[2]  EPC notes that despite BANA's repeated objection to what it refers to as EPC's "ruling" on SIP's Motion to Dismiss, BANA has no qualms with issuing its own "rulings" on behalf of the Federal Circuit Court of Appeals on an issue which has yet to be presented to that court, *i.e.*, whether these holdings do in fact affect the rule of law set forth in *Super Sack* and its progeny.

*MedImmune* involved a suit for declaratory judgment filed by a patent licensee against a licensor and the Supreme Court considered whether a case or controversy existed between these parties absent a breach of the licensing agreement at issue. The Court resolved that a case or controversy existed and held as follows:

> We hold that the petitioner was not required, insofar as Article III is concerned, to break or terminate its 1997 license agreement before seeking declaratory judgment in Federal Court that the underlying patent is invalid, unenforceable, or not infringed.

*MedImmune*, 127 S. Ct. at 777. Although a footnote in this case discusses the tension between the Federal Circuit's "reasonable apprehension" standard and certain Supreme Court rulings, it does not expressly overrule cases applying that test. Indeed, the only opinion abrogated by the Supreme Court's ruling is *MedImmune* was *Gen-Probe, Inc. v. Vysis, Inc.*, 359 F.3d 1376 (Fed. Cir. 2004). *Id.* at 768. Clearly, this case alone does not support BANA's contention that *Super Sack* is no longer good law.

In *Sandisk*, the proceedings involved a declaratory judgment and infringement suit arising out of negotiations for cross-licensing agreements. The defendant in the declaratory judgment suit had presented the plaintiff with a document setting forth the defendant's analysis of the plaintiff's infringement on fourteen (14) of the defendant's patents. *Sandisk*, 480 F.3d at 1375-76. This action was accompanied by an oral, non-verified statement that the declaratory judgment defendant would not sue. In deciding that a case or controversy existed, the Federal Circuit stated that:

> We hold only that where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in

> the identified activity before seeking a declaration of its
> legal rights.

480 F.3d at 1381. This holding clearly does not touch upon the rule of law announced in *Super Sack* and the facts of the case further demonstrate its inapplicability to the present situation. Here, not only has SIP not conducted the level of investigation undergone by the defendant in *Sandisk*, SIP has expressly stated and verified through an affidavit that it does not own the '191 patent and that it does not intend to sue BANA for any claims arising out of that patent.

In *Teva Pharmaceuticals*, a competitor of a patent holder filed an abbreviated new drug application ("ANDA") and the patent holder sued for infringement of one of the five patents disclosed in the ANDA. The competitor in turn filed a suit for declaratory judgment challenging the validity or infringement with respect to the remaining four disclosed patents. 482 F.3d at 1334-36. Prior to deciding that these facts[3] gave rise to a case or controversy, the Federal Circuit noted that the "reasonable apprehension" test had been overruled by *MedImmune.* 482 F.3d at 1339. Noticeably absent from this holding is any mention of *Super Sack* or its progeny. Further, the case is factually inapposite because SIP has not sued BANA on any patent related to the '191 patent and has expressly disavowed its ownership of that patent and ability to sue BANA for claims related thereto. Clearly, the Federal Circuit opinions cited by BANA do not support the contention that *Super Sack* and its progeny are "bad law."

Finally, this Court applied *Super Sack* subsequent to the publication of the decisions cited by BANA in *Merck & Co., Inc. v. Apotex, Inc.*, No. 06-230-GMS, 2007

---

[3]  *See Teva Pharmaceuticals*, 482 F.3d at 1341 ("In light of [defendant]'s pending suit on the same ANDA, the threat of litigation is a present injury creating justiciable controversy").

WL 1407453, WL Op. at *3-4, Sleet, J. (D. Del. May 21, 2007).  In *Merck*, this Court had to determine whether a patent holder's covenant not to sue removed the existence of a case or controversy from a declaratory judgment action.  After discussing *MedImmune*, *Sandisk* and *Teva Pharmaceuticals*, the Court cited *Super Sack* for the same proposition contained within EPC's Brief and stated that:

> Merck's covenant not to sue removes any cause for concern that Appotex could be held liable for infringement of the patents in suit.  *See Super Sack*, 57 F.3d at 1059. Moreover, "'[i]t is well established that a trial court may be divested or deprived of subject matter jurisdiction over a particular patent claim that the patentee covenants not to assert an infringement claim against a punitive infringer."[4]

*Id*. at *4.  Clearly, the law still holds that a party's promise not sue removes a justiciable case or controversy from an action for declaratory judgment.  BANA's argument to the contrary wholly lacks merit.

### B.    SIP'S Representations Through its Pleadings Foreclose its Ability to Assert a Claim Against BANA with Respect to the '191 Patent.

BANA also argues that even if *Super Sack* is good law, it does not apply to the present situation.  BANA asserts two arguments as to why SIP's statements, which have been verified by an affidavit, do not constitute a promise not to sue within the meaning of *Super Sack*.  BANA argues that SIP merely avows its lack of intention to sue BANA under the '191 patent and that SIP reserves the rights and privileges that arose during the time it was a licensee of EPC.  (D.I. 19, 13).  These arguments are without merit.  First, BANA's summary of SIP's reservation of right selectively quotes SIP's Motion to Dismiss

---

[4]    Quote from *Cross Bow Tech, Inc. v. Y.H. Tech, Inc.*, No. C03-04360, 2007 WL 174422, WL Op. at *2, Illston, J. (N.D. Cal. Jan. 22, 2007).

and blatantly misrepresents the statement made by SIP in its motion.[5]  This reservation of rights does not preserve the existence of a case or controversy between SIP and BANA.

Next, the representation of SIP with which BANA takes issue is the only logical promise SIP can make given the unique facts of this case.  SIP asserts that it has no intention to bring any claims against BANA in connection with the '191 patent.  (D.I. 14 at 1).  Since SIP also admits that it does not own the '191 patent, this representation constitutes the most thorough assurance that SIP can possibly offer to BANA regarding the fact that it cannot sue BANA over the '191 patent.  SIP's lack of ownership of the '191 patent prevents it from executing a formal covenant with regard to that patent.  Thus, the statement, which has been verified, from SIP is as close to the statement found to eliminate the case or controversy in *Super Sack* as SIP can make under this novel factual scenario.   EPC submits that, given these facts, the minor differences in the representations here and in *Super Sack* do not affect that case's application and the propriety of the conclusion that no case or controversy exists.  Indeed, the current situation is more factually similar to *Super Sack*, *et al.* than *Teva Pharmaceuticals* or *Sandisk* because, as noted above, SIP has not engaged in any activity or investigation related to suing BANA over this patent and has expressly disclaimed its intention to do so.  Under these facts, *Super Sack,* rather than the cases cited by BANA, controls the case or controversy issue and mandates dismissal of SIP from this action.

**C.      The First Filed Rule Applies and Warrants Dismissal, Stay or Transfer of this Action Regardless of SIP's Presence in this Suit.**

---

[5]  *See* SIP Motion at 1 n.1 ("SIP states that it has no 'current' rights to the '191 patent and retains all rights and privileges that arose during that time it was a licensee of EPC. **Those rights and privileges, however, do not relate to establishing the ownership and validity of the '191 patent and, in any event are not claims against BOA.''**)  (D.I. 14 at 1, emphasis added).

BANA's Opposition advances several reasons why it contends the first filed rule to be inapplicable. BANA's arguments in support of this contention mischaracterize EPC's filings to this Court in two respects. First, BANA states that "EPC *only* argues that venue isn't proper in Delaware *if* SIP is not a party to the action." (D.I. 19 at 7, emphasis added). Next, BANA claims that EPC concedes that the Florida action only contains a subset of the issues presented in this action. (D.I. 19 at 14). As established above, this latter summary of EPC's argument completely changes the meaning of EPC's pleading and deserves no consideration. The former statement also rings untrue because of an argument in EPC's Brief which BANA conveniently chooses to ignore. In EPC's Opening Brief, it argues that SIP's presence in this action does not affect the determination of the first filed rule's application. (D.I. 16 at 18-19). EPC states that the first filed rule indicates that the necessity of a party to an action and the first filed court's potential jurisdiction over that party are issues that the first filed court should resolve.[6] Thus, BANA's arguments concerning the Florida court's ability to obtain jurisdiction of SIP and SIP's status as a necessary party do not affect the application of the first filed

---

[6] EPC reiterates that argument here. *See Com 21, Inc. v. Hybrid Patents, Inc. (In re Com 21, Inc.)*, 357 B.R. 802, 809 (Bankr. N.D. Cal. 2006) ("In light of the difference to be given to the first filed case, whether [third parties] can and should be joined in the [first filed] litigation are issues that, in the first instance, should be considered by the [first filed] district court"); *Citigroup v. Citiholding Co.*, 97 F.Supp.2d 549, 556 n.4 (S.D.N.Y. 2000) ("Indeed, it is the court in which the first filed action was brought that should decide whether an exception to the first filed rule applies"); *cf. British Telecomms. v. McDonnell Douglas Corp.*, No. C-93-0677 MHP, 1993 WL 149860, WL Op. at *4-5, Patel, J. (N.D. Cal. May 3, 2003) (staying second filed suit pending first filed court's resolution of whether third party was proper party and could be joined in the first filed suit, noting that it would be presumptuous for [the second filed] court to decline to apply the first to file rule when the [first filed] court whose jurisdiction is being challenged has not had an opportunity to fully consider the issue").

rule. EPC again urges that the first filed rule warrants dismissal, transfer or stay of this action.

### D.      BANA Misrepresents the Reasons for the Florida Court's Progress to Date.

EPC must now clarify the facts surrounding the extension granted to EPC by BANA in this action and the agreement related thereto which BANA accuses EPC of violating. BANA blatantly misrepresents the facts by asserting that "the only reason why the Florida action is that far ahead of this one is because BANA voluntarily granted EPC a thirty (30) day extension of the deadline to respond to the Complaint." (D.I. 19 at 18). EPC notes that BANA fails to mention that EPC granted BANA a thirty (30) day extension for responding to the Florida suit. (*See* Ex. A, Defendants Motion for Extension of Time of Thirty Days, ¶ 2). Given that both parties granted equal extensions in each of these actions, BANA's quoted statement is absolutely false and should carry no weight in the determination of the issues herein. Further, BANA's baseless accusation that EPC violated an agreement between the parties wholly lacks merit. As Exhibit "E" to BANA's Opposition demonstrates, EPC's counsel agreed "not to use the extension as a basis to argue for Florida over Delaware." Nowhere in EPC's Brief does it make mention of the thirty (30) day extension nor does EPC argue that this thirty (30) day extension is a remotely significant factor in the venue determination. Rather, the Florida court's Local Rules require that it maintain the aggressive schedule established in that action. This argument does not violate the agreement contained in Exhibit "E" to BANA's Opposition. Finally, EPC is loathe to have to clarify for the Court that its arguments do not constitute a criticism of this Court, contrary to BANA's contentious representation otherwise. EPC has full confidence in this Court's ability to resolve issues in patent cases, and merely

seeks to preserve its chosen forum for litigation of this action through the dismissal, transfer or stay of this second filed suit.

**III.     CONCLUSION**

The arguments raised in BANA's Opposition do not change EPC's entitlement to an order dismissing, transferring, or staying this action.  The first filed rule plainly applies and vests this Court with discretion to grant EPC's motion and condones such a course of action.  The presence of SIP in this suit does not affect this rule's dispositive applicability as no case or controversy exists with respect to SIP.  Further, the rule provides that the Florida court must determine whether SIP belongs in the first filed suit. BANA's arguments do not contradict this point and EPC requests that this Court grant appropriate relief.

WHEREFORE, for the foregoing reasons, as well as the reasons stated by EPC in its opening brief, EPC respectfully requests that this Court dismiss or transfer this action. In the event that the Court sees fit to grant neither of these remedies, EPC requests this Court stay this action until the Florida litigation reaches its conclusion.


Dated: June 1, 2007

                                        Respectfully submitted,


                                        /s/ David L. Finger
                                        David L. Finger (DE Bar ID #2556)
                                        Finger & Slanina, LLC
                                        One Commerce Center
                                        1201 Orange Street, Suite 725
                                        Wilmington, DE  19801-1155
                                        (302) 884-6766

                                        Attorney for Defendant
                                        Every Penny Counts, Inc.

                                        and

PHELPS DUNBAR LLP
Harvey S. Kauget (FL Bar ID #116254)
Karl J. Brandes (FL Bar ID #0329797)
Brent B. Barriere (LA Bar ID #2818)
David L. Patron (LA Bar ID #22566)
Harry M. Barton (LA Bar ID #29751)

Of Counsel for Defendant
Every Penny Counts, Inc.

<u>CERTIFICATE OF SERVICE</u>

I, David L. Finger, hereby certify that on this 1st day of June, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send electronic notification to the following counsel of record:

**Richard L. Horwitz, Esq.**
Potter Anderson & Corroon, LLP
1313 N. Market St., Hercules Plaza, 6th Fl.
P.O. Box 951
Wilmington, DE 19899-0951

**Kurt M. Heyman, Esq.**
Proctor Heyman LLP
1116 West Street
Wilmington, DE 19801

/s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE  19801-1155
(302) 884-6766

Exhibit A

to Defendant Every Penny Counts, Inc.'s Reply Brief

in Support of its Motion to Dismiss, Transfer Venue or Stay

**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

| | | |
|---|---|---|
| EVERY PENNY COUNTS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:07-cv-42-FtM-99SPC |
| | ) | |
| BANK OF AMERICA CORPORATION | ) | |
| AND VISA U.S.A., INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**DEFENDANTS' MOTION FOR EXTENSION OF TIME OF THIRTY DAYS FROM
THE RESPECTIVE DUE DATES TO ANSWER OR OTHERWISE PLEAD**

Defendants, by and through undersigned counsel, and pursuant to Rule 6(b)(1), Fed.R.Civ.P., moves for leave of Court to extend the time to answer or otherwise plead to the allegations contained in Plaintiff's Complaint, and as grounds thereof, states:

1.    Plaintiff's complaint raises complex issues which cannot be analyzed for purposes of a responsive pleading before the February 20, 2007 deadline for Visa U.S.A., Inc. ("Visa") and the February 21, 2007 deadline for Bank of America Corporation ("BofA Corp.") .

2.    In house counsel for BofA Corp., on behalf of both Defendants, has conferred with counsel for Plaintiff, who has agreed not to oppose this motion for an extension of time to answer or otherwise plead to March 22, 2007 for Visa and March 23, 2007 for BofA Corp.

3.    This motion for extension of time is made in good faith, and is not intended to affect any other deadlines, and will not result in any prejudice to the Plaintiff.

ORLA_362811.2

4.       Therefore, Defendant respectfully requests that the Court enter an order extending the time for the parties to answer or otherwise plead up to and including the respective dates contained in Paragraph 2 above.

## MEMORANDUM OF LAW

Rule 6(b)(1), Federal Rules of Civil Procedure, allows the Court to extend time limits.  In the present case, good cause as stated above, has been demonstrated, and both parties agree to the requested extension of time.  This Motion has not been made for purposes of delay.

## COMPLIANCE WITH LOCAL RULE 3.01(g)

As noted above, Defendant complied with Local Rule 3.01(g) by conferring with counsel for Plaintiff prior to filing this motion, and counsel for plaintiff has agreed not to oppose the requested extension of time.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via electronic filing this 20th day of February 2007, to Counsel for Plaintiff, Harvey S. Kauget and Karl J. Brandes, Phelps Dunbar, LLP, 100 South Ashley Drive, Suite 1900, Tampa, Florida 33602-5311 and Brent B. Barriere, David L. Patron and Harry M. Barton, Phelps Dunbar LLP, 365 Canal Street, Suite 2000, New Orleans, Louisiana  70130.

/s/ James S. Grodin
James S. Grodin
Florida Bar No. 0655181
**FOLEY & LARDNER LLP**
111 North Orange Avenue, Suite 1800
Orlando, FL 32801-2386
Telephone: (407) 423-7656
Facsimile: (407) 648-1743
E-mail: jgrodin@foley.com
Attorneys for Defendant

2

Exhibit B

to Defendant Every Penny Counts, Inc.'s Reply Brief

in Support of its Motion to Dismiss, Transfer Venue or Stay

Westlaw.

2007 WL 1470453                                                                                              Page 1
--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)
**(Cite as: 2007 WL 1470453 (D.Del.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
**MERCK & CO., INC., Plaintiff,**
v.
APOTEX, INC., Defendant.
**C.A. No. 06-230(GMS).**

May 21, 2007.

Mary B. Graham, Esquire, and James W. Parrett, Jr.,
Esquire, of Morris, Nichols, Arsht & Tunnell LLP,
Wilmington, Delaware, and John DeQ. Briggs,
Esquire, John F. Lynch, Esquire, Kenneth W.
Donnelly, Esquire, Aaron Myers, Esquire, of Howrey
LLP, Washington, D.C., and Nicholas G. Barzoukas,
Esquire, Suzy S. Harbison, Esquire, Jason C. Abair,
Esquire, of Weil, Gotshal & Manges, Houston,
Texas, and Paul D. Matukaitis, Edward W. Murray,
Gerard M. Devlin, of Merck & Co., Inc. Attorneys
for Plaintiff.

Richard L. Horwitz, Esquire, and Kenneth L.
Dorsney, Esquire, of Potter Anderson & Corroon,
LLP, Wilmington, Delaware, and A. Sidney Katz,
Esquire, Robert B. Breisblatt, Esquire, Louise T.
Walsh, Esquire, Michael Krol, Esquire, of Welsh &
Katz, Ltd., Chicago, Illinois. Attorneys for
Defendant.

**OPINION**

SLEET, District Judge.

**I. INTRODUCTION**

*1 The plaintiff Merck & Co., Inc. ("Merck") filed
suit against the defendant Apotex, Inc. ("Apotex") in
the above-captioned matter, alleging that Apotex
committed an act of patent infringement under 35
U.S.C. § 271(e)(2)(A). Merck moves to dismiss its
complaint for lack of subject matter jurisdiction
because, since filing suit, it has given Apotex a
comprehensive covenant not to sue, which removed
the controversy between the parties. For the reasons
that follow, Merck's motion is granted.

**II. SUMMARY OF STATUTORY
FRAMEWORK**

The provisions of the Drug Price Competition and
Patent Term Restoration Act of 1984 (the "Hatch-
Waxman Amendments") govern the generic drug
approval process. [FN1] The Food and Drug
Administration ("FDA" or "Agency"), provides the
following summary explanation of the Act's statutory
provisions, at http://www
.fda.gov/cder/about/smallbiz/generic--
exclusivity.htm, which the court incorporates in
pertinent part:

> FN1. The Hatch-Waxman Amendments
> were modified by the Medicare Prescription
> Drug, Improvement, and Modernization Act
> of 2003. Pub.L. No. 108-173, §
> 1101(a)(2)(A)(ii), 117 Stat.2066 (amended
> 2003). Herein, all references to the Hatch-
> Waxman Amendments and its regulatory
> framework include the scope of the
> provisions as later modified.

The Hatch-Waxman Amendments are intended to
balance two important public policy goals. First, drug
manufacturers need meaningful market protection
incentives to encourage the development of valuable
new drugs. Second, once the statutory patent
protection and marketing exclusivity for these new
drugs has expired, the public benefits from the rapid
availability of lower priced generic versions of the
innovator drug.

The Hatch-Waxman Amendments amended the
Federal Food, Drug, and Cosmetic ("FD & C") Act
and created section 505(j). Section 505(j) established
the abbreviated new drug application ("ANDA")
approval process, which permits generic versions of
previously approved innovator drugs to be approved
without submission of a full new drug application
("NDA"). An ANDA refers to a previously approved
new drug application (the "listed drug") and relies
upon the Agency's finding of safety and effectiveness
for that drug product. The timing of an ANDA
approval depends in part on patent protections for the
innovator drug. Innovator drug applicants must
include in an NDA information about patents for the
drug product that is the subject of the NDA. The
FDA publishes patent information on approved drug
products in the Agency's publication "Approved Drug
Products with Therapeutic Equivalence Evaluations,"
otherwise known as the "Orange Book." The FD & C
Act requires that an ANDA contain a certification for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 1470453                                                                                          Page 2
--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)
**(Cite as: 2007 WL 1470453 (D.Del.))**

each patent listed in the Orange Book for the innovator drug. This certification must state one of the following: (i) that the required patent information relating to such patent has not been filed; (ii) that such patent has expired; (iii) that the patent will expire on a particular date; or (iv) that such patent is invalid or will not be infringed by the drug, for which approval is being sought.

A certification under paragraph I or II permits the ANDA to be approved immediately, if it is otherwise eligible. A certification under paragraph III indicates that the ANDA may be approved on the patent expiration date. A paragraph IV certification begins a process in which the question of whether the listed patent is valid or will be infringed by the proposed generic product may be answered by the courts prior to the expiration of the patent. The ANDA applicant who files a paragraph IV certification to a listed patent must notify the patent owner and the NDA holder for the listed drug that it has filed an ANDA containing a patent challenge. The notice must include a detailed statement of the factual and legal basis for the ANDA applicant's opinion that the patent is not valid or will not be infringed. The submission of an ANDA for a drug product claimed in a patent is an infringing act if the generic product is intended to be marketed before expiration of the patent, and therefore, the ANDA applicant who submits an application containing a paragraph IV certification may be sued for patent infringement. If the NDA sponsor or patent owner files a patent infringement suit against the ANDA applicant within 45 days of the receipt of notice, the FDA may not give final approval to the ANDA for at least 30 months from the date of the notice. This 30-month stay will apply unless the court reaches a decision earlier in the patent infringement case, or otherwise orders a longer or shorter period for the stay.

**\*2** The statute provides an incentive of 180 days of market exclusivity to the "first" generic applicant who challenges a listed patent by filing a paragraph IV certification and running the risk of having to defend a patent infringement suit. The statute provides that the first applicant to file a substantially complete ANDA containing a paragraph IV certification to a listed patent will be eligible for a 180-day period of exclusivity beginning either from the date it begins commercial marketing of the generic drug product, or from the date of a court decision finding the patent invalid, unenforceable or not infringed, whichever is first. These two events-- first commercial marketing and a court decision favorable to the generic--are often called "triggering"

events, because under the statute they can trigger the beginning of the 180-day exclusivity period.

In some circumstances, an applicant who obtains 180-day exclusivity may be the sole marketer of a generic competitor to the innovator product for 180 days. But 180-day exclusivity can begin to run, with a court decision, even before an applicant has received approval for its ANDA. In that case, some, or all, of the 180-day period could expire without the ANDA applicant marketing its generic drug. Conversely, if there is no court decision and the first applicant does not begin commercial marketing of the generic drug, there may be prolonged or indefinite delays in the beginning of the first applicant's 180-day exclusivity period. Approval of an ANDA has no effect on exclusivity, except if the sponsor begins to market the approved generic drug. Until an eligible ANDA applicant's 180-day exclusivity period has expired, the FDA cannot approve subsequently submitted ANDAs for the same drug, even if the later ANDAs are otherwise ready for approval and the sponsors are willing to immediately begin marketing. Therefore, an ANDA applicant who is eligible for exclusivity is often in the position to delay all generic competition for the innovator product.

### III. BACKGROUND

Merck is the owner of nine patents listed in the Orange Book for the drug alendronate sodium, which Merck markets and sells under the trademark Fosamax. [FN2] On February 24, 2006, Apotex sent Merck a letter informing Merck that Apotex filed ANDA No. 077-982, seeking approval from the FDA to market a generic version of Merck's Fosamax tablets. Apotex certified in its ANDA submission that certain Merck patents were invalid, unenforceable and/or will not be infringed by the commercial manufacture, use, or sale of Apotex's generic version. Apotex was not the first generic filer to challenge Merck's patents on the Fosamax drug.

FN2. The patents listed in Merck's NDA, which are the patents-in-suit, are U.S. Patent Nos. 5,358,941; 5,681,590; 5,849,726; 6,008,207; 6,090,410; 6,194,004; 5,994,329; 6,015,801; and 6,225,294.

In the absence of any further information than what Apotex provided in its February 2006 letter, on April 7, 2006, Merck filed this action to protect its rights under the Hatch-Waxman Act. Apotex counterclaimed for a declaratory judgment of invalidity and noninfringement of the nine patents at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 1470453                                                                                                     Page 3
--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)
**(Cite as: 2007 WL 1470453 (D.Del.))**

issue. In August 2006, after receiving more detailed information from Apotex regarding its generic version of Fosamax, Merck granted Apotex a comprehensive covenant not to sue.

## IV. LEGAL STANDARD

**\*3** The exercise of judicial power under Article III of the United States Constitution requires the existence of a case or controversy. The Declaratory Judgment Act "requires an actual controversy between the parties before a federal court may exercise jurisdiction over an action for a declaratory judgment." *EMC Corp. v. Norand Corp., 89 F.3d 807, 810 (Fed.Cir.1996).* The actual controversy requirement is met when, "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issue of a declaratory judgment." *Id.* (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co., 213 U.S. 270, 273 (1941)).* When an actual controversy does exist sufficient to warrant subject matter jurisdiction, however, "the district court is not required to exercise declaratory judgment jurisdiction, but has discretion to decline that jurisdiction." *EMC Corp., 89 F.3d at 810.*

## V. DISCUSSION

Merck argues that, as a result of its covenant not to sue Apotex on the asserted patents, this action is moot and the court lacks subject matter jurisdiction over the purported controversy. Conversely, Apotex asks that the court deny Merck's motion for the following reasons: (1) a dismissal without a finding of invalidity and/or noninfringement would operate to deny Apotex "its right to compete with Merck for want of a 'triggering event' " and that Apotex would be injured by delayed entry into the market; (2) the court should not sanction Merck's "manipulating the court's jurisdiction" by filing a patent infringement suit, later presenting a covenant not to sue, and then attempting to dismiss Apotex's counterclaims for lack of subject matter jurisdiction; and (3) the court has subject matter jurisdiction because this case satisfies the Supreme Court's test for determining an actual case or controversy. (D.I. 19 at 2.)

### Existence of an Actual Case or Controversy

In *Teva v. Novartis,* the Court of Appeals for the Federal Circuit ("Federal Circuit") acknowledged that the Supreme Court, in *MedImmune v. Genentech, 127 S.Ct. 764 (2007),* disagreed with the Federal Circuit's

"reasonable apprehension of suit" test, and refocused the declaratory judgment jurisprudence on earlier Supreme Court precedent. *Teva Pharms. USA, Inc. v. Novartis Pharms. Corp., 482 F.3d 1330, 1339 (Fed.Cir.2007).* Thus, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune v. Genentech, 127 S.Ct. at 771* (citing *Md. Cas. Co., 312 U.S. at 273).* In support of its argument that an actual case or controversy exists in this case, Apotex points to the Federal Circuit's observation in *Teva v. Novartis:*

**\*4** A justiciable declaratory judgment controversy arises for an ANDA filer when a patentee lists patents in the Orange Book, the ANDA applicant files its ANDA certifying the listed patents under paragraph IV, and the patentee brings an action against the submitted ANDA on one or more of the patents. The combination of these three circumstances is dispositive in establishing an actual declaratory judgment controversy as to all the paragraph IV certified patents, whether the patentee has sued on all or only some of the paragraph IV certified patents.

*482 F.3d at 1344.* The court agrees with the Federal Circuit's observation about what **establishes** a justiciable declaratory judgment controversy in the Hatch-Waxman context. Further, the court recognizes that, when filed, this case also presented a justiciable controversy. A significant distinction between the scenario in *Teva v. Novartis* and the case here is that Novartis had declined to give Teva a covenant not to sue. Here, after the case was filed, and Merck received further information upon which it could evaluate the infringement action, Merck presented Apotex with a comprehensive covenant not to sue. The actual controversy must be in existence at all stages of the litigation and cannot merely be present at the filing of the complaint. *Super Sack v. Chase, 57 F.3d 1054, 1058 (Fed.Cir.1995).*

Article III standing requires "[a] plaintiff [to] allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright, 468 U.S. 737, 751 (1984).* Here, having received a covenant not to sue, Apotex does not and cannot allege "*unlawful* conduct" attributable to Merck in connection with its declaratory judgment claim. Further, Apotex's articulated injury--delayed entry to the market--is not fairly traceable to Merck. There is no evidence to conclude that Apotex's delayed entry

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 1470453                                                          Page 4
--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)
**(Cite as: 2007 WL 1470453 (D.Del.))**

into the market is any different than what it would have been had Merck never sued it. Thus, Apotex's advancement of this case against Merck becomes merely a means to an end, where the desired "end" is a triggering event but the means to that end, the litigation itself, is not sanctioned under the current legal framework. To proceed to a substantive "court decision" on the merits of Apotex's claims of noninfringement or invalidity would amount to an impermissible advisory opinion. *See Preiser v. Newkirk, 422 U.S. 395, 401 (1975)* (holding that courts may not render advisory opinions or decide questions that do not affect the rights of the parties to the case).

 Merck's covenant not to sue removes any cause for concern that Apotex could be held liable for infringement of the patents in suit. *See Super Sack, 57 F.3d at 1059.* Moreover, " '[i]t is well-established that a trial court may be divested or deprived of subject matter jurisdiction over a particular patent claim if the patentee covenants not to assert an infringement claim against a putative infringer.' " *Crossbow Tech., Inc. v. YH Tech., Inc.,* No. C 03-04360, 2007 WL 174422, at *2 (N.D.Cal. Jan. 22, 2007)* (quoting *Eli Lilly & Co. v. Zenith Goldline Pharms., 101 F.Supp.2d 1139, 1142 (S.D.Ind.2000)).* Federal Rule of Civil Procedure 12(h)(3) states "*[w]henever* it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Accordingly, the court must dismiss this action for lack of subject matter jurisdiction. [FN3]

> FN3. Apotex also contends that the collateral consequences doctrine permits the court to retain jurisdiction. The court has considered the parties' arguments and finds Apotex's position to be without merit.

**Manipulation of Court Jurisdiction**

***5** Notwithstanding the body of law that mandates dismissal, the court is sensitive to Apotex's argument that Merck is manipulating the court's jurisdiction. Indeed, the court must guard its jurisdiction jealously. Apotex highlights an interesting yet troublesome practice that has emerged from the interplay of the Hatch-Waxman regulatory scheme, covenants not to sue, subject-matter jurisdiction, and the typical time cycle of a patent litigation. This lawsuit exposes the ability of pioneer drug companies to potentially hold generics at bay by suing them, as they are authorized to do when a paragraph IV certification is made in an ANDA, and then granting a covenant not to sue,

which divests the court of subject-matter jurisdiction. In this way, district courts can be viewed as unwitting agents in a pioneer drug company's ability to defer competition for as long as possible. As unfortunate as it may be for Apotex, this is the framework that the Hatch-Waxman Act created. [FN4] The legislative history suggests that, in fact, Congress contemplated the use of covenants not to sue as a means of resolving any controversy created by the filing of an ANDA:

> FN4. The court is also troubled by the practical realities of a scheme, which in effect, if left as is, enmeshes the district courts in unnecessary, and in this court's opinion, improper involvement in business competition. This cycle not only contributes to court congestion but it wastes the court's valuable time and limited resources by conducting the business it must for these cases, until it reaches the merits of such contested motions to dismiss. The time-triggered provisions of the statute unrealistically presuppose the time in which the district courts are to manage their cases. While the court endeavors to be efficient and expeditious in resolving the matters pending before it, time proscriptions such as those that Congress has assumed in the Hatch-Waxman provisions, and those upon which the litigants press the court, are idealistic at best and unfeasible in practice. The joint effort of the branches of government to balance the interests of consumers with those of innovator and generic drug companies should not be so tunnel-visioned as to facilitate litigants in their attempts to catapult ANDA litigation as a priority in the district courts.

The provision [a "civil action to obtain patent certainty"] ... is intended to clarify that Federal district courts are to entertain such suits for declaratory judgments so long as there is a "case or controversy" under Article III of the Constitution. We fully expect that, in almost all situations where a generic applicant has challenged a patent [by filing an ANDA with a paragraph IV certification] and not been sued for patent infringement, a claim by the generic applicant seeking declaratory judgment on the patent will give rise to a justiciable "case or controversy" under the Constitution. *We believe that the only circumstance in which a case or controversy might not exist would arise in the rare*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 1470453                                                    Page 5
--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)
**(Cite as: 2007 WL 1470453 (D.Del.))**

*circumstance in which the patent owner and brand drug company have given the generic applicant a covenant not to sue, or otherwise formally acknowledge that the generic applicant's drug does not infringe.*

149 Cong. Rec. S15885 (Nov. 25, 2003) (remarks of Sen. Kennedy, ranking member of Senate HELP committee) (emphasis added)).

ANDA litigation reaches the federal courts through specialized legislation enacted by Congress, perhaps without the prescience of the maze it would be creating, and the ingenuity of motivated business persons and lawyers to capitalize on its imperfections. These cases represent the intersecting roles of all three branches of government and the pharmaceutical industry: the court's interest in interpreting the existing law so that it can provide justice and equity to injured parties; congressional interest in making laws that will encourage research and development, as well as to speed entry of generic drugs into the market; a regulatory agency's interest in advancing the public health by helping to speed innovations that make medicines and foods more effective, safer, and more affordable; and the pharmaceutical industry's interest in protecting its bottom line. This court is without the power, however, to ameliorate the problems that have emerged from this interplay.

*6 Apotex argues that the Federal Circuit, in *Teva v. Novartis,* recognized that a patentee's actions of only suing on one of its patents frustrated the central purpose behind Hatch-Waxman, and that this court should similarly recognize the gamesmanship behind suing, covenanting not to sue, and moving to dismiss without a decision on the merits. In finding a justiciable controversy in *Teva v. Novartis,* however, the Federal Circuit found frustration of the Hatch-Waxman Act's purpose to be just one of numerous circumstances, in the "totality of circumstances" analysis, that warranted a finding of an actual controversy. 482 F.3d at 1344. Moreover, in the past, both innovator and generic companies have been accused of "gaming" the Hatch-Waxman regulatory regime to their respective benefit. [FN5] Congress responded through legislation. *See* 149 Cong. Rec. S15882-03, S15885 (Nov. 25, 2003) ("[I]n recent years both brand-name and generic drug companies have exploited certain aspects of the Hatch-Waxman Act to delay generic competition. The changes to the [ ] Act ... will stop these abuses.") (remarks of Sen. Kennedy, ranking member of the Senate HELP committee regarding the 'civil action to obtain patent certainty' provision under 21 U.S.C. § 355(j)(5)(C)).

Likewise, if it is the view of Congress that pharmaceutical companies are abusing the Act in the way that Apotex complains here, Congress can reform the Hatch-Waxman Amendments as it deems necessary.

> FN5. The Federal Trade Commission issued studies in 2002 and 2003 that examined and commented on the conduct of drug companies in the generic drug approval process. Fed. Trade Comm'n, Generic Drug Entry Prior to Patent Expiration: An FTC Study (2002), available at http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf; Fed. Trade Comm'n, To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy, (2003), available at http://www.ftc.gov/os/2003/10/innovationrpt.pdf.

**Right to Competition--Antitrust Claim**

Apotex's argument that a dismissal without a finding of invalidity or noninfringement would operate to deny Apotex "its right to compete with Merck for want of a 'triggering event' " coincides with its proposed antitrust counterclaim presented in its motion to amend. As such, the court will address this argument and Apotex's motion together.

Recognizing that motions to amend shall be granted freely under Federal Rule of Civil Procedure 15(a), the court has discretion to deny leave to amend when there is undue delay, bad faith, dilatory motive or undue prejudice to the opposing party, or when the amendment would be futile. *See Foman v. Davis,* 371 U.S. 178, 182 (1962); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997). In assessing futility, the court applies the same standard of legal sufficiency as applies under Rule 12(b)(6). *Id.* Thus, the court looks to whether Apotex's antitrust claim, if allowed, would survive a motion to dismiss.

The Supreme Court has outlined the factors that courts should consider when determining whether a party has standing to bring a private action under the antitrust laws: (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages. *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 263 (3d Cir.1998) (citing *Associated Gen. Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 537-45 (1983)).

*7 Apotex argues, both in its opposition to Merck's motion to dismiss and in Apotex's motion to amend, that if the court grants Merck's motion to dismiss, the 30-month stay on Apotex's ANDA application will not be terminated, the 180-day exclusivity period will not be triggered, and Apotex, as well as the other secondary generic applicants, will be prevented from entering the generic market until 180 days after the first generic applicant enters the market. With these consequences in mind, Apotex asserts that Merck's actions of filing suit, covenanting not to sue, and moving to dismiss for lack of subject matter jurisdiction, are an unlawfully anticompetitive and monopolistic scheme to delay entry by Apotex and other generic filers into the market for generic alendronate sodium.

One material aspect of this discussion is whether the FDA's 30-month stay on Apotex's ANDA will terminate upon the court's dismissal of the action. The 30- month stay was introduced to give the generic applicant and NDA holder the opportunity to resolve patent issues prior to commercial marketing. Fed. Trade Comm'n, Generic Drug Entry Prior to Patent Expiration: An FTC Study (2002), available at http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf, at 39. 21 U.S.C. § 355(j)(5)(B)(iii)(2003) provides:

> If such an action is brought before the expiration of [45 days after the date that the paragraph IV notice is received], the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (2)(B)(i) or such shorter or longer period as the court may order because either party to the action failed to reasonably cooperate in expediting the action, except that--
> **(I)** if before the expiration of such period the district court decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity), the approval shall be made effective on--
> **(aa)** the date on which the court enters judgment reflecting the decision; or
> **(bb)** the date of a settlement order or consent decree signed and entered by the court stating that

the patent that is the subject of the certification is invalid or not infringed;

Merck argues that the parenthetical clause of § 355(j)(5)(B)(iii)(I), "(including any substantive determination that there is no cause of action for patent infringement or invalidity)," instructs that a dismissal for lack of subject matter jurisdiction would lift the 30-month stay on an ANDA. Apotex contends that the FDA has not yet construed the provision, and that the FDA's construction of similar, previously disputed language suggests that nothing less than a court decision of invalidity, noninfringement or unenforceability would affect the stay. [FN6] Neither the parties nor the court can be certain of how the provision will be applied to Apotex. Moreover, the matters pending before the court do not mandate this court's interpretation of the statute. It is noteworthy, however, that the FDA considered a precise answer, by way of a proposed rule, but later withdrew it without comment. The FDA's proposed rule § 314.107(g) provided in pertinent part:

> FN6. *See Apotex, Inc. v. FDA*, 449 F.3d 1249 (D.D.C.2006) (upholding FDA's decision finding that dismissal for lack of subject matter jurisdiction did not qualify as a "court decision" sufficient to trigger the 180-day exclusivity period).

*8 *Effect of dismissal of litigation on 30-month stay.* If the patent litigation between the ANDA applicant and the patent owner or NDA holder described in paragraph (b)(3)(A) of this section is dismissed without a court decision on the merits of the patent claim, whether the dismissal is with or without prejudice, the agency may immediately approve the ANDA that was the subject of the litigation, if it is otherwise eligible for approval. 180-Day Generic Exclusivity for Abbreviated New Drug Applications, 64 Fed.Reg. 42873, 42886 (1999) (to be codified at 21 C.F.R. pt. 314) (proposed Aug. 6, 1999), withdrawal of proposed rule reflected in 67 Fed.Reg. 66593 (2002).

Certainly, if the mere filing of a patent infringement suit can result in an irrevocable 30-month stay on an ANDA application, except in the limited circumstances of a "substantive decision" on the merits or other narrower circumstances where a court may shorten the stay, then Apotex has a legitimate concern about how such a policy is susceptible to abuse by pioneer drug companies. Ultimately, however, the court cannot remedy every harm or prejudice a party endures. Moreover, not every

2007 WL 1470453                                                                                          Page 7
--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)
**(Cite as: 2007 WL 1470453 (D.Del.))**

business disadvantage is appropriately deemed legal injury. The fiercely competitive pharmaceutical industry does not escape these realities. The existing law does not provide an absolute right of a generic drug company to enter the market in which a pioneer drug company and a first-filing generic applicant have legally achieved some market exclusivity.

The court understands that Apotex is at a competitive disadvantage, but as to the harm it claims to have endured, and the relief it seeks, the court's hands are tied. In *Teva v. Pfizer,* the Federal Circuit stated:

> The fact that Teva is disadvantaged from a business standpoint by Ivax's 180- day exclusivity period and the fact that Pfizer's decision not to sue Teva creates an impediment to Teva's removing that disadvantage are matters separate and distinct from whether an Article III controversy exists between Teva and Pfizer. The injury about which Teva complains is the product of the Hatch-Waxman scheme and the fact that Pfizer has acted in a manner permitted under that scheme. It is not the product of a threat of suit by Pfizer.

395 F.3d 1324, 1338 (Fed.Cir.2005), *abrogated by MedImmune v. Genentech,* 127 S.Ct. 764 (2007). Notwithstanding the Supreme Court's abrogation of the Federal Circuit's reasonable apprehension test, the Federal Circuit's analysis of the distinction between a business disadvantage and an Article III controversy applies with equal force to Apotex's opposition to Merck's motion to dismiss, as well as its motion to add an antitrust counterclaim on the same grounds.

Apotex attempts to distinguish its case from *Teva v. Pfizer* by emphasizing that, unlike Pfizer, Merck chose to sue Apotex, knowing there was no infringement, and then covenanted not to sue. The court will not engage in factfinding as to the disputed accounts of what Merck knew about the merits of an infringement claim against Apotex at the time it filed suit, and whether and under what circumstances, Merck attempted to glean further information before filing suit. The court does not need to resolve these issues because the mere filing of a paragraph IV certification in an ANDA constitutes infringement. *See* 35 U.S.C. § 271(e)(2)(A). Accordingly, Apotex's filing of its ANDA on Merck's Fosamax drug was an act of infringement that afforded Merck the right to sue. The statutory provisions that allow suit under these circumstances render the patentee's subjective motivations for filing suit irrelevant. [FN7]

FN7. The court is by no means discharging

the requirements of Rule 11 in the context of Hatch Waxman litigation. In this case, however, there are no alleged facts from which the court can conclude that, in fact, Merck knew that Apotex's generic version of Fosamax did not infringe Merck's patents at the time it filed suit pursuant to its statutory right to do so upon Apotex's paragraph IV certification. Although the Rule 12(b)(6) standard requires the court to accept all well-pleaded allegations as true, and to view them in the light most favorable to plaintiff, the court will not credit bald and conclusory allegations. *See United States v. Vespe,* 868 F.2d 1328, 1340 (3d Cir.1989) (stating conclusory statements need not be credited).

**\*9** Intellectual property law and principles foster the creation of market power and antitrust law and principles respond to market power abuses, however, both systems operate to advance consumer welfare by allocating resources, cultivating innovation, and promoting technological progress. *See, e.g.,* Lawrence A. Sullivan & Warren S. Grimes, *The Law of Antitrust: An Integrated Handbook,* (West Group 2000), § § 15.1 at 800-801. A patent "is an exception to the general rule against monopolies and to the right to access to a free and open market." *See Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 816 (1945). Thus, "[b]y their nature, patents create an environment of exclusion, and consequently, cripple competition. The anticompetitive effect is already present." *Schering-Plough v. Federal Trade Comm'n,* 402 F.3d 1056, 1065-1066 (11th Cir.2005). When patentees attempt to extend their legal monopoly beyond that which is permitted by their statutory grants, such actions can trigger antitrust liability. *Andrx Pharms., Inc. v. Biovail Corp. Intern.,* 256 F.3d 799, 813 (D.C.Cir.2001) ("[E]ven a patent-right holder is not immune from antitrust liability.").

Any adverse effects within the scope of a patent or statutory right to exclude, however, cannot be redressed by antitrust law. *See United States v. Studiengesellschaft Kohle, m.b.H.,* 670 F.2d 1122, 1127 (D.C.Cir.1981) ("[T]he conduct at issue is illegal if it threatens competition in areas other than those protected by the patent *and is otherwise legal.*") (emphasis added). The existing body of case law involving antitrust allegations in the context of ANDA litigation tends to fall within two categories: cases in which the parties bilaterally entered into a collusive agreement that exceeded the scope of a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 1470453                                                                                            Page 8
--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)
**(Cite as: 2007 WL 1470453 (D.Del.))**

patent grant, thus warranting antitrust scrutiny, [FN8] and cases in which the patentee was considered to have lawfully enforced its patent right, albeit with the consequence of delaying or inhibiting competition. *See, e.g., In re Cardizem CD Antitrust Litig., 332 F.3d 896 (6th Cir.2003)* and *Valley Drug Co. v. Geneva Pharm., Inc., 344 F.3d 1294 (11th Cir.2003)* (involving agreements among innovator and generic drug companies that incurred antitrust liability).

> FN8. "It is widely understood that the 180-day exclusivity period offers the potential for collusive settlement arrangements between pioneers and generics. A pioneer could initiate a patent infringement suit against a first generic ANDA filer and settle the litigation with a 'non-entry' payment to the generic, under which the generic would delay commercialization of the generic product, thus postponing the commencement of the 180-day exclusivity period and locking other generics out of the market indefinitely." Herbert Hovenkamp et al., *Anticompetitive Settlement of Intellectual Property Disputes,* 87 Minn. L.Rev. 1719, 1755 (2003).

The futility of Apotex's proposed amendment is further demonstrated by previously unsuccessful efforts to attach antitrust liability to pharmaceutical companies acting within the Hatch-Waxman regulatory framework and patent grant. *See, e.g., In re Ciprofloxacin Hydrochloride Antitrust Litig., 363 F.Supp.2d 514, 524 (E.D.N.Y.2005)* (holding that conduct within the scope of the patent grant is exempt from antitrust scrutiny); *In re Tamoxifen Citrate Antitrust Litig., 466 F.3d 187 (2d Cir.2006)* (affirming district court decision, which held that the claimed injury was not "antitrust injury," which must be caused by something other than the regulatory action limiting entry to the market); *Bristol-Myers Squibb Co. v. Copley Pharm., Inc., 144 F.Supp.2d 21, 23-25 (D.Mass.2000)* (dismissing an antitrust counterclaim of second ANDA filer against pioneer drug company because the counterclaimant failed to show antitrust injury where the statutory scheme, and not the pioneer drug company, prevented it from entering the market).

**\*10** Thus, Merck's challenged conduct--filing suit upon notice of Apotex's paragraph IV certification and covenanting not to sue--are expressly sanctioned by the Hatch-Waxman Amendments or contemplated by its legislative history. Likewise, the consequences to Apotex--delayed entry in the market for

alendronate sodium tablets--are specific products of the statute. Having failed to establish antitrust injury and causal connection between Merck's legal actions and Apotex's alleged harm, which are necessary requirements for antitrust standing, the court considers Apotex's requested amendment to be futile.

**VI. CONCLUSION**

Accordingly, Merck's motion to dismiss (D.I.15) is granted as Apotex has failed to establish the existence of an actual case or controversy under the current state of the law. The Clerk of the Court shall mark this action closed and all other pending motions are denied.

**ORDER**
IT IS HEREBY ORDERED that:

1. Merck's motion to dismiss for lack of subject matter jurisdiction (D.I.15) is GRANTED.

2. Apotex's motion for leave to file a surreply (D.I.26) is DENIED.

3. Apotex's motion for leave to file its first amended answer, affirmative defenses, and counterclaims (D.I.28) is DENIED.

4. Apotex's motion for leave to substitute corrected exhibits to its pending motion for leave (D.I.36) is DENIED as moot.

5. Merck's motion to stay (D.I.68) is DENIED as moot.

6. All claims in Merck's Complaint (D.I.1) are DISMISSED.

7. All counterclaims in Apotex's Answer, Affirmative Defenses, and Counterclaims (D.I.8) are DISMISSED.

8. Each party shall bear its own costs and attorneys' fees.

2012299056

2012299056

--- F.Supp.2d ----, 2007 WL 1470453 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.